## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **AUDREY D. FINCH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.:** |
| **v.** | ) | **2:07-CV-024-MHT** |
| | ) | |
| **DEPARTMENT OF MENTAL** | ) | |
| **HEALTH AND MENTAL** | ) | |
| **RETARDATION, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS DEPARTMENT OF MENTAL HEALTH AND JOHN HOUSTON'S EVIDENTIARY SUBMISSION IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

The State Department of Mental Health and Mental Retardation, and John Houston, Commissioner, (hereinafter "Defendants"), hereby submit the following evidentiary submissions in support of their Motion for Summary Judgment.

1. Plaintiff's First Deposition, October 9, 2001. ("Pl. depo I, Oct. 9, 2001")

2. Plaintiff's Second Deposition, November 20, 2007. ("Pl. depo II, Nov. 20, 2007")

3. Declaration of Jim Elliot, with Exhibits A through J. ("Elliot decl.")

Respectfully submitted,

/s/ Theodore P. Bell
Warren B. Lightfoot, Jr.
John B. Holmes, III
Theodore P. Bell
Attorneys for the Defendants
Department of Mental Health
    and Mental Retardation, and
John Houston, Commissioner

1

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
2400 Regions/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-4604
Telephone:    (205) 254-1000
Facsimile:    (205) 254-1999
Email:        wlightfoot@maynardcooper.com
              jholmes@maynardcooper.com
              tbell@maynardcooper.com
              aavery@maynardcooper.com

Courtney W. Tarver
Tamara R. Pharrams
DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION
P.O. Box 301410
Montgomery, Alabama 36130-1410
Telephone:  (334) 242-3038

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2007, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

For the Plaintiff:

Russell W. Adams, Esq.
Rocco Calamusa, Jr., Esq.
WIGGINS CHILDS QUINN & PANTAZIS, P.C.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203-3204

/s/ Theodore P. Bell
Of Counsel

Page 1

1          IN THE UNITED STATES DISTRICT COURT
2          FOR THE MIDDLE DISTRICT OF ALABAMA
3                  NORTHERN DIVISION
4
5   IN RE:
    EMPLOYMENT DISCRIMINATION
6   LITIGATION AGAINST THE
    STATE OF ALABAMA,
7
    EUGENE CRUM, JR., et al.,
8
            Plaintiffs,
9
    vs.                          CASE NO. CV-94-T-356-N
10
    STATE OF ALABAMA, et al.,
11
            Defendants.
12
13          *  *  *  *  *  *  *  *  *  *  *
14          DEPOSITION OF AUDREY DENISE FINCH, taken
15   pursuant to stipulation and agreement before Dee
16   Johnson, Court Reporter and Commissioner for the
17   State of Alabama at Large, in the Law Offices of
18   Capell & Howard, 150 South Perry Street,
19   Montgomery, Alabama, on Tuesday, October 9, 2001
20   commencing at approximately 9:22 a.m.
21
22          *  *  *  *  *  *  *  *  *  *  *
23

DEOPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

---

**Page 2**

1　　　　　APPEARANCES
2　FOR THE PLAINTIFFS:
3　Mr. Joseph H. Calvin, III
　　GORDON, SILBERMAN, WIGGINS & CHILDS
4　Attorneys at Law
　　1400 SouthTrust Tower
5　420 20th Street North
　　Birmingham, Alabama 35203
6
　　FOR DEFENDANTS DEPARTMENT OF MENTAL HEALTH,
7　DEPARTMENT OF PUBLIC HEALTH, DEPARTMENT OF
　　HUMAN RESOURCES, DEPARTMENT OF CORRECTIONS,
8　ALCOHOL BEVERAGE CONTROL BOARD, and
　　EMERGENCY MANAGEMENT AGENCY:
9
　　Mr. Warren B. Lightfoot
10　MAYNARD, COOPER & GALE
　　Attorneys at Law
11　1901 Sixth Avenue North
　　Birmingham, Alabama 35203
12
　　FOR DEFENDANT DEPARTMENT OF MENTAL HEALTH
13　AND MENTAL RETARDATION:
　　Mr. Courtney W. Tarver
14　Deputy Attorney General and General Counsel
15　DEPARTMENT OF MENTAL HEALTH
　　AND MENTAL RETARDATION
16　RSA Union Building
　　100 North Union Street
17　Montgomery, Alabama 36130
18　FOR DEFENDANTS ALABAMA STATE PERSONNEL
　　DEPARTMENT AND ALABAMA STATE PERSONNEL BOARD:
19
　　Mr. R. Taylor Abbot, Jr.
20　Ms. Nikaa Jordan
　　CABANISS, JOHNSTON, GARDNER,
21　DUMAS & ONEAL
　　Attorneys at Law
22　2001 Park Place North, Suite 700
　　Birmingham, Alabama 35203
23

---

**Page 3**

1　(APPEARANCES, continued:)
2　FOR DEFENDANT GOVERNOR DON SIEGELMAN:
3　Ms. Cinda R. York (Morning)
　　Ms. Amy L. Stuedeman (Afternoon)
4　CAMPBELL, WALLER & LOPER
　　Attorneys at Law
5　2100-A Southbridge Parkway
　　Suite 450
6　Birmingham, Alabama 35209
7　FOR DEFENDANTS DEPARTMENT OF INDUSTRIAL
　　RELATIONS, DEPARTMENT OF AGRICULTURE &
8　INDUSTRIES, COMMISSION ON PHYSICAL FITNESS,
　　DEPARTMENT OF REVENUE, ALABAMA DEPARTMENT OF
9　EDUCATION, and BOARD OF REGISTRARS:
10　Mr. J. Dorman Walker, Jr. (Afternoon)
　　BALCH & BINGHAM
11　Attorneys at Law
　　The Winter Building
12　2 Dexter Avenue
　　Montgomery, Alabama 36104
13
　　FOR DEFENDANTS DEPARTMENT OF LABOR,
14　DEPARTMENT OF FINANCE, ETHICS COMMISSION,
　　and REHABILITATION SERVICES:
15
　　Mr. Wesley C. Redmond
16　Mr. Jason Osborn
　　BERKOWITZ, LEFKOVITS, ISOM & KUSHNER
17　Attorneys at Law
　　SouthTrust Tower, Suite 1600
18　420 20th Street North
　　Birmingham, Alabama 35203
19
20
21
22
23

---

**Page 4**

1　(APPEARANCES, continued:)
2　FOR DEFENDANTS ALABAMA DEVELOPMENT OFFICE,
　　ALABAMA DEPARTMENT OF ECONOMIC AND COMMUNITY
3　AFFAIRS, ALABAMA INDUSTRIAL DEVELOPMENT
　　TRAINING, and BUREAU OF TRAVEL AND TOURISM:
4
　　Ms. Dana McGowin
5　THE HUNTLEY FIRM
　　Attorneys at Law
6　708 Government Street
　　Mobile, Alabama 36602
7
　　ALSO PRESENT:
8
　　Mr. Jim Elliott
9
10　　　　＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊
　　　　EXAMINATION INDEX
11
　　AUDREY DENISE FINCH
12　BY MR. LIGHTFOOT　　　　6
　　BY MR. WALKER　　　　141
13　BY MS. McGOWIN　　　143
　　BY MR. REDMOND　　　144
14　BY MS. JORDAN　　　150
　　BY MR. OSBORN　　　231
15　BY MS. JORDAN　　　236
　　BY MR. LIGHTFOOT　　237
16　BY MS. JORDAN　　　242
　　BY MR. ABBOT　　　270
17　BY MS. JORDAN　　　271
　　BY MR. ABBOT　　　273
18
19　　　　＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊
　　　　STIPULATIONS
20
　　It is hereby stipulated and agreed by
21
　　and between counsel representing the parties that
22
　　the deposition of AUDREY DENISE FINCH is taken
23
24　pursuant to the Federal Rules of Civil Procedure

---

**Page 5**

1　and that said deposition may be taken before Dee
2　Johnson, Court Reporter and Commissioner for the
3　State of Alabama at Large, without the formality
4　of a commission; that objections to questions
5　other than objections as to the form of the
6　questions need not be made at this time but may
7　be reserved for a ruling at such time as the
8　deposition may be offered in evidence or used for
9　any other purpose as provided for by the Federal
10　Rules of Civil Procedure.
11　　　　It is further stipulated and agreed by
12　and between counsel representing the parties in
13　this case that said deposition may be introduced
14　at the trial of this case or used in any manner
15　by either party hereto provided for by the
16　Federal Rules of Civil Procedure.
17　　　　＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊ ＊
18　　　　AUDREY DENISE FINCH
19　　　　The witness, having first been sworn to
20　speak the truth, the whole truth and nothing but
21　the truth, testified as follows:
22
23

DUNN, KING & ASSOCIATES　　　　431 South Court Street　　　Montgomery, AL  36104
toll-free (800) 359-8001　　　website: www.dunnking.com　　ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA                                        TAKEN OCTOBER 9, 2001

Page 6

1              EXAMINATION
2    BY MR. LIGHTFOOT:
3    Q. Good morning, Ms. Finch. I'm Warren
4       Lightfoot. I represent several departments
5       of the State of Alabama that you've sued
6       including the Department of Mental Health
7       where you worked for a substantial period of
8       time. I guess I ought to go ahead and tell
9       you who else I represent. I represent the
10      Department of Corrections, the Department of
11      Human Resources, the Department of Public
12      Health, ABC and the EMA.
13          All right. Have you ever given a
14      deposition before?
15   A. No.
16   Q. Okay. Nothing complex about it. I'm going
17      to be asking you a bunch of questions today.
18      And then after I get through, some of these
19      other lawyers will be asking you questions.
20      Dee is going to take down every word that
21      both I say and that you say, so we don't need
22      to talk over each other. And I try to -- I
23      will not interrupt you. And if you'll let me

Page 7

1       finish my questions before you answer, that
2       would be great. Let me know if you don't
3       understand anything that I'm asking, please,
4       because I'd be happy to clarify any question
5       so that you do understand it. Otherwise, if
6       you answer my question, I'll assume that you
7       understood what I was asking, okay?
8    A. Okay.
9    Q. Are you under any -- are you taking any
10      medication or taking anything that would
11      prevent you from thinking clearly or
12      understanding me this morning?
13   A. No.
14   Q. Okay. State your name for the record,
15      please?
16   A. It's Audrey Denise Finch.
17   Q. Please give me your address?
18   A. 825 Seven, it's spelled out, S-E-V-E-N,
19      Springs Drive, Birmingham, Alabama 35215.
20   Q. All right. How long have you lived at that
21      address?
22   A. Since '94.
23   Q. So did you commute to your job at the Mental

Page 8

1       Health Department or --
2    A. At Glenn Ireland.
3    Q. No, I'm sorry. Glenn Ireland is in
4       Birmingham. I've been at other facilities in
5       some of these other depositions. Sorry about
6       that. You said you lived there since '94.
7    A. Yes.
8    Q. Take me back, please, to the addresses that
9       you had prior to 1984 and go back, please, to
10      1986.
11   A. I think it was 1544 Tuscaloosa Avenue. And
12      that's Birmingham, Alabama 35211.
13   Q. Would that have been the address just prior
14      to the address you gave me earlier?
15   A. No. That would have been 1309 21st Street
16      North. And that's Birmingham, Alabama,
17      35234.
18   Q. Okay.
19   A. And 3022 31st Avenue North. And that's
20      Birmingham, Alabama 35207.
21   Q. On that first address, would you just say it
22      for me again, please. I didn't write it
23      down.

Page 9

1    A. 1544 --
2    Q. The one before that one. The first address
3       you gave me?
4    A. 825 Seven Springs Drive.
5    Q. Seven Springs?
6    A. Seven, S-E-V-E-N.
7    Q. Springs?
8    A. Uh-huh. Drive.
9    Q. Drive. In Birmingham 35215?
10   A. Right.
11   Q. Now, the ordering on those, which was the one
12      you lived at the longest time ago of all
13      those you just gave me?
14   A. The longest?
15   Q. Yes, the least recent in time.
16   A. The least is the 825.
17   Q. Okay. I tell you what. That's the one where
18      you live right now, right?
19   A. Right now, right.
20   Q. And what was the one right before that?
21   A. 1309 21st.
22   Q. Okay. And then what was the one right before
23      that?

DUNN, KING & ASSOCIATES                431 South Court Street           Montgomery, AL  36104
toll-free (800) 359-8001              website: www.dunnking.com      ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 10

1   A. 1544.
2   Q. And before that was the 3022?
3   A. 3022, right.
4   Q. Does that take me back to 1986?
5   A. Right.
6   Q. Okay. Now, the best you can -- the best you
7      can recall, give me the periods of time that
8      you lived there at the 31st Avenue North one,
9      when would that have been, from when to when
10     approximately?
11  A. From probably 1968 until maybe -- I'm not
12     sure -- maybe '82.
13  Q. '82? All right. Then the next one would be
14     the 1544 Tuscaloosa Avenue. Would that be
15     from '82 until when approximately?
16  A. Probably '82 maybe to '86. I'm not exactly
17     sure on that.
18  Q. Okay. The next one was the 1309 21st North.
19     That was from when to when?
20  A. Probably from maybe eighty -- I'd say maybe
21     '87 or '88 -- I'm not exactly sure -- up
22     until '94.
23  Q. Until '94? And then '94 to present at the

Page 11

1      Seven Springs?
2   A. Right.
3   Q. During those time periods have you lived at
4      any other addresses other than those four?
5   A. No.
6   Q. Did you always receive your mail at those
7      addresses?
8   A. Right.
9   Q. You never had any mail problems at those
10     addresses?
11  A. No.
12  Q. Give me, please, your birth date and your
13     Social Security number?
14  A. 2/6/57. 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.
15  Q. All right. And are you married?
16  A. No.
17  Q. Have you ever been?
18  A. No.
19  Q. Do you have any children?
20  A. Yes.
21  Q. How many children?
22  A. One.
23  Q. All right. And who is that?

Page 12

1   A. Keandra Denise Finch.
2      MR. CALVIN: Spell the first name.
3      THE WITNESS: K-E-A-N-D-R-A.
4   Q. How old is she?
5   A. 22.
6   Q. Is she a dependent on you?
7   A. Yes.
8   Q. Does she live with you?
9   A. She's in school at the University of Alabama.
10  Q. So she does not live with you?
11  A. Off and on, when she comes home. But she's
12     in school.
13  Q. Okay. Has anyone ever lived with you at any
14     of these four addresses other than your
15     daughter?
16  A. I lived with my grandmother at the 3022 and
17     my brother and sister. And at the 1544, I
18     lived with my sister. And at the 1309, I
19     lived with my daughter and myself.
20  Q. From '94 to the present, though, at the Seven
21     Springs address, you've only lived with your
22     daughter from time to time?
23  A. And my nephew, and I had a foster child that

Page 13

1      lived with me.
2   Q. Okay. How far did you go in school?
3   A. I received a master's degree.
4   Q. All right. Let's see. Did you graduate from
5      high school?
6   A. Yes, I did.
7   Q. Where?
8   A. Carver High School in Birmingham, Alabama.
9   Q. What year approximately?
10  A. 1975.
11  Q. All right. And that's a diploma from there,
12     not a GED?
13  A. Diploma.
14  Q. Diploma. Okay. And where did you go to
15     college?
16  A. Alabama State University, Montgomery,
17     Alabama.
18  Q. All right. And did you get -- you got a
19     degree?
20  A. BA, sociology.
21  Q. BA in sociology?
22  A. Master's in counselling.
23  Q. And then after your BA in sociology, you got

4 (Pages 10 to 13)

DEPOSITION OF AUDREY DENISE FINCH                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 14

1    a master's in counselling?
2    A. Right.
3    Q. And the master's program takes how long?
4    A. It varies.
5    Q. If you take it straight through, is it one
6       year?
7    A. Maybe two.
8    Q. What year did you get your degree from Ala --
9       your BA in sociology from --
10   A. 1979, June 1st.
11   Q. And then what year did you get your master's?
12   A. I completed my requirements in 1990, but we
13      only had graduation one time, so I received
14      it in 1991, May 25th.
15   Q. And did you take courses for several years
16      off and on to get it?
17   A. Off and on, right, from 1986.
18   Q. To '90?
19   A. To '90.
20   Q. And that was while you were holding down a
21      job?
22   A. Exactly. Two jobs.
23   Q. Two jobs?

Page 15

1    A. Yes.
2    Q. Okay. Let's see. From the time that you
3       graduated from high school in 1975, how many
4       jobs did you have prior to going to work for
5       the Department of Mental Health for the
6       State?
7    A. Probably two.
8    Q. Okay. Let's go through those, please. What
9       was the first job you would have had coming
10      out of high school?
11   A. Coming out of -- I worked a summer job, and
12      I'm not exactly sure. Not right out of high
13      school. Let's see. Maybe while I was in
14      high school I worked on the summer job.
15   Q. I'm sorry. I realize you went straight into
16      college?
17   A. Exactly.
18   Q. After college -- yeah, after college, when
19      you graduated in '79, that's when I meant.
20      When did you start there?
21   A. After college, I started at Sears in
22      Birmingham in 1980. I worked with the Census
23      Bureau prior to that on a temporary job which

Page 16

1    would have been probably 1980 also.
2    Q. That was less than a year?
3    A. Right.
4    Q. All right. Then you went to Sears?
5    A. Yes.
6    Q. In approximately 1980?
7    A. Yes.
8    Q. How long were you there?
9    A. Presently.
10   Q. Oh, you're still there?
11   A. Still there.
12   Q. Okay. And what have you done at Sears?
13   A. I've worked in sales.
14   Q. And in which department?
15   A. In ladies.
16   Q. Okay. And has that ever been a full-time job
17      for you?
18   A. No.
19   Q. So you've worked something less than 40 hours
20      pretty much per week throughout the whole
21      time?
22   A. Yes.
23   Q. Is there -- is there a standard amount of

Page 17

1    time that you've worked over the last 20
2    years per week or does it vary?
3    A. It varies.
4    Q. Okay. Give me the range as best you can.
5    A. As far as hours per week?
6    Q. Yeah.
7    A. I may work maybe four hours a week, I may
8       work 22 hours or 27 hours a week.
9    Q. I see.
10   A. It just vary.
11   Q. All right. And what's your position? Is it
12      a sales associate or --
13   A. Right.
14   Q. You're not in management?
15   A. No.
16   Q. Okay. All right. Where else did you work
17      other than Sears?
18   A. Well, I worked for -- let's see, after
19      Sears -- I worked for Hillcrest Behavioral
20      Health Center.
21   Q. Hillcrest Behavior?
22   A. Health.
23   Q. What is that?

5 (Pages 14 to 17)

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 18

1　A. I worked in a group home working with
2　　children in the group home like a child care
3　　attendant.
4　Q. Is that in Birmingham?
5　A. Yes.
6　Q. Okay. And from when to when did you do that?
7　A. 1996 to 2000.
8　Q. Okay. And that was part-time as well?
9　A. Part-time. Well, it was full-time after I
10　　left Glenn Ireland. I think I worked maybe a
11　　few months full-time there.
12　Q. Part-time before you left Glenn Ireland?
13　A. Part-time -- it was full-time -- I think I
14　　started like, if I'm not mistaken, maybe
15　　March of that '96 -- not March of '96. Maybe
16　　May of '96 if I'm not mistaken. Somewhere
17　　along in there. I'm not sure of the exact
18　　dates on it.
19　Q. You were laid off from your job at -- I guess
20　　at the Mental Health Department in
21　　approximately March of 1996?
22　A. Exactly.
23　Q. Okay. And so prior to that date, you worked

Page 19

1　　part-time at the Hillcrest home?
2　A. No.
3　Q. No?
4　A. No. I worked for Sears part-time. Because I
5　　went to -- went to Hillcrest after we were
6　　laid off from Glenn Ireland.
7　Q. You never worked --
8　A. It was -- it was further down. It wasn't
9　　right after I left Glenn Ireland.
10　Q. You never worked at Hillcrest while you were
11　　working at Glenn Ireland?
12　A. No.
13　Q. Oh. Okay. And you said -- have you worked
14　　both part-time and full-time there?
15　A. Yes. I worked full-time I think maybe a
16　　couple of months and then I worked for PHP of
17　　Alabama probably a couple of months, too,
18　　full-time.
19　Q. What's that?
20　A. I worked as a supervisor, house manager.
21　　It's Mental -- Mental Health.
22　Q. Okay. From when to when?
23　A. I'm not sure exactly the dates. It was in

Page 20

1　　'96. I'm not exactly sure of the time span
2　　that I was there.
3　Q. '96?
4　A. Uh-huh. It was about two months that I
5　　worked full-time there.
6　Q. Is this something different from the
7　　Hillcrest job?
8　A. Yes. Yes.
9　Q. Is that --PHP was a different employer in
10　　Birmingham?
11　A. Well, PH -- well, they were in conjunction
12　　with each other. I worked with PHP and
13　　Hillcrest during the same period of time.
14　Q. Okay. All right. Where else have you
15　　worked?
16　A. Seraaj Family Homes.
17　Q. I'm sorry?
18　A. Seraaj.
19　Q. Seraaj. Would you spell that?
20　A. S-E-R-A-A-J Family Homes.
21　Q. From when to when?
22　A. It was in '96. I'm not sure exactly what
23　　dates I might have started. I think it might

Page 21

1　　have been around -- I want to say May of '96
2　　until maybe like October of '96.
3　Q. And where was that?
4　A. It's in Birmingham.
5　Q. Is that connected to Hillcrest or PHP?
6　A. No.
7　Q. What did you do there?
8　A. I worked as a family therapist.
9　Q. Okay. Anywhere else that you've worked?
10　A. Okay. Let's see. I may have worked at
11　　Church's -- I worked at Church's Chicken in
12　　Montgomery probably about three months in
13　　1975 or '76. And, let's see. I also worked
14　　at -- I can't remember the name of it --
15　　Positive Interventions. And that was -- this
16　　was in '96 also. I worked as a family
17　　therapist there, too, maybe about two months.
18　Q. So this was in '96 as well?
19　A. Uh-huh.
20　Q. Is Positive Interventions in Birmingham?
21　A. Yes. And then I went to Disability
22　　Determination Services in '97. That's where
23　　I am presently.

6 (Pages 18 to 21)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

---

Page 22

1   Q. Disability Determination Services?
2   A. Uh-huh.
3   Q. Please say yes.
4   A. Yes.
5   Q. Is that in Birmingham?
6   A. Yes.
7   Q. And what do they do?
8   A. We determine disability claims.
9   Q. For Social Security?
10  A. Yes.
11  Q. Is it a public employer?
12  A. State of Alabama.
13  Q. Is it in a department of the State of
14     Alabama?
15  A. It's the Department of Education.
16  Q. I see. And you went there on June 3rd of
17     1997; is that right?
18  A. June 9th, I think.
19  Q. Okay. But June of 1997?
20  A. '97, right.
21  Q. As a Disability Determination Examiner I?
22  A. Right.
23  Q. Do you abbreviate that? Do you say DDE?

---

Page 23

1   A. We say DDS.
2   Q. DDS?
3   A. Well, that's -- the department's DDS.
4   Q. Oh, I see. And you're still working there?
5   A. Yes.
6   Q. Prior to going to work for the State of
7      Alabama, did you work anywhere other than the
8      Census Bureau and Sears and maybe Church's
9      Chicken?
10  A. South Central Bell. It was in nineteen
11     eighty -- '85, December '85 to I think May of
12     '86. Wait a minute. No, no, no, no. '84.
13     December '84 to May of '85.
14  Q. Was that in Birmingham?
15  A. Yes.
16  Q. What did you do for them?
17  A. Sold telephones over the phone.
18  Q. Have you ever been terminated or
19     involuntarily left a job?
20  A. I left Glenn Ireland due to the closure.
21  Q. Due to the closure?
22  A. Uh-huh.
23  Q. When the Glenn Ireland facility closed, I

---

Page 24

1      assume that was in the '96 time frame?
2   A. Yes.
3   Q. Was everybody laid off at the exact same time
4      or did it -- was there a progression?
5   A. It was a progression -- well, the supervisors
6      were laid off first, and then from that I
7      don't know exactly how the sequence went.
8   Q. You were in March of '96?
9   A. Right.
10  Q. Right?
11  A. Uh-huh.
12  Q. Were you in the last group or the middle
13     group or the first group or do you know?
14  A. The first group.
15  Q. You were one of the first to be laid off?
16  A. Yes.
17  Q. So some employees remained at Glenn Ireland
18     for a little while longer?
19  A. Yes.
20  Q. And then when was your understanding as to
21     when the whole thing shut down?
22  A. November '96.
23  Q. Okay. Have you now told me about everywhere

---

Page 25

1      that you can recall working since college?
2   A. Yes.
3   Q. And that would include -- you've told me
4      everywhere now that you've worked since you
5      left the Glenn Ireland facility in
6      approximately March of 1996?
7   A. Yes.
8   Q. Okay. I'll show you what I'm marking as
9      Exhibits #1099 and #1100. I believe these
10     are -- I believe the first one is a motion to
11     intervene and a complaint that were filed on
12     your behalf by your lawyers in this lawsuit,
13     and I believe #1100 is an amended motion to
14     intervene filed by your lawyers in this
15     lawsuit. I'll just ask you to -- an amended
16     motion to intervene and a complaint in
17     intervention. And I guess --
18        MR. CALVIN: I don't know that both of
19        them were filed.
20        MR. LIGHTFOOT: You don't?
21        MR. CALVIN: Off the top of my head, I
22        don't see a filed stamp on it so I
23        can't tell you if they were filed

---

7 (Pages 22 to 25)

Page 26

1       or not.
2       MR. LIGHTFOOT:  What I have isn't even
3         signed for the amended.  Joe, page
4         5 of the complaint in
5         intervention.
6       MR. CALVIN:  You just -- as far as you
7         know, both the complaints in
8         intervention are the same, aren't
9         they?  Off the record.
10        (Off-the-record discussion)
11      MR. LIGHTFOOT:  Same standard reserving
12        of my rights to redepose Ms. Finch
13        if necessary, but the same speech
14        from the last three depos we've
15        taken.
16      MR. CALVIN:  Okay.  That's fine.  Just
17        I guess note for the record that
18        her documents were delivered to
19        Mr. Lightfoot on Friday afternoon,
20        and it is now Tuesday morning.
21        And the package of documents was
22        much thinner than the packages
23        before.

Page 27

1       MR. LIGHTFOOT:  That's right.
2         Delivered at five o'clock.
3       MR. CALVIN:  And also that I saw
4         Mr. Lightfoot jogging this
5         weekend.  The time he could have
6         spent --
7         (Off-the-record discussion)
8   Q.  All right.  Looking at Defendants' Exhibit
9       #1099 -- and I guess I'm pointing you to page
10      5 of the complaint because that's the --
11      that's the section of the complaint that
12      talks about your specific complaints.  Are
13      you familiar with the complaint contained in
14      #1099?
15      MR. CALVIN:  Hold on a minute.
16        (Off-the-record discussion)
17  Q.  Have you ever seen the complaint that's
18      contained in the document #1099?
19  A.  Yes.
20  Q.  Okay.  Drafted by your lawyers?
21  A.  Yes.
22  Q.  Okay.  And it contains some complaints that
23      you have against various departments of the

Page 28

1       State of Alabama?
2   A.  Yes.
3   Q.  Okay.  Are you familiar with the complaint
4       that's contained in #1100?  And I'll direct
5       you, I guess, to page 4 of that complaint.
6   A.  Yes.
7   Q.  Are you making any complaints in this lawsuit
8       that are not contained in the complaints that
9       I have just put in front of you?
10  A.  I'm -- you -- ask the question again, please.
11  Q.  Sure.  Are you making any complaints in this
12      lawsuit that are not contained in the two
13      written complaints that I've just showed you?
14  A.  Yes.
15  Q.  You are?
16  A.  Yes.
17  Q.  All right.  How many complaints do you have
18      that are not actually recorded in those
19      complaint documents?
20  A.  Social Worker for DHR, and I think it's
21      administrator -- I can't remember is it -- if
22      it's Administrator II or III with the
23      Department of Mental Health.  It's II or --

Page 29

1   Q.  You think it's II?  Okay.  So as you sit here
2       today, you are complaining about the things
3       that are contained in these two complaints;
4       you're complaining about a Social Worker at
5       DHR position --
6   A.  Yes.
7   Q.  -- that you believe you should have gotten?
8   A.  Yes.
9   Q.  Okay.  And did you mention one other?
10  A.  Administrator -- I believe it was
11      Administrator III position at Glenn Ireland.
12  Q.  Okay.  Any other positions that you claim you
13      should have gotten that you're complaining
14      about in this lawsuit other than the
15      positions mentioned in these two complaints
16      and these two that you've just told me about?
17  A.  No.
18  Q.  Okay.
19      MR. ABBOT:  Let the record reflect that
20        I'm now turning over to Joe Calvin
21        a list of plaintiffs' names and
22        addresses and phone numbers.
23  Q.  All right.  Are you making any complaints in

DUNN, KING & ASSOCIATES                431 South Court Street              Montgomery, AL  36104
toll-free (800) 359-8001               website: www.dunnking.com           ph:(334)263-0261;fax 263-1243

Page 30

1    this lawsuit that have anything to do with
2    the time period preceding January of 1986
3    when you first began to work for the State?
4  A. Yes.
5  Q. All right. And what -- what claims do you
6    have that precede 1986?
7  A. DHR, Social Worker.
8  Q. Okay. So you applied for that Social Worker
9    at DHR position prior to 1986?
10  A. Yes.
11  Q. Do you remember what year it was?
12  A. Well, I started in 1979 taking the exam with
13    DHR. I would normally take it every nine
14    months to make sure that it was current.
15  Q. Okay. I also see that you applied for some
16    other jobs prior to 1986?
17  A. Yes.
18  Q. You're not complaining about any of those in
19    this lawsuit?
20  A. No.
21  Q. Okay. So prior to your beginning work at the
22    Department of Mental Health in January of
23    1986, you're not complaining about any

Page 31

1    actions taken by any State department other
2    than any actions taken by a State department
3    relating to the Social Worker at DHR
4    position; is that correct?
5  A. That's correct.
6  Q. Okay. That you're aware of at this time,
7    tell me the departments you're making
8    complaints against.
9  A. Department of Mental Health and Mental
10    Retardation.
11  Q. Okay. And that's where you worked for ten
12    years, right?
13  A. A little over ten years.
14  Q. Okay.
15  A. And Department of Human Resources.
16  Q. You have a complaint against them?
17  A. Yes.
18  Q. Now, is that simply based upon that Social
19    Worker position or are there other complaints
20    you have against DHR?
21  A. Based on the Social Worker position.
22  Q. The one that was sometime before 1986?
23  A. Yes.

Page 32

1  Q. Okay. You applied for and did not receive, I
2    believe, some jobs at other departments
3    throughout your employment at the Department
4    of Mental Health. Corrections, and some
5    others. Are you making any complaints
6    against those departments in this lawsuit?
7  A. No.
8  Q. Okay. It looks to me like you applied for
9    and were not chosen for some positions at the
10    Corrections Department, at the Public Health
11    Department, and some other departments after
12    you started working for the Department of
13    Mental Health in 1986? And you're telling me
14    today that you're not complaining about any
15    of those positions that you were not selected
16    for?
17  A. No.
18  Q. Okay. So I can just leave Corrections out --
19    Corrections and the Public Health Department,
20    we can just not waste our time on that
21    because you're not complaining about anything
22    against them?
23  A. No.

Page 33

1  Q. No, you're not making any --
2  A. I'm not complaining of them.
3  Q. Okay. Thanks. What kinds of complaints are
4    you making against the Mental Health
5    Department and the Department of Human
6    Resources?
7  A. The complaint that I'm making against those
8    departments is because I didn't receive
9    promotions or a job based on the color of my
10    skin.
11  Q. Okay. So you're making claims of race
12    discrimination?
13  A. Exactly.
14  Q. Okay. Are you complaining about any other
15    kind of discrimination like sex
16    discrimination or disability discrimination
17    or anything like that?
18  A. No.
19  Q. Okay. Are you making -- you're not
20    complaining of retaliation in this lawsuit
21    against any department, are you?
22  A. In terms of?
23  Q. Yeah, are you making any claims in this

Page 34

1    lawsuit against the Department of Mental
2    Health or DHR for retaliating against you?
3   A. No.
4   Q. And to be clear on that, you filed an EEOC
5    charge in July of 1993; do you recall filing
6    that?
7   A. Yes.
8   Q. And so that's the only EEOC charge that
9    you've filed that I'm aware of, right?
10 A. Yes.
11 Q. Have you ever filed any other EEOC charge
12   ever?
13 A. No.
14 Q. Okay. And I'll identify that in just a
15   minute. It does appear to me it was in July
16   of '93. Is that consistent with your
17   recollection?
18 A. Yes.
19 Q. Okay. And so you're not complaining about
20   any retaliation against either of those
21   departments for filing that charge?
22 A. No.
23 Q. I have not seen that you ever filed any

Page 35

1    internal complaints of race discrimination.
2    Did you ever file anything -- any internal
3    complaints of race discrimination?
4   A. No.
5   Q. So you certainly aren't complaining about any
6    retaliation with regard to any internal
7    complaints of race discrimination?
8   A. (Witness shaking head.)
9   Q. Is that -- did you --
10 A. No.
11 Q. Okay. In terms of race discrimination, I
12   want to figure out what categories of claims
13   of race discrimination you have. Certainly
14   it's obvious to me from your complaints that
15   you're complaining about promotion decisions;
16   in other words, positions that you wanted and
17   sought and did not get, and you're claiming
18   that's on the basis of your race?
19 A. Positions that I should have received and
20   didn't get.
21 Q. Okay. So I call those promotion decisions.
22   You're not claiming that you were ever
23   demoted on the basis of race, right?

Page 36

1   A. No.
2   Q. You don't have any termination -- go ahead.
3   A. Okay. On -- you said demoted?
4   Q. I do.
5   A. Okay. Then we can go back to saying we were
6    demoted because there was a -- a question of
7    when we were laid off from Glenn Ireland.
8    They decided, said, well, look, you can
9    become a Mental Health Worker. So that's a
10   demotion -- would have been a demotion.
11 Q. That's right. To have gone from your HTS
12   position to an MH I --
13 A. Right.
14 Q. -- would have been a demotion, right?
15 A. Exactly.
16 Q. Was that option offered to you by the Mental
17   Health Department instead of layoff?
18 A. It was offered to us by the director of Glenn
19   Ireland Center.
20 Q. Okay. So was that basically we're closing
21   Glenn Ireland, but if you want to go -- if
22   you want to take a demotion and go be an MH I
23   at another facility, that's an option that's

Page 37

1    available? Is that the way it came about?
2   A. According to them. But it wasn't an option
3    because you had to get on the register. You
4    had to take the test and be on the register
5    in order to become a Mental Health Worker I
6    even though I had started out as a Mental
7    Health Worker I.
8   Q. Okay. Is that the only time a demotion issue
9    is involved in this lawsuit, what you've just
10   described to me about when you were leaving
11   Glenn Ireland in the layoff and you were
12   offered what you've just told me?
13 A. Yes.
14 Q. Okay. All right. Are you making any claims
15   of race discrimination with regard to the
16   termination of your employment or your
17   layoff?
18 A. No.
19 Q. So you're not claiming that you're being
20   included in the layoff of all the employees
21   at Glenn Ireland was race discrimination, are
22   you?
23 A. Well, most of the people in the position were

10 (Pages 34 to 37)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL 36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 38

1  black.
2  Q. Most of the people in the -- most of the
3     people laid off were black because most of
4     the people at Glenn Ireland were black,
5     right?
6  A. It's a good many were.
7  Q. Okay. So you're not claiming that's evidence
8     of race discrimination by the Mental Health
9     Department, are you?
10  A. No.
11  Q. So no complaints about the layoff or about
12     any termination; that's correct?
13  A. Yes.
14  Q. Okay. Are you making any claims in this
15     lawsuit about harassment, that you were
16     harassed on the basis of your race at any
17     time at the Mental Health Department?
18  A. No.
19  Q. And included in harassment, I guess that
20     would be any claims relating to a hostile
21     work environment or to any insulting or
22     offensive conduct by any Mental Health
23     employees towards you because of your race.

Page 39

1  A. No.
2  Q. Nothing like that?
3  A. No.
4  Q. Are there any other kinds of race
5     discrimination that you're complaining about
6     in this lawsuit other than promotion claims
7     like we've discussed here, or the sort of
8     demotion claim that you've mentioned to me
9     about the MH I position that occurred around
10     the layoff time. Are those the only two
11     types of claims that you have in this
12     lawsuit, promotion and demotion?
13  A. Yes.
14  Q. Do you have any evidence or information that
15     any Mental Health Department or DHR manager
16     ever made a racist statement or a statement
17     that was derogatory on the basis of race,
18     directed toward you or any other black
19     employee or person?
20  A. No.
21  Q. Are you aware of or do you have any
22     information that any manager or personnel
23     employee at the Mental Health Department or

Page 40

1  at DHR ever made any statement that -- ever
2     made any statements that would lead you or
3     anyone else to believe that race was in any
4     way a factor in any of these promotion
5     decisions that you're complaining about or in
6     regard to this demotion offer that was made
7     to you?
8  A. No.
9  Q. Did anything -- other than not getting some
10     promotions and perhaps being offered this
11     demotion that you've mentioned to me, did
12     anything negative ever happen to you while
13     you were employed at the Mental Health
14     Department for those approximately ten years
15     on the basis of your race or that you believe
16     was on the basis of your race?
17  A. No.
18  Q. Were you ever mistreated in any way by any
19     Mental Health manager or personnel employee
20     at any time during your ten years on the
21     basis of race?
22  A. No.
23  Q. Did all of the Mental Health managers and

Page 41

1  personnel employees always treat you with
2     respect throughout your ten years of
3     employment?
4  A. Yes.
5  Q. I assume those would be both black and white
6     managers that would be included in that?
7  A. Direct -- the people that I was directly
8     associated with.
9  Q. Would include both black and white managers?
10  A. Right.
11  Q. And black and white personnel employees?
12  A. Yes.
13  Q. And when I say personnel, I'm talking about
14     the personnel inside the Mental Health
15     Department as opposed to the State Personnel
16     Department, right? Do you understand?
17  A. I understand.
18  Q. I say that because we've been going through
19     this and it's not always clear when you --
20     when someone like me just says personnel
21     whether you're talking about inside the
22     Mental Health Department or for the whole
23     State.

11 (Pages 38 to 41)

DEPOSITION OF AUDREY DENISE FINCH                                TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 42

1   A. But when you say in terms of the people that
2       were related, the people that was around me.
3       In other words, that's the only thing I can
4       say.
5   Q. Yeah.
6   A. Those people that were directly -- that I
7       directly associated with.
8   Q. Yes. You have the most contact, during your
9       ten years at the Glenn Ireland facility --
10      you had the most contact with the people that
11      worked around you, your direct supervisors,
12      maybe the supervisors one level above them
13      and the personnel employees at your facility,
14      right?
15  A. Yes.
16  Q. And who were -- who was the personnel manager
17      at Glenn Ireland for the bulk of your time at
18      Glenn Ireland?
19  A. I had several.
20  Q. You had several?
21  A. I had Sally Grier.
22  Q. Sally Grier?
23  A. Jim -- Jim Elliott, and -- I can't recall --

Page 43

1       Tommy.
2   Q. Judd?
3   A. Judd, yeah.
4   Q. Okay. And then who were your direct
5       supervisors?
6   A. Vivian Powe Richardson and I think Len
7       Hamilton.
8   Q. I assume that Vivian and Len would have been
9       unit directors?
10  A. Well, they became unit directors.
11  Q. Oh, and you know, I don't even --
12      MR. LIGHTFOOT: Off the record.
13      (Off-the-record discussion)
14  Q. What were Vivian and Len's positions?
15  A. Okay. Vivian was my immediate supervisor
16      when I started at Glenn Ireland.
17  Q. And what was her position?
18  A. She was cottage supervisor. And then she
19      went on to become a unit director.
20  Q. And a cottage supervisor is an HTS, right?
21  A. The name changed, yes.
22  Q. All right. What was Len Hamilton?
23  A. When he became a cottage supervisor, he was

Page 44

1       the unit director.
2   Q. Oh, Len is a man?
3   A. Yes, he.
4   Q. Okay. L-Y-N-N? You're not sure? Or L-E-N?
5       It doesn't matter. All right. And what did
6       you say he was again?
7   A. He's a unit director.
8   Q. Okay. You were hired on in, it appears to
9       me, January of 1986 as an MH I at Glenn
10      Ireland; is that correct?
11  A. Yes, January 21st.
12  Q. Okay. How did you find out about that job at
13      Glenn Ireland?
14  A. I went to the black book down at the
15      Employment Office.
16  Q. At which Employment Office?
17  A. In Birmingham.
18  Q. The --
19  A. And filled out the applications.
20  Q. The State Employment Office?
21  A. Yes.
22  Q. Is that the same as the Unemployment Office?
23  A. Yes.

Page 45

1   Q. Okay. And you saw a listing of jobs. You
2       called it the black book?
3   A. Yes.
4   Q. Does it list a bunch -- jobs with the State
5       or just jobs, period?
6   A. With the State.
7   Q. Okay. Jobs with the State. And you saw in
8       there an MH I position?
9   A. Yes.
10  Q. And did you believe you were qualified for
11      it?
12  A. Yes.
13  Q. And did you apply for it?
14  A. Yes.
15  Q. Did you take a test?
16  A. Yes.
17  Q. Were you placed on a register?
18  A. Yes.
19  Q. And how did you know you'd been placed on a
20      register? Did a letter come and tell you
21      that?
22  A. Yes.
23  Q. Okay. And then after you were placed on that

Page 46

1  register, approximately how long before you
2  were informed that you had gotten the
3  appointment?
4  A. Maybe several years. I took the test off and
5  on.
6  Q. Oh, I see.
7  A. From '79 on.
8      MR. TARVER: Off the record.
9      (Off-the-record discussion)
10 Q. You at some point got on a register and
11    you're not sure how long it was before you
12    had been informed that you had been selected?
13 A. No.
14 Q. Okay. Did you actually see the register that
15    you received your appointment off of, if that
16    makes sense?
17 A. No.
18 Q. Okay. So you don't know whom you were chosen
19    over?
20 A. Well, it was several people. I started at
21    Glenn Ireland before the facility opened, so
22    the facility opened I think around February
23    of '86. So I started training -- I was in

Page 47

1  the second -- second group of people that
2  were trained to be -- to work at Glenn
3  Ireland.
4  Q. You mean you had some indication before you
5  had even been hired that you were going to
6  get the job?
7  A. No.
8  Q. This is after you were hired?
9  A. Right.
10 Q. You were just one of the first people to get
11    there?
12 A. The second group. I was in the second group.
13 Q. You were the second group to get there?
14 A. Right. It was a group in December.
15 Q. I gotcha.
16 A. And it was a group in January.
17 Q. I gotcha. All right. And you were an MH I
18    for -- it looks to me like approximately five
19    years?
20 A. From '86 to I think around '90.
21 Q. Yeah. My documents show January of '91, but
22    do you know when you actually --
23 A. Yeah, well, '91.

Page 48

1  Q. Okay. So you were there for five years doing
2    that. Tell me what you did as an MH I at
3    Glenn Ireland, please.
4  A. Well, I worked directly with the clients. I
5    bathed, I fed them, I did different
6    activities with them, took them on outings,
7    clothed them, interacted with individuals
8    that were there.
9  Q. And your supervisor, was that one of the two
10    people you've already told me?
11 A. Vivian.
12 Q. Vivian Richardson?
13 A. Richardson.
14 Q. Who was either an HTS or a cottage
15    supervisor?
16 A. Right.
17 Q. Okay. Did you apply for an HTS position
18    sometime prior to January 12th of 1991?
19 A. Yes.
20 Q. Was that the first time that you had applied
21    for an HTS or cottage supervisor position?
22 A. In 1986.
23 Q. Okay. So the first year you were there, you

Page 49

1  applied to be a cottage supervisor?
2  A. Yes.
3  Q. Was that for a specific position that needed
4    to be filled at Glenn Ireland?
5  A. Yes.
6  Q. Okay. And you didn't get it?
7  A. No.
8  Q. Do you know who did?
9  A. It was -- they had several people that got
10    positions as cottage supervisors. Because
11    they were filling the cottages, they needed
12    supervisors for the cottages because we were
13    getting people in from Partlow and maybe some
14    people from the community. So it was several
15    people that got positions.
16 Q. Okay. So between '86 and '91, some other
17    people got the cottage supervisor or HTS
18    position?
19 A. Yes.
20 Q. At Glenn Ireland?
21 A. Yes.
22 Q. All right. You're not complaining about any
23    of those positions that were selected, are

13 (Pages 46 to 49)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL 36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 50

1    you?
2    A. Yes.
3    Q. Okay. You are?
4    A. Yes.
5    Q. All right. How many of those are you
6       complaining about in this lawsuit?
7    A. I don't know exactly how many, but it was
8       several people that got the positions in
9       between that time from the '86 up until the
10      '91 period.
11   Q. Between '86 and '91 you said there were
12      several?
13   A. Several.
14   Q. Okay. I assume both black and white
15      candidates got those jobs?
16   A. Yes.
17   Q. Are you complaining about both the black and
18      the white selections?
19   A. I'm complaining about the white selection.
20   Q. All right. No complaint about the black
21      selections?
22   A. Well, it was a few that got them.
23   Q. I'm sorry?

Page 51

1    A. It was a few people that got positions
2       because they chose people off the street with
3       little or no experience in Mental Health.
4    Q. Okay. But for those times when black
5       candidates were chosen over you, even if they
6       came from off the street or from some other
7       department of Mental Health, you're not
8       making a complaint in this lawsuit about race
9       discrimination, are you?
10   A. I am making a complaint about race
11      discrimination in this lawsuit.
12   Q. Okay. I may not have stated that as well as
13      I intended to. I understand that you're
14      certainly making claims of race
15      discrimination in this lawsuit. I'm asking
16      you, though, about the specific promotions
17      where black candidates were chosen for the
18      cottage supervisor or HTS position over you
19      regardless of where they came from but where
20      a black candidate was chosen over you. Are
21      you making a complaint of race discrimination
22      with regard to those?
23   A. No.

Page 52

1    Q. Okay. All right. Now, how many white
2       candidates got these cottage supervisors or
3       HTS positions between '86 and '91 that you're
4       complaining about in this lawsuit?
5    A. I don't know because I don't have that
6       record.
7    Q. All right. You just say several or --
8    A. Several.
9    Q. One or two?
10   A. It was more than two.
11   Q. More than two?
12   A. It was several people.
13   Q. More than two?
14   A. It's been years ago so I don't know exactly
15      how many.
16   Q. More than two, less than five?
17   A. Probably more than five.
18   Q. All right. Less than ten?
19   A. I'm not sure.
20   Q. Less than 50?
21   A. Yes, less than 50.
22   Q. Less than 25?
23   A. Yeah, less than 25.

Page 53

1    Q. Okay. Can you give me the name or the time
2       frame or anything else, any other information
3       about any of those selections for cottage
4       supervisor or HTS position between '86 and
5       '91 where a white candidate was selected over
6       you?
7    A. Well, I can give you a few names. I can't
8       remember all of them.
9    Q. Please tell me.
10   A. It was -- we had John Justice. Let's see.
11      And I can't say exactly how many. I can't
12      remember all of them because it's been a --
13      it's been a while ago. Mary Edith Moore.
14   Q. Mary Edith Moore?
15   A. Uh-huh. It's another guy. I can't remember
16      his name. His name was Tim something. I
17      can't remember his name. And I -- and I
18      can't think of the rest of them right off.
19   Q. Okay. These would all be white employees?
20   A. Yes.
21   Q. Who got the promotion to HTS or cottage
22      supervisor between '86 and '91?
23   A. Yes.

14 (Pages 50 to 53)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

Page 54

1  Q. Are you claiming that you are equally or more
2     qualified than any of these three
3     individuals?
4  A. More qualified.
5  Q. You're claiming you're more qualified than
6     all three?
7  A. Yes.
8  Q. All right. Why are you more qualified than
9     John Justice?
10 A. Okay. They hired them off the street. I had
11    worked at Glenn Ireland maybe years before
12    they came. And I worked directly with the
13    individuals that was there at the center.
14 Q. Do you know what John's education was?
15 A. He had a bachelor's degree, I assume.
16 Q. Do you know --
17 A. Because I don't know right off.
18       MR. CALVIN: If you don't know, don't
19          assume. He just wants to know
20          what you know.
21 Q. Do you know what his education was?
22 A. No.
23 Q. Do you know what his background was --

Page 55

1  A. No.
2  Q. -- his experience?
3  A. No.
4  Q. Do you know what Mary Edith or Tim's
5     education or experience was?
6  A. No.
7  Q. Okay. So for all you know, those three folks
8     could have had substantially more education
9     than you and substantially more experience in
10    the Mental Health field than you, right?
11 A. That I don't know.
12 Q. All right. Is your complaint the same about
13    all three of them in terms of their
14    qualifications that they were hired off the
15    street and that you had worked at that
16    facility longer?
17 A. Yes.
18 Q. Is there any other complaint about those
19    three in terms of qualifications that you
20    have?
21 A. No.
22 Q. And nothing else about their selection over
23    you suggests to you race discrimination, does

Page 56

1     it, other than what you've told me, that they
2     were hired off the street and that you had
3     worked there for more time than they had?
4  A. And I worked directly with the individuals,
5     yes.
6  Q. Did you interview for any of those positions
7     between '86 and '91 for cottage supervisor?
8  A. Yes.
9  Q. All right. Do you think it was on these
10    times where these three people got them?
11 A. Yes.
12 Q. Okay.
13 A. Each time the job was posted, I filled out
14    the application for the position and was
15    interviewed for them.
16 Q. All right. And so when John Justice got it,
17    you -- you were interviewed?
18 A. I'm sure I was. I'm not sure exactly. But I
19    interviewed each time that job was posted.
20 Q. Okay. Can you remember who was in the
21    different interview panels that interviewed
22    you?
23 A. No.

Page 57

1  Q. You know what I mean by that? The people --
2  A. The people that were there, no. It's been
3     years ago so I don't remember exactly who
4     interviewed me for each -- each time that I
5     interviewed.
6  Q. Okay. Every time it was posted that you
7     filled an application between '86 and '91,
8     were you given an interview?
9  A. I was given one, yes.
10 Q. Okay. So you're not complaining about not
11    getting an interview. It's just that after
12    the interview you weren't selected. That's
13    what you're complaining about?
14 A. Yes.
15 Q. Was there -- were you always interviewed by
16    more than one person?
17 A. Normally.
18 Q. Normally?
19 A. Uh-huh.
20 Q. And normally was there both black and white
21    employees involved in the interview process?
22 A. I can't remember.
23 Q. Was there ever a time there wasn't a black

15 (Pages 54 to 57)

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 58

1    employee involved in the interview process?
2  A. I can't remember.
3  Q. Okay. You've never complained about any of
4    these instances where you didn't get these
5    promotions between '86 and '91 to cottage
6    supervisor or HTS, have you?
7  A. Repeat that.
8  Q. Have you ever complained about not getting
9    those promotions to anybody?
10  A. I did. I complained about it.
11  Q. Okay. You've never complained in writing?
12  A. Never in writing.
13  Q. And never to the EEOC?
14  A. No.
15  Q. All right. Who did you complain to?
16  A. I talked to several friends of mine that was
17    at the Center.
18  Q. Several friends of yours?
19  A. Uh-huh.
20  Q. Okay. But you never complained to anybody in
21    management or in personnel, right?
22  A. No.
23  Q. Okay. At some point in approximately 1991,

Page 59

1    you actually received the promotion, correct?
2  A. Yes.
3  Q. You were promoted to HTS or cottage
4    supervisor?
5  A. Yes.
6  Q. Were you happy about that promotion?
7  A. Yes.
8  Q. Okay. Because that's the one you'd been
9    seeking, right?
10  A. One of the ones I had been seeking.
11  Q. Were you interviewed for that position?
12  A. Yes.
13  Q. Who was on your interview panel?
14  A. I don't remember.
15  Q. Were there other employees that were trying
16    for that position?
17  A. I'm not sure.
18  Q. You mean you think you may have been the only
19    one?
20  A. No.
21  Q. You just don't know?
22  A. I don't know.
23  Q. Okay. That changed you from a merit -- let's

Page 60

1    see. That changed you from a merit position
2    job as MH I to an exempt job as HTS; is that
3    correct?
4  A. Yes. Yes.
5  Q. And we've said that was a promotion, right?
6  A. Yes.
7  Q. And that gave you more pay, right?
8  A. Yes.
9  Q. But also gave you more responsibility, right?
10  A. Yes.
11  Q. Prior to that -- prior to becoming an HTS or
12    cottage supervisor, you had not supervised
13    any employees at Glenn Ireland, had you?
14  A. Well, we had lead workers. I was sometimes
15    chosen as the lead worker to be in charge of
16    the cottage in the absence of the supervisor.
17  Q. I see. Other than that, though, had you ever
18    supervised any employees at Glenn Ireland?
19  A. No.
20  Q. All right. Then once you became an HTS or
21    cottage supervisor, then you would have
22    supervised both MH I's and MH II's; is that
23    correct?

Page 61

1  A. We only had just ones at that -- I think we
2    only had ones at that point.
3  Q. You think you just supervised MH I's?
4  A. Uh-huh.
5  Q. Where were there no MH II's?
6  A. I don't know.
7  Q. Don't know? Let me show you what I'm marking
8    as #1101.
9        MR. REDMOND: What's that number
10        again? I'm sorry.
11        MR. LIGHTFOOT: I confused -- I tried
12        to throw you off.
13        MR. ABBOT: #1101.
14        MR. LIGHTFOOT: #1101.
15        MR. CALVIN: Warren has had trouble
16        with these numbers throughout. He
17        may be removed as the official
18        crier of the numbering system.
19        MR. LIGHTFOOT: Off the record.
20        (Off-the-record discussion)
21  Q. Okay. The document that I've marked as
22    #1101, is that the document informing you of
23    your promotion and attached to it is a copy

DUNN, KING & ASSOCIATES                431 South Court Street                Montgomery, AL 36104
toll-free (800) 359-8001            website: www.dunnking.com        ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 62

1   of your application?
2       MR. LIGHTFOOT: While we're at it, I'm
3       going to go ahead and mark #1102
4       as your initial employment
5       appointment to MH I and your
6       application with that. I'll just
7       get you to identify both of them
8       at the same time.
9       MR. CALVIN: How far is this question
10      going to last?
11      MR. LIGHTFOOT: Yeah. I can just --
12      it's a good stopping point.
13      MR. CALVIN: You want to stop right
14      now?
15      MR. LIGHTFOOT: Sure. Why don't we
16      just get her to -- well, yeah.
17      Let's get her to identify them,
18      because that's really all I have
19      to say on that.
20  Q. All right. What I've marked first as #1101,
21      Ms. Finch, is that the letter discussing your
22      appointment to the HTS position?
23  A. Yes.

Page 63

1   Q. And attached to it, is that an application
2       that you filled out?
3   A. Yes.
4   Q. And was that truthful and accurate?
5   A. Yeah.
6   Q. And when I say that, was the application that
7       you filled out truthful and accurate?
8   A. Yes.
9   Q. Okay. Now, the other document is #1102.
10      That is confirming your appointment to be an
11      MH I back in '86, correct?
12  A. Uh-huh.
13  Q. And attached to that is an application that
14      you filled out, correct?
15  A. This is an application. One does not have a
16      date on it. It's two applications here.
17  Q. It is two?
18  A. Uh-huh.
19  Q. Do you recognize the handwriting on both?
20  A. I recognize the handwriting. I don't know
21      the date.
22  Q. So you filled out both of them?
23  A. Yes.

Page 64

1   Q. Are they both truthful and accurate?
2   A. Yes.
3       MR. LIGHTFOOT: You want to call him?
4       MR. CALVIN: Yeah.
5       (Recess taken from
6           11:29 a.m. to 12:05 p.m.)
7   Q. To be clear, we talked about -- we talked
8       about a lot of departments that you weren't
9       making complaints against, and I specifically
10      mentioned Corrections and Public Health. I
11      also meant to include in there ABC. You're
12      not making any complaints against ABC?
13  A. No.
14  Q. At all?
15  A. No.
16  Q. Okay. After you got the promotion to HTS in
17      approximately January of 1991, you were over
18      a cottage; is that correct?
19  A. Yes.
20  Q. How many cottages were there at Glenn Ireland
21      at that time?
22  A. I think -- I believe it's seven.
23  Q. And you were over one of them?

Page 65

1   A. Yes.
2   Q. Okay. What were your duties as an HTS?
3   A. My duties were to supervise the staff to
4       ensure that the residents were properly taken
5       care of, to make sure -- day-to-day
6       operations in the cottage.
7   Q. And you would have supervised approximately
8       five Mental Health Workers at any one time
9       or --
10  A. In that particular cottage I may have
11      supervised about seven or -- seven or eight
12      in that cottage. But during weekends, we'd
13      supervise the whole campus or in the
14      afternoon in the absence of another
15      supervisor, we'd supervise that particular
16      cottage. And also we were responsible for
17      making sure that the coverage -- that we had
18      enough coverage there on the facility.
19  Q. And who was your supervisor once you were
20      promoted to HTS?
21  A. Len Hamilton.
22  Q. And Len Hamilton remained your supervisor
23      throughout the rest of your time at Glenn

17 (Pages 62 to 65)

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 66

1    Ireland?
2    A. Yes.
3    Q. And that's a male?
4    A. Yes.
5    Q. White or black?
6    A. Black.
7    Q. All right. Are there any promotions that
8    you're complaining about in this lawsuit that
9    you did not get between nineteen ninety --
10    1991 and your layoff in 1996?
11    A. Yes. A QMRP. That's one of the -- one of
12    the jobs. And I think the other position was
13    Administrator III if I'm not mistaken. I
14    don't know if it was the -- the -- no, it was
15    Administrator II, and I think the next one
16    was Administrator III.
17    Q. Okay. When you say QMRP position, is that
18    sometimes called the Q?
19    A. Yes.
20    Q. Was that a -- was there another name for that
21    position?
22    A. Hab Treatment Coordinator. Habilitation
23    Treatment Coordinator.

Page 67

1    Q. HTC or wasn't it also HTL, Habitation Team
2    Leader?
3    A. HTL. Right.
4    Q. Okay. That's all the same thing?
5    A. Yes.
6    Q. Now, to be QMRP certified, you have to have a
7    master's in the required discipline, correct?
8    A. Yes.
9    Q. And you did not have a master's in the
10    required discipline to be QMRP certified;
11    correct?
12    A. Yes, I do.
13    Q. You do?
14    A. Yes.
15    Q. I thought your master's was in counselling.
16    A. It is.
17    Q. All right. But it's your belief that a
18    master's in counselling is sufficient to
19    satisfy the master's requirement --
20    A. yes.
21    Q. -- for QMRP?
22    A. Yes.
23    Q. Okay. If -- have you ever gotten a license

Page 68

1    or a certificate saying that you're QMRP
2    certified?
3    A. There was no license or certificate. You
4    just have to have the qualifications in that
5    area.
6    Q. Did you ever sign off as anything as the Q?
7    Sign off on any sheets as the Q for your
8    facility?
9    A. No.
10    Q. What do you base your statement that you were
11    QMRP certified on?
12    A. Because I have a master's in counselling.
13    Q. Okay. If the requirement says that you must
14    have a master's in psychology, rehabilitation
15    counselling, or therapy but doesn't mention
16    master's in counselling, what do you base
17    your statement that you were -- that you
18    satisfied that requirement?
19        MR. CALVIN: Object to the
20        hypothetical. You can answer.
21    A. Yeah, it's a hypothetical question. The
22    people that got the position only had a
23    bachelor's of arts or bachelor of science

Page 69

1    degree.
2    Q. Who told you that you were QMRP certified at
3    any time?
4    A. According to the Wyatt court ordered
5    standards, I would be QMRP certified;
6    master's in counselling along with
7    experience.
8    Q. But who ever told you that you were QMRP
9    certified? Nobody?
10    A. No.
11    Q. How many times between 1991 and 1996 did you
12    apply for and not get the HTL position that
13    we were just talking about?
14    A. I don't know the exact amount of times
15    because it's been years ago. So I don't know
16    how many times I applied for the position.
17    Each time the position was posted --
18    Q. I see.
19    A. -- I applied for the position.
20    Q. Okay. And approximately how many times did
21    it come open or was it posted during those
22    five years?
23    A. That, I don't know.

18 (Pages 66 to 69)

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 70

1  Q. All right. How many times were people
2     selected for that position that weren't you?
3  A. That I don't know. That's a personnel issue.
4  Q. It was at least once, right?
5  A. Yes.
6  Q. Fewer than five times?
7  A. I'm not sure.
8  Q. Well, fewer than ten?
9  A. I'm not sure.
10 Q. Well, you're complaining about all the times
11    that it happened in this lawsuit, right, that
12    you didn't get it?
13 A. Uh-huh.
14 Q. So I'd like you to give me your best judgment
15    as to how many times that was, please.
16    MR. CALVIN: Well, don't argue with the
17       witness. If she has an answer for
18       it, she'll give it to you, but she
19       said she doesn't know.
20 Q. Less than 25 times?
21 A. I'm not sure.
22 Q. I want to -- I want to -- I'm trying to
23    defend the Mental Health Department in this

Page 71

1     lawsuit. And in order to do that, I need to
2     know to the very best of your knowledge all
3     of the promotion claims that you have against
4     it. In order to do that, I need to know the
5     specific promotions or selections that were
6     made that you're complaining about. You
7     filed an EEOC charge about one of them. So I
8     know about that one, the one that happened in
9     1993, okay? Are there others that you're --
10    are there other selections for the position
11    of HTL or HTC that you're complaining about
12    in this lawsuit?
13 A. It is.
14 Q. Okay. Is it less than 25 of those?
15 A. I'm not sure on the amount.
16 Q. It's possible there were more than 25
17    selections to HTL between 1991 and 1996 that
18    you're complaining about here?
19 A. I am not sure.
20 Q. Can you give me any specifics about any of
21    the selections to the HTL position other than
22    the one in 1993 that's referenced in your
23    EEOC charge?

Page 72

1  A. Okay. Rephrase that.
2  Q. Okay. I'm aware of some specifics with
3     regard to a complaint you had about an HTL
4     selection where you didn't get it and someone
5     else did. I'm aware of that. It's in your
6     complaint and it's in your EEOC charge. Are
7     there other occasions where people were
8     selected that weren't you between '86 --
9     sorry, between '91 and '96 that you're
10    complaining about in this lawsuit?
11 A. It was, but I don't know the number.
12 Q. Do you recall not getting the HTL position in
13    approximately February of 1993?
14 A. If I applied for it, I didn't get it.
15 Q. Do you recall not getting the HTL position in
16    approximately February of 1993?
17 A. If I applied for it and didn't get it, then
18    it's possible.
19 Q. It's possible that you recall it?
20 A. I don't recall.
21 Q. Do you have a complaint about the HTL
22    selection that occurred in February of 1993?
23 A. If it's part of my complaint.

Page 73

1     THE WITNESS: May I see the complaint
2        again. Is this my '93?
3        (Brief pause)
4  Q. Do you recall Diane McCullar receiving a
5     promotion to HTL in approximately January of
6     1993?
7  A. Yes.
8  Q. All right. How did you know Diane McCullar?
9  A. She started as a I think Psychological
10    Assistant.
11 Q. Where?
12 A. At Glenn Ireland.
13 Q. When?
14 A. That's a good question. I don't know the
15    exact date.
16 Q. Before or after you were there?
17 A. After.
18 Q. Is a Psychological Associate above or below
19    an MH I?
20 A. Above.
21 Q. All right. Are you aware of her getting an
22    HTL -- and let me go ahead and just state
23    this for the record. And I think I'm going

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

Page 74

1    to need to get more specific. Are you clear
2    on various occasions whether you were
3    applying for an HTC I, an HTC II or an HTL
4    position, or do you think of them as all
5    being the same?
6    A. I was applying for both positions.
7    Q. Both of which ones?
8    A. HT -- well, HTL -- it's the same.
9    Q. Do you think of HTC I, HTC II, and HTL as all
10   being the same?
11   A. Okay. HT -- the I and the II are different.
12   Q. The I and the II are different?
13   A. Uh-huh.
14   Q. HTC I and HTC II?
15   A. Uh-huh.
16   Q. And which one of those is an HTL?
17   A. They were both considered HTL positions.
18   Q. Okay. All right. Sometime in January of
19   1993, Diane McCullar -- is Diane white?
20   A. Yes.
21   Q. She was promoted to one of the HTL positions
22   in approximately January of 1993, correct?
23   A. Yes.

Page 75

1    Q. All right. Are you complaining about that
2    promotion in this lawsuit?
3    A. Yes.
4    Q. All right. In fact, you didn't apply for
5    that position, did you?
6    A. I did.
7    Q. You did apply for that?
8    A. Yes, I did.
9    Q. And what makes you say that you applied for
10   that position?
11   A. Because I filled out the application for it.
12   Q. Assume for me that you didn't apply for that
13   position. If you didn't apply for that
14   position, do you have any complaints relating
15   to her getting that position?
16   A. I applied for the position.
17   Q. Okay. And I'm going to go through that
18   next. I'm going to ask you about that in a
19   little bit. Assume for me that you didn't
20   Assume for me that you're mistaken in your
21   belief. Assume for me that you didn't apply
22   for that position. If you didn't apply for
23   it, do you have any complaints about her

Page 76

1    getting the position?
2    A. I applied for the position so I can't assume.
3    Q. In general, if you -- if you don't apply for
4    any position and someone else gets the
5    position, do you have any complaints of race
6    discrimination about that kind of selection?
7    A. No.
8    Q. All right. Now, you say you applied for this
9    position that Diane McCullar got?
10   A. Yes.
11   Q. All right. Do you have a copy of your
12   application for it?
13   A. No. I don't keep copies of the applications.
14   Q. All right. You would have given that -- you
15   would have filled that out at the Mental
16   Health Department?
17   A. I would have filled it out at Glenn Ireland.
18   Q. And given it to the personnel office at Glenn
19   Ireland?
20   A. Yes.
21   Q. And you weren't interviewed for that
22   position, right?
23   A. I was.

Page 77

1    Q. For the one that Diane McCullar got?
2    A. Yes.
3    Q. Okay. You understand around the same time
4    that Jonathan Graves got a promotion?
5    A. Yes.
6    Q. All right. That's the one you were
7    interviewed for, right?
8    A. I was interviewed for both or it was maybe
9    two or three positions.
10   Q. Okay. So it's your testimony that you
11   applied for this one that Diane McCullar
12   got. Is it your testimony that you were
13   interviewed for it?
14   A. Yes.
15   Q. All right. Who interviewed you?
16   A. I'm not sure of who interviewed me. I can't
17   think back that far. I guess I could but I
18   don't remember it.
19   Q. All right. Is it your testimony that you
20   were equally or more qualified than Diane
21   McCullar for the position?
22   A. More qualified.
23   Q. More qualified. And why is it that you say

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

---

Page 78

1  you were more qualified?
2  A. Because Diane was hired off the street. And
3    I worked with the individuals at Glenn
4    Ireland from the -- from 1986 up until the
5    time that she got to the center, to the
6    facility.
7  Q. Okay. I'm confused about hired off the
8    street.
9  A. Well, I had more experience --
10 Q. I believe you told me --
11 A. -- than Diane.
12 Q. Okay.
13 A. I worked with mentally retarded people prior
14   to her coming to Glenn Ireland.
15 Q. In fact, when she got the position, she
16   wasn't off the street. She came from right
17   there at Glenn Ireland, right?
18 A. Yes.
19 Q. You're saying, though, that you're
20   complaining about it because you had been
21   there longer?
22 A. And I was there longer and had more
23   experience working with the individuals

---

Page 79

1  there.
2  Q. You say you were there working longer. Do
3    you know what her experience was prior to
4    going to Ireland?
5  A. Drug and alcohol or something like that.
6  Q. You have her application?
7  A. I do.
8  Q. How did you get it?
9  A. It must have been in my office. Evidently
10   somebody gave it to me. I'm not even sure on
11   that.
12 Q. How did you get a copy of her application?
13 A. Evidently someone gave it to me.
14 Q. Did Diane give it to you?
15 A. No. I don't know who gave it to me, but I
16   had a copy of it.
17 Q. Are you supposed to have that?
18 A. I'm not sure. Someone gave it to me, so I
19   couldn't turn it down.
20 Q. Did someone get it inappropriately or
21   improperly?
22 A. I'm not sure. I don't even know who gave it
23   to me.

---

Page 80

1  Q. Is a copy of her application in the documents
2    that you produced to me that you gave to your
3    lawyer?
4      MR. CALVIN: If you gave -- if she gave
5        it to me, I gave it to you.
6  A. Yeah, it is.
7      MR. LIGHTFOOT: Okay. Yeah, I see it.
8      MR. CALVIN: You see it? Yeah. Okay.
9  Q. Okay. I show you what I've marked as #1103.
10   That's a letter from Reed Bechtel to Diane
11   McCullar talking about her getting this
12   promotion that we're -- we've just been
13   talking about, right? Is that what it is?
14 A. Yes.
15 Q. All right. And that's a document you
16   produced to me, correct? I mean, you
17   produced to your lawyer who then produced it
18   to me? Did you produce it to your lawyer?
19 A. I'm not sure.
20     THE WITNESS: Did I produce it to you?
21     MR. CALVIN: Let me look. Yes.
22 A. Yes.
23 Q. All right. And then what I'm marking as

---

Page 81

1  #1104 is Diane McCullar's application,
2  correct?
3  A. Yes.
4  Q. And you don't know where you got that from?
5  A. No.
6  Q. Okay. Am I right that the only complaint
7    that you have about Diane McCullar receiving
8    the position over you is because you had been
9    at that facility longer?
10 A. I had more experience working with the
11   clients at Glenn Ireland. And she had no
12   experience working with mentally retarded
13   people.
14 Q. You didn't have any experience other than at
15   Glenn Ireland, did you?
16 A. Just Glenn Ireland.
17 Q. Okay. Is that the only evidence you have
18   that -- are you claiming that that was race
19   discrimination?
20 A. Yes.
21 Q. Okay. Is there any other basis for you
22   alleging race discrimination other than what
23   you've just told me?

---

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL 36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 82

1  A. Well, she -- she's white and I'm black and
2      she had less experience than I have. You can
3      tell from -- from the application.
4  Q. Right. But any reason other than that?
5  A. No.
6  Q. Okay. All right. There was also a -- an
7      HTL -- and I'm not sure if it's an HTC I or
8      II -- well, yeah, I am.
9  A. And to add -- excuse me. May I add to this?
10  Q. Yeah.
11  A. And also you questioned me about having a
12      master's in counselling.
13  Q. Right.
14  A. The evidence shows that she does not have a
15      master's at all.
16  Q. Okay.
17  A. And that was part of the requirements for the
18      job.
19  Q. Okay. Let's see. Are you aware of the
20      position that Jonathan Graves got in
21      approximately January of 1993?
22  A. Yes.
23  Q. And that was an HTC I position?

Page 83

1  A. Yes.
2  Q. Is that a position that you applied for?
3  A. Yes.
4  Q. I show you what I've marked as #1105. Is
5      that a letter discussing Jonathan Graves's
6      appointment to the position?
7  A. Yes.
8  Q. Was that a yes?
9  A. Yes.
10  Q. And I show you what I'm marking at #1106.
11      That's an HTC I -- or is that an HTC I job
12      description or a job posting?
13  A. Yes.
14  Q. All right. And that looks like that's from
15      '91, so I don't know if that's in that exact
16      time period. You probably don't recall
17      whether that's the exact one or similar to
18      it.
19  A. Uh-huh. It's '92. It's a '92.
20  Q. It is a '92?
21  A. Uh-huh.
22  Q. So that may or may not be in the right time
23      frame?

Page 84

1  A. Right.
2  Q. It's at least close?
3  A. Uh-huh.
4  Q. Okay. You did not have a master's degree in
5      psychology, correct?
6  A. No.
7  Q. You did not have a master's in vocational and
8      rehabilitation counselling, correct?
9  A. No.
10  Q. You did not have a master's in social work?
11  A. No.
12  Q. And you did not have a master's in special
13      education; is that correct?
14  A. Correct.
15  Q. Do you recall anybody else that applied for
16      the HTC I position that Jonathan Graves got?
17  A. I think John Justice.
18  Q. Okay. Do you know whether any of the
19      applicants for that job had the required
20      master's degree?
21  A. They didn't.
22  Q. None of the six did or none of the applicants
23      did period?

Page 85

1  A. Not of the ones that's in question here,
2      Diane McCullar, John Graves, John Justice.
3  Q. Okay. Do you recall who was on your
4      interview panel?
5  A. I don't remember.
6  Q. All right. Do you have any reason to
7      disbelieve that it was two black staff
8      members and one white staff member?
9  A. I don't remember.
10  Q. You just don't remember one way or the other?
11  A. No. I mean, it's a possibility, but I don't
12      remember exactly who it was.
13  Q. Okay. Do you remember that one of the black
14      staff members was actually the supervisor for
15      that position?
16  A. It's a possibility.
17  Q. Okay.
18  A. Which year? Excuse me. Which year? Which
19      time?
20  Q. This is for the HTC I position that Jonathan
21      Graves got in approximately January of 1993?
22  A. Okay.
23  Q. You don't recall that?

22 (Pages 82 to 85)

DEPOSITION OF AUDREY DENISE FINCH                          TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 86

1   A. I don't recall who was on the panel.
2   Q. Okay. Did you know anything about Jonathan
3      Graves's experience?
4   A. When I started at Glenn Ireland, he was the
5      trainer, so he trained me for the position of
6      Mental Health Worker.
7   Q. Okay. And did you understand that he had
8      experience even prior to Glenn Ireland
9      working with the mentally retarded?
10  A. Yes.
11  Q. So you're not claiming that Jonathan Graves
12     was -- you're not complaining -- let me start
13     over. You're not claiming that Jonathan
14     Graves was equally or less qualified than
15     you, are you?
16  A. Yes.
17  Q. Okay. I may not have asked that right. Do
18     you think you were as qualified as Jonathan
19     Graves for the position?
20  A. Yes.
21  Q. You think you were?
22  A. Yes.
23  Q. Do you think you were more qualified for the

Page 87

1      position than him?
2   A. Equally.
3   Q. Equally?
4   A. Uh-huh.
5   Q. Even though he trained you?
6   A. Yes.
7   Q. And even though he had more experience than
8      you?
9         MR. CALVIN: Object to the use of the
10           word experience.
11  Q. Did he have more experience in the Mental
12     Health field than you, Ms. Finch?
13  A. There's a possibility.
14  Q. Even if he trained you and had more
15     experience than you --
16  A. Well, he trained me for a Mental Health
17     Worker position. But he didn't have that
18     master's degree that required for that
19     position.
20  Q. Well, none of y'all did, right?
21  A. I did. I have a master's in counselling.
22  Q. Is it your position that your master's in
23     counselling satisfies the master's degree

Page 88

1      requirement that specifies psychology,
2      vocational and rehabilitation counselling,
3      social work, or special education?
4   A. In order to get that master's in counselling,
5      I had to do rehabilitation counselling, had
6      to do educational counselling. I had to do
7      all levels of counselling in order for me to
8      gain that master's of counselling.
9   Q. Ms. Finch, are you testifying that you had a
10     master's degree in vocational or
11     rehabilitation counselling? Because if you
12     are, I'd like to know it.
13  A. I'm testifying that I have a master's degree
14     in general counselling which covered
15     vocational counselling. It didn't say, per
16     se, vocational counselling or rehabilitative
17     counselling. And neither did the other
18     people there have a master's at all.
19  Q. Do you believe that your master's in
20     counselling is the equivalent or is the same
21     thing as a master's in vocational or
22     rehabilitation counselling?
23  A. I went to school to get a master's in

Page 89

1      counselling. It's the same principle as a
2      person that goes into vocational rehab or
3      rehabilitation counselling. It's the same
4      program. And I had to go through
5      rehabilitative counselling. I had to go
6      through all areas of counselling in order to
7      get a degree in counselling.
8   Q. Ms. Finch, you understand that what you have
9      is different -- that the counselling degree
10     that you have is different from a vocational
11     slash rehabilitation counselling master's
12     degree, don't you?
13  A. I understand the difference.
14  Q. You understand they're different, right?
15  A. Uh-huh, yes.
16  Q. Okay. Now, I believe you just told me that
17     you believed that you were equally qualified
18     for this job as Jonathan Graves; is that
19     correct?
20  A. That's correct.
21  Q. Would you be willing to say that you're more
22     qualified than Jonathan Graves?
23  A. I said equally.

23 (Pages 86 to 89)

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 90

1  Q. Okay. Do you have any basis -- or do you
2     claim that him getting the position over you
3     in approximately January of 1993 was race
4     discrimination?
5  A. Yes, I do.
6  Q. Why?
7  A. Based on my experience working directly with
8     the individuals at Glenn Ireland for over
9     five years at that time. I worked directly
10    with the individuals. And he trained me to
11    become a Mental Health Worker. He didn't
12    train me to become anything other than that.
13 Q. If the interview panel unanimously
14    recommended that Jonathan Graves get that
15    position over you, are you alleging that that
16    interview panel discriminated against you on
17    the basis of your race?
18 A. I do.
19 Q. Do you have any reason to believe that that
20    interview panel was racially biased against
21    blacks?
22 A. I do.
23 Q. Why?

Page 91

1  A. Because if they looked at the qualifications
2     and the degree requirements as you stated
3     above, rehabilitative counselling, neither of
4     these people have a -- a master's at all.
5     Neither of these people have a master's. You
6     know, if it was just based solely on
7     experience, then it's no sense in any of us
8     going to school to achieve the next level.
9     So that's my -- my defense.
10 Q. Okay. Are you aware of an Indian woman named
11    Urmila Yadav?
12 A. Urmila.
13 Q. I'm sorry?
14 A. Urmila.
15 Q. Urmila Yadav getting an HTC II position?
16 A. Yes, I am.
17 Q. Okay. I show you what I'm marking as #1107
18    and ask you is that a job posting in that
19    approximate time period for the HTC II
20    position?
21 A. Yes, this is it. Yes, uh-huh. This is it.
22 Q. Okay. And I'll show you what I'm marking as
23    #1108, which is a very bad copy of a letter

Page 92

1     from Jim Elliott to Ms. Yadav telling her
2     that she had gotten the position. It looks
3     to me like it's in December of 1992. Is that
4     what that appears to be to you?
5  A. Yes.
6  Q. Oh, and behind it I guess is a copy of her
7     application; is that correct? Do you know
8     that to be her application? Well, first --
9        MR. LIGHTFOOT: Is she still looking?
10       THE WITNESS: I am.
11 Q. Okay. Is what I've marked as #1108, is that
12    a letter to Ms. Yadav?
13 A. Yes.
14 Q. From Jim Elliott?
15 A. Yes.
16 Q. And I believe -- is that a document that you
17    had that you gave to your lawyer?
18 A. I don't know.
19 Q. No?
20 A. I don't know.
21       MR. CALVIN: Not for sure? Hold it and
22       I can tell you.
23       MR. LIGHTFOOT: Okay. It may not be.

Page 93

1        MR. CALVIN: That's not ours.
2        MR. LIGHTFOOT: Okay.
3  A. I know this is an appointment letter, but I
4     don't know if this is her application or not.
5  Q. You don't know?
6  A. No, I don't know that.
7  Q. Okay. Did you know Ms. Yadav?
8  A. I know her.
9  Q. Did you know her at the time?
10 A. Yes.
11 Q. All right. And would you testify that you
12    were equally or more qualified for the HTC II
13    position than she was?
14 A. Equally.
15 Q. Equally?
16 A. Uh-huh.
17       MR. CALVIN: Warren, just for the
18       record, the application that she
19       turned in is an application for
20       QMRP position. She doesn't use
21       HTC II nomenclature. The
22       appointment letter uses the HTC II
23       nomenclature. You're saying that

24 (Pages 90 to 93)

Page 94

1    the two are the same thing?
2    MR. LIGHTFOOT:  I think so.
3    MR. CALVIN:  Okay.  I just wanted to
4      make that clear.
5    MR. LIGHTFOOT:  Yeah.  I'm not
6      perfectly clear on it.
7    Q.  But you understood that she had -- that
8      Ms. Yadav had a master's in psychology?
9    A.  I don't know.
10   Q.  You don't know?
11   A.  No.
12   Q.  All right.  What did you know about her
13     background?
14   A.  I don't know.  I just know her from being
15     hired at Glenn Ireland.
16   Q.  Did you know that she was a professor of
17     psychology --
18   A.  No.
19   Q.  -- prior to coming --
20   A.  I don't know.
21   Q.  -- prior to applying for this job?
22   A.  I don't know.
23   Q.  Did you know that she had been a Mental

Page 95

1    Health supervisor for six months?
2    A.  I don't know.
3    Q.  Did you know that she was QMRP certified?
4    A.  I don't know.
5    Q.  Okay.  Did you know that she had been an
6      HTC I at -- at Tarwater for five years prior
7      to getting this HTC II position at Glenn
8      Ireland?
9    A.  I don't know.
10   Q.  All right.  If that's in fact the case, would
11     you still say that you were equally or more
12     qualified than Ms. Yadav for the position?
13   A.  Equally qualified.
14   Q.  Still equally qualified?
15   A.  Equally qualified.
16   Q.  Even if she had been an HTC I at Tarwater?
17   A.  Yes, sir.  Yes, sir.
18   Q.  And even if she had a master's in psychology?
19   A.  Yes, sir.
20   Q.  Why would you say you were equally qualified?
21   A.  Because I know the residents, I know how to
22     write up the programs, had I been given an
23     opportunity to do the job.  I was never given

Page 96

1      an opportunity to do the job.
2    Q.  Okay.  Are you claiming that your not
3      receiving this position and Ms. Yadav
4      receiving the position in approximately
5      December of 1992 was race discrimination?
6    A.  Yes.
7    Q.  Okay.  What did you understand her descent to
8      be?
9    A.  Maybe Indian.
10   Q.  Indian?  All right.  And do you think it was
11     discriminatory against your race, black, your
12     not receiving the position?
13   A.  Yes.
14   Q.  Any reason upon which you base that claim of
15     race discrimination?
16   A.  The same as before on the others.
17   Q.  Did you even apply for that HTC II position
18     in -- that was posted in I believe October of
19     1992?
20   A.  Yes, I did.
21   Q.  Do you recall applying for it?
22   A.  Yes.
23   Q.  Were you interviewed for it?

Page 97

1    A.  Yes.
2    Q.  Who was on the panel?
3    A.  I don't remember who was on -- was on the
4      panel.
5    Q.  Would you think it would be a positive
6      qualification for the job of HTC II someone
7      that had already performed the HTC I position
8      in the Mental Health field?
9    A.  There's not -- there's not much difference in
10     these jobs.  HTC I or HTC II.  It's not that
11     much difference in the jobs.
12   Q.  My question is would you consider that to be
13     a positive factor that someone had already
14     performed the HTC job prior to getting the
15     promotion?
16   A.  I'm not sure on that.
17   Q.  You're not sure if you'd consider that to
18     even be a positive factor?
19   A.  In getting it?  Restate the question.
20   Q.  Would you consider it to be a positive factor
21     for someone seeking the position of HTC II
22     that a person had worked in the HTC I
23     position at the time they applied for it?

25 (Pages 94 to 97)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

---

Page 98

1   A. No, not necessarily.
2   Q. Not necessarily. All right. Would you
3       consider it to be a negative factor?
4   A. No.
5   Q. Just neutral?
6   A. Yes.
7   Q. You don't have a copy of your application for
8       that HTC II position, do you?
9   A. No.
10  Q. But you do recall applying for it?
11  A. Yes.
12  Q. Is it possible that you're confused about
13      applying for the position that Ms. Yadav got
14      and that Ms. McCullar got and that you in
15      fact only applied for the Jonathan Graves
16      position?
17  A. No.
18  Q. You recall applying for all three?
19  A. Exactly.
20  Q. And being interviewed for all three?
21  A. Exactly.
22  Q. And not receiving all three?
23  A. Right.

---

Page 99

1   Q. Okay. Are there any other promotions to the
2       HTL -- and when I say HTL, I mean both HTC I
3       and HTC II position -- that you're
4       complaining about in this lawsuit from 1991
5       through 1996, the date of your layoff --
6   A. No.
7   Q. -- other than these three that we've just
8       described?
9   A. I believe that's it.
10  Q. Okay. I want you to think about it. I mean,
11      today is the day. If there were other HTC
12      positions that you applied for and didn't get
13      and you're complaining about them in terms of
14      race discrimination, I'd like to hear about
15      them.
16  A. Okay. That's all.
17  Q. Okay. Your complaint -- let's see. One
18      complaint talks about two white females
19      recently being promoted or hired for the HTC
20      position. One only had a BS degree while the
21      other had six years less experience than
22      Ms. Finch. Those would be the two that we've
23      just talked about, Diane McCullar and

---

Page 100

1       Ms. Yadav; is that correct?
2   A. That's correct.
3   Q. So even though it says white, I guess it
4       should say one white and one Indian, right?
5       I mean, one person of Indian descent? Or is
6       there another white female that you're
7       complaining about I guess is what I should
8       ask?
9   A. No.
10  Q. Okay. So when this complaint talks about to
11      white females, those are the two we're
12      talking about?
13  A. Right.
14  Q. Okay. Looking at the other complaint --
15      MR. LIGHTFOOT: And I can't remember
16          what we marked those two.
17      MR. CALVIN: Are we looking at the
18          amended now?
19      MR. LIGHTFOOT: Yeah. One is #1099 and
20          one is --
21      MR. CALVIN: #1100.
22      MR. WARREN: Thanks. #1100.
23      MS. JORDAN: This is the amended one.

---

Page 101

1       MR. CALVIN: #1100 is the amended.
2   Q. It talks about since 1992, you continuously
3       sought a promotion to the position of HTC.
4       So now have we covered all of the promotions
5       to HTC that you're complaining about in this
6       lawsuit?
7   A. Yes.
8   Q. Okay. It then mentions Administrator II.
9       Tell me about all the promotions to
10      Administrator II that you're complaining
11      about in this lawsuit.
12  A. The administrator, I think it -- it may be
13      two or three. One was received by a white
14      male, Terry Avery.
15  Q. Terry Avery?
16  A. And I don't have a copy of that announcement.
17  Q. Did you say that was a white male?
18  A. Yes.
19  Q. All right. What year was that?
20  A. It may have been ninety -- '94, '95. I'm not
21      exactly sure on the exact year.
22  Q. Is that an exempt position or a merit system
23      position?

---

26 (Pages 98 to 101)

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 102

1   A. Exempt.
2   Q. And what does an Administrator II do at the
3      Glenn Ireland -- was it at the Glenn Ireland
4      facility or was it at another facility?
5   A. No. It was at Glenn Ireland.
6   Q. What does an Administrator II do?
7   A. The Administrator II's that we have were the
8      people that were considered as the unit
9      directors. They were over the cottage
10     supervisors.
11  Q. There we go. They were over the cottage
12     supervisors?
13  A. Right. They were in charge of the cottage.
14  Q. Okay. So would there be, say, two or three
15     unit directors at any given time at Glenn
16     Ireland?
17  A. On day shift it was maybe four --
18  Q. Okay.
19  A. -- or five. Somewhere along in there.
20  Q. All right. How many times are you
21     complaining about an Administrator II job
22     being posted that you didn't get that you're
23     complaining about in this lawsuit?

Page 103

1   A. One.
2   Q. Once?
3   A. Uh-huh.
4   Q. I'm sorry. I couldn't see your mouth.
5      MR. CALVIN: You need to say yes.
6      THE WITNESS: Yes.
7   Q. And was that the one that Terry Avery got?
8   A. Yes.
9   Q. And Terry is a white male?
10  A. Yes.
11  Q. And you told me that was approximately '94 or
12     '95?
13  A. Yes.
14  Q. All right. Did you apply?
15  A. Yes.
16  Q. Were you interviewed?
17  A. Yes.
18  Q. Who was on the panel?
19  A. I think Dr. Gillespie.
20  Q. Okay.
21  A. And I think Tommy Judd. I'm not exactly
22     sure, but I know Dr. Gillespie was one of the
23     people that was in there.

Page 104

1   Q. Okay. What was Terry's position at the time?
2   A. He was a police officer over the police
3      department.
4   Q. I'm sorry?
5   A. Over the police department.
6   Q. All right. In Birmingham?
7   A. Yes, at Glenn Ireland.
8   Q. Oh, was -- okay. Was he an employee of the
9      Glenn Ireland facility?
10  A. Yes.
11  Q. As some sort of security officer?
12  A. Yes.
13  Q. Okay. Had he been there -- how long had he
14     been there?
15  A. Several months. I don't know the exact
16     amount.
17  Q. Okay. And you know that you and Terry
18     interviewed?
19  A. Yes.
20  Q. Do you know of anybody else that interviewed?
21  A. I believe Don Bush -- Donald Bush
22     interviewed, Kelvin Barnes. I do believe
23     those people -- two people interviewed for

Page 105

1      the position along with myself.
2   Q. Let me ask you this while I'm thinking about
3      it. On those three HTC positions -- well, I
4      guess I should say those three HTL positions
5      that we just talked about prior to moving
6      into this -- are you aware of anybody else
7      that applied for those positions other than
8      you and the people who got it?
9   A. I am not sure.
10  Q. Okay. All right. Are Donald Bush and Kelvin
11     Barnes black?
12  A. Yes.
13  Q. All right. And you said you -- you believe
14     Dr. Gillespie and Tommy Judd were on the
15     interview team. How did you find out Terry
16     got the position?
17  A. Well, it was stated that he had received it.
18  Q. I mean, who told you? Or did you get a
19     letter?
20  A. No, I didn't get a letter.
21  Q. Who told you?
22  A. It was just -- I can't remember exactly who
23     said it, but he got the position.

27 (Pages 102 to 105)

Page 106

1  Q. Word of mouth?
2  A. Word of mouth, right.
3  Q. Okay.
4  A. Word of mouth.
5  Q. And are you claiming that you were equally or
6     more qualified for that Administrator II
7     position than Terry Avery?
8  A. More.
9  Q. More qualified?
10 A. Uh-huh.
11 Q. Why?
12 A. Because I hold a bachelor's degree in
13    sociology, a master's degree in counselling,
14    a license as a Social Worker, and Mr. Avery
15    did not have any of the experience. He never
16    worked directly with the residents and that
17    was one of the requirements for -- for the
18    job was to work directly with the residents,
19    and neither did he -- he doesn't even have a
20    degree.
21 Q. You say he'd been a security guard for
22    several months. Had he held --
23 A. Well, at Glenn Ireland.

Page 107

1  Q. At Glenn Ireland. Had he held any other
2     positions?
3  A. It appeared that he had.
4  Q. Oh, you've got his --
5         (Off-the-record discussion)
6  Q. All right. I show you what I'm marking as
7     #1110 and ask you if it's Donald -- I'm
8     sorry, Terry Avery's application.
9  A. It has his name on it.
10 Q. All right. And that's a document that you
11    gave to your lawyer?
12 A. Yes.
13 Q. You don't know where you got it?
14 A. No.
15 Q. Did you get some documents from the EEOC?
16 A. Just the information they sent. But I'm
17    sure you have the same thing.
18 Q. Yeah. My question is have you ever gotten
19    any information from the EEOC?
20     MR. CALVIN: Object. Vague.
21 A. In terms of what?
22 Q. Anything. Have you ever gotten documents
23    from the EEOC --

Page 108

1  A. I mean, what type documents?
2  Q. Did you get Terry Avery's --
3  A. I don't know where I got it from.
4  Q. -- application from the EEOC.
5  A. I don't think I got it from the EEOC.
6  Q. What are the candidates from where you got
7     it? What are the candidates? What are the
8     likely places where you got his application?
9  A. Somebody may have given it to me.
10 Q. Who do you think gave it to you?
11 A. That's a good question. I don't know. I'm
12    sure I've had it a -- probably a while, maybe
13    since this time. Because I don't know where
14    I got it from.
15 Q. Well, was it obtained illegally?
16 A. I'm not sure. If they gave it to me, I don't
17    know whether it was illegal or not.
18 Q. Did you obtain it illegally?
19     MR. CALVIN: Objection. Asked and
20        answered. You've already asked
21        her that.
22 Q. I'm just trying to figure out where the
23    document -- did you steal this document from

Page 109

1     the Mental Health Department?
2  A. No, I did not. I don't steal.
3  Q. Did someone else steal it from the Mental
4     Health Department?
5  A. I don't know. Someone gave it to me, but I
6     don't know who gave it to me.
7  Q. Who do you think gave it to you?
8  A. I don't know.
9  Q. Who's given you documents that relate to
10    promotions or applications at the Mental
11    Health Department?
12 A. I don't know.
13 Q. All right. That confuses me. You don't have
14    any idea who gave you documents relating to
15    the Mental Health Department?
16 A. No.
17 Q. Do they just show up at your house? How do
18    you get them?
19     MR. CALVIN: Well, what documents are
20        we talking about?
21     MR. LIGHTFOOT: Okay. I'm talking
22        about this one.
23     MR. CALVIN: We've answered that one.

28 (Pages 106 to 109)

Page 110

1    What other documents are you
2    talking about?
3  Q. Did this document, did document #1109 just
4    show up magically at your house?
5  A. It's been a while since I've had that so I
6    don't know where it showed up at. I mean,
7    it's a possibility it may have shown up at my
8    house or may have shown up at my work. I
9    don't know where I got it from.
10 Q. Have you had mysterious documents show up?
11 A. Well, if we consider that mysterious, yes.
12 Q. Has any friend of yours ever handed you
13    documents or mailed you documents or put
14    documents in a house of yours that relate to
15    the Mental Health Department?
16 A. No.
17 Q. Has anybody anonymously ever left documents
18    for you or given you documents that relate to
19    the promotions or applications at the Mental
20    Health Department?
21    MR. CALVIN: I object just to the
22    extent -- how would you know if an
23    anonymous person has left it if

Page 111

1    they're anonymous?
2    MR. LIGHTFOOT: That's the question is
3    -- is it anonymous if she doesn't
4    know who it is?
5    MR. CALVIN: That's a circular
6    question. Yes, Mr. Anonymous left
7    the anonymous packages
8    anonymously.
9    (Off-the-record discussion)
10 Q. What's your best judgment where you got Terry
11    Avery's application document that you gave to
12    your lawyer?
13    MR. CALVIN: Objection. Asked and
14    answered.
15 Q. Go ahead.
16 A. My best judgment?
17 Q. Yep. Where it came from, how you got it.
18 A. I don't know.
19 Q. Who is Kelvin Barnes?
20 A. Kelvin Barnes worked with me at Glenn
21    Ireland. He was a supervisor.
22 Q. Is he a friend of yours?
23 A. Well, he was when we were at Glenn Ireland.

Page 112

1  Q. Has Kelvin ever given you documents?
2  A. No.
3  Q. Kelvin ever offered to help you in this
4    lawsuit or with your EEOC charge?
5  A. No.
6  Q. Have you ever discussed your -- any
7    complaints you have against the Mental Health
8    Department with Kelvin?
9  A. I have.
10 Q. What things have you complained to Kelvin
11    about?
12 A. Promotions.
13 Q. Are you still in touch with Kelvin?
14 A. No.
15 Q. Do you know where he is now?
16 A. No.
17 Q. When's the last time you talked to him?
18 A. Several years ago.
19 Q. All right. On this Administrator II
20    position, we've talked about Terry Avery
21    getting it. And have you told me all the
22    reasons that you believe that was race
23    discrimination?

Page 113

1  A. Can you read back what I told you.
2  Q. You said something about your -- your college
3    degree, your master's degree and that you
4    were a licensed Social Worker. And that was
5    in the context of telling me you thought you
6    were more qualified than he was.
7  A. Yes. And I worked directly with the
8    residents at Glenn Ireland. He had no
9    experience working with any of the residents.
10 Q. All right. Anything that makes you think,
11    though, that his selection over you was based
12    upon race?
13 A. Yes.
14 Q. What?
15 A. It goes back to he has no degree -- he has no
16    degree. He'd never worked directly with the
17    residents, he was only a police -- security
18    at the facility, and that was not the
19    requirements for the job.
20 Q. Okay. Are you complaining about any other
21    promotions or selections to Administrator II
22    that you did not receive?
23 A. No.

29 (Pages 110 to 113)

DEOPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 114

1  Q. Are you complaining about any other exempt
2     positions in the Mental Health Department
3     that you were not selected for that you
4     believe you should have been?  I guess we're
5     now talking -- I believe I've asked that
6     question for the first part of your
7     employment.  So I'll now ask it from '91 to
8     '96.
9  A. It would be the same with the exception of I
10    applied for mental health police officer as
11    well was one of the other positions that I
12    applied for.
13 Q. Like security officer?
14 A. Yes.  Uh-huh.
15 Q. You applied for that?
16 A. Yes.  And that was between '86 to the --
17 Q. Ninety.  I mean, '86 to '91?
18 A. Right.  During that period of time.
19 Q. Okay.  And you didn't get it?
20 A. No.
21 Q. Who got it?
22 A. It was several people got it in between that
23    time.

Page 115

1  Q. Did you apply for it?
2  A. They were all males.
3  Q. Did you apply for it?
4  A. Yes, I did.
5  Q. They were all males?
6  A. Uh-huh.
7  Q. So that's not a race complaint.  That's just
8     because they were males and you were female?
9  A. It was a gender.  Uh-huh.
10 Q. So that would be more of a gender complaint?
11 A. That's a gender.  Yeah.
12 Q. So you're not making that claim in this
13    lawsuit?
14 A. No.
15 Q. All right.  And nothing about that was race
16    discrimination?
17 A. No.
18 Q. Okay.  Any other selections or promotions
19    that you're complaining about against the
20    Mental Health Department in this lawsuit?
21    MR. CALVIN:  That she's now aware of.
22 Q. That you're now aware of?
23 A. No.

Page 116

1  Q. Are there any other merit system promotions
2     that you're complaining about in this
3     lawsuit?
4  A. No, none that I'm aware of.
5  Q. Okay.  Because I'm aware of some times you
6     were certified out for various positions.
7     And I believe -- I believe we've already sort
8     of -- I believe you've already told me you're
9     not complaining about them, but I want to
10    make sure.  There were some times you were
11    certified out for positions with regard to --
12    hang on a second.  Let me start over.
13       (Brief pause)
14 Q. Do you have any complaint against any
15    department that we've not already discussed
16    in which you were certified for a position by
17    the State Personnel Department off a register
18    and did not receive a promotion?
19 A. No.
20    MR. LIGHTFOOT:  That saves a lot of
21    time.
22 Q. All right.  We've talked about that demotion
23    offer, right, that you received around the

Page 117

1     time of your layoff?
2  A. Yes.
3  Q. And you told me that you do have a complaint
4     of race discrimination about that although
5     you do not have a complaint of race
6     discrimination about your actual being
7     included in the layoff or in the -- being
8     terminated in the layoff.  With regard to
9     that demotion offer, who made you the offer
10    of the demotion?
11 A. Ellen Gillespie.
12 Q. All right.  If you were laid off in March --
13    approximately March 16th of 1996, when did
14    she make you the offer of the demotion?
15 A. Okay.  The letter that I have is dated
16    February 27th.
17 Q. Of '96?
18 A. '96.
19 Q. Okay.  I'll go ahead and mark it.  Is that
20    the Ellen Gillespie memorandum to you dated
21    February 27th of 1996 that I've just marked
22    as Defendants' Exhibit #1110?
23 A. It's an opportunity to take the exam for

30 (Pages 114 to 117)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                              TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 118

1    Mental Health Worker I. This is what this
2    letter is.
3    Q. Is that related to this demotion offer?
4    A. This is related to taking the exam.
5    Q. But what I'm saying, are we talking about the
6    same subject matter?
7    A. Yes.
8    Q. And what did you understand this offer to be?
9    A. The offer was to take the exam to become a
10   Mental Health Worker I which is a merit
11   system job.
12   Q. Which is a merit system job?
13   A. Uh-huh.
14       MR. CALVIN: Say yes or no for the
15          court reporter.
16   A. Yes. I'm sorry.
17   Q. All right. Did you take Dr. Gillespie up on
18   this offer?
19   A. No, I didn't.
20   Q. Why not?
21   A. Because I had qualifications other than being
22   a Mental Health Worker I. I had been a
23   Mental Health Worker I for the amount of

Page 119

1    years that I had been at Glenn Ireland. And
2    in order for us to become a Mental Health
3    Worker I, we would have had to take an
4    examination, would have had to get on a
5    register and had to be certified out through
6    the State Personnel Department.
7    Q. Okay. This memorandum went not just to you,
8    right?
9    A. I'm not sure.
10   Q. You don't know if this went to other HTS's at
11   Ireland?
12   A. It just have my name on it. I don't know
13   about anybody else.
14   Q. You don't have any idea whether similar --
15   other employees got similar memos?
16   A. Not that I know of. There's a possibility
17   that they could have.
18   Q. Okay. Did you know any that actually took
19   her up on the offer?
20   A. I don't think so.
21   Q. Okay.
22   A. I mean, if they got the same offer, I'm not
23   sure.

Page 120

1    Q. Okay. And are you alleging that this offer
2    of taking a test and then I guess being
3    considered for an MH I position, are you
4    claiming that's race discrimination?
5    A. Yes, it is.
6    Q. Why?
7    A. Because I worked with the residents. We go
8    back to the Administrator II position. That
9    person did not work directly with the
10   residents there. So we could have eliminated
11   a position with the Administrator II rather
12   than eliminating positions that dealt
13   directly with the residents. We were putting
14   the residents at a disadvantage in that
15   sense. We were putting them at a
16   disadvantage by getting rid of the people
17   that worked directly with them. We were
18   holding open positions as administrators
19   rather than someone to take care of the
20   residents that were there at the Ireland
21   Center.
22   Q. All right. This was an offer to convert to
23   an MH I worker at that facility -- at the

Page 121

1    same facility?
2    A. It was an offer but she couldn't make that
3    offer. The offer would have had to come from
4    the State Personnel Department because that's
5    a merit system position. That Mental Health
6    Worker I is a merit system position. It's
7    not an exempt classification.
8        (Off-the-record discussion)
9    Q. Okay. You declined the opportunity to take
10   that test, right?
11   A. I declined the opportunity to take the test
12   as a Mental Health Worker because there were
13   no positions open at Glenn Ireland for mental
14   health workers. We are downsizing.
15   Q. Okay. You understood, though, that there
16   were Mental Health Worker I positions at
17   other facilities, right?
18   A. I don't know whether it was or not.
19   Q. You don't know whether that was an option
20   that you could have gone to another facility
21   as an MH I?
22   A. No. But why go as an MH I when if it was
23   opened at other facilities, the opportunity

31 (Pages 118 to 121)

Page 122

1  should have been in the equal classification.
2  Q. Are you aware of available HTS's at other
3     facilities?
4  A. No, I was not.
5  Q. Okay. Well, when faced with the prospect of
6     being laid off or downsized or staying
7     employed at the Mental Health Department, you
8     chose to be laid off, right?
9  A. I chose not to take a position as a Mental
10    Health Worker I.
11 Q. You don't have any reason to believe that you
12    were singled out for this memo on the basis
13    of your race, do you?
14 A. Well, majority of us there was black --
15 Q. Right.
16 A. -- that was in that position.
17 Q. But other than that, you don't have any
18    reason to think you were singled out because
19    of your race, do you?
20 A. I'm not sure on that.
21 Q. Well, tell me every reason that you think
22    it's even possible that race was a factor
23    in -- in your getting this memo?

Page 123

1  A. Well, race was a factor because if all of us
2     was black -- and then you're going to tell me
3     that I have to become a Mental Health Worker
4     I and you have a person with a GED and that
5     person can hold an administrator position,
6     race played a big factor in this -- in the
7     facility or downsizing of the people that
8     were there. If all of us were black, you
9     could have cut the -- they -- Mental Health
10    could have easily cut the administrative
11    positions and ensured that the residents were
12    well taken care of at the facility. We
13    wasn't concerned about the residents.
14 Q. Who wasn't concerned about the residents?
15 A. The administration, Mental Health.
16 Q. And being offered this demotion, do you have
17    any evidence at all that you were singled out
18    on the basis of your race?
19 A. No.
20 Q. Do you have any evidence at all that white
21    employees were treated more favorably with
22    regard to this demotion situation?
23 A. They were not affected by it so they could

Page 124

1  not have been singled out.
2  Q. Well, are you aware of any white employees
3     being treated more favorably on your level?
4  A. On my level?
5  Q. Yes.
6  A. That depend on what the level is.
7  Q. Well, tell me every white HTS that was
8     treated more favorably than you in this
9     circumstance.
10 A. I don't know who was left. If you give me
11    the list of employees that was there, maybe I
12    can look at it and go name by name and see
13    what was what.
14 Q. You don't have any reason to believe that the
15    white HTS's at the Ireland Center in that --
16    in this time period didn't receive the same
17    memo you did?
18 A. I don't know whether they did or if they
19    didn't.
20 Q. So you don't have any evidence that any of
21    the white HTS's were singled out?
22 A. No, I don't.
23 Q. Or were treated more favorably than you, do

Page 125

1     you?
2  A. No, I don't.
3  Q. Anything else that makes you think that
4     this -- asking you to take an examination or
5     giving you the demotion offer is race
6     discrimination?
7  A. To take the exam for five months, there was
8     no guarantee of a job there. There was no
9     guarantee in the demotion. There was no
10    guarantee on this letter. Nothing said I
11    guarantee you a job.
12 Q. And you're upset about that? You're upset
13    about that?
14 A. Well, I was.
15 Q. You don't have any reason to think it was
16    racially discriminatory, do you?
17 A. Well, it was.
18 Q. Why?
19 A. As I stated earlier, based on the evidence of
20    going -- I started out at Glenn Ireland with
21    a degree. If a person without a degree would
22    hold a position, then you want to tell me
23    that I can become a Mental Health Worker.

32 (Pages 122 to 125)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

Page 126

1    That was demeaning to me.
2  Q. All right. But if the same thing happened to
3    white employees at Glenn Ireland, it would
4    have been demeaning to them, too, right?
5  A. I wouldn't know because I'm not white.
6  Q. Any evidence or information from any source
7    that you were treated differently in this
8    whole demotion scenario than any white
9    employee at Glenn Ireland?
10 A. I don't know.
11    MR. LIGHTFOOT: I think I'm real close.
12    MR. CALVIN: Yeah, I want to plow
13       through your section. Get
14       finished with your stuff, and then
15       we can adjourn and then get back,
16       and Taylor --
17    MR. LIGHTFOOT: I'm probably through
18       other than sort of my usual few
19       questions, so I think it's a
20       decent stopping point.
21    MR. ABBOT: Why don't we take a lunch
22       break?
23    MR. LIGHTFOOT: Let's do that. I can

Page 127

1       ask some more of my stock stuff.
2       Let me just keep going.
3    MR. CALVIN: Now, how much longer do
4       you have on your stock stuff? Is
5       it like 20 minutes?
6    MR. LIGHTFOOT: Yeah.
7    MR. CALVIN: Let's just get through
8       that.
9    MR. LIGHTFOOT: That's fine. I agree.
10 Q. Have you ever filed any other lawsuits other
11    than this one?
12 A. No.
13 Q. Have you ever been sued?
14 A. No.
15 Q. You've told me you've not filed any other
16    EEOC charges. Who are your witnesses to any
17    of these acts of discrimination that you've
18    described for me?
19 A. Excuse me. May I consult?
20    (Off-the-record discussion)
21    MR. ABBOT: Let the record reflect that
22       the witnesses is consulting with
23       her attorney.

Page 128

1    MR. CALVIN: Yeah, sure. She's asking
2       me what that means.
3    (Off-the-record discussion)
4  Q. Another quick question on a different
5    subject. We'll come back to that in just a
6    second. You complained -- you mentioned a
7    little earlier something where you said some
8    males got a job or were considered and you
9    weren't, and you thought it may have been
10    based upon sex or gender. Remember when you
11    mentioned that?
12 A. Uh-huh, yes.
13 Q. As I understand this lawsuit, there are
14    potentially some claims of sex discrimination
15    being alleged by maybe some plaintiffs. Are
16    you -- I know I've asked you. Are you making
17    any claims of sex discrimination in this
18    lawsuit?
19 A. No.
20 Q. At all?
21 A. No.
22 Q. Do you have any evidence that supports anyone
23    else's claims of sex -- sex or gender

Page 129

1    discrimination in this lawsuit?
2  A. No.
3  Q. All right. Witnesses. Who are you aware of
4    that has any information that relates to --
5    or supports your claims?
6  A. Knowledge of my filing -- you mean, in terms
7    of knowledge.
8  Q. In terms of knowledge that may support your
9    claims about maybe you -- I mean, I don't
10    know what it could be, but that supports your
11    claims like that knows about you applying or
12    being interviewed and not receiving a
13    promotion I guess would be --
14 A. Brenda Walker. In addition to the other two
15    people, Don Bush and Kelvin Barnes.
16 Q. You told me those two.
17 A. Yeah.
18 Q. Donald Bush and Kelvin Barnes. All right.
19 A. Most -- most of the people there knew I
20    applied for the positions.
21 Q. Does Donald or Kelvin or Brenda, do they have
22    any information that suggests that race was
23    in any way a factor in any decisions made

33 (Pages 126 to 129)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL 36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 130

1    about you?
2    A. Oh, I don't know. I mean --
3    Q. You've not heard it if they know it?
4    A. No.
5    Q. All right. What is Brenda Walker's race?
6    A. Black.
7    Q. Where is she located?
8    A. In Birmingham.
9    Q. Where? Where does she work?
10   A. Disability Determination.
11   Q. Did she work with you at Glenn Ireland?
12   A. Glenn Ireland, yes.
13   Q. And what was her position?
14   A. She was Administrator II.
15   Q. Administrator II?
16   A. Uh-huh.
17   Q. That's like a unit director?
18   A. Yes.
19   Q. When did she get her promotion?
20   A. '91, the same day. I think the same day that
21      I got mine. From -- she was a cottage
22      supervisor.
23   Q. All right.

Page 131

1    A. It was around that time.
2    Q. You've told me you don't know where Kelvin
3       Barnes is, right?
4    A. No.
5    Q. Where is Donald Bush?
6    A. He's in Birmingham.
7    Q. Where does he work?
8    A. He works for Mental Health. It's -- I think
9       it's part of Bryce, if I'm not mistaken.
10   Q. In Birmingham?
11   A. In Tuscaloosa.
12   Q. Tuscaloosa. Okay. Did you attempt to
13      transfer at the time of the layoff to any
14      other facility?
15   A. That was not an option.
16   Q. Okay. All right. So are Brenda and Donald
17      and Kelvin the only witnesses that you're
18      aware of that have information that support
19      your claims of race discrimination that
20      you've described here to me today?
21   A. Not on this. I mean, there was several
22      people that knew that I had applied for those
23      positions.

Page 132

1    Q. Okay. How many other people that knew you
2       applied for the positions?
3    A. Most of the supervisors that I worked with.
4       Maxine Neal, John Bonner, Wimberly Hardrick,
5       most of them there, Ronald Armstrong, so.
6    Q. To your knowledge, do any of them have any
7       evidence that suggests that you were
8       discriminated against on the basis of your
9       race in any of those decisions?
10   A. I don't know.
11   Q. Are you claiming that the Mental Health
12      Department or DHR manipulated any registers
13      or changed any qualifications or in any way
14      monkeyed with or manipulated any of the
15      application or certification process for any
16      position?
17   A. Yes, I am.
18   Q. You have evidence that the Mental Health
19      Department did that?
20   A. The evidence that we've already presented to
21      you.
22   Q. You mean presented to me verbally today --
23   A. Yes.

Page 133

1    Q. -- or you mean documents?
2    A. Well, the documents on Mr. Avery and
3       Ms. McCullar and Mr. Graves.
4    Q. Okay. But your complaints as I understand
5       them there, I was trying to ask a separate --
6       sort of a separate question. Your complaints
7       as I understand them there are about you not
8       being selected for the position, right?
9    A. Yes, sir.
10   Q. On the basis of your race?
11   A. Right.
12   Q. Do you have any complaints about anything
13      leading up to the selection like any
14      manipulation or any -- any inappropriate
15      activities that changed qualifications or
16      that manipulated registers or that did
17      anything else in the -- that led up to the
18      selection process?
19   A. On the registers, everybody -- if you have a
20      band -- if you have band one -- I don't know
21      how they exactly select people out of that
22      band, but if you're name is on band one, then
23      they can select whoever they want to off that

34 (Pages 130 to 133)

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 134

1    register.
2    Q. Okay. But do you have any evidence that the
3       Mental Health Department did anything
4       inappropriate of that nature?
5    A. No.
6    Q. Have we talked about your complaint about
7       relating to DHR?
8    A. No, I don't know.
9    Q. I believe you told me you had a complaint
10      against DHR, right?
11   A. Right.
12   Q. Oh, that's the -- that's the Social Worker.
13      That's the pre-1986 one. Yeah. And you
14      don't have any -- any information other than
15      what you've already told me, right? I mean,
16      like you don't even know who got it or when
17      it was. You just know it was prior to 1986
18      and you thought you should have gotten it?
19   A. Before and after '86. I took the test
20      several times for DHR.
21   Q. Right. And do you have any evidence with
22      regard to any time that you didn't get the
23      Social Worker position at DHR that race was a

Page 135

1    factor?
2    A. No.
3    Q. Or any evidence of race discrimination other
4       than the fact that you didn't get them?
5    A. Right.
6    Q. Have you ever suffered any emotional distress
7       or mental anguish based upon the decisions
8       that were made by either DHR or the Mental
9       Health Department with regard to these
10      promotions that we've talked about?
11   A. Well, I've suffered some stress over the
12      situation.
13   Q. Have you ever seen a doctor for that stress?
14   A. No.
15   Q. All right. Have you ever taken any
16      medication for that stress?
17   A. No.
18   Q. Has it ever affected your ability to work?
19   A. No.
20   Q. Are you claiming any damages for that
21      emotional distress?
22   A. No.
23   Q. And I assume you've never had any physical

Page 136

1    symptoms that have resulted from that stress?
2    A. No.
3    Q. And you can't pinpoint a date when you
4       suffered the actual stress, can you?
5    A. Well, through my entire applying for jobs
6       with the State of Alabama.
7    Q. Okay. So that would have been even before
8       you started with the State of Alabama, right?
9    A. Uh-huh. During that time.
10   Q. All the way from before you started until
11      your layoff in '96? Well, actually,
12      actually, up to the present, right?
13   A. I don't have any stress now.
14   Q. When did your stress stop over these
15      circumstances?
16   A. The stress stopped after I got my new
17      position at Glenn -- I mean, excuse me. At
18      Disability.
19   Q. Okay. Because you're happy there?
20   A. Yes, I am.
21   Q. Okay. And you have been since June of 1997
22      when you started?
23   A. Yes.

Page 137

1    Q. Have you ever been convicted of a crime?
2    A. No.
3    Q. All right. What I've marked as #1111, is
4       that a letter that Ellen Gillespie sent you
5       on or around February the 23rd of 1996?
6    A. Yes.
7    Q. And this was the letter basically telling you
8       you were being laid off?
9    A. Yes.
10   Q. They note in here -- Ellen Gillespie notes
11      that the Mental Health Department -- or Glenn
12      Ireland facility assisted you in identifying
13      other job opportunities. Did they do that?
14   A. I've got a list of what they gave us. It
15      wasn't for that facility. It was for -- this
16      is what we had.
17   Q. Okay. Let me go ahead and mark that #1112.
18   A. And it said a Master's Level Social Worker --
19      which I'm not a Master's Level Social
20      Worker -- Master's Level Licensed Practical
21      Counselor, which I didn't qualify for;
22      Licensed Graduate Social Worker, which I
23      didn't qualify for. Licensed Practical

35 (Pages 134 to 137)

DEPOSITION OF AUDREY DENISE FINCH            TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

---

Page 138

1    Social Worker Certified, which I didn't
2    qualify for. Did not have the license as a
3    Bachelor Level Social Worker. None of these
4    jobs I qualified for.
5        MR. CALVIN: Bachelor's Level Social
6        Worker.
7        THE WITNESS: Social Worker.
8        MR. CALVIN: Okay.
9        THE WITNESS: That's licensed.
10   Q. All right. Did you receive the document that
11     I've marked as #1112?
12   A. Yes.
13   Q. Was that from Tommy Judd?
14   A. Yes.
15   Q. And it was to all employees?
16   A. I don't know.
17   Q. What the purpose in sending that out as far as
18     you could tell to help employees that were
19     about to be laid off locate other job
20     opportunities?
21   A. To help locate them?
22   Q. Yeah, to help the employees that were about
23     to be laid off and lose their jobs, help them

Page 139

1    find other jobs as far as you could tell?
2   A. I assume that's the purpose of it, but I
3     didn't qualify for any of these jobs. Maybe
4     I could have taken the Service Social
5     Worker I position, but the other positions I
6     didn't even qualify for. And even a person
7     who has a degree in recreation didn't qualify
8     for Service Social Worker or Practical
9     Counselor, which you stated earlier about my
10    degree in counselling.
11   Q. There's a letter in the documents that you
12     gave me that appears to be a memorandum dated
13     March 12th of 1996 to JoAnn Pruitt from Tommy
14     Judd about a voluntary demotion to ASA I.
15     Where did you get that document?
16   A. I don't even know. It must have been in
17     these documents here. I just really read
18     over that. Maybe whoever gave me the other
19     documents must have put that in here as well.
20   Q. Does that have -- does this -- does this
21     document that's marked as #1113, the JoAnn
22     Pruitt document, is that a document that you
23     gave your lawyer?

Page 140

1   A. Yes.
2   Q. You don't know how you got that document?
3   A. No.
4   Q. Does that relate in any way to your lawsuit
5     against the Mental Health Department?
6   A. No. No.
7   Q. Okay. In fact, it shows, though, JoAnn
8     Pruitt taking a demotion, right?
9   A. Yes.
10   Q. Which was also an option available to you to
11     try to get a demotion to MH I?
12   A. I don't know why JoAnn was taking a demotion.
13   Q. Is JoAnn white or black?
14   A. JoAnn was black. JoAnn didn't work with the
15     residents. JoAnn worked in Personnel.
16     MR. LIGHTFOOT: Thanks.
17     MR. ABBOT: Lunch break. One hour.
18     MR. CALVIN: Are you going to be able
19     to plow through it if we take a
20     one hour break?
21     MR. ABBOT: Possibly.
22     MR. CALVIN: I want to finish her
23     today.

Page 141

1     MR. ABBOT: Well, if we can't finish,
2     Joe, we'll have to go through
3     tomorrow.
4     MR. CALVIN: I want to stay until we
5     finish, because I've got
6     commitments I have got to do
7     tomorrow.
8     MR. ABBOT: We can stay after five.
9     That's fine.
10     MR. LIGHTFOOT: We're off.
11     (Off-the-record discussion)
12     (Lunch recess taken from
13     1:39 p.m. to 2:28 p.m.)
14     EXAMINATION
15 BY MR. WALKER:
16   Q. Hello, Ms. Finch.
17   A. Hey.
18   Q. My name is Dorman Walker, and I would like to
19     ask you just one or two very brief questions
20     about the people who I represent. And let me
21     show you what was earlier marked as
22     Defendants' Exhibit #1024. I'd like to ask
23     you to look at the squares here that have not

36 (Pages 138 to 141)

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 142

1   been crossed out, okay? And those are the
2   names of the agencies and the people who I
3   represent. Would you take a second to look
4   at that?
5       Now, again, looking only at the squares
6   that aren't marked out with green, do you
7   know any of those people there?
8   A. Dr. Richardson.
9   Q. Do you know him personally?
10  A. No.
11  Q. You know who he is as superintendent of
12  education?
13  A. Yes, right.
14  Q. Do you have a claim against any of those
15  people there?
16  A. No.
17  Q. Do you see the agencies that are listed
18  there?
19  A. Yes.
20  Q. Do you have a claim against any of those
21  agencies?
22  A. No.
23  Q. Do you intend to testify as a witness against

Page 143

1   any of those people or agencies?
2   A. Not that I know of.
3   Q. Okay. Are you aware of any employment
4   practice by any of those people or those
5   agencies that is discriminatory on the basis
6   of race?
7   A. Not that I know of.
8   Q. Okay.
9       MR. WALKER: Thank you very much.
10      That's all I have.
11          EXAMINATION
12  BY MS. McGOWIN:
13  Q. Ms. Finch, my name is Dana McGowin, and I
14  represent four separate agencies. And I just
15  have a few questions about each one of them.
16  I represent the Alabama Department of
17  Economic and Community Affairs, the Alabama
18  Development Office, the Alabama Industrial
19  Development Training, and the Bureau of
20  Travel and Tourism. As of the time of the
21  filing of this lawsuit, are you making any
22  claims of racial discrimination against any
23  of those four agencies?

Page 144

1   A. No.
2   Q. Have you ever applied for, sought, or
3   submitted applications for any positions with
4   any of those agencies?
5   A. Repeat them again.
6   Q. Okay. The Alabama Department of Economic and
7   Community Affairs?
8   A. No.
9   Q. The Alabama Development Office?
10  A. No.
11  Q. The Alabama Industrial Development Training?
12  A. No.
13  Q. And the Bureau of Travel and Tourism.
14  A. No.
15      MS. McGOWIN: Okay. That's all I
16      have.
17      MR. REDMOND: Anybody else? My turn.
18          EXAMINATION
19  BY MR. REDMOND:
20  Q. Ms. Finch, my name is Wesley Redmond. I
21  represent several agencies also, and I also
22  will just have hopefully a very few
23  questions. One of the agencies I represent

Page 145

1   is the Department of Labor. Have you ever
2   applied for a position with the Department of
3   Labor?
4   A. Not that I'm aware of.
5   Q. Is there any action that you know of that
6   anyone at the Department of Labor has taken
7   that has adversely affected your employment
8   with the State?
9   A. No.
10  Q. And I understand from the answers you gave
11  earlier today, you're not making any claim in
12  this case, are you, against the Department of
13  Labor?
14  A. No.
15  Q. And you're not aware of any vacancies at the
16  Department of Labor that you would have liked
17  to have applied for but that you believe were
18  withheld from being made available to you?
19  A. No.
20  Q. Now, I also represent the Finance
21  Department. Have you ever applied for a
22  position with the Finance Department?
23  A. No.

37 (Pages 142 to 145)

DEOPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 146

1   Q. Is there any action you know of that's been
2      taken by anyone at the Finance Department
3      that has adversely affected your employment
4      with the State?
5   A. No.
6   Q. Are there any vacancies with the Finance
7      Department that you're aware of now that you
8      would have liked to have applied for
9      previously?
10  A. No.
11  Q. And again, I understand from the prior
12     questions you were asked that you are not
13     making any claim against the Finance
14     Department?
15  A. No.
16  Q. Now, I also represented the Department of
17     Rehabilitation Services. And I think I
18     understand that you have in fact applied for
19     positions at the Department of Rehabilitation
20     Services?
21  A. Yes.
22  Q. Let me ask you this first. Are all of the
23     positions that you applied for with the

Page 147

1      Department of Rehabilitation Services, were
2      they all merit system positions?
3   A. Yes.
4   Q. Are you aware today who got -- and I'm not
5      going to go through each one of those. I
6      think there's probably about 14 different
7      times that you have sought employment with
8      the Department of Rehabilitation Services.
9      On any of those occasions, do you know who
10     got the position that you sought?
11  A. Only what's listed. I don't know any of the
12     people.
13  Q. Okay. Do you know what the races of any of
14     the individuals are for any of the particular
15     positions that you sought?
16  A. I do believe they were white.
17  Q. Do you have any belief or contention in this
18     case that your race is the reason you did not
19     get a position with the Department of
20     Rehabilitation Services?
21  A. Not that I'm aware of.
22  Q. Has anyone ever told you or given you any
23     information that race might have been a

Page 148

1      factor at all in the decisions that were made
2      as to who would get the positions that you
3      applied for?
4   A. No.
5   Q. Do you know what the qualifications are of
6      any of the individuals that got the positions
7      at the Department of Rehabilitation Services
8      that you applied for?
9   A. No.
10  Q. Are you able to tell us today whether you are
11     more, less, or equally qualified with the
12     individuals who got the various positions
13     that you applied for at the Department of
14     Rehabilitation Services?
15  A. I'm sure I was qualified for the position.
16  Q. Yes, I -- I understand. I'm not asking if
17     you think that you were qualified. But I'm
18     asking do you know whether -- in relation to
19     the person who got each of those positions,
20     do you know whether you were more qualified,
21     equally qualified, or less qualified than
22     those individuals?
23  A. I don't know what their qualifications were.

Page 149

1   Q. Okay. And again, I understand from the
2      earlier questions you were asked that you're
3      not making any claim in this case against the
4      Department of Rehabilitation Services; is
5      that right?
6   A. Not at this time.
7   Q. Okay. Well, when you say not at this time, I
8      mean, is there some additional information
9      that you may be obtaining from somewhere that
10     may allow you to -- to make such a claim?
11  A. Not at this time.
12  Q. And I guess by that you're telling me at this
13     time you're not aware of any further
14     information you're going to be looking at?
15  A. No.
16  Q. Other than your not receiving those positions
17     that you applied for, are there any other
18     actions that anyone at the Department of
19     Rehabilitation Services has taken that has
20     adversely impacted your employment with the
21     State?
22  A. No.
23  Q. Have you ever heard anyone from the

38 (Pages 146 to 149)

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 150

1  Department of Rehabilitation Services make
2  any racist comments or comments derogatory
3  about blacks in the workplace?
4  A. No.
5  Q. Has anyone ever told you that anyone at that
6  department has made any such statements?
7  A. No.
8      MR. REDMOND: That's all I got.
9      MS. JORDAN: Ms. Finch, my name is --
10     MR. ABBOT: Wait, wait, wait, wait. Do
11        you want to ask any?
12     MS. STUEDEMAN: No, we don't have any
13        questions.
14          EXAMINATION
15  BY MS. JORDAN:
16  Q. My name is Nikaa Jordan. I'm one of the
17  attorneys who represents the State Personnel
18  Department in connection with this lawsuit
19  that you filed. You are clear on the
20  distinction between the State Personnel
21  Department and the Personnel Department that
22  may have been associated with the Mental
23  Health Department? When I ask you a question

Page 151

1  about State Personnel Department, even if I
2  say Personnel Department, I'm talking about
3  the State Personnel Department and not the
4  one that's associated with Mental Health.
5  A. You may want to clarify it for me.
6  Q. Okay. The Mental Health Department that you
7  were employed with has -- or may have had its
8  own personnel department there at Glenn
9  Ireland where you worked, where you went to
10  find out about non-merit system positions and
11  made applications for non-merit system
12  positions. Is that a yes?
13  A. Okay. Uh-huh. Uh-huh.
14     MR. CALVIN: You've got to say yes for
15        the court reporter.
16  A. Yes.
17  Q. And there is the Alabama State Personnel
18  Department that oversees the merit system
19  positions. Do you understand the distinction
20  between those two agencies and those two
21  types of positions?
22  A. Yes.
23  Q. Okay. From 1983 to 1998, you made a series

Page 152

1  of applications for merit system positions
2  through the State Personnel Department. I'm
3  going to ask you about those applications.
4  First I want to talk about the ones that you
5  made that were rejected by State Personnel,
6  and then we'll talk about the ones that were
7  accepted and resulted in your being placed on
8  the register.
9  A. Okay.
10  Q. Okay? Do you recall that in September of
11  1987, you applied for the Rehabilitation
12  Counselor I position?
13  A. I'm not sure. Do you have a copy of it?
14  Q. Do you recognize that as the job announcement
15  relating to the Rehabilitation Counselor I
16  position that you applied for in 1987?
17  A. It's a possibility. I mean, I don't know if
18  that's the exact announcement.
19  Q. Well, if this -- you don't have any reason to
20  think that this was not the announcement --
21  A. No, I don't.
22  Q. -- in effect at the time that you applied?
23  A. Unh-unh.

Page 153

1  Q. Your application for that position was
2  rejected on the basis of experience; is that
3  correct?
4  A. I am not sure.
5  Q. Do you have any complaint or contention with
6  respect to race discrimination in connection
7  with your application to the Rehabilitation
8  Counselor I position in 1987?
9  A. Not at this time.
10  Q. I'm going to show you what I've marked as
11  #1115. That's the job announcement for the
12  Equal Employment Officer position. Did you
13  make application for that position in October
14  of 1987?
15  A. It's a possibility. I'm not sure. I don't
16  remember back that far. I applied for
17  several positions so I'm not sure exactly.
18  Q. Well, my records --
19  A. If it's listed -- if it's listed, then I
20  applied for it.
21  Q. My records indicate that you did apply for it
22  in October of 1987 and that your application
23  was rejected because of experience.

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 154

1     MR. CALVIN: Is there a question?
2  Q. Do you recall that your application was
3     rejected because of experience?
4  A. No, I don't.
5  Q. Are you making any complaint or contention
6     that the rejection of your application to the
7     Equal Employment Officer position in 1987 was
8     because of your race?
9  A. Not at this time.
10 Q. Do you recall any particular applications
11    that you made to the State Personnel
12    Department that were rejected that you're
13    complaining about?
14 A. I don't know right off.
15 Q. Ms. Finch, this is Exhibit #1116. It's a job
16    announcement for the position of
17    Rehabilitation Specialist II. Do you recall
18    that you made application for that position
19    in 1996?
20 A. I do.
21 Q. You do recall?
22 A. Yes.
23 Q. Do you recall what the result of that

Page 155

1     application was?
2  A. I was placed on the register for this
3     position.
4  Q. You believe that you were placed on the
5     register for that position?
6  A. You're saying '97?
7  Q. April of 1996.
8  A. '96. I'm not sure of '96. I know I was
9     placed on a register for Rehab Specialist.
10 Q. My records indicate that you applied for the
11    Rehabilitation Specialist II position in
12    April of 1996 and that your application was
13    rejected because of experience.
14 A. Okay.
15 Q. Are you making any claim of race
16    discrimination in connection with the
17    rejection of that application in 1996?
18 A. Not at this time.
19 Q. Might there be something that occurs later
20    that causes you to make a complaint about
21    race discrimination in connection with that
22    application or the two previous ones that
23    we've discussed?

Page 156

1  A. I am not sure at this time.
2  Q. This is Exhibit #1117. It's an announcement
3     for the position of Rehabilitation Specialist
4     I. Do you recall that you applied for that
5     position also in April of 1996?
6  A. It's a possibility, I'm not sure. I applied
7     for several positions. So I'm sure if it's
8     listed, then I applied for it.
9  Q. Are you making any complaint with respect to
10    race discrimination in connection with your
11    application for Rehabilitation Specialist I?
12 A. Not at this time. May I ask a question?
13    What year was this on the Rehab Specialist I
14    that I made application?
15 Q. My records show that you applied for the
16    Rehabilitation Specialist I in April of
17    1996. When I asked you, Ms. Finch, whether
18    you were making any complaint of race
19    discrimination in connection with either of
20    the Rehabilitation Specialist I -- excuse me, the
21    Rehabilitation Specialist I or II positions,
22    you answered that you were not at this time.
23 A. Exactly.

Page 157

1  Q. Is that correct?
2  A. That's correct.
3  Q. Is there anything that you could look at, any
4     documents that you could review to determine
5     whether you at some point are going to make a
6     claim of race discrimination in connection
7     with those two positions?
8  A. I don't have any documents today to support
9     it.
10 Q. Do you have any documents -- even though you
11    don't -- is there anything that you know of
12    that you could look at to help us decide?
13 A. Not at this time.
14 Q. Did you apply for the Human Services Program
15    Coordinator position in October of 1996?
16 A. Yes.
17 Q. And what happened to your application after
18    you submitted it?
19 A. I am not sure.
20 Q. My records indicate that it was rejected
21    because of experience. Are you in any way
22    now or do you think at any point you may be
23    making a claim of race discrimination in

40 (Pages 154 to 157)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                                          TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 158

1   connection with the Human Services Program
2   Coordinator position?
3   A. Not at this time.
4   Q. Is there anything that you know of that you
5     could review that would indicate to you
6     whether you might make a claim of race
7     discrimination in connection with that
8     position?
9   A. Not at this time.
10  Q. This is Exhibit #1118. Do you recognize that
11    as the job announcement for the position of
12    Senior Service Social Worker?
13  A. Yes.
14  Q. Did you apply for that position in October of
15    1996?
16  A. I don't know the date but I applied for the
17    position.
18  Q. And what was the result of that?
19  A. I'm not sure. I applied for several
20    positions so I'm not sure what the results
21    were.
22  Q. My records indicate that that application was
23    rejected because you lacked the required

Page 159

1   education. Are you alleging that that
2     rejection was in any way based upon your race
3     or a result of racial discrimination?
4   A. The qualifications said a master's degree in
5     social work.
6   Q. Yes, ma'am, did you have that?
7   A. And I don't hold a master's in social work.
8   Q. Did you agree, then, with the determination
9     that you were not qualified for that
10    position?
11  A. No.
12  Q. You did not agree?
13  A. No, I didn't. No, I don't.
14  Q. Why is it that you feel you were qualified
15    for the position of Senior Service Social
16    Worker 50221?
17  A. Why was I qualified for it?
18  Q. Yes, ma'am. Why do you feel that you were
19    qualified for the Senior Service Social
20    Worker position?
21  A. Because I have a -- I was licensed as a
22    Social Worker. I am licensed as a social
23    worker.

Page 160

1   Q. Looking, Ms. Finch, under the heading
2     qualifications needed to apply, does your
3     copy say that a master's degree in social
4     work from a school accredited by the Counsel
5     on Social Work education is required?
6   A. That's what it said.
7   Q. And did you in fact have a master's degree in
8     social work from such a school?
9   A. No.
10    MS. JORDAN: Dee, could you read the
11    last question and her answer back.
12    (The court reporter read the
13      previous question and
14      answer.)
15  Q. Do you believe, Ms. Finch, that the master's
16    degree in counselling that you do have should
17    have substituted for the master's degree in
18    social work that's required by the
19    announcement?
20  A. Yes, I do.
21  Q. On what do you base that?
22  A. I based it on having completed a master's
23    degree in counselling where social work and

Page 161

1   counselling are interrelated and being
2     licensed.
3   Q. Do you believe that the decision not to
4     substitute a master's degree in counselling
5     for a master's degree in social work is
6     somehow based upon your race?
7   A. I'm not sure of that.
8   Q. You're not sure whether or not you think that
9     that is based upon your race?
10  A. No.
11  Q. Are you claiming that it is based on your
12    race?
13  A. No, I'm not.
14  Q. Are you familiar with the job duties of a
15    Senior Service Social Worker?
16  A. According to what's written.
17  Q. Do you have any other form of knowledge or do
18    you have any knowledge from any other source
19    of the job duties of a Senior Service Social
20    Worker?
21  A. Only that that's written.
22  Q. You've never actually observed anyone do the
23    position of Senior Service Social Worker?

41 (Pages 158 to 161)

Page 162

1   A. When I did my training to become a counselor,
2       the person had a master's degree in social
3       work. So I worked with that -- the person
4       that had the master's in social work.
5   Q. What I'm asking, Ms. Finch, is whether you
6       ever observed anyone performing the duties of
7       a Senior Service Social Worker position as --
8       as referenced in this job announcement, not
9       whether you know of anybody that has a
10      master's degree in social work or not whether
11      you know anyone here.
12  A. It says the State of Alabama. It didn't say
13      what department.
14  Q. Well, in any department. I would assume that
15      a Senior Service Social Worker could work in
16      one of many departments.
17  A. No.
18  Q. Have you ever seen a Senior Service Social
19      Worker doing his or her job in any department
20      within the State of Alabama?
21  A. May I consult with my attorney?
22      MR. ABBOT: Give an answer. Wait,
23          wait, wait, wait.

Page 163

1   Q. Wait. Could you answer the question first?
2       MR. ABBOT: Let's get an answer first,
3           and then you can consult.
4   A. Okay. Ask the question again.
5   Q. What I'm trying to find out, Ms. Finch, is
6       whether you have any knowledge, based on
7       anything other than the description of job
8       duties contained in this announcement, of
9       what it is that a Senior Service Social
10      Worker does.
11  A. No.
12  Q. Okay.
13      MR. ABBOT: Now you may consult with
14          your attorney.
15          (Off-the-record discussion)
16  Q. Do you have an opinion as to whether a
17      master's degree in social work is necessary
18      or beneficial to performing the job duties of
19      a Senior Service Social Worker?
20  A. Is it beneficial to have a master's degree in
21      social work?
22  Q. Yes, ma'am. To perform the job duties of
23      Senior Service Social Worker.

Page 164

1   A. No.
2   Q. And why is that?
3   A. Because having a master's in counselling,
4       social work and counselors are interrelated.
5       These people perform the same duties.
6   Q. What facts do you have to indicate that the
7       requirement of a master's degree in social
8       work as opposed to the requirement of a
9       master's degree in counselling for this
10      position is in some way motivated by race or
11      racially discriminatory?
12  A. I don't have any at this time.
13  Q. Is there something that you might look at at
14      a later time that would -- that would give
15      you those facts?
16  A. Okay. I'm not sure of that.
17  Q. You don't know of anything at this time?
18  A. Not at this time.
19  Q. Did you apply for the Rehabilitation
20      Specialist I position in November of 1996?
21  A. I'm sure I did.
22  Q. And we've already established that you also
23      applied for it in April of 1996?

Page 165

1   A. Right.
2   Q. Do you have any reason to believe that your
3       application for Rehabilitation Specialist I
4       in November of 1996 was not rejected on the
5       basis of experience?
6   A. Not at this time I don't.
7   Q. Do you have any facts to indicate that the
8       rejection of your application for that
9       position on the basis of experience was
10      motivated by race?
11  A. Not at this time.
12  Q. Is there something that you know of that you
13      might review that at some later point would
14      give you such facts?
15  A. Can we go back on that? You asked me about
16      the Rehab Specialist or Rehab Counselor?
17  Q. The Rehab Specialist.
18  A. That was rejected.
19  Q. One. Yes, ma'am.
20  A. Okay.
21  Q. I think we've made that an exhibit.
22  A. Okay. Exhibit #1117.
23      MR. CALVIN: Well, #1117 has an

42 (Pages 162 to 165)

Page 166

1    announcement date of December of
2    '95. The question was regarding a
3    position in November of '96.
4  Q. Ms. Finch, do you have any reason to believe
5    that the Rehabilitation Specialist I position
6    was re-announced from the time of April 1996
7    when you initially applied until November of
8    1996 when you applied for the second time?
9  A. It was re-announced.
10  Q. Did you see a different job announcement for
11    the November 1996 announcement than the one
12    that I've already showed you for the April
13    '96 application?
14  A. I am not sure of that.
15  Q. Did you think that the qualifications for
16    that position had somehow changed from April
17    of '96 to November of '96?
18  A. I am not sure of that.
19  Q. Your application for that position was
20    rejected on the basis of experience in
21    November 1996. Do you have any reason to
22    disagree with that?
23  A. Yes, in 1996?

Page 167

1  Q. Yes, ma'am.
2  A. Yes.
3  Q. Then let me ask it this way. What happened
4    to the application that you made in November
5    of 1996 for the Rehabilitation Specialist I
6    position?
7  A. What happened to the application?
8  Q. Yes, ma'am. What -- what was the outcome of
9    the application? Was it rejected or were you
10    placed --
11  A. I'm not sure. I mean, you have the documents
12    there to let me know whether it was rejected
13    or not. I'm not sure.
14  Q. Yes, ma'am. I asked you -- I asked you
15    whether you had any reason to disagree with
16    the statement that your application for
17    Rehabilitation Specialist I was rejected in
18    November of 1996 because of experience. And
19    I believe you answered yes.
20  A. Yes, I did.
21  Q. You did answer yes?
22  A. Yes.
23  Q. Then what is it that makes you believe that

Page 168

1    your application for Rehabilitation
2    Specialist I position was not rejected on the
3    basis of experience in November of 1996?
4  A. It goes back to having a master's degree in
5    counselling, working in the field of Mental
6    Health, independent living. Working social
7    work. I mean, it's clearly -- it's stated
8    here. Master's degree. And I worked in
9    Mental Health, independent living. It's
10    stated here. Organizational skills, record
11    keeping, training.
12  Q. I'm sorry, Ms. Finch. I'm trying to find my
13    copy of that job announcement.
14    MS. JORDAN: I think I gave her two
15    copies.
16    THE WITNESS: You gave me a I and a II.
17  Q. I and a II?
18  A. Uh-huh.
19  Q. Well, in any event, am I understanding you
20    correctly when you say that you believe that
21    the education requirement for the
22    Rehabilitation Specialist I position should
23    have been broader so that your master's

Page 169

1    degree in counselling would fit that?
2  A. I didn't say broader. I said I had the
3    experience working in Mental Health.
4  Q. So it's the experience requirement and not
5    the educational requirement?
6  A. Education and experience.
7  Q. Okay. Let's talk about education first,
8    then.
9  A. Okay.
10  Q. You have a master's degree in counselling?
11  A. Yes.
12  Q. Is a master's degree in counselling listed on
13    the educational requirements?
14  A. Yes.
15  Q. Can I see that?
16  A. Yes.
17  Q. Okay. I apologize, Ms. Finch. That was --
18    that was my mistake. Your application was
19    rejected because of experience and not
20    because of education. Do you have any reason
21    to believe that that's not the case?
22  A. Yes.
23  Q. You do have a reason to believe that your --

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 170

1    A. Yes, I do.
2    Q. My records show, Ms. Finch, that this
3       application for Rehabilitation Specialist I
4       was rejected because of experience. Are you
5       claiming that that rejection was because of
6       your race?
7    A. I am.
8    Q. And tell me all the facts that you know of to
9       support that contention.
10   A. The facts are that the education
11      requirements, the experience within the
12      Mental Health field, like independent
13      living. We taught all of those.
14   Q. Let me interrupt you for one second. Let's
15      talk about all of the experience
16      requirements, and you tell me which work
17      experience you have that meets those.
18   A. Okay. On one it say four years of
19      experience. On the other it says three years
20      of experience.
21   Q. We need to establish which one it is we're
22      talking about. Let's talk about the 50344
23      first.

Page 171

1    A. Okay. The 50344, the Rehabilitation
2       Specialist. The qualification was a master's
3       degree, three years of professional level
4       experience providing independent living
5       skills, special education.
6    Q. And when was it that you had the three years
7       of professional experience in independent
8       living skills?
9    A. Working at Glenn Ireland. That was one of
10      the qualifications that we -- that I -- we
11      had to have. In working with the individuals
12      there, we taught them to be independent so
13      that they can go from the facility into an
14      independent living setting.
15   Q. Do you believe that someone at SPD drafted
16      those requirements -- those experience
17      requirements so that they would disadvantage
18      African-Americans?
19   A. I'm not sure of that.
20   Q. Are you making that argument or contention in
21      your lawsuit that those experience
22      requirements were -- were put there to keep
23      people such as yourself out?

Page 172

1    A. I can't say that at this time.
2    Q. Is there anything that you can do or review
3       to tell us whether you might at some point be
4       saying that?
5    A. Not at this time.
6    Q. Have you told me all the ways in which you
7       feel that your experience was sufficient for
8       the Rehabilitation Specialist I position?
9    A. Like I stated before, I have the master's in
10      counselling, I have the knowledge of
11      rehabilitation process, I worked with
12      mentally retarded people. We taught them
13      independent living. I am a licensed social
14      worker.
15   Q. Do you have experience in vocational
16      rehabilitation?
17   A. I have a general knowledge of vocational
18      rehabilitation.
19   Q. Of --
20   A. And that was one of the things that we taught
21      the residents at Glenn Ireland on how to
22      become independent.
23   Q. Is there any other criticism or complaint

Page 173

1       that you have with respect to the
2       Rehabilitation Specialist I position --
3    A. No.
4    Q. -- that you haven't already told me? You
5       also applied, did you not, Ms. Finch, from
6       for the Rehabilitation Specialist II
7       position?
8    A. Yes.
9    Q. In November of 1996?
10   A. Yes.
11   Q. Was your application for that rejected on the
12      basis of experience?
13   A. If it's listed, yes.
14   Q. Do you feel that the rejection of that
15      application was because of your race?
16   A. Yes.
17   Q. And please give me all the facts and evidence
18      you have to support that contention.
19   A. Okay. It's the same as the Rehabilitation
20      Specialist I with the exception of it said
21      four years of experience.
22   Q. And you believe that you had the four years
23      of experience --

44 (Pages 170 to 173)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 174

1   A. Yes.
2   Q. -- in all of those areas?
3   A. Yes.
4   Q. Do you believe that that experience
5      requirement was somehow put there to make it
6      more difficult or impossible for African-
7      Americans to be placed into the
8      Rehabilitation Specialist II position?
9   A. I'm not sure.
10  Q. You're not -- are you saying that you're not
11     sure if it was placed there for that or are
12     you saying that you're not sure whether or
13     not you're making that argument?
14  A. I'm not sure whether it was placed there for
15     that purpose.
16  Q. Then if you're not sure if it was placed
17     there for that purpose, you're not making the
18     argument that it was?
19  A. Not at this time.
20  Q. Is there anything that you can do or review
21     to determine whether at some time you may be?
22  A. Not at this time.
23  Q. Do you know of any white people whose

Page 175

1      applications were rejected for the 50 --
2      excuse me, the Rehabilitation Specialist I
3      position?
4   A. No.
5   Q. Do you know of any other people who applied
6      for that position at all, be they black or
7      white?
8   A. No.
9   Q. Do you know of any white people whose
10     applications were rejected for the
11     Rehabilitation Specialist II position?
12  A. No.
13  Q. Do you know of any who applied?
14  A. No.
15  Q. Do you know of any other -- okay. I'm going
16     to start over with that question. Did you
17     apply in February of '98 for the Human
18     Services Program Coordinator position?
19  A. I applied for the position, but I don't know
20     the exact date.
21  Q. Do you have any reason to think it wasn't on
22     or around February of '98?
23  A. No.

Page 176

1   Q. What is a Human Services Program Coordinator,
2      Ms. Finch?
3   A. I'm not exactly sure at this time.
4   Q. Well, can you just give me your best judgment
5      or description as to what that position is?
6   A. The position is under the Department of Youth
7      Services.
8   Q. Who does what?
9   A. I'm not exactly sure, but I can give you my
10     best judgment since it's been a while since I
11     looked at that announcement.
12  Q. Sure.
13  A. But I think it deals with writing the
14     programs for the -- the youth offenders at --
15     the DYS department.
16  Q. Do you know which option it was that you were
17     interested in with respect to the Human
18     Services Program Coordinator position?
19     There's several options related to that
20     position; is that correct, Ms. Finch?
21  A. I am not sure. It's been a while.
22  Q. Do you recall the result of your application
23     for that position?

Page 177

1   A. No.
2   Q. Are you making any claim or contention in
3      this lawsuit with respect to the Human
4      Services Program Coordinator classification?
5   A. No, not at this time.
6   Q. Is there anything that you can do to
7      determine whether you may be at some
8      subsequent time making a claim with respect
9      to that classification?
10  A. Not at this time
11     MS. JORDAN: Can we get off the record
12        for a second?
13        (Off-the-record discussion)
14  Q. Have we now talked about, to your knowledge,
15     Ms. Finch, every application that you filed
16     with the State Personnel Department that was
17     rejected on the basis of experience or
18     education?
19  A. According to what you've told me.
20  Q. Is there anything other than what I've told
21     you that you know about that makes you think
22     that there are some applications that you
23     filed that were rejected because of

DUNN, KING & ASSOCIATES                431 South Court Street                  Montgomery, AL  36104
toll-free (800) 359-8001            website: www.dunnking.com          ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 178

1    experience or education that we have not
2    talked about?
3    A. Not that I know of.
4    Q. Do you have any documents that you can look
5        at to determine that?
6    A. Not that I know of right now.
7        MR. ABBOT:  Could we take a break,
8        please?
9        (Recess taken from
10           3:20 p.m. to 3:33 p.m.)
11   Q. Ms. Finch, I may not have told you, but at
12       any time that you want to take a break, just
13       let us know and we'll do that.
14   A. Yes.  Okay.
15   Q. We've talked, Ms. Finch, I believe about all
16       of the applications that you filed with SPD
17       that were rejected because of education and
18       experience.  Are there any that you can think
19       of that I've left out?
20   A. Not that I am aware of.
21   Q. A number of your applications were rejected
22       for a reason other than education or
23       experience according to my records.  Do you

Page 179

1    recall that you applied for the Mental Health
2    Worker I position in February of 1984?
3    A. Yes.
4    Q. My records indicate that you failed to appear
5        at the test given in connection with that
6        application.  Do you have any recollection of
7        that?
8    A. That's not true.
9    Q. That is not true?
10   A. No.
11       MR. CALVIN:  This is the one in July of
12       '84?
13       MS. JORDAN:  I think it's February of
14       '84.  It's 40131.
15       MR. CALVIN:  Right.
16   Q. You believe you did show up at that written
17       test, Ms. Finch?
18   A. I do.
19   Q. Where did you go to take the test for the
20       Mental Health Worker I position in February
21       of 1984?
22   A. As I recall, the tests that were -- that I
23       took in the previous years were over at UAB

Page 180

1    for the State of Alabama.
2    Q. Do you have a specific recollection of taking
3        the test for Mental Health Worker I in
4        February of 1984?
5    A. I remember taking the test, but I don't know
6        the exact date.
7    Q. Do you recall how many tests for Mental
8        Health Worker I that you took?
9    A. Normally I would take the test every nine
10       months.
11   Q. Is it your testimony that you did take the
12       test for Mental Health Worker I in February
13       of '84 at UAB?
14   A. I am not sure.  The question that you asked
15       me, you said that I failed to appear for the
16       test in '84.  And I said that I never failed
17       to appear for a test that was given, but I
18       don't know the exact date.
19   Q. My question was whether you recall that you
20       took the test for Mental Health Worker I at
21       UAB in February of 1984 one way or the other?
22   A. I recall taking a test, but I don't know the
23       date.

Page 181

1    Q. Do you recall where you took the test?
2    A. I took the -- the earlier years, I took the
3        test at UAB.
4    Q. Was there any year that you took one at any
5        place other than UAB?
6    A. Yes.
7    Q. Where was that?
8    A. I took a test at the Davis School in
9        Bessemer.
10   Q. Are there any other facts or circumstances
11       that you can give me in connection with the
12       first application for Mental Health Worker I
13       that you made in February of 1984?
14   A. I don't know if that was the first
15       application or not.
16   Q. Well, my records indicate that it is the
17       first application that you made to Mental
18       Health Worker I.  Do you have any reason to
19       disagree with that?
20   A. No.
21   Q. Then is there anything else that you can tell
22       me in connection with that test?
23   A. No.

46 (Pages 178 to 181)

DEPOSITION OF AUDREY DENISE FINCH                          TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 182

1   Q. My records indicate that you applied for the
2      Activity Program Aide I position also in
3      February of 1984. Do you recall making that
4      application?
5   A. I recall making the application for
6      Activities.
7   Q. Do you recall taking the written test in
8      connection with Activity Program Aide I?
9   A. Yes.
10  Q. And where was that given?
11  A. I'm sure it was at UAB.
12  Q. What was your score on that test?
13  A. I am not sure.
14  Q. Do you recall your score on the Mental Health
15     Worker I test in February of 1984?
16  A. No.
17  Q. Do you know of anything to explain my records
18     that you didn't take the written test for
19     Mental Health Worker I in February of '84?
20     Do you know how it could have gotten into the
21     file that you didn't come to that test?
22  A. No.
23  Q. Do you know of anything to explain why my

Page 183

1      records show that you didn't take the test
2      for Activity Program Aide I in 1984?
3   A. No.
4   Q. When you applied for the Mental Health Worker
5      I position in February of '84, did SPD send
6      you something through the mail or in some
7      other way notify you about where the test was
8      going to be and what time it was going to be
9      and all the details that -- that you needed
10     to both show up for and take the test?
11  A. I am not sure of that, because you stated
12     that I did not take the test in '84.
13  Q. Yes, ma'am. And you recalled that you did.
14  A. I remember taking the test for the Mental
15     Health Worker I and Activity Program Aide,
16     but I don't remember the exact dates.
17  Q. Okay. Do you recall taking the test for
18     Correctional Officer Trainee in October of
19     1987?
20  A. I applied for the position.
21  Q. Did you take the test?
22  A. I am not sure of that.
23  Q. My records indicate that you did not take the

Page 184

1      test. Do you have any reason to believe that
2      you in fact did take the test?
3   A. No.
4   Q. Are you claiming, Ms. Finch, that your
5      failure to appear for that test was in -- in
6      some way the fault of the State Personnel
7      Department?
8   A. No.
9   Q. Do you recall that you applied for the
10     position of Disability Determination Examiner
11     I in May of 1996?
12  A. Yes.
13  Q. Is it true that that would have been your
14     first application to that position?
15  A. Yes.
16  Q. My records indicate that your application was
17     rejected because you failed to submit certain
18     qualifying materials that were requested in
19     connection with your application. Do you
20     recall that?
21  A. Yes.
22  Q. What were the circumstances surrounding that
23     failure? I mean, what was it they were

Page 185

1      asking for that you didn't provide?
2   A. I didn't return the questionnaire back on
3      time.
4   Q. What did the questionnaire ask for?
5   A. The questionnaire was -- you fill out the
6      questionnaire and they would grade you on
7      that -- on the questionnaire that you send
8      back to them.
9   Q. What kind of questions were on the
10     questionnaire?
11  A. I don't remember.
12  Q. Well, was it like a test or was it a bunch of
13     questions about preferences that you had in
14     terms of location?
15  A. Experience.
16  Q. Are you making any complaint about the fact
17     that you -- that SPD determined that you
18     didn't get your qualifying materials in on
19     time?
20  A. No.
21  Q. Did you apply for the Probation and Parole
22     Officer I position in August of 1996?
23  A. Yes.

47 (Pages 182 to 185)

DEOPOSITION OF AUDREY DENISE FINCH                          TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 186

1  Q. Do you recall the -- do you recall that you
2     failed the written test for that position?
3  A. Yes.
4  Q. Are you making any claim or contention
5     that -- that that failure was caused by any
6     discriminary policy or practice of the
7     State Personnel Department?
8  A. No.
9  Q. Did you apply for the Service Social Worker I
10    position in March of 1997?
11 A. Yes.
12 Q. Were you given a performance test in
13    connection with that application?
14 A. Yes.
15 Q. Did you fail the performance test?
16 A. I am not sure.
17 Q. If my records indicated that you did fail the
18    performance test, would you have any reason
19    to believe that that's not true?
20 A. No.
21 Q. Are you making any claim or complaint in
22    connection with the performance test that you
23    failed against SPD?

Page 187

1  A. No.
2  Q. Are you alleging that that test in any way
3     was discriminatory or designed to cause
4     African-Americans to fail?
5  A. Not that I'm aware of.
6  Q. Is there something that you can review or do
7     to determine whether you are making such a
8     claim?
9  A. Not at this time.
10 Q. Do you have any complaint with respect to any
11    written tests that were ever administered by
12    SPD?
13       MR. CALVIN: Objection. Vague and
14          ambiguous.
15 Q. Do you have any complaint with respect to any
16    specific question --
17       MR. CALVIN: Objection. Vague and
18          ambiguous. You can answer if you
19          know how to respond.
20 A. Repeat the question.
21 Q. Are you complaining that any written test
22    that was ever given to you by SPD was
23    discriminatory on the basis of your race?

Page 188

1        MR. CALVIN: Objection. Vague and
2          ambiguous.
3  Q. You can answer it.
4  A. I'm listening. Well, on the Service Social
5     Worker, you don't have records prior to that
6     time that in '97 it was one that -- that I
7     failed on the Service Social Worker. Now,
8     prior to that time, I passed all the -- all
9     of the tests that I had taken for the Social
10    Worker positions. And I may need to see the
11    qualifications for the Service Social Worker
12    plus the other social workers that I did
13    pass.
14 Q. How many Social Worker positions did you
15    apply for, Ms. Finch?
16 A. It's been several. I don't know exactly the
17    number.
18 Q. But you did apply for the Service Social
19    Worker, right?
20 A. It was one of the positions, right.
21 Q. Did you also apply for a Social Worker I
22    position?
23 A. Yes.

Page 189

1  Q. Do you recall any other social work positions
2     that you applied for other than this Service
3     Social Worker and this Social Worker I?
4  A. Those are the only ones I can recall.
5  Q. And what is your complaint with respect to
6     the Service Social Worker position?
7  A. The complaint is prior to '97, I was asking
8     what's the difference between the Service
9     Social Worker and maybe the Social Worker I,
10    because I took the test for the Social Worker
11    several times from ninety -- from '79 on, and
12    I always passed those exams.
13 Q. Well, those are two -- are those not two
14    distinct classifications?
15 A. That's what I was asking, what was the
16    difference in those two.
17 Q. We'll come back to those Social Worker
18    positions if that's okay, Ms. Finch. Are you
19    complaining about any -- are you making any
20    claim of race discrimination with regard to
21    any question on any written exam that was
22    administered to you by SPD?
23 A. Not at this time.

DUNN, KING & ASSOCIATES          431 South Court Street          Montgomery, AL 36104
toll-free (800) 359-8001          website: www.dunnking.com          ph:(334)263-0261;fax 263-1243

DEOPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 190

1  Q. Are there any documents that you can review
2     to refresh your memory that would allow you
3     at this time to be making such complaints?
4  A. I don't have any with me.
5  Q. Do you have any somewhere else?
6  A. I am not sure of that.
7  Q. You're not sure whether or not you have at
8     some other place some documents that you can
9     look at to refresh your recollection about
10    whether you're making a claim of race
11    discrimination with respect to a particular
12    question?
13 A. Right.
14 Q. Do you know of any?
15 A. Not right offhand.
16    MR. ABBOT: Well, if you think of any,
17       would you let your lawyer know so
18       your lawyer can let us know,
19       please, Ms. Finch?
20    THE WITNESS: I will.
21    MR. ABBOT: Thank you. Joe, will you
22       let us know?
23    MR. CALVIN: Absolutely.

Page 191

1  Q. On those occasions when your applications
2     were rejected by State Personnel Department
3     for lack of experience or lack of education
4     or any of the other reasons that we've talked
5     about that those applications were rejected,
6     did you receive notice from State Personnel
7     of those rejections?
8  A. I am not sure.
9  Q. Do you have any complaint with respect to any
10    notice that you ever received or did not
11    receive from State Personnel in connection
12    with your rejected applications?
13 A. No.
14 Q. Ms. Finch, we've discussed the exams that --
15    the written tests -- excuse me, not exams --
16    that you failed with respect to a few of the
17    positions. They were the Probation and
18    Parole Officer I position and the Service
19    Social Worker I position. You recall that we
20    talked about those in the last section? Do
21    you have any information or do you know of
22    any information that makes you believe that
23    those tests did not accurately and fairly

Page 192

1     measure your ability to do the jobs that they
2     were testing for?
3  A. Not at this time.
4  Q. Is there something you can look at to refresh
5     your memory to give you any facts or
6     information to make you believe that?
7  A. Not at this time.
8  Q. Do you know of anything that indicates that
9     those tests in general were designed so that
10    African-Americans would do poorly on them,
11    not just with respect to yourself?
12 A. I am not aware of that.
13 Q. You're not aware of any facts that indicate
14    that?
15 A. No.
16 Q. A number of your applications were accepted
17    and scored and you were placed on the
18    registers for the various positions. Do you
19    have recollection of any classification that
20    you got on the register for that you have a
21    complaint about?
22 A. No. Let me change that. Repeat that
23    question to make sure I understand.

Page 193

1  Q. Yeah, that was perhaps a bad question of the
2     day.
3     MR. ABBOT: Don't ever admit you asked
4        a bad question. Not on the record
5        anyway.
6  Q. Not a bad question. A convoluted question.
7     MR. ABBOT: Oh, that's better.
8     MR. REDMOND: That's even worse.
9     MR. CALVIN: I guess it's time to move
10       on.
11 Q. With respect to those classifications that
12    you were put on the register for -- and I'm
13    talking about the time from 1983 until
14    1988 -- are you making any complaint or claim
15    that your rank or score on any of those
16    registers was racially discriminatory?
17 A. Is that in addition to what we talked about
18    earlier about DHR, Social Worker?
19 Q. Yes.
20 A. No.
21 Q. No, you are not?
22 A. Right.
23 Q. How is it that you believe that your rank on

49 (Pages 190 to 193)

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 194

1    the Social Worker register was unfair or
2    inaccurate because of your race?
3    A. On the Social Worker register -- and I'm sure
4    the register is just a vague number.  You can
5    just pull a name off that list.  And I know
6    people that were hired as Social Workers that
7    may have just come out of school.  And I had
8    been on the list taking the test over and
9    over and over and over again.  I know people
10   who were hired as Social Workers and they
11   came out of school maybe ten years after I
12   did and they got a position as a Social
13   Worker and I was not offered a position, not
14   even an interview for a position as a Social
15   Worker.
16   Q. Do you know of any other people who are on
17   this Social Worker register at the same time
18   as you were?
19   A. No.
20   Q. Who did you have reference to when you said
21   people were hired off of the register with
22   less experience than you?
23   A. Maybe that's a general statement.  But I --

Page 195

1    in terms of people that have worked at DHR,
2    and I know they finished school maybe ten
3    years after I did or maybe even 15 years
4    after I did, and a lot of those -- or even
5    during the same time that I did, and a lot of
6    those people were hired on as Social Workers.
7    Q. Do you have any reason to think that the
8    people who were hired as Social Workers were
9    ranked below you on the register?
10   A. I don't have a copy of the register.
11   Q. What specific complaints do you have about
12   your rank on the register?  How is it that
13   you think that SPD did something to you
14   because of your race that made your rank on
15   the register something other than it should
16   have been?
17   A. If the -- if you certify ten names out, then
18   that person on that list may not be granted
19   an interview.  So we don't know what the
20   qualifications of that individual person is
21   or was because you can just interview anybody
22   that's on that list that you choose.
23   Q. Do you understand, Ms. Finch, that the agency

Page 196

1    to which a list of eligibles is sent is
2    responsible for granting the interviews?
3    A. I understand.
4    Q. Do you understand that SPD is responsible for
5    giving the tests and accepting the
6    applications and forming the registers and
7    not for conducting interviews?
8    A. Yes.
9    Q. What I want to talk about is your rank on the
10   register that SPD forms.  And I would like
11   for you to tell me how it is that you think
12   you've been disadvantaged on any particular
13   register but especially this -- the Social
14   Worker register because of your race.
15   A. The way the register is set up.  If everybody
16   have the same ranking, then what's equal?
17   There's no equal footage on that register.  I
18   mean, if I didn't get an interview.  I
19   understand that each agency will interview
20   the people.  But if you send out a register
21   of ten people, out of over a year or two
22   years' time, my name should have -- should
23   have come back up on that register.  And I

Page 197

1    never was granted an interview.  So I don't
2    know whether you sent my name out or not.  I
3    don't know whether I was certified out or
4    not.
5    Q. Did you ever receive notice that you were
6    certified out?
7    A. No.
8    Q. For no position?
9    A. Not for Social Worker.
10   Q. Do you know of any white people who were
11   certified out for the Social Worker position?
12   A. During the time that I applied, I don't know.
13   Q. You don't know of any white people who were
14   on the register and certified out from the
15   register at the time that you were on the
16   register; is that what you're saying?
17   A. Right.
18   Q. Do you know of any white people who were
19   ranked lower than you on the register?
20   A. I don't know.  I don't have a copy of the
21   register.
22   Q. You don't really know of anybody on the
23   register at any point?

50 (Pages 194 to 197)

Page 198

1   A. No.
2   Q. You don't know what your score was on the
3      register?
4   A. I know the score that they sent, but I don't
5      know exactly what it was -- I knew at that
6      time when they sent a score out. If I scored
7      98, I knew I scored 98 on that test.
8   Q. Do you have any evidence that your rank on
9      the register for Social Worker I was racially
10     discriminatory?
11  A. I don't have any evidence.
12  Q. Do you have any evidence that your rank on
13     the Service Social Worker register was
14     racially discriminatory?
15  A. I don't have any information at this time.
16  Q. Is there some document that you can look at
17     or some information that you can review that
18     would give you those facts?
19  A. I don't have it at this time.
20  Q. Have you had it at any time?
21  A. I would have to review the documents that I
22     have at home if I have any.
23  Q. Do you think that you may have documents at

Page 199

1      home relating to your rank on the registers
2      that you haven't produced to your attorney?
3   A. I am not sure of that.
4   Q. Would you go and check? I mean, not right
5      now, obviously, but would you check as soon
6      as you can, because we really need them.
7   A. If I have some, I will present them.
8   Q. Right. That's all I'm asking for. Do you
9      have any evidence that your rank on any
10     register with respect to any position other
11     than the Senior Service Social Worker and the
12     Social Worker was based on your race?
13  A. Repeat the question.
14  Q. Do you have any evidence that your rank or
15     score on the register for any classification
16     that you were ever placed on was
17     discriminatory?
18  A. I am not sure of that.
19  Q. Are there any documents or information that
20     you could look at that would give you that
21     information?
22  A. Not that I'm aware of.
23  Q. If at some point you become aware of them and

Page 200

1      you do review them and it does in fact give
2      you information that your rank was -- was
3      discriminatory, will you give those to your
4      attorney?
5   A. I will.
6   Q. Okay. Are you making any complaint that the
7      training and experience evaluations that SPD
8      uses to rank you on the register were
9      discriminatory?
10  A. In which job?
11  Q. Any job.
12  A. Well, we had several that were considered
13     under training.
14  Q. Are you referring to the announcements that
15     we spoke of?
16  A. Yes.
17  Q. Do you understand, Ms. Finch, that the
18     announcements advertise the position in
19     effect? You sometimes applied for the
20     positions that the announcements referred to,
21     and we have talked today about all the times
22     that your applications were rejected. Do you
23     believe that we have talked today about all

Page 201

1      the times that your applications were
2      rejected?
3   A. According to what you have told me.
4   Q. And you don't know of anything other than
5      what I've told you today essentially; is that
6      correct?
7   A. No.
8   Q. And now I want to ask you, Ms. Finch, about
9      those times when you applied for the position
10     and were placed on the register for that
11     position. Do you have any facts to indicate
12     that the methods or criteria that State
13     Personnel used to rank you on these various
14     registers were discriminatory?
15  A. Not at this time I don't.
16  Q. Is there anything that you can look at or
17     anything that you can do that would give you
18     those facts?
19  A. I don't have that information.
20  Q. What information is it that you need to
21     answer?
22  A. Well, I -- if you show me a copy of the
23     register, show me a copy of the other

51 (Pages 198 to 201)

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 202

1    announcements, show me a copy of the tests
2    that I took.
3    Q. What's your understanding of the certified
4    out process, Ms. Finch?
5    A. There is a list of candidates for the job,
6    and on that if the agency asks for a
7    register, then the State Personnel Department
8    will send them a register of the names of the
9    people that's on that particular register.
10   Q. All of the names?
11   A. No.
12   Q. Which of the names?
13   A. Whatever the rankings are. If you're in band
14   one, I'm sure they would send you -- if maybe
15   they ask for ten people, they may send the
16   top ten. They may send the top three.
17   Q. You've talked to Mr. Lightfoot about a number
18   of positions that you were certified out for
19   to various State agencies. Do you have any
20   complaint regarding State Personnel in
21   connection with your certified out
22   classifications?
23   A. Are you asking me about the Social Worker

Page 203

1    position?
2    Q. I'm asking you about any position that you
3    were ever certified out for that you claim
4    SPD should have done differently or treated
5    you unfairly in connection with.
6    A. In terms of being certified out, if -- if I
7    was in band one, you send out a list of names
8    and I never got a interview for those
9    positions.
10   Q. But you understand, Ms. Finch, that SPD is
11   not responsible for granting interviews?
12   A. I understand.
13   Q. Then is it fair to say that -- that you're
14   not complaining with respect to the State
15   Personnel Department about whether or not you
16   got an interview for a position you were
17   certified out for?
18   A. I'm complaining because you will list 200
19   people on a list. Everybody would have the
20   same ranking. So where -- there's no level
21   playing field.
22   Q. White people can be ranked equal to you,
23   couldn't they?

Page 204

1    A. That's a possibility.
2    Q. Do you think that SPD did this equal-ranking
3    system as you call it because of your race?
4    A. It's possible.
5    Q. Do you have any facts or evidence to support
6    that?
7    A. Not at this time I don't.
8    Q. Is there anything that you can do or review
9    that would give you those facts or evidence?
10   A. Not at this time.
11   Q. And I have asked you and is it that you have
12   told me every fact that you know of to
13   support your claim that the formation of the
14   registers was discriminatory?
15   A. Yes.
16   Q. You know of nothing other than what you've
17   told me to support that allegation; is that
18   true?
19   A. That's true.
20   Q. Do you have any complaints about the way that
21   State Personnel administered exams, the
22   places that they were given and the times
23   that they were given and the notice that you

Page 205

1    got for them?
2    A. No.
3    Q. Do you have any complaint that the questions
4    on the exam were unfair on the basis of race?
5    A. I would have to look at a -- at a test or
6    look at a question because I don't know one
7    in particular at this time.
8    Q. Have you at any point known of one in
9    particular? When you filed your complaint in
10   this lawsuit, for example, did you know of a
11   question that you felt to be racially
12   discriminatory?
13   A. I didn't file a complaint against State
14   Personnel.
15   Q. Are you making no claims against State
16   Personnel Department in this lawsuit?
17   A. I am. You're -- you asked a question when I
18   filed my complaint. You're bringing me
19   things to the table based on something
20   that -- applications that I filled out years
21   ago. That's what you're asking me.
22   Q. Before you filed your complaint?
23   A. Right.

52 (Pages 202 to 205)

DEOPOSITION OF AUDREY DENISE FINCH                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 206

1  Q. Right?
2  A. Before I filed my complaint. And then after
3     that, too.
4  Q. Okay. Then what about with respect to the
5     questions on tests before you filed your
6     complaint? Are you alleging that any of
7     those were unfair to you because of your
8     race?
9  A. I can't answer that.
10  Q. Why?
11  A. Because I would have to have a copy of the
12     tests that I took on the Probation Officer
13     and the Senior Service Social Worker since
14     those are the two that you say I failed to --
15     I failed.
16  Q. When you took the test for the Probation and
17     Parole Officer, did you notice that there was
18     a question on there that you objected to on
19     the basis of race?
20  A. I can't remember back -- what questions were
21     on the test.
22  Q. I'm not asking you to remember which
23     questions were on the test. I'm asking you

Page 207

1     if you recall when you were taking the test
2     or right after you took the test whether
3     there was a question on there that you
4     objected to because it was unfair on the
5     basis of your race?
6  A. I don't recall.
7  Q. Do you recall that when you took the test for
8     Senior -- I'm sorry, for Service Social
9     Worker, that there was a question that you
10     objected to at the time you took the test on
11     the basis of your race?
12  A. I don't recall.
13  Q. Can you tell me, Ms. Finch, today of any
14     questions that you have ever encountered on
15     any exam that you object to because they were
16     unfair based on race?
17  A. I don't recall any.
18  Q. Ms. Finch, you and Mr. Lightfoot talked at
19     length about your attempts to be promoted to
20     an HTS, H -- slash HTL position?
21  A. Right.
22  Q. First of all, is the HTS position the same as
23     an HTL position?

Page 208

1  A. No.
2  Q. Did you seek applications to both of those
3     positions separately?
4  A. Yes.
5  Q. Okay. Which one of those is the same as a
6     cottage supervisor?
7  A. HTS.
8  Q. Is the HTS position or the cottage supervisor
9     position a merit system position?
10  A. No.
11  Q. Is the HTL position a merit system position?
12  A. No.
13  Q. Is the Administrator II position a merit
14     system position?
15  A. No.
16  Q. Is there a separate position that you refer
17     to as QMRP?
18  A. It's the same as the HTL.
19  Q. As HTL?
20  A. Uh-huh.
21  Q. Okay. And that's obviously not a merit
22     system position because the HTL is not a
23     merit system position; is that correct?

Page 209

1  A. Right.
2  Q. Do you have any complaint with respect to
3     anything that the State Personnel Department
4     did that affected in any way your failure to
5     be promoted to the HTS position?
6  A. No.
7  Q. Do you have any complaint against the State
8     Personnel Department for something that it
9     did that caused you to not be promoted to the
10     HTL position or the QMRP -- QMRP position?
11  A. No.
12  Q. Do you have any complaint with respect to
13     anything that SPD did that may have caused
14     you not to be promoted to the Administrator
15     II position?
16  A. No.
17  Q. Did you at any time talk to the State
18     Personnel Department about your attempts to
19     be promoted to these non-merit system
20     positions?
21  A. No.
22  Q. Is the Mental Health Police Officer a
23     non-merit system position?

53 (Pages 206 to 209)

Page 210

1  A. I do believe that it is.
2  Q. That it is a non-merit system?
3  A. Non-merit.
4  Q. Do you have any complaint that SPD did
5     anything that caused you not to be promoted
6     to that position?
7  A. No.
8  Q. Are you claiming that the State Personnel
9     Department had anything at all to do with
10    your layoff from Glenn Ireland in 1996?
11 A. No.
12 Q. You and Mr. Lightfoot talked about the
13    demotion offer that was made to you in
14    conjunction with your layoff from Glenn
15    Ireland. Do you know of any role that SPD
16    had in that?
17 A. With the layoffs?
18 Q. No, ma'am. With the demotion offer. I
19    believe that you testified to Mr. Lightfoot
20    that -- that you felt that their offering
21    your 40132, Mental Health Worker II position,
22    was discrimination on the basis of race?
23 A. Mental Health position one.

Page 211

1  Q. Okay.
2  A. They would have to have gotten it approved
3     through the Personnel Department in order to
4     offer us to take the exam.
5  Q. But you didn't try to take that exam; is that
6     right?
7  A. Right.
8  Q. So, then, do you have any complaint about
9     anything that the State Personnel did --
10    State Personnel Department did in connection
11    with those demotion offers?
12 A. Yes.
13 Q. And what is that?
14 A. Because the State Personnel Department, it
15    wasn't a special place for the test to be set
16    up. In other words, with the State Personnel
17    Department, you're telling me that it's a
18    merit system job. If -- if the people at
19    Glenn Ireland, the supervisors, five, six,
20    seven, however many of the supervisors were
21    able to take that test at that time and then
22    get a job as a Mental Health Worker and
23    someone that may have already been on the

Page 212

1     list, there was no level playing ground
2     there. So the Personnel Department would
3     have had to give Dr. Gillespie the okay to
4     say, well, look, you-all can take the test on
5     this day. And I know that the State
6     Personnel Department would have had a date
7     that -- that the test would have been given.
8     It wouldn't have just been given to the five,
9     six, or seven of us. I can't remember
10    exactly how many. So they had to play a role
11    in the demotion process because you had to
12    say that it was okay for them to even offer
13    us a job as a Mental Health Worker I, and
14    even though I had been in that position as a
15    Mental Health Worker I prior to that time.
16 Q. What specifically is it that you're
17    complaining about that the State Personnel
18    Department did in setting up the exam for the
19    Mental Health Worker I position? How is it
20    that you say that that is racial
21    discrimination?
22 A. The test was never set up for us. But I had
23    to make application to get on the register to

Page 213

1     become a Mental Health Worker I.
2  Q. Did --
3  A. Let me ask this question.
4        MR. CALVIN: Hold on. Don't ask a
5        question.
6        THE WITNESS: I'm sorry.
7        MR. CALVIN: You give answers.
8        THE WITNESS: I'm sorry. Okay. I'm
9        sorry.
10       MR. CALVIN: If you don't know the
11       answer, tell her.
12       THE WITNESS: Okay.
13 Q. Is it the offer to take the Mental Health
14    Worker I exam that you're complaining about
15    or is it something else?
16 A. Well, the offer came from Glenn Ireland for
17    us to take the exam. But according to my
18    knowledge, the offer would have had to come
19    from the State Personnel Department. Now,
20    the test would have been set up for anybody
21    that made application to take that exam, not
22    necessarily the five or six people -- it
23    wasn't -- it wasn't a special thing for me to

54 (Pages 210 to 213)

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 214

1    take that exam. Even though I had been in
2    that position as a Mental Health Worker I,
3    I'm sure a couple more people may have been
4    in that position as a Mental Health Worker
5    I. We could have -- if that had been the
6    case instead of taking the exam, could have
7    moved into that position, even though there
8    were no positions open at Glenn Ireland for
9    Mental Health Worker I.
10   Q. You didn't want to return to the Mental
11      Health Worker I position; isn't that correct?
12   A. The offer was to take the exam. I had to
13      fill out the application and the process
14      would have been to fill out the application
15      for the Mental Health Worker I. I was
16      promoted up.
17   Q. I'm not sure what you mean by that.
18   A. I was promoted to a supervisor. It's -- the
19      State Personnel Department, there were other
20      jobs besides Mental Health Worker I in the --
21      through -- in the State Personnel Department
22      that I qualified for.
23   Q. Are you saying, then, that rather than

Page 215

1    offering for you to take -- to make
2    application for the Mental Health Worker
3    position, they should have written you a
4    letter and told you to make application for
5    some other position?
6    A. They could have given a list of the -- the
7       vacancies that they had within the State.
8    Q. Have you ever been to the State Personnel
9       Department, Ms. Finch?
10   A. No, I haven't.
11   Q. Have you ever tried to find out which
12      vacancies they have open for any given
13      position or in any given field?
14   A. Yes, I have.
15   Q. How have you done that?
16   A. I've gone through the Employment Office -- or
17      the unemployment office and they have a list
18      of merit system jobs. They have a list of
19      other jobs in the employment or the
20      unemployment office.
21   Q. So are you saying that that wasn't
22      sufficient, that State Personnel Department
23      should have written you a letter at the time

Page 216

1    of your demotion and told you all the jobs
2    that you might want to apply for?
3    A. My answer is that the State Personnel
4       Department could have given not only myself
5       but the other people that were in a
6       professional position a list of jobs that the
7       State had available other than a Mental
8       Health Worker. Because all of us had -- had
9       a degree. And I moved up from being a Mental
10      Health Worker, even though it took me a while
11      to move from that position to the next level.
12   Q. And how is it that you think that their
13      failure to do that was directed at you
14      because of your race? What facts do you have
15      to show that -- that that was a form of race
16      discrimination?
17   A. Because several people that were laid off --
18      that were going to be laid off prior to all
19      of us being laid off got jobs in other
20      areas. They were not offered Mental Health
21      Worker positions.
22   Q. Were those white people or black people?
23   A. Some were both.

Page 217

1    Q. You did not make an application for this
2       position; is that correct?
3    A. Which position?
4    Q. For the Mental Health Worker I that they
5       offered to you.
6    A. No, I did not.
7    Q. Did you apply for any other position in
8       connection with your layoff? Were there any
9       other positions suggested to you by Glenn
10      Ireland?
11   A. Glenn Ireland only gave a list of jobs and
12      I'm sure you have it on that exhibit -- that
13      they passed out to all of us.
14   Q. What steps did you take to find out the jobs
15      that the State Personnel Department might
16      have had that you could have applied for
17      instead of the Mental Health Worker I
18      position?
19   A. Through the Employment Office.
20   Q. Anything else?
21   A. No.
22   Q. Ms. Finch, you said that SPD told other
23      people of jobs that they could get -- let me

55 (Pages 214 to 217)

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 218

1  start over with that. Were there other
2  people, Ms. Finch, that SPD informed about
3  jobs other than this Mental Health Worker I
4  position?
5  A. Now, this is a list dated March 6th, '96 from
6  Tommy Judd. It's a State -- vacant State
7  positions.
8  Q. Do you know of anybody who got that letter?
9  A. This states to all employees. I don't know
10  who else got it. I just have a copy of it.
11  Q. Did you get that one?
12  A. Yes, I have a copy of it.
13  Q. And it has jobs other than the Mental Health
14  Worker I?
15  A. Yes.
16     MR. ABBOT: Can you identify the
17        exhibit number for us she's
18        referring to?
19     MR. CALVIN: DX #1112.
20     MR. ABBOT: Thank you.
21  Q. Ms. Finch, at the time that you were demoted
22  at Glenn Ireland and made the offer to apply
23  for the 40131 Mental Health Worker I

Page 219

1  position, were there other employees at Glenn
2  Ireland who were also demoted who had gotten
3  other jobs with State Personnel Department?
4  A. Not the people that were demoted.
5  Q. Anyone who worked at Glenn Ireland which was
6  closing -- isn't it true that Glenn Ireland
7  was closing at that time?
8  A. They were slated to close.
9  Q. They were in the process of closing?
10  A. Yes.
11  Q. Some of the -- did you say that some of the
12  people who were going to lose their jobs
13  because of the Glenn Ireland closing were
14  able through SPD to find other employment in
15  merit system positions?
16  A. During the time that I was called in along
17  with some of the supervisors and the maybe
18  recreation staff, the only position that they
19  offered was a Mental Health Worker position.
20  Q. Do you know of any other people that they
21  offered positions other than the Mental
22  Health Worker I position to?
23  A. No. Can I say something else? And this was

Page 220

1  just the people that were being demoted at
2  that time. There was other people like Jim,
3  for instance. He got a job somewhere else
4  with another agency. But the only thing that
5  was offered to the people that were there was
6  a Mental Health Worker position.
7  Q. The February 7th letter refers to the Mental
8  Health Worker I position and the March 6th
9  letter refers to about -- several other
10  positions. Do you agree with that,
11  Ms. Finch?
12  A. Yes.
13  Q. So actually, there were several jobs that --
14  that were mentioned and not just the Mental
15  Health Worker I.
16  A. This was a memorandum to all the employees
17  there. It wasn't necessarily to the people
18  that were being laid off from the position.
19  Q. Well, if it were to all employees, would that
20  not include the people who are being laid
21  off?
22  A. I said not necessarily only for those people
23  that were laid off. And on these jobs, it

Page 221

1  say master's level Social Worker which we
2  covered in some of the documents there --
3  Q. Yes, ma'am.
4  A. -- that I didn't qualify for. It says a
5  bachelor level Social Worker which we don't
6  have the announcement for that. A master's
7  level Licensed Practical Counselor. Licensed
8  Graduate Social Worker. Licensed Practical
9  Social Worker Certified. And it also
10  states -- is written in at the top Senior --
11  I mean, excuse me, Service Social Worker I
12  which it was stated that I didn't pass that
13  exam that I took in -- was that '96? So
14  these jobs were obsolete because none of us
15  qualified for these jobs.
16  Q. Do you know of any white people who didn't
17  qualify for that job?
18  A. I don't know.
19  Q. You don't know of any or there weren't any?
20  A. I don't know.
21  Q. Do you know of any black people who did
22  qualify for those jobs?
23  A. I don't know.

56 (Pages 218 to 221)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL 36104
ph:(334)263-0261;fax 263-1243

Page 222

1   Q. Did you make applications for these
2      positions?
3   A. On the -- on the Service Social Worker, you
4      can tell that I made application for it
5      because it stated that I didn't pass that
6      particular job. I didn't have the
7      qualifications for the master's level Social
8      Worker.
9   Q. Are you making some --
10  A. Or the license and -- and I'm not licensed as
11     a counselor. So I couldn't make application
12     for these particular jobs. And then, there
13     was no -- it didn't give any qualifications
14     on these jobs. It just gave a list of jobs
15     that may have been available.
16  Q. And this did not come from SPD? It came from
17     Mental Health?
18  A. It came from Mental Health, but they said we
19     were advised today by Central Office.
20  Q. Central Office -- do you know that Central
21     Office refers to SPD?
22  A. Does it refer to them?
23  Q. Well, I think you indicated that -- that this

Page 223

1      list of alternative positions was somehow put
2      before you because of something that the
3      State Personnel Department did, and I'm
4      trying to figure out why it is you think
5      that.
6   A. It says the Central Office.
7   Q. And I'm asking you if you know or have any
8      reason to think that when the writer of this
9      memo says Central Office, they mean State
10     Personnel Department.
11  A. I took it to mean that.
12  Q. Is there any reason that you took it to mean
13     that? You just made that assumption?
14  A. No, because the Central Office would be the
15     central personnel office, not Department of
16     Mental Health. And it also went on to say
17     that they were available at Youth Services at
18     Mt. Meigs. And it --
19  Q. Ms. Finch, if -- I'm sorry.
20  A. Okay. It says the State positions that were
21     available.
22  Q. Ms. Finch, if you later found out that
23     Central Office did not mean State Personnel

Page 224

1      Department, would you have any complaint
2      about any of these jobs that were mentioned
3      as alternatives for the people that were
4      being demoted?
5   A. What's the difference in the Central Office?
6         MR. CALVIN: Don't ask a question.
7         THE WITNESS: I'm sorry. I keep
8            forgetting that.
9   A. Okay. Repeat the question.
10  Q. If your assumption that Central Office is not
11     the same thing as the State Personnel
12     Department was incorrect, what complaint
13     would you then have about these five or six
14     jobs that are listed here on #1112 with
15     respect to the State Personnel Department?
16  A. In order for me to answer that question, I
17     have to be sure that it's not the same.
18  Q. Fair enough. Pretending for a minute that it
19     wasn't the same and that we knew that it
20     wasn't the same, what complaint would you
21     have in connection with the State Personnel
22     Department's role with this?
23  A. I still couldn't answer it. I'd have to be

Page 225

1      exact.
2         MR. ABBOT: You'd have to be what?
3         THE WITNESS: Exact.
4   Q. Exact with respect to what?
5   A. I have to know whether Central Office is
6      State Personnel.
7   Q. Now, I'm asking you to assume --
8   A. And I can't assume.
9   Q. -- that it's not. But you assumed that it
10     was earlier?
11  A. Exactly. That's true. So that's why I can't
12     answer that question since I assumed prior to
13     that.
14  Q. Okay. Is your assumption that Central Office
15     is the same thing as State Personnel
16     Department the only -- the only reason
17     that -- that you have to think that the State
18     Personnel Department had a role in #1112?
19     Other than that assumption, is there any --
20     any other facts that you know of?
21  A. I can't assume.
22  Q. I'm not asking you to assume, Ms. Finch. I'm
23     asking you other than that assumption, is

DEPOSITION OF AUDREY DENISE FINCH                                          TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 226

1    there anything else that you know of?
2  A. No.
3  Q. Okay. Have we now talked about every
4    complaint that you have with respect to these
5    suggestions for alternative jobs that are
6    listed in #1110 and #1112?
7  A. Yes.
8  Q. Yes?
9  A. Yes.
10 Q. Ms. Finch, in your complaint, you allege that
11   your duties as a Habilitation Treatment
12   Specialist I were the same as those of Mental
13   Health Worker II and Administrator II but
14   that you weren't able to be promoted to the
15   Administrator II position. I want to know
16   how exactly it is that the merit system
17   position, Mental Health Worker II, factors in
18   to your attempts to be promoted to the
19   Administrator II position.
20 A. Repeat your question.
21 Q. That wasn't really a question, was it? We've
22   established that you sought promotion to the
23   non-merit system positions HTS and

Page 227

1    Administrator II. Did you seek any promotion
2    to the merit system position of Mental Health
3    Worker II?
4  A. No.
5  Q. Do you in any way allege that the job duties
6    or criteria of the Mental Health Worker II as
7    established by SPD prevented you from moving
8    to those non-merit system positions that you
9    wanted?
10 A. Mental Health Worker II --
11 Q. Yes, ma'am.
12 A. -- was rated on -- I'm not sure whether a
13   test was given for that position or not.
14 Q. Did you apply for that position?
15 A. No, I didn't. And on the Hab Treatment
16   Specialist, the qualifications were to have
17   the experience plus the degree in the
18   specified area.
19 Q. And that's a non-merit system position?
20 A. Non-merit.
21 Q. Do you have any complaint whatsoever with
22   respect to the Mental Health Worker II
23   classification?

Page 228

1  A. No.
2  Q. Okay. Are you alleging that something that
3    SPD did caused you not to seek application to
4    the Mental Health Worker II position?
5  A. No.
6        MS. JORDAN: Can we take a break?
7        MR. CALVIN: Sure. That's fine.
8        MR. ABBOT: But of course.
9        (Recess taken from
10           4:42 p.m. to 5:10 p.m.)
11       MR. ABBOT: Joe and I have been
12         discussing in the hall various
13         matters relating to Ms. Finch's
14         deposition, and some of her
15         testimony today including
16         testimony that she made
17         regarding -- in answer to
18         questions about discriminatory
19         tests and rankings on registers
20         and other type questions, she
21         indicated in some testimony that
22         she would need to review certain
23         documents in order to be able to

Page 229

1        answer those questions or some of
2        those questions. Joe and I have
3        agreed that we will convene this
4        deposition today in approximately
5        45 minutes or so and that after
6        that, we will get to Joe on behalf
7        of Ms. Finch the documents that
8        she has indicated that she needs
9        to review in order to answer those
10       questions. And then at a later
11       mutually convenient date, we will
12       reconvene with Ms. Finch for the
13       sole and only purpose of asking
14       questions about those documents
15       that she has reviewed.
16      MR. CALVIN: The only caveat to that is
17        that once they're produced, if
18        Ms. Finch cannot offer any
19        additional testimony after review
20        of those documents, then Taylor
21        and I have agreed that we can so
22        stipulate to that and that there
23        would not be a need to reconvene

58 (Pages 226 to 229)

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 230

1    to take any further deposition
2    testimony since there's no new
3    testimony to be offered after such
4    a review. Is that correct?
5    MR. ABBOT: That's correct.
6    MR. CALVIN: Okay. That okay with
7        you?
8    THE WITNESS: That's fine.
9    MR. ABBOT: If there's not going to be
10       any testimony from this particular
11       witness at any hearing or trial,
12       including a class cert hearing on
13       the trial on the merits regarding
14       those particular tests and
15       registers and rankings, then we
16       will gladly so stipulate with Joe
17       that we will not need to re-depose
18       her at all.
19   MR. CALVIN: Hold a minute.
20       (Off-the-record discussion)
21   MR. ABBOT: I misspoke. If there's no
22       additional testimony further or
23       any more specific than or detailed

Page 231

1        or with any more facts or
2        information than what we heard
3        today from Ms. Finch at any class
4        cert hearing or trial, then in
5        that event we will so stipulate.
6    MR. CALVIN: Okay. I think that's
7        good.
8        EXAMINATION
9    BY MR. OSBORN:
10   Q. Ms. Finch, I'm Jason Osborn. I'm with the
11       Department of Rehabilitation Services.
12       Regarding the interviewing process, are you
13       claiming that the Department of
14       Rehabilitation Services did not grant you an
15       interview when you believed that they should
16       have or that you should have been granted
17       one?
18   A. Exactly.
19   Q. I'm sorry?
20   A. That's true.
21   Q. That is?
22   A. That's correct.
23   Q. You are claiming that?

Page 232

1    A. Yes.
2    Q. That you were denied an interview when you
3        should have been granted one?
4    A. Yes.
5    Q. In that case, would you describe each and
6        every instance that you're aware of when you
7        were denied an interview but should have been
8        granted one?
9    A. I noted on the registers that I was certified
10       out, and maybe that's my mistake. But that I
11       was certified out for interviews -- to be
12       interviewed by the Department, I think in
13       Birmingham and a couple of times in
14       Tuscaloosa. But the one in Birmingham, I
15       never even got a call for those positions.
16   Q. Can you review your document list and provide
17       the dates for those instances?
18   A. Okay.
19       MR. REDMOND: If you would, Ms. Court
20           Reporter, would you let the record
21           reflect that she's referring to
22           her counsel after questions given
23           before answer.

Page 233

1        MR. CALVIN: Well, let me just say for
2            the record, we were asked by
3            Mr. Osborn to look at some
4            documents to try to help him
5            answer his questions. So that's
6            what we're doing. If you don't
7            want us to do that, we won't do
8            that.
9        MR. REDMOND: No. We appreciate your
10           doing that. Just want it to
11           reflect she wasn't doing it on her
12           own.
13   A. Can you repeat your -- we're ready.
14   Q. Okay.
15   A. Repeat your question.
16   Q. Provide the dates that -- provide the dates
17       of the instances that you claim you should
18       have been granted an interview but weren't.
19   A. I still didn't understand.
20   Q. Describe --
21       MR. CALVIN: Can't hear you.
22   Q. Describe the dates that you should have been
23       granted an interview or rather that you

DUNN, KING & ASSOCIATES          431 South Court Street          Montgomery, AL 36104
toll-free (800) 359-8001          website: www.dunnking.com          ph:(334)263-0261;fax 263-1243

Page 234

1  believe you should have been granted an
2  interview but were not?
3  A. According to this, I don't know exactly what
4  the dates would have been that they may have
5  granted me an interview. But on this
6  particular time --
7      THE WITNESS: December of '97?
8      MR. CALVIN: Yes.
9  A. Oh, December of '97, I was not granted an
10  interview for the position in Jefferson
11  County.
12  Q. Were there any others?
13  A. I was called about a position in Tuscaloosa
14  County, but I declined that interview.
15  Q. Is the position that you've just mentioned in
16  Jefferson County December of '99 -- or
17  December of '97, is that the only interview
18  you were not granted that you believe you
19  should have been?
20  A. I -- I see a couple of times on here where it
21  was for Tuscaloosa County. I can only recall
22  one time being asked to come in for an
23  interview, and that was in Tuscaloosa. Now,

Page 235

1  the others I don't actually recall. And I
2  can't give you a specific date on the --
3  which one in Tuscaloosa.
4  Q. Do you believe you weren't granted interviews
5  with rehabilitation services because of your
6  race?
7  A. That I can't answer.
8  Q. What about because of your gender?
9  A. I can't answer that either.
10  Q. Do you have any evidence or facts that would
11  indicate whether it was based on your race or
12  gender?
13  A. Not at this time.
14  Q. Do you know who was interviewed for -- for
15  the December '97 period when you claim you
16  should have been interviewed?
17  A. No, I don't.
18  Q. And do you know what criteria was used in
19  determining who would be interviewed?
20  A. The criteria would have been to get the --
21  the certified names from the State Personnel
22  Department.
23  Q. Can you identify anyone that was interviewed

Page 236

1  in December of '97?
2  A. I don't know of anyone that applied for this
3  position.
4  Q. Are you making a claim in this case that race
5  discrimination or sex discrimination is the
6  reason that you weren't granted an interview
7  in December of '97?
8  A. It's a possibility.
9  Q. Have you included that in any charge of
10  discrimination?
11  A. No.
12      MS. OSBORN: That's all.
13      EXAMINATION
14  BY MS. JORDAN:
15  Q. Ms. Finch, with respect to all of the tests
16  that you failed, do you have any information
17  or do you know of any information that leads
18  you to believe that any of those tests didn't
19  accurately and fairly measure your ability or
20  the ability of African-Americans generally to
21  do the job?
22  A. I can't answer that question because I have
23  no statistical measures to go by.

Page 237

1  Q. With respect to all the occasions that you
2  took a test and had some assessment of your
3  training and experience and got on a
4  register, do you have any reason to believe
5  that the tests or assessments didn't fairly
6  and accurately measure your ability to
7  perform the job?
8  A. Repeat that question.
9      MS. JORDAN: Dee, would you read that
10      question back, please.
11      (The court reporter read the
12      pending question.)
13  A. No.
14      MS. JORDAN: Warren, are you ready now?
15      MR. LIGHTFOOT: Yes, thank you.
16      EXAMINATION
17  BY MR. LIGHTFOOT:
18  Q. What I'm marking as Exhibit #1119, that's an
19  HTC I position for -- for 1992.
20      MR. CALVIN: I haven't seen that one.
21      MR. LIGHTFOOT: That's a different one.
22      MR. CALVIN: I've seen the position,
23      just not that one.

60 (Pages 234 to 237)

DEPOSITION OF AUDREY DENISE FINCH                                TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 238

1    MR. LIGHTFOOT:  That's right.  You've
2        seen that job position.
3    MR. CALVIN:  I see.
4    Q.  Do you think you meet the qualifications on
5        #1119?
6    A.  Yes.
7    Q.  All right.  And why is that?
8    A.  Okay.  It says a master's degree in
9        psychology, vocational education,
10       rehabilitation counselling, social work,
11       special education or a related field or a
12       master's degree in psychiatric nursing.
13       Other job-related education or experience may
14       be substituted for all or part of these basic
15       requirements.
16   Q.  Okay.  And why do you think you meet that?
17   A.  Because I have the experience and I have the
18       education.
19   Q.  Okay.  I show you what I'm marking as #1120.
20       Did you receive this letter from Jim Elliott
21       telling you that you hadn't received the
22       promotion in January of 1993?
23   A.  I don't recall seeing it.  I'm sure I

Page 239

1        probably got it.
2    Q.  Okay.  Is the address right?
3    A.  My address?
4    Q.  Yes.
5    A.  Glenn Ireland II Developmental Center,
6        Tarrant, Alabama 35215.
7    Q.  Oh, I guess it was in your box maybe.
8    A.  Yes.
9    Q.  How would that have been given to you, if you
10       recall?
11   A.  It may have been --
12   Q.  You just --
13   A.  I'm not sure.  It may have been given to the
14       secretary or --
15   Q.  Okay.  You just don't recall one way or the
16       other?
17   A.  I don't recall exactly.
18   Q.  All right.  Are you making any claims of back
19       pay in this lawsuit?
20   A.  Yes, I am.
21   Q.  Beginning when?
22   A.  Beginning from the time I started applying
23       for Habilitation Treatment Specialist or

Page 240

1        Cottage Supervisor.
2    Q.  Okay.  Where is JoAnn Pruitt located?
3    A.  I don't know.
4    Q.  Is she a friend of yours?
5    A.  She worked at Glenn Ireland.
6    Q.  Was she a friend of yours?
7    A.  It depend on what you mean in terms of
8        friend.
9    Q.  Was she a work friend of yours?
10   A.  She worked in personnel and I worked in a
11       different -- residential service.
12   Q.  Did you socialize with her at work?
13   A.  No, not like I would with some other friends
14       I may have had there.  But, no, not like --
15       if I saw her, we would speak.  Other than
16       that --
17   Q.  Did you ever talk with her outside of work?
18   A.  No.
19   Q.  You don't know where she is now?
20   A.  Okay.  Let me change that.  Have I talked to
21       her outside of work.  I talked to her if she
22       came to the mall.
23   Q.  Okay.  And you don't know where she is now?

Page 241

1    A.  The last I heard, she was at the Highway
2        Department.
3    Q.  Is she a witness in this lawsuit to any of
4        the -- that supports any of your claims?
5    A.  Not with me.
6    Q.  Okay.  Did she give you any documents?
7    A.  No.
8    Q.  At any time?
9    A.  No.
10   Q.  Did the folks at the Mental Health Department
11       around the time you were being laid off, did
12       they try to find you jobs not only in other
13       State departments, but also with private
14       employers?
15   A.  They gave us a list for JBS.  I think we have
16       that.
17   Q.  Right.  We've gone through that list.  But
18       they did more than that, didn't they, to try
19       to help you find a job?
20   A.  No.
21   Q.  Didn't they try to help you find private jobs
22       as well?
23   A.  No.

DUNN, KING & ASSOCIATES                431 South Court Street                Montgomery, AL  36104
toll-free (800) 359-8001            website: www.dunnking.com        ph:(334)263-0261;fax 263-1243

Page 242

1    Q. Okay.
2    A. Okay. Let me -- let's go back. When you say
3       in terms of private jobs, they gave us a list
4       of jobs that may have been open at JBS and
5       also someone from the Employment Office came
6       out.
7    Q. What's JBS?
8    A. Jefferson, Blount, St. Clair.
9    Q. Okay. Did they try to help you find jobs
10      that weren't with State government or Federal
11      government?
12   A. They sent someone out from the Employment
13      Office.
14   Q. To talk with y'all?
15   A. To talk with us, right.
16   Q. About job opportunities?
17   A. Right.
18   Q. Okay.
19      MR. LIGHTFOOT: That's it. Thanks.
20      EXAMINATION
21   BY MS. JORDAN:
22   Q. Ms. Finch, were you ever given job duties
23      outside of your classification as a Mental

Page 243

1       Health Worker I?
2    A. Yes.
3    Q. And what were those? Or first of all, who
4       gave them to you?
5    A. The supervisor.
6    Q. Who was that?
7    A. Vivian Richardson or Vivian Powe Richardson.
8    Q. Who were those duties?
9    A. I would become the lead worker.
10   Q. Did you object to being made lead worker?
11   A. No.
12   Q. Do you think that SPD had anything to do with
13      you being made lead worker?
14   A. Not to my knowledge.
15   Q. Were you ever given job duties outside of
16      your classification as a Disability
17      Determination Examiner?
18   A. No.
19   Q. Have you told me today all of the complaints
20      that you have regarding the way the registers
21      are formed?
22   A. Yes.
23   Q. Have you ever been deleted from a register

Page 244

1       after the classification was re-announced and
2       the register reformed?
3    A. I'm not sure.
4    Q. Do you know of any occasion when that's
5       happened to you?
6    A. I don't.
7    Q. Are you making any complaints or contentions
8       in this lawsuit regarding the abolishment of
9       registers?
10   A. I don't know which registers were abolished.
11   Q. Do you know of any registers that you were on
12      that were abolished that you're complaining
13      about?
14   A. I don't know if any were abolished.
15   Q. Are you making any complaints about any
16      registers that were replaced?
17   A. I don't know if any were replaced.
18   Q. You don't know if any were or --
19   A. I don't know if any registers were replaced.
20   Q. Are you making any claim that the State
21      Personnel Department's procedures for giving
22      you notice about exams or about whether or
23      not you got on a register were insufficient?

Page 245

1    A. No.
2    Q. Do you contend that the people who graded
3       your exams or who scored your applications at
4       the State Personnel Department based any
5       decisions that they made on race?
6    A. Okay. We're talking about two different
7       types of jobs with the State Personnel
8       Department. We're talking about those that
9       may have been hand scored that were exempt or
10      maybe some that would have been scored by the
11      machine. At least that's my knowledge about
12      them.
13   Q. Are you making any claim that those that were
14      hand scored were somehow manipulated on the
15      basis of your race by the people who hand
16      scored them?
17   A. I'm not sure.
18   Q. Is there any document that you know of that
19      you could review to determine whether you are
20      making that contention?
21   A. Not at this time.
22   Q. There is no document at the time or there is
23      no document you know of at this time?

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 246

1   A. It's not one that I know of at this time.
2   Q. Okay. And with respect to the others that
3      were machine graded, do you have any
4      complaint about those?
5   A. Not at this time.
6   Q. Is there anything you can look at that might
7      tell you whether or not you do in fact have a
8      complaint about that?
9   A. No.
10  Q. Are you making any claims that the State
11     Personnel Department retaliated against you
12     in any way?
13  A. No.
14  Q. Is the EEOC charge that you filed in 1993
15     that you discussed with Mr. Lightfoot the
16     only one that you have ever filed?
17  A. Yes.
18  Q. Were you represented by an attorney at that
19     time?
20  A. No.
21  Q. How did you come to learn of the EEOC?
22  A. It's public knowledge about the EEOC.
23  Q. Have you ever had an African-American

Page 247

1      supervisor?
2   A. Yes, I have.
3   Q. Who was that?
4   A. Vivian Richardson, Len Hamilton, Vickie
5      DeVaughn, Addie Walton. I've had several.
6   Q. Have you yourself ever been a supervisor?
7   A. I have.
8   Q. Have you supervised white people?
9   A. Let's see. No.
10  Q. Have you supervised black people?
11  A. Black, yes.
12  Q. Is it that you exclusively supervised black
13     people? Sorry about that.
14  A. I have been a direct supervisor of mostly
15     black people.
16  Q. Were there some white people that you did
17     supervise?
18  A. When I was responsible for the entire campus
19     there was white people that were there.
20  Q. Have you ever had any role in hiring or
21     promoting or disciplining employees?
22  A. Yes.
23  Q. Can you recall the names and races of the

Page 248

1      employees that you had a role in hiring?
2   A. I had a role in interviewing people for the
3      position of Mental Health Worker II and all
4      of those people were black.
5   Q. Did you help decide who would be interviewed?
6   A. Yes.
7   Q. How did you go about deciding who you'd
8      interview and who you would not interview?
9   A. We interviewed the people that were -- that
10     were up for the Mental Health Worker II
11     position.
12  Q. What do you mean by up for the position?
13  A. We got the list from the Personnel Department
14     if I'm not mistaken, and those people that
15     were on the list for the Mental Health Worker
16     position, those were the people that we
17     interviewed.
18  Q. Was there a Certificate of Eligibles that you
19     got?
20  A. Yes.
21  Q. And you interviewed every one of the people
22     on the Certificate of Eligibles?
23  A. According to my knowledge, we did.

Page 249

1   Q. And every person certified out for that
2      Mental Health Worker II position was black?
3   A. I do believe they were.
4   Q. Have you had any role in promoting employees?
5   A. I assisted with the interviews with the
6      Mental Health Worker II position, so that
7      would have been a promotion from the Mental
8      Health I up to a II.
9   Q. What about in terms of in-house promotions or
10     promotions to positions that aren't merit
11     system?
12  A. No.
13  Q. Okay. Have you had any role in disciplining
14     employees?
15  A. Yes.
16  Q. Can you tell me the names and races of all
17     the employees that you've disciplined?
18  A. I don't know all the names. But they were
19     all black.
20  Q. Did you have any role in demoting employees?
21  A. No.
22  Q. Did you ever recommend that somebody be
23     terminated or hired or promoted and they

63 (Pages 246 to 249)

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 250

1   weren't?
2   A. No.
3   Q. Have you ever had any contact or
4      communication with any employee or official
5      at the State Personnel Department?
6   A. No.
7   Q. Have you ever telephoned the State Personnel
8      Department?
9   A. No.
10  Q. Have you ever heard anyone at SPD use
11     derogatory racial terms?
12  A. No.
13  Q. Do you believe that you have ever been
14     adversely affected by the timing of the
15     calling of a register? Let me rephrase that,
16     Ms. Finch. I'm sorry. That wasn't clear.
17  A. Okay.
18  Q. Do you think you've ever been disadvantaged
19     by the timing of the calling for the
20     Certificate of Eligibles off of the register?
21  A. I still don't understand.
22  Q. Okay. Do you think that anyone has asked for
23     a Certificate of Eligibles at a time that

Page 251

1      they knew there would be less blacks on it
2      or -- or fewer whites or vice versa?
3   A. No.
4   Q. You don't think that in any way the
5      Certificates of Eligibles -- the needs for
6      the certificate is manipulated so that
7      African-Americans would be disadvantaged in
8      terms of whether they got certified out?
9   A. I can't answer that because I don't know.
10  Q. Based on what you know, do you think that?
11  A. Not that I'm aware of.
12  Q. Have you ever been hired into a temporary
13     position by State Personnel, or by any State
14     agency?
15  A. No.
16  Q. Have you ever been a contract employee?
17  A. No.
18  Q. Do you believe that the practice of temporary
19     appointments disadvantages African-Americans?
20  A. I can't answer that.
21  Q. Do you believe that contract employment
22     disadvantages African-Americans or advantages
23     whites?

Page 252

1   A. I can't answer that.
2   Q. Are there facts or information that -- that
3      you could review to help you answer those
4      questions?
5   A. I don't have any.
6   Q. Is it just that you don't have an opinion on
7      that right now either way?
8   A. I don't have an opinion on it.
9   Q. Okay. Other than your lawyers, have you
10     talked to anybody to prepare for your
11     deposition?
12  A. No.
13  Q. Other than the documents that you produced to
14     your attorney, have you looked at any other
15     documents to get ready for your deposition?
16  A. No.
17  Q. And you testified earlier, I believe, that
18     you could have some more at home and that you
19     were going to look for those and turn them
20     over to Joe; is that right?
21  A. I said if I have any documents, I would turn
22     them over to him.
23  Q. Okay. Did you make any audiotapes in

Page 253

1      connection with your employment with the
2      State? Did you record on a tape recorder any
3      conversations or anything that happened to
4      you?
5   A. I didn't know that was a requirement.
6   Q. Well --
7         MR. CALVIN: Just answer yes or no.
8   A. No.
9   Q. I didn't mean as a requirement for your job.
10     I just meant for the purposes of posterity,
11     to help you remember stuff later.
12  A. No.
13  Q. Okay. Did you make any journals or diaries
14     or logs for the same reason?
15  A. No.
16  Q. Do you believe that the State Personnel
17     Department has any role in performance
18     evaluations that were given to you every --
19     annually or semiannually?
20  A. No.
21  Q. Have you had any contact with any other named
22     plaintiffs in this case about the case?
23  A. No.

64 (Pages 250 to 253)

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 254

1  Q. Do you know any other named plaintiffs?
2  A. No.
3  Q. Have you ever had any contact with a
4    potential class member?
5  A. No.
6  Q. Do you know of any other people who may be
7    class members?
8  A. Only the names that was listed.
9  Q. And which names were those?
10  A. The names on -- I mean, I don't know them
11    personally. I just only know the names that
12    was listed as a class member.
13  Q. Oh, because of some pleading that you saw,
14    some complaint that -- a paper that was filed
15    in the lawsuit that had the names on it?
16  A. Right. But I don't know them personally.
17  Q. Okay. And do you know of anybody who -- who
18    might be class members, whether or not
19    they're listed in the list?
20  A. No.
21  Q. Ms. Finch, are you aware that -- that you've
22    filed this lawsuit on your own behalf and on
23    behalf of others in similar situations?

Page 255

1  A. Yes.
2  Q. Are you aware that you have waived the right
3    to damages on their behalf -- on your own
4    behalf. Are you aware that you waived your
5    right to compensatory damages?
6  A. Yes.
7  Q. Are you aware that you waived the rights of
8    other potential class members for the same
9    sorts of damages?
10  A. Yes.
11  Q. How did you come to know that you had in fact
12    waived those damages?
13  A. In consulting with my attorney, we went over
14    them.
15  Q. And you decided that it was a good idea to do
16    so?
17  A. Yes.
18  Q. And what did you base your decision on?
19    MR. CALVIN: I'm going to instruct you
20    not to -- if -- if you can answer
21    it, don't -- in any part of your
22    answer, don't relate any part of
23    any conversation that you had with

Page 256

1    an attorney.
2  Q. Other than anything that your attorneys said
3    to you, do you have any independent reasoning
4    or basis for that waiver?
5  A. No.
6  Q. When was the first time that you talked to a
7    lawyer?
8  A. It was after -- I don't know the exact date,
9    neither do I know the year. After I talked
10    to them -- after I got the right-to-sue
11    letter from EEOC.
12  Q. And was that Joe or someone with Joe's firm
13    that you talked to?
14  A. Yes.
15  Q. And who initiated that contact?
16  A. I did.
17  Q. How did you come to learn of Joe's firm?
18  A. I got a reference from somebody.
19  Q. From another African-American State employee?
20  A. I'm not sure exactly who it was. But
21    it may have been from someone -- someone
22    within the agency.
23  Q. Someone within the agency?

Page 257

1  A. It may have been, someone that I worked with.
2  Q. Another employee?
3  A. Yes.
4  Q. Okay. How is it that you found out that
5    there was -- that there was and had been for
6    some time a lawsuit pending against the State
7    Personnel Department?
8  A. I don't remember.
9  Q. Okay. You told Mr. Lightfoot that you had
10    suffered emotional distress because of some
11    things that you say the Mental Health
12    Department did. Are you claiming that you
13    suffered any emotional distress or damages
14    because of something that the State Personnel
15    Department did?
16  A. No.
17  Q. Have you talked to anyone -- any other
18    African-American State employee to tell them
19    about the lawsuit, to talk to them about the
20    lawsuit or to talk to them about becoming
21    class members?
22  A. No.
23  Q. Who, then, are the people that you seek to

65 (Pages 254 to 257)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL  36104
ph:(334)263-0261;fax 263-1243

Page 258

1  represent in this lawsuit, Ms. Finch?
2  A. I represent all the African-Americans who
3     have been discriminated against by the
4     various departments of the State of Alabama.
5  Q. Can you tell me any of those -- any of the
6     names of those people?
7  A. I don't have that information at this time.
8  Q. What is it that you might need to do or look
9     at to get that information?
10 A. May I consult?
11 Q. I'm sorry?
12 A. May I consult with Joe?
13    MR. CALVIN: Well, just -- if you know
14       the answer to it, go ahead and
15       answer. If you don't know, tell
16       her you don't know.
17 A. I don't know the answer to it.
18 Q. I suppose, then, if you haven't talked to
19    anybody about the lawsuit, you haven't asked
20    anybody to join it; is that correct?
21 A. Not at this time.
22 Q. As of today, you have not asked anybody else
23    to be in this lawsuit that you bring on

Page 259

1  behalf of all the African-Americans in State
2  employment?
3  A. I can't answer that at this time.
4  Q. Why not?
5  A. Because I don't have the answer to it at this
6     time.
7  Q. Well, the question was whether as of today
8     you had talked to anybody else about being in
9     this lawsuit.
10 A. And I said I could not answer.
11 Q. Do you not remember whether or not you have?
12 A. I said I can't answer.
13 Q. Why can't you answer it, Ms. Finch?
14 A. Because I don't have an answer for it.
15 Q. Is it that you don't have a recollection?
16 A. I don't have an answer.
17 Q. Okay.
18    MR. CALVIN: Ask again.
19 Q. Have you talked to any African-American
20    employee or any other person who has applied
21    for employment with the State about being in
22    this lawsuit?
23    MR. CALVIN: About their being in this

Page 260

1  lawsuit?
2     MS. JORDAN: Right. Right. Yes. I'm
3        sorry.
4  A. You asked have I talked to anybody about
5     being in -- in the lawsuit or about the
6     lawsuit?
7  Q. Well, let's break it down. First of all,
8     being in the lawsuit.
9  A. No.
10 Q. Okay. What about just about the lawsuit?
11 A. I've talked to someone about the lawsuit.
12 Q. Is the person -- or are the people who you
13    talked to about the lawsuit potential class
14    members?
15 A. Not at this time.
16 Q. Who are those people, Ms. Finch?
17 A. That I talked to about the lawsuit?
18 Q. About the lawsuit, yes, ma'am.
19 A. Well, I talked to Don Bush about it and
20    I've -- I've talked to Brenda Walker about
21    the lawsuit. I've talked to several people
22    about it, but not being a part of it.
23 Q. Well, what did you say to Don Bush about the

Page 261

1  lawsuit?
2  A. Just the general thing about filing the suit
3     because of not getting a position at Glenn
4     Ireland.
5  Q. Anything else that you said?
6  A. Not that I can recall.
7  Q. What did he say?
8  A. I don't recall.
9  Q. What did you say to Brenda Walker?
10 A. The same thing.
11 Q. The same thing as what?
12 A. Not being -- getting a position at Glenn
13    Ireland.
14 Q. And what did Brenda Walker say?
15 A. I don't recall.
16 Q. Did either Don Bush or Brenda Walker ask you
17    how it was that they could go about joining
18    the lawsuit?
19 A. No.
20 Q. Are those the only two people that you have
21    talked to about the lawsuit?
22 A. Well, I've talked to several people about the
23    lawsuit.

66 (Pages 258 to 261)

DEPOSITION OF AUDREY DENISE FINCH                                           TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 262

1  Q. Are those the only two names of people that
2     you can recall that you've talked to about
3     the lawsuit?
4  A. No. Raynard Henderson, Kelvin Barnes, John
5     Bonner, Wimberly Hardrick, Arnetta Willis,
6     Anetta Key.
7  Q. To your knowledge, are any of those people
8     potential class members?
9  A. Not to my knowledge.
10 Q. Are all those people African-American?
11 A. Yes, they are.
12 Q. Are they now or have they at any time ever
13    been employed by the State?
14 A. They have been employed by the State and some
15    still are.
16 Q. Is Don Bush a Mental Health employee?
17 A. He is.
18 Q. Is Brenda Walker?
19 A. DDS.
20 Q. And Raynard?
21 A. He's no longer employed by the State.
22 Q. Which agency was he most recently employed
23    with?

Page 263

1  A. Mental Health.
2  Q. And Kelvin is a Mental Health employee; is
3     that correct?
4  A. He was a Mental Health employee.
5  Q. John Bonner?
6  A. He was a Mental Health employee.
7  Q. Wimberly?
8  A. He was a Mental Health employee.
9  Q. And someone named --
10 A. And also -- excuse me, Enid, E-N-I-D,
11    Calcert.
12 Q. Which agency was she employed by?
13 A. Mental Health. Maxine Neal.
14 Q. Mental Health?
15 A. Uh-huh.
16 Q. Arnetta Key or Arnetta somebody?
17 A. Anetta Key.
18 Q. Anetta. Okay. Was she a Mental Health
19    employee?
20 A. Yes.
21 Q. And that's everyone that you recall talking
22    to about the lawsuit?
23 A. I talked to Sandra Bush.

Page 264

1  Q. Mental Health?
2  A. Mental Health. Anthony Thigpen -- it was
3     several people.
4  Q. Is Sandra Bush a Mental Health employee?
5  A. She was.
6  Q. And Anthony is also a Mental Health employee?
7  A. He was.
8  Q. Ms. Finch, what's your understanding of the
9     role of a class representative?
10 A. That I represent the people who were
11    discriminated against by the State of Alabama
12    in various departments.
13 Q. Right. And what does that entail for you?
14    MR. ABBOT: Can you answer the
15        question, Ms. Finch?
16    THE WITNESS: I haven't.
17    MR. CALVIN: I object. Vague and
18        ambiguous.
19 Q. You can answer it anyway.
20    MR. CALVIN: If you understand, you can
21        answer it.
22 A. No.
23    MR. CALVIN: No, you don't understand

Page 265

1     it?
2     THE WITNESS: No, I don't understand
3        it.
4  Q. Do you remember what the question was?
5  A. The question was being a class
6     representative, what does that entail?
7  Q. Right.
8  A. And according to my knowledge, it would be
9     consulting with -- with the attorneys in
10    the -- in the lawsuit and bringing forth any
11    information that I would have -- that we
12    would have.
13 A. What do you think it is that qualifies you to
14    be a class representative?
15    MR. CALVIN: Objection to the extent it
16        calls for a legal conclusion.
17 Q. Have you ever been arrested?
18 A. No.
19 Q. Have you told me everything that you know
20    about the way that you believe the State
21    Personnel Department has discriminated
22    against you?
23 A. According to my knowledge.

67 (Pages 262 to 265)

DEPOSITION OF AUDREY DENISE FINCH
CRUM VS. STATE OF ALABAMA

TAKEN OCTOBER 9, 2001

Page 266

1     MS. JORDAN: Can we take a break? I
2        think that's all I have.
3     MR. ABBOT: Yes, we may.
4        (Recess taken from
5           5:57 p.m. to 6:07 p.m.)
6  Q. Ms. Finch, you told me about the time that
7     you participated in reviewing a Certificate
8     of Eligibles that had been sent to the Mental
9     Health Department. Do you recall the date of
10    that whole process?
11 A. I don't recall the exact date. And let me --
12    I didn't understand the question in the
13    beginning. You said I reviewed the records
14    of those individuals. I misunderstood the
15    question. And when we interviewed the people
16    for the Mental Health Worker II positions,
17    the names were already given to the
18    Residential Services Director. And I was in
19    on the interviews that interviewed the people
20    for the position.
21 Q. Was it an interview panel that you were on?
22 A. Yes.
23 Q. Who asked you to be on the panel?

Page 267

1  A. Director of Residential Service.
2  Q. Who was that at the time?
3  A. Charles Cutts.
4  Q. Who else was on the panel?
5  A. I believe -- and I'm not exactly sure, but I
6     think Ron Armstrong but I'm not exactly
7     sure. But I know I was on there and Charles
8     Cutts was on that panel. And it may have
9     been another person.
10 Q. I know that you said you don't recall the
11    exact date of that. Can you give me an
12    approximation?
13 A. It may have been ninety -- I can give you
14    maybe the year.
15 Q. That would be good.
16 A. It may have been '94 or '95.
17 Q. Okay. How many people did you interview?
18 A. It may have been about six or seven.
19 Q. Who eventually was appointed to the position?
20 A. I've got to remember. I believe it was
21    Sandra Bush, Sandra Harris, Johnnie Mae
22    Oliver, and I think -- I'm not sure on this
23    last person, but I think it was Shirley

Page 268

1     Little.
2  Q. Shirley?
3  A. Little. I'm not sure on that last person.
4  Q. How was it that you made the decision who
5     would be appointed?
6  A. We did the interviews and the Director of
7     Residential Services made the final
8     determination as to who would get the
9     position.
10 Q. Did you make a recommendation for it?
11 A. I did.
12 Q. Based on what?
13 A. Based on experience and based on the
14    interview.
15 Q. Based on what specifically in the interview?
16    What were you looking for?
17 A. How they related to the individuals there and
18    their job performance, if they came to work
19    on time. That's basically it.
20 Q. You looked at performance evaluations?
21 A. No. The performance -- I observed their
22    performance. They were Mental Health Worker
23    I's that we were moving them up to II's.

Page 269

1  Q. So you didn't look at documents to -- to make
2     that decision?
3  A. No.
4  Q. Just based on your best recollection?
5  A. Yes.
6  Q. And how was it that you decided who -- which
7     of the people you would interview, if you
8     did?
9  A. The Residential Services Director -- well,
10    through -- I'm sure through Personnel set up
11    the interviews for the people, and I was to
12    sit in on the interviews.
13 Q. So you didn't have, then, any role in
14    deciding who got interviewed?
15 A. No.
16    MR. ABBOT: You mind if I ask a couple
17       of questions about that?
18    MR. CALVIN: That one topic?
19    MR. ABBOT: Uh-huh.
20    MR. CALVIN: Of the interviews?
21    MR. ABBOT: Uh-huh.
22    MR. CALVIN: Two questions.
23    MR. ABBOT: Well, I might have to ask

68 (Pages 266 to 269)

DUNN, KING & ASSOCIATES
toll-free (800) 359-8001

431 South Court Street
website: www.dunnking.com

Montgomery, AL 36104
ph:(334)263-0261;fax 263-1243

DEPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 270

1       more than that, but it will be
2       just on that topic.
3              EXAMINATION
4    BY MR. ABBOT:
5    Q. Do you know what a structured interview is,
6       Ms. Finch?
7    A. No.
8    Q. Did you work off of, in asking questions of
9       these candidates, a set list or a
10      predetermined list of questions to ask each
11      candidate?
12   A. No.
13   Q. In your belief and opinion, Ms. Finch, were
14      the interviews successful in giving you some
15      insight into the relative abilities and
16      merits of the candidates for the position?
17   A. Yes.
18   Q. Do you favor the use of interviews as a tool
19      for determining who should be appointed to
20      certain positions?
21   A. Yes.
22          MR. ABBOT: That's all I have. Thank
23      you.

Page 271

1              EXAMINATION
2    BY MS. JORDAN:
3    Q. Ms. Finch, what's the purpose of the notes
4       that you've taken today in your deposition?
5    A. Which notes? All of them or some of them?
6    Q. All of them.
7    A. Some of them so I can discuss some things
8       with my attorney.
9    Q. And what about the others?
10   A. So I can discuss some things with my
11      attorney.
12          MR. ABBOT: Oh, I see the difference
13      now.
14   Q. Yeah. Are all of the notes that you have
15      taken over there for the purpose of
16      discussing things with your attorney?
17   A. Except for one.
18          MS. JORDAN: We would like those --
19      that one.
20          MR. ABBOT: No, we'd like them all.
21          MR. CALVIN: You can't have that.
22          MR. ABBOT: Why?
23          MR. CALVIN: Because it's things she's

Page 272

1       made notes of she wants to talk
2       with me about after the
3       deposition.
4          MR. ABBOT: That's a communication to
5       herself, not a communication to
6       her attorney. We make a request
7       for those notes.
8          MR. CALVIN: I'm not going to give them
9       to you.
10         MR. ABBOT: Let me ask some follow-up
11      questions, then, about them so we
12      can determine the extent, if any,
13      of the privilege. I assume you're
14      making an attorney/client
15      privilege objection; is that
16      right, Joe? I just want to know
17      the basis of the objection so I
18      can ask questions.
19         MR. CALVIN: I think that's right.
20         MR. ABBOT: Is there any other basis on
21      which you --
22         MR. CALVIN: Not that I recall.
23         MR. ABBOT: At this time?

Page 273

1          MR. CALVIN: At this time.
2              EXAMINATION
3    BY MR. ABBOT:
4    Q. Ms. Finch, were those notes made pursuant to
5       the instructions of your attorney?
6    A. No.
7    Q. Did you address them to your attorney at the
8       top of the page or in any other place on the
9       notes?
10   A. No.
11   Q. Were they reminders to yourself about things
12      you wanted to discuss with your attorney?
13   A. Some of them are.
14   Q. Is there any way for us to determine which
15      ones are and which ones aren't?
16   A. Repeat that question.
17   Q. Is there any way for us to determine which of
18      the notes are -- are reminders to yourself of
19      things that you wish to discuss with your
20      attorney?
21   A. I don't have an answer for that.
22   Q. Why not?
23   A. I don't have an answer for that.

69 (Pages 270 to 273)

DEOPOSITION OF AUDREY DENISE FINCH                                    TAKEN OCTOBER 9, 2001
CRUM VS. STATE OF ALABAMA

Page 274

1   Q. Did you at any point in time intend to hand
2       those notes over to your attorney as opposed
3       to talking to your attorney about the things
4       that are in the notes?
5   A. These notes were for discussion with my
6       attorney.
7   Q. For you to have in front of you when you
8       discussed things with your attorney?
9   A. Exactly.
10          MR. ABBOT:  That's all the questions I
11          have.  We renew our request.
12      MR. CALVIN:  Finished?
13      MS. JORDAN:  Yes.
14      MR. ABBOT:  I would ask you on the
15          record, too, to preserve --
16          safeguard those notes.
17      MR. CALVIN:  I will.  I will.  All
18          right.  Let's get all the exhibits
19          together.  I'm missing a few.
20          (The deposition concluded at
21          5:19 p.m.)
22      * * * * * * * * * * *
23      FURTHER DEPONENT SAITH NOT

Page 275

1           REPORTER'S CERTIFICATE
2   STATE OF ALABAMA
3   ELMORE COUNTY
4       I, Dee Johnson, Court Reporter and
5   Commissioner for the State of Alabama at Large,
6   hereby certify that on Tuesday, October 9, 2001,
7   I reported the deposition of AUDREY DENISE FINCH,
8   who was first duly sworn or affirmed to speak the
9   truth in the matter of the foregoing cause, and
10  that pages 6 through 274 contain a true and
11  accurate transcription of the examination of said
12  witness by counsel for the parties set out
13  herein.
14      I further certify that I am neither of kin
15  nor of counsel to any of the parties to said
16  cause, nor in any manner interested in the
17  results thereof.
18      This 18th day of October, 2001.
19
20
21      _____
        DEE JOHNSON, Court Reporter
22      Commissioner for the State
        of Alabama at Large
23
        MY COMMISSION EXPIRES: 2/10/2005

70 (Pages 274 to 275)





STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH
# AND MENTAL RETARDATION

### GLENN IRELAND II DEVELOPMENTAL CENTER
### REGION V

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217

PHONE (205) 849-0654

LARRY L. LATHAM, PhD
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

RITA A. WRIGHT
REGIONAL DIRECTOR

GUY HUNT
GOVERNOR

J. MICHAEL HORSLEY
COMMISSIONER

January 28, 1991

Ms. Audrey D. Finch
Mental Health Worker I
Glenn Ireland II Developmental Center

Dear Ms. Finch:

Congratulations!  Effective January 12, 1991, you were promoted to the
position of Habilitation Treatment Specialist.  Your new rate of pay will
be $717.70 biweekly, Step 1 of Pay Range 63.  This increase will be
reflected in your paycheck on February 8, 1991.  As a result of this
promotion, you must successfully complete a six month probationary
period and your raise month will change to January.

I am pleased that your performance with the Glenn Ireland II Developmental
Center warrants this promotion.  Thank you for the excellent manner in
which you perform your duties.  Keep up the good work!

Sincerely,

Rita Wright

Rita A. Wright
Regional Director

RAW/SKG/rjs

cc: ███████████

DEFENDANT'S
EXHIBIT
1101

PENGAD-Bayonne, N.J.



# APPLICATION FOR PROFESSIONAL EMPLOYMENT
## Exempt Classification

**RETURN TO:**
Glenn Ireland II
Developmental Center
91 Black Creek Road
Tarrant, Alabama 35217



RECEIVED AUG 07 1990

**GENERAL INSTRUCTIONS**

Complete all portions of this application that are applicable to you and the position for which you are applying. Failure to do so may result in your not being considered for the position for which you are applying. Type or print clearly in ink.

## AN EQUAL OPPORTUNITY EMPLOYER

---

Full Name: *Audrey Denise Finch*
First | Middle | Last

Address: *1309 - 21st St. No. #101*
House or Apartment No. | Street

*Birmingham  Al  35234*
City | State | Zip Code

Legal Residence: *Birmingham  Jefferson  Alabama*
City | County | State

Title of Position For Which You Are Applying: *Habilitation Treatment Specialist*

Date of Birth: Mo. *2*  Day *6*  Yr. *57*

Telephone Number: Home *252-1664*  Office *849-0654*

Place of Birth: *Birmingham  Jefferson  Alabama*
City | County | State

Social Security Number: *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*

---

NOTE. This Department is an equal opportunity employer. To comply with Federal reporting requirements we must maintain statistics on employment of protected classes.

Sex (Check one)
1. | | Male
2. |X| Female

Age: *33*

Race (Check one)
| | White  | | Black  | | Hispanic
| | Other

---

## EDUCATION

High school graduate or GED?  |✓| Yes   | | No

If no, circle highest grade completed:  1  2  3  4  5  6  7  8  9  10  11  (12)

| Name and location of business, correspondence, or vocational school attended: | FROM (Mo.) (Yr.) | TO (Mo.) (Yr.) | Did you Graduate? | Area of Study | Degree |
|---|---|---|---|---|---|
| | | | | | |

| Name and location of Colleges and Universities Attended | FROM (Mo.) (Yr.) | TO (Mo.) (Yr.) | Did you Graduate? | Field(s) of Study Major(s) / Minor(s) | Degree and Date |
|---|---|---|---|---|---|
| *Alabama State University Montgomery, Al* | *9  75* | *6  79* | *Yes* | *Sociology* / *Urban Studies* | *B.A. '79* |
| **Graduate or Professional School** *Alabama State University* | *8  89* | *5  90* | | *Counseling* | *M.S. 91* |

If you attended college, but did not graduate, show credit received. Sem. hrs. _____ Qtr. hrs. _____

List professional certificate(s) or license(s) and state where issued
_____

---

List below courses included in your education which are particularly related to the duties or qualifications of the position for which you are applying.

| Subjects | Sem. hrs. | Qtr. hrs. | Subjects | Sem. hrs. | Qtr. hrs. |
|---|---|---|---|---|---|
| *Group Counseling* | *3* | | *Principles of Guidance* | *3* | |
| *Exceptional Children* | *3* | | *Theories and Techniques of Counseling* | *3* | |
| *Advance Psychology* | *3* | | | | |

---

## CERTIFICATE (Must be signed in ink by applicant):

I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I understand that any false statements may cause me to be refused the opportunity of employment or cause my employment to be immediately terminated without recourse to due process or protection provided by law.

Signed *Audrey D. Finch*     Date *8/2/90*

| Name | Address | Occupation |
|---|---|---|
| FAYE J. Wilson | #48 Norwood Cir B'ham, AL 35234 | R.N. Quality Assurance |
| Edith Fisher | 513-10th Terr. West B'ham, AL 35214 | School Counselor |
| Gail Graves | 2304-Mayfield Ave SW B'ham, AL 35211 | Research Interviewer |

Do you have any physical handicaps or health problems that would keep you from doing the kind of work for which you are making application?    | | Yes  |✔| No

Have you ever been involuntarily terminated or forced to resign from a position?    | | Yes  |✔| No

Have you ever been convicted of a law violation other than a minor traffic violation?    | | Yes  |✔| No

**If you answered "Yes" to any of the above questions, attach an explanation on a separate sheet.**

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED

Beginning with your PRESENT or most recent employment, list in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your specific duties as they relate to the duties of the position for which you are applying. (Attach additional sheets if necessary)

1. Current or Last Employer: **Glenn Ireland II**

Your Official Job Title: **Mental Health Worker I**

Address: **91 Black Creek Rd B'ham, AL 35217**

Type of Business: **State**

| FROM Month / Year | TO Month / Year | Total Months | If part-time, number of hours per week | Beginning Salary $ ___ per ___ | Ending Salary $ ___ per ___ | May we contact employer? | | Yes | | No |
|---|---|---|---|---|---|---|
| 1 | 86 | Present | | | | | |

Number/Title of Employees you Supervised:

Equipment you Operated:

Reason for Leaving:

Describe your Duties in Detail: Habilitating and Rehabilitating mentally-ill and mentally retarded clients by training them self-help skills so that they can become as independently as possible. Also, record data for unusual behavior documentating forms for behavior management, home visits, clients, money distribution, and medical appointments.

2. Employer: **Sears Roebuck & Co.**

Your Official Job Title: **Sales Associate**

Address: **7500 Crestwood Blvd B'ham, AL 35210**

Type of Business: **Retail**

| FROM Month / Year | TO Month / Year | Total Months | If part-time, number of hours per week | Beginning Salary $ ___ per ___ | Ending Salary $ ___ per ___ |
|---|---|---|---|---|---|
| 7 | 80 | Present | | | |

Number/Title of Employees you Supervised:

Equipment you Operated:

Reason for Leaving:

Describe your Duties in Detail: Assist customers with their purchases, set up advertisments, do stock work.

3. Employer South Central Bell

Your Official Job Title Equipment Specialist

Address 3500 Blue Lake Dr. B'ham, Al 35243

Type of Business Tele Communications

| FROM | | TO | | Total Months | If part-time, number of hours per week _____ | Beginning Salary $ _____ per _____ | Ending Salary $ _____ per _____ |
|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | | |
| 12 | 84 | 6 | 85 | | | | |

Number/Title of Employees you Supervised

Equipment You Operated

Reason for Leaving Temporary

Describe your Duties in Detail: Sold telephones and telephone equipment over the telephone to residential customers.

4. Employer U.S. Dept of Commerce

Your Official Job Title Clerk

Address 222-2nd Ave No. B'ham Al

Type of Business Government

| FROM | | TO | | Total Months | If part-time, number of hours per week _____ | Beginning Salary $ _____ per _____ | Ending Salary $ _____ per _____ |
|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | | |
| 3 | 80 | 7 | 80 | | | | |

Number/Title of Employees you Supervised

Equipment You Operated

Reason for Leaving Temporary

Describe your Duties in Detail: Went over the 1980 Census forms to make sure all of the information

5. Employer V.A. Medical Center Drug & Alcohol Center

Your Official Job Title (Student) Field Placement

Address 1717- 11th Ave So. B'ham, Al

Type of Business Government

| FROM | | TO | | Total Months | If part-time, number of hours per week _____ | Beginning Salary $ 0 per _____ | Ending Salary $ _____ per _____ |
|---|---|---|---|---|---|---|---|
| Month | Year | Month | Year | | | | |
| 9 | 89 | 11 | 89 | | | | |

Number/Title of Employees you Supervised

Equipment You Operated

Reason for Leaving Field Placement

Describe your Duties in Detail: Interviewed clients with drug and Alocohol additions.

6. Using the above format, show other experience by using additional sheets.

Your application will be placed in our current files for one year, and you will be notified of any vacancies for which you qualify at those facilities in which you express an interest. Please indicate below at which of our facilities you would consider employment. You will only be sent announcements of openings at those facilities which you check. After one year and after each succeeding year, you will need to contact this office and request that your application remain in our active files and/or submit an updated application. Failure to do so will result in your name being removed from our mailing list and your application will be destroyed.

# LOCATIONS



## Mental Illness Facilities

| | Bryce State Hospital — Tuscaloosa, AL

| | Searcy State Hospital — Mt. Vernon, AL

| | Eufaula Adolescent Adjustment Center — Eufaula, AL

| | North Alabama Regional Hospital — Decatur, AL

| | Thomasville Adult Adjustment Center — Thomasville, AL

| | Hardin Secure Medical Facility — Tuscaloosa, AL

| | Greil Psychiatric Hospital — Montgomery, AL

## Mental Retardation Facilities

| | Partlow State School & Hospital — Tuscaloosa, AL

| | Albert P. Brewer Developmental Center — Mobile, AL

| | Lurleen B. Wallace Developmental Center — Decatur, AL

| | I.S.Tarwater Developmental Center — Wetumpka, AL

| X| Glenn Ireland II Developmental Center — Birmingham, AL

| | Central Administrative Offices — Montgomery, AL

What is the minimum annual salary that you would consider? _____

Are you willing to accept shift work during evening and night hours?   Yes |  |    No |  |

# AUTHORITY TO RELEASE INFORMATION

TO WHOM IT MAY CONCERN:

I hereby authorize the Security Division or Personnel Office of the Alabama Department of Mental Health and Mental Retardation bearing this release or copy thereof, within six (6) months of this date, to obtain any information in your files pertaining to my previous employment, educational records and/or transcripts, arrests and/or conviction records and any medical record reflecting treatment or care for any illness or disability sustained by me within the past three (3) years. I hereby authorize you to release such records or information upon request of the bearer of this release document. The information you supply will be used principally as a basis for an investigation to determine my qualifications, suitability and fitness for employment with the Alabama Department of Mental Health and Mental Retardation. I hereby release you as the custodian of such records from any and all liability damages which may result to me, my heirs or family, because of compliance with this authorization and request to release information, or any attempt to comply with it. Should there be any question as to the validity or authenticity of this release, you may contact me as indicated below.

FULL NAME _Audrey D. Finch_
(No Initials Please!)             Signature

FULL NAME: _Audrey Denise Finch_
                        (Typed or Printed Name)

DATE OF BIRTH _02-06-57_

PLACE OF BIRTH _Birmingham, AL_

WITNESS: _____   TITLE _____

SOCIAL SECURITY NUMBER _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_

CURRENT ADDRESS _1309-21st St. No. #101_
_Birmingham, AL 35234_

DATE _8/2/90_



STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

**GLENN IRELAND II DEVELOPMENTAL CENTER**
**REGION V**

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217

PHONE (205) 849-0654

BILLY R. STOKES, Ed.D., M.B.A.
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

ELLEN B. GILLESPIE, Ph.D.
REGIONAL DIRECTOR

GUY HUNT
GOVERNOR

ROYCE G. KING
COMMISSIONER

January 19, 1993

8846:056

Mr. Jonathan Frank Graves
295 Retreat Lane
Columbiana, AL  35051

Ref:  Habilitation Treatment Coordinator I

Dear Mr. Graves:

This letter confirms your appointment to the above named classification at Glenn Ireland II Developmental Center.  Your rate of pay will be $ __964.90__  bi-weekly. Since State government requires a two week delay in processing payroll, you will receive your first paycheck from our Department four weeks after your appointment date.  Your first day of employment will begin on __January 25, 1993__ .  Please report to the Personnel Office at 8:00 a.m. for orientation.  Prior to reporting to your assigned work area, you will be required to participate in and successfully complete an extensive orientation training which will be conducted by our Staff Development Department.

Please bring your Social Security card with you and be prepared to designate two beneficiaries related to insurance and retirement programs.  You will be asked to provide the name, address and birthdate of these beneficiaries.  In addition, you will be given an opportunity to choose your group health insurance plan with either Blue Cross/Blue Shield or Complete Health.  Also, you will be given an opportunity to enroll your eligible dependents under the plan you choose.  Coverage for your dependents may be effective the day you report for work if you so choose. The monthly rate to cover your dependents will be $ __152.00__  per month.

Your appointment is contingent upon the completion of a favorable background and security check which we have already begun.  Also, all new employees will be required to have a full screening for hepatitis during their probationary period. A further condition of employment requires that you must have the university/college from which you graduated foward an original transcript with an official seal attesti to its validity to us.  We cannot accept a substitute, a copy of a transcript or one delivered to us except from the university/college.  Failure to have this documentat furnished to us will result in termination of your employment.  If this document has been furnished previously, please advise us when you report to work.

We welcome you as a valued employee of the Glenn Ireland II Developmental Center and look foward to many years of association in the future.

Sincerely,

Jim Elliott
Assistant  Personnel Officer

DEFENDANT'S
EXHIBIT
1105

cc:  Director's Office
Staff Development
Executive Department Head
Department Head



STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH
# AND MENTAL RETARDATION

**GLENN IRELAND II DEVELOPMENTAL CENTER
REGION V**

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217

PHONE (205) 849-0654



BILLY R STOKES, Ed.D., M.B.A.
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

ELLEN B GILLESPIE, Ph.D.
REGIONAL DIRECTOR

GUY HUNT
GOVERNOR

ROYCE G KING
COMMISSIONER

### ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT SYSTEM POSITION
### WE ARE AN EQUAL OPPORTUNITY EMPLOYER

| | |
|---|---|
| **JOB TITLE:** HABILITATION/TREATMENT COORDINATOR I | **NUMBER:** 91 – 20 |
| **JOB CODE:** 02000 | **POS. #:** 8846086 |
| **SALARY RANGE:** 67($20,615 – $31,278) | **DATE:** 09-09-92 |

**JOB LOCATION:** GLENN IRELAND II DEVELOPMENTAL CENTER
91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217

**QUALIFICATIONS:** Master's degree in psychology, vocational/rehabilitation counseling, social work or special education. Licensure and/or certification as required by the State of Alabama. Habilitation/Treatment Coordinator I does not require expeience.

**KIND OF WORK:** Insure individual's rights to privacy, dignity and humane care. Insure individual's are scheduled for appropriate type, quality and quantity of programming. Insure that individual records are maintained in accorance with prescribed procedures. Insure accurate upkeep of training and behavior management data. Insure that at least annual staffings are held for each individual and that progress reports are undated monthly. Respond to habilitation team's recommendations. Coordinate service delivery. Develop and approve, as necessary, development of behavior management programs. Monitor and insure quality of programs under their supervision. Assists in the inservice and assigning of staff. Updated and insure filing of individual's habilitation plans. Review program progress of each individual on a 30 day basis. Summarize progress and records recommendations on QMPP monthly progress notes. Approve the use of time-out, restraint and restriction for individuals. Monitor safety and cleanliness of living conditions. Review programmatic data, shift reports. Serve as responsible QMRP for assigned caseload. Ensure implementation of standards required by Court Order and Title XIX. Monitor implementation of IHP.



DEFENDANT'S EXHIBIT
PENGAD-Bayonne, N.J.
1106

HABILITATION/TREATMENT COORDINATOR I
PAGE 2

REQUIRED KNOWLEDGE, SKILLS AND ABILITIES:  Considerable
knowledge of psychological principles and techniques applied
in a mental retardation setting.  Competency is expected in
the following areas:  interdisciplinary team approach,
individual advocacy, objective writing, development,
assessment and interpretation, program development, learning
and behavior modification theory and direct application, IHP
development and implementation, program review of progress,
program updating and revision, program monitoring,
professioanl report writing.  Clinical judgement utilizing
acceptable clinical practices within the field of mental
retardation.  Cooperative leadership.  Planning and
implementing of community, residential and program
placement.  Knowledge of current literature regarding
treatment of the mentally retarded.  Working knowledge of
ICF/MR regulations and Wyatt Court Order Standards.

METHOD OF SELECTION:  Applicants will be rated on the basis
of an evaluation of their training, experience and
education, and should provide adequate work history
identifying experience related to the duties and minium
qualifications as mentioned above.  All relevant information
is subject to verification.

HOW TO APPLY:  Use an Official Application for Professional
Employment which may be obtained from this office.
Application should be returned to the Personnel Office at
the above address.  In order to be considered for this
position, your application should be received by _____
_____.

# APPLICATION FOR PROFESSIONAL EMPLOYMENT
## Exempt Classification

RETURN TO:
Glenn Ireland II
Developmental Center
91 Black Creek Road
Tarrant, Alabama 35217

**RECEIVED**
JUN 11 1992
PERSONNEL

**GENERAL INSTRUCTIO**

Complete all portions c
application that are applica
you and the position for whic
are applying. Failure to do s
result in your not being cons
for the position for which y
~~pplying. Type or print clearl

## AN EQUAL OPPORTUNITY EMPLOYER

| Full Name | Terry | Durand | Avery |
|---|---|---|---|
| | First | Middle | Last |

Address: 4527  18th Ave E  #127
House or Apartment No    Street

Tuscaloosa   Alabama   35405
City    State    Zip Code

Legal Residence: Tuscaloosa   Tuscaloosa   Alabama
City    County    State

NOTE: This Department is an equal opportunity employer. To comply with Federal reporting requirements we must maintain statistics on employment of protected classes.

Title of Position For Which You Are Applying: Administrator II

| Date of Birth | | | Telephone Number |
|---|---|---|---|
| Mo | Day | Yr. | Home (205) 556-195 |
| 06 | 04 | 53 | Office (205) 849-06 |

Place of Birth: Tuscaloosa   Tuscaloosa   Alabam
City    County    State

Social Security Number:

| Sex (Check one) | Age | Race (Check one) |
|---|---|---|
| 1. ✓ Male | 39 | ✓ White   Black |
| 2. Female | | Other |

**EDUCATION**   High school graduate or GED? ✓ Yes   No

If no, circle highest grade completed:  1  2  3  4  5  6  7  8  9  10  11  12

Name and location of business, correspondence, or vocational school attended:

| | FROM (Mo) (Yr) | TO (Mo) (Yr) | Did you Graduate? | Area of Study |
|---|---|---|---|---|

| Name and location of Colleges and Universities Attended | FROM (Mo) (Yr) | TO (Mo) (Yr) | Did you Graduate? | Field(s) of Study Major(s) | Minor(s) | D an |
|---|---|---|---|---|---|---|
| Brewer State Jr. College, Fayette | 09 72 | 04 74 | NO | Bus Admin | Currently enroll | |
| U of A  Tuscaloosa | 09 74 | 12 74 | NO | Bus Admin | external degree | |

Graduate or Professional School

If you attended college, but did not graduate, show credit received.  Sem. hrs. 50   Qtr. hrs.

List professional certificate(s) or license(s) and state where is
Al Peace Officer Standards Training  UofA
Certified Instructor  Al Peace Office

List below courses included in your education which are particularly related to the duties or qualifications of the position for which you are

| Subjects | Sem hrs | Qtr hrs | Subjects | Sem |
|---|---|---|---|---|
| Business Law | 3 | | Certified Public Manager  Level I | NC |
| Statistical Method | 6 2/3 | | Supervisor Training | |
| Written Business Comm | 3½ | | | |
| English Literature | 3⅓ | | | |
| Leadership Training | NC | | | |

DEFENDANT'S EXHIBIT 1109   PENGAD-Bayonne, N.J.

**CERTIFICATE** (Must be signed in ink by applicant:
I certify that all statements on or attached to this application are true and correct to the bes     and that any fal
may cause me to be refused the opportunity of employment or cause my employment to be immediately terminated without recourse to
protection provided by law.

Signature: _Avery_    Date: June 11, 1992

## REFERENCES

List three reliable persons, not relatives or present employer, who know you well enough to give information about you

| Name | Address | Occupation |
|---|---|---|
| Richard E. Koerner | DMH/MR 200 Interstate Pk Montg Al | Chief Investigator |
| ___ K. Long | HARDEN SMF 1301 River Rd N.E. Twe Al | Personnel Officer |
| Lveta Barr | 4301 24th Ave Twc Al | Owner - Quality MAZDA |

Do you have any physical handicaps or health problems that would keep you from doing the kind of work for which you are making application?

Have you ever been involuntarily terminated or forced to resign from a position?                | | Yes  | ✓ | No

Have you ever been convicted of a law violation other than a minor traffic violation?           | | Yes  | ✓ | No

**If you answered "Yes" to any of the above questions, attach an explanation on a separate sheet.**   | | Yes  | ✓ | No

## WORK HISTORY

### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED

Beginning with your PRESENT or most recent employment, list in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your specific duties as they relate to the duties of the position for which you are applying. (Attach additional sheets if necessary)

**1. Current or Last Employer**
W. D. Partlow Developmental Center

**Your Official Job Title**
DMH/MR Security Officer IV (MAJOR)

**Address**
P.O. Box 1730 Tuscaloosa Al 35403

**Type of Business**
MR Developmental Center

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week | Beginning Salary | Ending Salary | May we contact employer? |
|---|---|---|---|---|---|---|
| 01/89 | 1/92 | 26 | | $ ___ per ___ | $1232 per B/wk | ✓ Yes  | | No |

**Number/Title of Employees you Supervised**
2- CAPTAINS / 6- Officers / 5- OPERATORS

**Equipment you Operated**

**Reason for Leaving**

**Describe your Duties in Detail:** Administrative work Involving day to day operations of Police & Communication Division. Developed, revised and monitored police and procedures for the effective delivery of services. Served on Utilization Review And Policy and Procedure Committee. Coordinator for Facility Investigation into allegation of abuse, neglect, mistreatment of individuals who receive services, insured Investigation Conducted within Policy And Procedure of Facility And Alabama State Law. Liaison with Local and State Police Departments developed training for Community Providers Regarding Investigation Techniques and instructed

**2. Employer**
DMH/MR

**Your Official Job Title**
Mental Health Investigator

**Address**
200 Interstate Park

**Type of Business**

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week | Beginning Salary | Ending Salary |
|---|---|---|---|---|---|
| 10/81 | 01/89 | 90 | | $ ___ per ___ | $1015 per B/wk |

**Number/Title of Employees you Supervised**
2- MH INV / 1- Clerk

**Equipment you Operated**

**Reason for Leaving**
Promotion to Partlow

**Describe your Duties in Detail:** Advanced Investigative work Involving Allegations, Complaints And Incidents which the department deemed worthy of Investigation. Responsibilities included travel, meeting with Directors and others appropriate to Investigation, providing verbal and written testimony, Liaison with Community Law Enforcement and supervision of section for 2 years. Met with Director of Legal, and Coordinated Investigation Assigned to the division And reviewed results with appropriate person to ensure Follow up actions.

Bryce Hospital

**Your Official Job Title**
Police Officer I

**Address**
200 Univ Blud E Tuscaloosa Al

**Type of Business**
MH Institution

| FROM | | TO | | Total Months | If part-time, number of hours per week | | Beginning Salary | Ending Salary |
|------|--|----|--|-------------|------------------|--|------------------|---------------|
| Month 11 | Year 76 | Month 10 | Year 81 | 61 | | | $_____ per _____ | $_____ per _____ |

**Number/Title of Employees you Supervised**
Ofc on Absence of Superv

**Equipment you Operated**
Two way Comm

**Reason for Leaving**
Promotion to Investigator

**Describe your Duties in Detail**
Routine security work in protecting state property and maintaining a secure environment. Patrolled ground and assisted in Fire/Safety. Division 1980-1981 helped organize the Bryce Investigative Division and conducted investigations into allegations, complaints, providing written and verbal reports to appropriate personnel. Assisted in training other officers in Investigative skills.

---

**4. Employer** Avery's Portable Buildings

**Your Official Job Title**
Owner-Operator

**Address**
1806 Hargrove Rd E. Tuscaloosa, Al

**Type of Business**
Sale and Service

| FROM | | TO | | Total Months | If part-time, number of hours per week | | Beginning Salary | Ending Salary |
|------|--|----|--|-------------|------------------|--|------------------|---------------|
| Month 02 | Year 75 | Month 02 | Year 79 | 49 | | | $_____ per _____ | $_____ per _____ |

**Number/Title of Employees you Supervised**
Extra help sale and delivery

**Equipment you Operated**
Truck and Loading Equipment

**Reason for Leaving**
Closed to devote time to B

**Describe your Duties in Detail**
Established a Portable Building Unit Retail Sale Center, located supplier and worked on contract basis to purchase and service the Superior Brand of Building. Hired and trained Sale help and delivery help on the appropriate techniques. Worked with General Public and with industrial purchasing agents.

---

**5. Employer** Wee Tot School

**Your Official Job Title**
Co-Owner

**Address**
24 Lakeview Tuscaloosa, Al

**Type of Business**
Child Day Care

| FROM | | TO | | Total Months | If part-time, number of hours per week | | Beginning Salary | Ending Salary |
|------|--|----|--|-------------|------------------|--|------------------|---------------|
| Month 1 | Year 76 | Month 7 | Year 79 | 42 | | | $_____ per _____ | $_____ per _____ |

**Number/Title of Employees you Supervised**
Teacher and labor help

**Equipment you Operated**

**Reason for Leaving**
Closed center

**Describe your Duties in Detail**
Purchased an Established day care center, and assisted with day to day operation. Scheduled work and activities to insure quality day care, Assisted with direct care of children and met with parents and staff regarding care.

---

6. Using the above format, show other experience by using additional sheets

...ress _Tuscaloosa News_

_6ᵗʰ St Tuscaloosa_

Your Official Job Title _Composer_

| FROM | | TO | | Total Months | If part-time, number of hours per week _____ |
|------|------|------|------|------|------|
| ...s' | | 07 | 75 | 38 | |
| ...r Year | Month | Year | | | |

Type of Business _News Paper_

Beginning Salary $ ____ per ____

Ending Salary $ ____ per ____

...mber, Title of Employees you Supervised

Equipment you Operated _Typesetting, Camera, Photography_

Reason for Leaving _to open own business_

...scribe your Duties in Detail: _Composed advertisements for News Paper, operated typesetting equipment, Camera Negative equipment, Composed Page of type for review of editor. Assisted back up Foreman as needed_

---

...mployer _Tuscaloosa News_

...ress _6ᵗʰ St, Tuscaloosa, Al_

Your Official Job Title _INDEPENDENT CONTRACTOR_

| ...OM | | TO | | Total Months | If part-time, number of hours per week _____ |
|------|------|------|------|------|------|
| ...62 | 05 | 90 | | | |
| Year | Month | Year | | | |

Type of Business

Beginning Salary $ ____ per ____

Ending Salary $ ____ per ____

...er/Title of Employees you Supervised

Equipment you Operated

Reason for Leaving _Retired_

...ibe your Duties in Detail: _Managed a daily subscriber Route, contact with Customers ...re two Adults who worked for me throwing route. Maintained ...cord of Payments and Appropriate documentation as required_

---

...oyer

Your Official Job Title

| | TO | | Total Months | If part-time, number of hours per week _____ |
|------|------|------|------|------|
| ...r | Month | Year | | |

Type of Business

Beginning Salary $ ____ per ____

Ending Salary $ ____ per ____

.../Title of Employees you Supervised

Equipment you Operated

Reason for Leaving

...your Duties in Detail:

---

...e above format, show other experience by using additional sheets.

Duties (Cont)   W.D. Partlow Center

Same. Conducted harassment investigation with Personnel Officer, met with Personnel Officer, and Director regarding findings of all investigation and discussed appropriate disciplinary and criminal actions. Reorganized facility parking policy. And monitored procedures to insure compliance with Alabama State Law.

In August 1991, temporarily assigned to Glenn Deeland Developmental Center in Tarrant, Alabama to assist in the reorganization of the Police and Communication Section. Provide coordination of facility investigations, assistance to Bureau of Special Investigation when needed. Assist in recommending appropriate action regarding investigations to Regional and Facility Director. Review potential applicant files and provide testimony in PDC's and court matters as required. Developed investigative inservice for officers, staff and community providers and instructed same. Guest instructor for Decatur Police Department, presentation on how to recognize and handle emotionally disturbed. Serve on various special task force committees as assigned, liaison with local, State Law Enforcement staff. Presentation scheduled for September 1992 on investigative techniques for Mental Health Board Conference.

Continue to be guest instructor for U of A Law Enforcement Academy in Tuscaloosa.

Community involvement include F.O.P, Al. Peace officers, United Way, religious organizations.

# FREEDOM COURT REPORTING

Page 1

```
1        UNITED STATES DISTRICT COURT
2        MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4    AUDREY D. FINCH,
5        Plaintiff,
6    Vs.         2:07CV24-MHT
7    STATE OF ALABAMA PERSONNEL
8    DEPARTMENT, et al.,
9        Defendant.
10
11   DEPOSITION OF:  AUDREY D. FINCH
12
13       In accordance with Rule 5(d) of the
14   Alabama Rules of Civil Procedure, as
15   Amended, effective May 15, 1988, I, Susan
16   Masters Goldman, CSR, License Number 83, am
17   hereby delivering to WARREN B. LIGHTFOOT,
18   JR., ESQ., the original transcript of the
19   oral testimony taken on the 20th day of
20   November, 2007, along with exhibits.
21       Please be advised that this is the
22   same and not retained by the Court Reporter,
23   nor filed with the Court.
```

Page 2

```
1        UNITED STATES DISTRICT COURT
2        MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4    AUDREY D. FINCH,
5        Plaintiff,
6    Vs.         2:07CV24-MHT
7    STATE OF ALABAMA PERSONNEL
8    DEPARTMENT, et al.,
9        Defendant.
10           STIPULATION
11       IT IS STIPULATED AND AGREED, by and
12   between the parties through their respective
13   counsel, that the deposition of AUDREY D.
14   FINCH, taken before Susan Masters Goldman,
15   Certified Shorthand Reporter, License Number
16   83, and Notary Public at Maynard, Cooper &
17   Gale, 2400 AmSouth Harbert Plaza,
18   Birmingham, Alabama, on the 20th day of
19   November, 2007, commencing at 10:00 a.m.
20       IT IS FURTHER STIPULATED AND AGREED
21   that the signature to and the reading of the
22   deposition by the witness is waived, the
23   deposition to have the same force and effect
```

Page 3

```
1    as if full compliance had been had with all
2    laws and rules of Court relating to the
3    taking of deposition.
4        IT IS FURTHER STIPULATED AND AGREED
5    that it shall not be necessary for any
6    objections to be made by counsel as to any
7    questions, except as to form or leading
8    questions, and that counsel for the parties
9    may make objections and assign grounds at
10   the time of the trial, or at the time said
11   deposition is offered in evidence, or prior
12   thereto.
13       IT IS FURTHER STIPULATED AND AGREED
14   that notice of the filing of the deposition
15   by the Commissioner is waived.
16            INDEX
17   EXAMINATION BY           PAGE NO.
18   Mr. Lightfoot          6; 90
19   Ms. Byrne              53
20          EXHIBITS
21   Defendant's One          55
22   Defendant's Two          79
23
```

Page 4

```
1         APPEARANCES
2    BEFORE:
3        Susan Masters Goldman, CSR, License Number
4    83, and Notary Public.
5    APPEARING ON BEHALF OF THE PLAINTIFF:
6        Joseph H. Calvin, III, Esq.
7        Wiggins, Childs & Quinn & Pantazis
8        The Kress Building
9        301 - 19th Street North
10       Birmingham, Alabama 35203
11   APPEARING ON BEHALF OF THE DEFENDANTS:
12       Warren B Lightfoot, Jr. Esq.
13       Theodore P. Bell, Esq.,
14       Maynard, Cooper & Gale
15       2400 AmSouth Harbert Plaza
16       Birmingham, Alabama 35203
17
18       Tamara R. Pharrams, Esq.
19       State of Alabama
20       64 North Union Street
21       Montgomery, Alabama 36130
22
23
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

```
1   APPEARANCES CONTINUED:
2     Alice Ann Byrne, Esq.
3     State of Alabama
4     64 North Union Street
5     Montgomery, Alabama 36130
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
```

Page 6

```
1      I, Susan Masters Goldman, CSR, License
2   Number 83, acting as Notary Public, certify
3   that on this date as provided by Rule 30 of
4   the Alabama Rules of Civil Procedure, and
5   the foregoing stipulations of counsel, there
6   came before me at the law offices of
7   Maynard, Cooper & Gale, 2400 AmSouth Harbert
8   Plaza, Birmingham, on the 20th day of
9   November, 2007, at or about 10:00 a.m.,
10  AUDREY D. FINCH, witness in the above cause,
11  for oral examination, whereupon, the
12  following proceedings were had:
13
14          AUDREY D. FINCH
15  after having been first duly sworn,
16  testified as follows:
17
18  EXAMINATION BY MR. LIGHTFOOT:
19    Q. Mrs. Finch, my name is Warren
20  Lightfoot. I think we met six years ago
21  when I took your deposition. I'm going to
22  be asking you some follow-up questions
23  today; some additional and some follow-up
```

Page 7

```
1   questions.
2      Do you understand you're under oath
3   here today?
4      A. Yes.
5      Q. And as I ask you questions here today,
6   I want you to let me know if you don't
7   understand any question that I ask, and then
8   please tell me if you don't and ask me to
9   clarify and I'll be happy to do so.
10  Otherwise, if you answer my questions, I
11  will assume that you understood what I was
12  asking. Okay?
13     A. Yes.
14     Q. Please answer all my questions
15  verbally. If it's a yes or no answer, with
16  a yes or a no instead of like an uh-huh or
17  an huh-uh or nodding of the head the way we
18  all talk, but we just need to do it for a
19  clean record. Okay?
20     A. Yes.
21     Q. Are you on any medication today that
22  prevents you from hearing me or thinking
23  clearly or understanding me?
```

Page 8

```
1      A. No.
2      Q. Okay. Let's see. State your name for
3   the record, please?
4      A. It's Audry Denise Finch.
5      Q. Okay. What's your current address,
6   Mrs. Finch?
7      A. 825 Seven Springs Drive, Birmingham
8   Alabama, 35215.
9      Q. Okay. Was that the same residence
10  that you had when I deposed you six years
11  ago?
12     A. Yes.
13     Q. Okay. So you have lived there for
14  some time?
15     A. Yes.
16     Q. All right. Where are you currently
17  employed?
18     A. I'm employed with the State of Alabama
19  Disability Determination Service.
20     Q. Okay. I believe when I deposed you
21  back in 19 -- in 2001, you were employed
22  with Disability as well then; correct?
23     A. Yes.
```

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 9

1  Q. And in fact, you went straight from
2  Mental Health to Disability; right?
3  A. No.
4  Q. Oh, there was somewhere in between.
5  Okay. Where did you go after Glen Ireland
6  closed?
7  A. Let me think back. After Glen Ireland
8  closed, I went to Seraaj Family Home.
9  Q. I'm sorry?
10  A. I went to Seraaj Family Home.
11  Q. That's not a State of Alabama
12  position?
13  A. No.
14  Q. I don't even know if I asked you
15  this -- I may have asked you this in the
16  last deposition, but let's talk about it
17  anyway. S-A-R --
18  A. S-E-R-A-A-J.
19  Q. All right. And would that have been
20  in approximately March of '06 -- March of
21  '96?
22  A. I'm thinking it was -- it was in '96,
23  but I don't think it was March of '96. I

Page 10

1  can't remember the exact date.
2  Q. Glen Ireland closed somewhere around
3  March of '96; correct?
4  A. Right.
5  Q. Okay. Do you recall how long a gap
6  there was before you went to Seraaj?
7  A. I can't really say. It may have been
8  about two or three months. I'm not really
9  sure at this point.
10  Q. Okay. All right. And how long did
11  you work at Seraaj, approximately?
12  A. Approximately about four months.
13  Q. Okay. And what did you do there?
14  A. I was a therapist.
15  Q. All right. Do you remember what your
16  rate of pay was?
17  A. Twenty-five dollars an hour.
18  Q. Okay. And was that in Birmingham?
19  A. Yes.
20  Q. Where did you go after that?
21  A. After that, I went to Hillcrest
22  Behavioral Health.
23  Q. What is Hillcrest Behavioral Health?

Page 11

1  A. I worked in the group home. I worked
2  with the residents. It's a hospital for
3  people that's mentally ill.
4  Q. Is it State of Alabama?
5  A. No.
6  Q. Okay. And do you recall when you
7  started there?
8  A. December '96.
9  Q. Okay. And about how long were you
10  there?
11  A. About four and a half years.
12  Q. Okay. Do you remember what your
13  starting and ending rates of pay were,
14  approximately?
15  A. Maybe -- I'm not exactly sure.
16  Probably about eleven dollars an hour.
17  Q. Would that be when you started?
18  A. Yes.
19  Q. And then when you finished, do you
20  recall what it was?
21  A. I don't remember.
22  Q. Was it higher than eleven?
23  A. Yes.

Page 12

1  Q. Okay. All right. And then where did
2  you go after Hillcrest?
3  A. I had another job in between some of
4  those. I worked with PHP of Alabama, too.
5  Q. PHP?
6  A. Yes, of Alabama.
7  Q. Okay. What is PHP?
8  A. It's mental health. A group home.
9  Q. It's a group home. It's not owned by
10  the State?
11  A. No.
12  Q. It's not run by the State?
13  A. No.
14  Q. Was Hillcrest in Tuscaloosa?
15  A. In Birmingham.
16  Q. Birmingham. And what about PHP?
17  A. In Birmingham.
18  Q. Okay. All right. And how long do you
19  think you worked at PHP?
20  A. About four months.
21  Q. Was that prior to Hillcrest?
22  A. I think it was in between Hillcrest or
23  before Hillcrest --

3 (Pages 9 to 12)

# FREEDOM COURT REPORTING

Page 13

1    Q. Okay.
2    A. -- because they may have been
3  simultaneously.
4    Q. All right.  Do you remember what your
5  rate of pay was at PHP?
6    A. I'm not sure.
7    Q. Okay.  Where did you go after
8  Hillcrest?
9    A. Disability.
10   Q. All right.  And what's the official
11 name of the department?
12   A. It's under the Department of
13 Education, Disability Determination Service.
14   Q. Disability Determination Service.  And
15 you are a merit system employee?
16   A. Yes.
17   Q. And did you start there in 2001?
18   A. '97.
19   Q. Oh, '97.
20   A. June 9th, '97.
21   Q. All right.  Let's see.  I'm little
22 confused.  Weren't you working at Disability
23 when I deposed you back in 2001?

Page 14

1    A. I was.
2    Q. Have you worked there for sort of two
3  separate tenures?
4    A. No.
5    Q. Did you work there one time and left
6  and came back, or is it just one continuous
7  time?
8    A. It's continuous.
9    Q. Do you think you started there in '97?
10   A. I started in '97.
11   Q. So you have now worked there ten in a
12 row?
13   A. I have worked there ten years.
14   Q. Oh, okay.  All right.  Did you also
15 work at Hillcrest Behavioral Health while
16 you were at Disability?
17   A. Yes.
18   Q. Got you.  You worked two jobs?
19   A. I worked -- actually, I still work at
20 Sears, so Sears should be in there
21 somewhere.  I work at Sears at Century
22 Plaza.
23   Q. All right.

Page 15

1    A. I have worked there for twenty-seven
2  years.  I work there part-time.
3    Q. Sears part-time, twenty-seven years.
4  And you are still there?
5    A. Yes.
6    Q. And what do you do at Sears?
7    A. I'm a cashier.
8    Q. That's in Birmingham?
9    A. Yes.
10   Q. Okay.  Which Sears?
11   A. Century Plaza.
12   Q. Century Plaza.  All right.  Do you
13 think you went to Disability some time in
14 '97, which would have been the year after
15 Glen Ireland closed?
16   A. June 9th, 1997.
17   Q. Okay.  And you have been there for
18 about -- well, it looks like it's just over
19 ten years.
20   A. Yes.
21   Q. Okay.  And do you remember what your
22 starting rate of pay was at Disability,
23 maybe your biweekly salary?

Page 16

1    A. I think about twenty-two thousand a
2  year.
3    Q. You ended at Glen Ireland somewhere in
4  the vicinity of eight hundred and
5  seventy-seven dollars biweekly.  Does that
6  sound right?
7    A. That sounds right.
8    Q. So do you know what you started at at
9  Disability?
10   A. The same.
11   Q. The same, eight seventy-seven?
12   A. Uh-huh.
13   Q. Okay.  And what do you make now at
14 Disability, approximately?
15   A. Nineteen sixty-nine twenty-two
16 biweekly.
17   Q. Nineteen sixty-nine twenty-two?
18   A. Yes.
19   Q. Okay.  And I assume that is from a
20 series of raises over the past ten years?
21   A. Yes.
22   Q. Have you ever gone back to work for
23 the Mental Health Department since 1996?

4 (Pages 13 to 16)

# FREEDOM COURT REPORTING

Page 17

1    A. No.
2    Q. Have you ever applied to go back to
3  work at the Mental Health Department since
4  1996?
5    A. I am not sure of that question.
6    Q. Okay. I am not aware, and that's just
7  from a review of your file, I'm not aware of
8  you ever applying to go back to Mental
9  Health, but please tell me if you're aware
10  of any time that you have.
11    A. I am not aware.
12    Q. Okay. So you worked for Mental
13  Health, I believe, for about a ten year
14  period, from '86 to '96?
15    A. Yes.
16    Q. And the first place you ever worked
17  was at Glen Ireland -- in fact, the only
18  place you ever worked was at Glen Ireland
19  for Mental Health; is that right?
20    A. Yes.
21    Q. Is the Glen Ireland facility still
22  closed?
23    A. Yes.

Page 18

1    Q. Okay. It looks to me like in terms of
2  your raises, it looks to me like you started
3  out -- well, let me just read it out to you
4  and you tell if you know any differently.
5  It looks to me like you started out at
6  Mental Health at roughly four hundred and
7  eight dollars bi-weekly. And then I have
8  you in 1990, which is four years later,
9  going up to five hundred and nine dollars.
10  And all these numbers are biweekly. Okay?
11  Just like we talked about that nineteen
12  sixty-nine number, which is the biweekly
13  number at Disability. In '91, I have you
14  going to five seventy-four. And then you
15  got at promotion in 1991 to be an HTS. Do
16  you remember that?
17    A. Yes.
18    Q. And I have that rate as seven hundred
19  and seventeen dollars biweekly. And then I
20  have a series of raises, in '92 going to
21  seven hundred and thirty-five dollars; in
22  '93 seven hundred and fifty-four dollars,
23  and I'm not telling you the cents; in 1994

Page 19

1  seven hundred and seventy-three dollars, and
2  then I have in 1995 that there were no merit
3  raises, and that was declared by SPD. And
4  then 1996, I have you going to eight hundred
5  and seventy-seven dollars biweekly.
6    Do those amounts sound about right to
7  you, or do you have some reason to think
8  that any of those are wrong?
9    A. I'm not sure if they are correct or
10  not.
11    Q. Okay. Do you remember what your
12  ending rate was, approximately, eight
13  hundred and seventy-seven dollars biweekly
14  at the time the Glen Ireland facility closed
15  in approximately March of '96?
16    A. Repeat the question.
17    Q. Eight hundred and seventy-seven
18  dollars biweekly, that's what I have as your
19  ending rate at Glen Ireland in March of '96.
20  Does that sound about right?
21    A. That sounds right.
22    Q. Were you aware of times that there
23  were no merit raise for any State employees;

Page 20

1  in other words, freezes that were put on and
2  no raises during a couple of occasions
3  during your employment at Mental Health?
4    A. There were several times that we
5  didn't get a pay increase, but I can't tell
6  you exact years.
7    Q. Okay. I have one of them as 1995,
8  which would been the year before the Glen
9  Ireland facility closed. Do you recall that
10  one?
11    A. I don't recall which year.
12    Q. Okay. How did you learn if a freeze
13  had been put in place by the State; in other
14  words, informed that there will be no merit
15  raises during a given year?
16    A. They would send a memo out.
17    Q. Okay. And you do remember receiving
18  that at some point at Mental Health?
19    A. Yes.
20    Q. How many lawsuits have you filed in
21  your life, Mrs. Finch?
22    A. This is the only one.
23    Q. All right. Have you ever been a

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 21

1  defendant in a lawsuit?
2      A. No.
3      Q. Okay. Have you ever filed an EEOC
4  charge other than the one EEOC charge that
5  you filed back in -- well, I can't remember
6  when it was, but it was prior to the last
7  time we deposed you.
8      MR. BELL: '93.
9      Q. (BY MR. LIGHTFOOT) '93, I think.
10     A. No.
11     Q. Is that the only EEOC charge that you
12  have ever filed?
13     A. Yes.
14     Q. Have you filed any other complaints
15  with any administrative or government
16  agencies other than that 1993 EEOC charge?
17     A. No.
18     Q. Okay. Have you ever declared
19  bankruptcy?
20     A. No.
21     Q. Okay. What did you do to prepare for
22  this deposition, Mrs. Finch?
23     A. I don't understand what you mean.

Page 22

1      Q. Okay. Well, at some point your
2  lawyer, your esteemed lawyer told you were
3  going to be deposed today; right?
4      A. May I talk to my attorney?
5      (OFF-THE-RECORD.)
6      A. Can you repeat the question, please?
7      Q. (BY MR. LIGHTFOOT) Did you meet with
8  your attorney to prepare for this
9  deposition?
10     A. I met with him.
11     Q. When was that?
12     A. This morning.
13     Q. Okay. Had you met with him prior to
14  that, since 2001?
15     MR. CALVIN: Well, I am going to
16  object to that. That's not relevant.
17     Q. (BY MR. LIGHTFOOT) All right. The
18  documents that you brought here today, is
19  that responsive to the document request that
20  we put in the deposition notice?
21     A. Rephrase it.
22     MR. CALVIN: Let me answer that.
23     MR. LIGHTFOOT: Go ahead.

Page 23

1      MR. CALVIN: You sent out a document
2  request, a regular document request. I
3  believe that document request was then
4  pasted and copied into the deposition notice
5  itself. As far as I know, they're one in
6  the same document request.
7      MR. LIGHTFOOT: Okay.
8      MR. CALVIN: Are you with me?
9      MR. LIGHTFOOT: I am.
10     Off the record.
11     (OFF-THE-RECORD.)
12     Q. (BY MR. LIGHTFOOT) The documents that
13  are being copied, you saw those documents
14  that your lawyer handed to me, are those the
15  documents that you have that you are aware
16  of that answer those document requests?
17     A. Yes.
18     Q. Okay. That, along with the documents
19  that y'all gave me six years ago at the
20  deposition?
21     A. Yes.
22     Q. Are there any documents that you're
23  aware of that support your claims in this

Page 24

1  lawsuit other than the documents that your
2  lawyer produced at your deposition six years
3  ago and the documents that were given to me
4  here today?
5      A. No.
6      Q. Did you review your deposition, Mrs.
7  Finch, the time when I deposed you? There
8  is a written transcript of your deposition
9  from 2001. You have seen that before;
10  right?
11     A. Yes.
12     Q. Did you read it?
13     A. Yes.
14     Q. When did you read it most recently?
15     A. When I got it.
16     Q. And when was that?
17     A. I don't remember the date.
18     Q. Okay. Has it been within the last
19  couple of weeks?
20     A. No.
21     Q. Okay. Has it been within the last six
22  months?
23     A. I don't remember.

6 (Pages 21 to 24)

# FREEDOM COURT REPORTING

Page 25

1  Q. How did you get it? Did your lawyer
2  send it to you and suggest that you read it?
3  A. Yes.
4  Q. Okay. Was that Mr. Calvin?
5  A. Yes.
6  Q. And did you read it?
7  A. I did.
8  Q. Okay. Did you tell the truth in that
9  deposition?
10  A. I did.
11  Q. Okay. And to the best of your
12  knowledge, was your testimony accurate in
13  that first deposition that you took?
14  A. To the best of my knowledge.
15  Q. Okay. Is there any part of your
16  deposition testimony that you want to change
17  or withdraw in any way?
18  A. Not that I can recall.
19  Q. All right. The deposition was in
20  October of 2001, and then you filed -- or
21  your lawyer on your behalf filed an amended
22  complaint in September of this year, just a
23  few months ago, and -- I guess some of these

Page 26

1  questions will almost be for you, Joe, but
2  let me see what I need to ask you or her.
3  I'm trying to understand what claims you are
4  making in this lawsuit, what claims you are
5  still making, because it looks a little
6  different, the claims you were making at the
7  time I deposed you the first time and the
8  claims that you are now making, so I just
9  want to try to clear that up. For instance,
10  I see promotion claims in both, really. I
11  see promotion claims that talk about three
12  types of positions.
13      MR. CALVIN: Let me see if I can
14  clarify it. This is not the same lawsuit
15  that you examined her in in 2001. That was
16  the Crumb lawsuit where she was a plaintiff
17  intervenor in that case. Okay? Whole
18  different caption. Judge Thompson has, as
19  you know, taken all those intervenors and
20  put them into separate lawsuits for their
21  own individual claims. So the only claims
22  that are before us and before the court are
23  the claims that are in that amendment

Page 27

1  complaint. That amended complaint is not an
2  amended complaint to the complaint that was
3  filed in 2001. It's an amended complaint to
4  the original complaint that was filed in
5  this lawsuit, where y'all filed your motion
6  for more definite statement, motion to
7  dismiss based on the securities case that
8  talked about how specific you have to be.
9  So that's what that amended complaint is.
10  So the only claims that are alive in this
11  lawsuit are what are in that complaint.
12      And for the record, I'm not aware of
13  any claim in this lawsuit that was not
14  covered in the 2001 deposition.
15      MR. LIGHTFOOT: I think you're right.
16  I think you're right. I think there were
17  claims covered in that deposition --
18      MR. CALVIN: Which are no longer
19  alive.
20      MR. LIGHTFOOT: -- which are no longer
21  alive.
22      MR. CALVIN: That's exactly right.
23      MR. LIGHTFOOT: Like the demotion

Page 28

1  claim. And that's what I just want to ask
2  and make clear and get one of the two of you
3  to tell me. For instance, there were some
4  complaints about how Mental Health, she
5  thought, might have manipulated registers
6  and such. To me, that's gone from this
7  lawsuit.
8      MR. CALVIN: I can't say it any more
9  clear, if it's not here -- if it's not in
10  the amended complaint, it's not in this
11  case.
12      MR. LIGHTFOOT: Like the layoff from
13  Glen Ireland?
14      MR. CALVIN: She's never made a claim
15  for that.
16      MR. LIGHTFOOT: Okay. But she did
17  have some testimony, Joe --
18      MR. CALVIN: Because you asked her,
19  but she did not make a claim for that.
20      MR. LIGHTFOOT: She didn't have a
21  written claim, that's right.
22      MR. CALVIN: Didn't make a claim in
23  the lawsuit for it either. I mean, I just

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 29

1  read that testimony this morning.
2       MR. LIGHTFOOT: Okay. That's fine.
3       Q. (BY MR. LIGHTFOOT) All right. In the
4  2001 deposition, there were three different
5  positions that you talked about where you
6  were complaining of race discrimination.
7  You were complaining that you did not
8  receive promotions because of your race with
9  regard to three positions. Those three
10  positions are the HTS position, the HTC or
11  otherwise called HTL position and the
12  Administrator II position. So just in terms
13  of positions, I think there are three
14  positions involved.
15      All right. Also, what I understood
16  you to say in your deposition in 2001, with
17  regard to that first one, with regard to
18  HTS, there are three white people that you
19  have identified that got HTS positions
20  between '86 and '91; you don't know when
21  they got them between '86 and '91, but you
22  know it was in that time period. It was in
23  the time period before you actually got your

Page 30

1  HTS promotion. So I understand you to be
2  complaining about those three promotions
3  that went to white individuals and not you.
4       As to the next type of position, that
5  is the HTC or HTL position. You made a
6  complaint in your deposition of two people
7  who were selected to those positions, two
8  white people who were selected and you
9  weren't. In fact, I remember those names.
10  Those are Diane McCollum and Jonathan
11  Graves.
12      All right. As to the third type of
13  position, that was an Administrator II
14  position, and that person's name was Terry
15  Avery; that was a white person that got that
16  promotion to Administrator II that you
17  didn't get.
18      All right. From your previous
19  deposition, those are the six individual
20  promotions that I'm aware of you claiming
21  that you believe you should have gotten and
22  you didn't and it's because of race
23  discrimination that you didn't get them. Is

Page 31

1  that correct?
2       A. Yes.
3       Q. Okay. Are there any other claims that
4  you're making in this lawsuit in any way
5  other than those six promotions that we've
6  just talked about?
7       MR. CALVIN: You're talking about with
8  regard to Mental Health?
9       MR. LIGHTFOOT: Yes, with regard to
10  Mental Health.
11      A. Repeat the question.
12      Q. (BY MR. LIGHTFOOT) Sure. We have just
13  talked about six positions that you claim
14  you should have gotten. There are three
15  different types of positions and six actual
16  promotions. Are there any claims at all
17  that you are making against Mental Health in
18  this lawsuit other than those six promotion
19  claims that we have just talked about?
20      A. No.
21      Q. Okay. Did all of those positions end
22  in March of 1996, when the Glen Ireland
23  facility was closed?

Page 32

1       MR. CALVIN: Do you mind repeating
2  that?
3       MR. LIGHTFOOT: I don't mind repeating
4  it.
5       Q. (BY MR. LIGHTFOOT) Do you remember
6  when that facility was closed, the Glen
7  Ireland facility in 1996? Do you remember
8  it was close?
9       A. It was closed in November, November
10  '96.
11      Q. Okay. It was closed in November of
12  '96?
13      A. Yes.
14      Q. Okay. Are you aware of any of those
15  positions, those six positions that we just
16  talked about, are you aware of those
17  positions continuing past whatever date the
18  Glen Ireland facility closed?
19      A. Yes.
20      Q. Which of those positions continued
21  past Glen Ireland closing?
22      A. All of them.
23      Q. Okay. Did they continue at some other

8 (Pages 29 to 32)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 33

1  location?
2      A. No.
3      Q. Tell me then what you mean by those
4  positions continuing? I guess I have it in
5  my mind that when a facility closes, all the
6  jobs end at that facility. Are you saying
7  that some of those positions continued after
8  the closing of the facility?
9      A. If I have the question correct, some
10 of those positions continued at other
11 facilities.
12     Q. That's my question. Yeah, that's what
13 I am asking you. Are you aware of any of
14 those positions continuing at other
15 facilities?
16     A. Yes.
17     Q. Okay. Let's go with the most recent
18 one. You talked about the Administrator II
19 position that Terry Avery got in '94 or '95.
20 Did that position continue somewhere else?
21     A. Now, if I'm correct, the positions
22 continued at other facilities because each
23 facility made have had an Administrator II

Page 34

1  or HTC, and they had the HTS's as well. So
2  they would have continued at the other
3  facilities. I don't know if the names were
4  the same, but I believe they continued
5  there.
6      Q. Do you know if Terry Avery continued
7  to be employed with Mental Health after the
8  facility closed, the Glen Ireland facility
9  closed?
10     A. I am not sure.
11     Q. Okay. And are you aware as to
12 whether -- I don't know if Terry Avery was
13 still in that position when it closed, that
14 might have been a year or two after he got
15 the promotion that you're complaining about.
16 Are you aware of that position or anyone in
17 that position going to another facility?
18     A. I am not aware.
19     Q. Okay. What about with regard to
20 Jonathan and Diane, the HTC or HTL
21 positions, are you aware of those positions
22 or the people in them continuing at another
23 facility?

Page 35

1      A. I am not aware if they continued at
2  the other facilities or not because I left
3  March of '96, and the facility did not close
4  until November of '96.
5      Q. Okay. How about with regard to the
6  three people that you have complained about
7  getting the HTS positions, are you aware of
8  those people -- and I think those names are
9  John Justice, Mary Edith Moore and Tim.
10 We don't know Tim's last name. Are you
11 aware that those people or the people in
12 those positions continuing to perform those
13 positions or to perform similar positions at
14 other facilities?
15     A. I am not aware.
16     Q. Did you know where any of those people
17 went when the Glen Ireland facility closed?
18     A. No.
19     Q. And you said you started -- I believe
20 you told me you started Disability in June
21 of 1997?
22     A. Yes.
23     Q. Did you have a period of unemployment

Page 36

1  at all after March of 1996?
2      A. No.
3      Q. Okay. So you either were employed in
4  the gap there -- you know, I never asked you
5  that. With Hillcrest, I think you told me
6  you went there in December of '96; right?
7      A. Yes.
8      Q. All right. Do you still work there?
9      A. No.
10     Q. You told me you worked there four and
11 a half years. Was that a part-time job?
12     A. Yes.
13     Q. And were you also working at
14 Disability during that time that you worked
15 at Hillcrest?
16     A. Yes.
17     Q. Were you ever working at Mental Health
18 while you were working for Hillcrest?
19     A. No.
20     Q. I can't remember if we covered this or
21 not in the previous deposition, but in terms
22 of these six promotions that we're talking
23 about, do you believe you were interviewed

9  (Pages 33 to 36)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 37

1  for each of those positions?  I know we
2  talked about you being interviewed for some
3  of them.  I'm wondering if you recall that
4  you were interviewed for all of those six
5  that you did not get?
6      A. I believe I was interviewed for all of
7  them.
8      Q. Okay.  Do you know if you ever went to
9  like a second stage of interviews for any of
10  them?  I don't even know if that happened.
11  I know sometimes there's a first stage of
12  interviews and a second stage.  Do you
13  recall whether you ever had more than one
14  interview for any of those six?
15      A. I don't recall.
16      Q. Have you ever been to a second
17  interview where you --
18      A. I have.
19      Q. Okay.  Was that at the Mental Health
20  Department?
21      A. I'm not sure.
22      Q. Okay.  I believe I asked you last time
23  with regard to any of those interviews that

Page 38

1  you had for those six positions, I asked you
2  if you recalled who was on the panel of any
3  of those interviews.  And I believe there
4  was one interview where you thought you
5  recalled Dr. Gillespie and Tommy Judd being
6  on the panel.  Do you recall that?
7      A. Yes.
8      Q. Okay.  I don't think -- either I
9  didn't ask or I don't think you told me
10  anybody else that were any of those panels.
11  So let me just ask it.  Let me just try to
12  clean that up a little bit.  Are you aware
13  of anybody that was on those panels for
14  those six selections other than the one --
15  whichever one it was that you testified
16  about where you believed that Dr. Gillespie
17  and Tommy Judd were on the panel?
18      A. I don't recall who else was on it.
19  I'm not sure if another person was on it or
20  not.
21      Q. Well, let me ask my question in a
22  different way to make sure you understand
23  it.  I can walk through all of these if you

Page 39

1  want me to.  For instance, John Justice, and
2  I could say, do you remember who was on the
3  panel that interviewed you for the selection
4  that John Justice eventually got for the HTS
5  position.  Do you know who it was?
6      A. No.
7      Q. Do you know who those panelists were?
8      A. No.
9      Q. Mary Edith Moore, do you remember who
10  those panelists were?
11      A. No.
12      Q. Tim?
13      A. No.
14      Q. Diane McCollum?
15      A. No.
16      Q. Jonathan Graves, I think, is the one
17  where you told me you thought you
18  remembered.
19          MR. BELL:  It was Terry.
20      Q. (BY MR. LIGHTFOOT) Do you remember who
21  was on the panel for Jonathan Graves when he
22  got the job?
23      A. No.

Page 40

1      Q. Terry Avery, that may be the one where
2  you told me you thought Dr. Gillepie and
3  Tommy Judd were on it.
4      A. Yes.
5      Q. But you don't remember who else was on
6  it?
7      A. No.
8      Q. All right.  And just to be clear and
9  to beat this dead horse, can you recall any
10  of the panelists for any of those six
11  interviews?
12      A. I don't recall.
13      Q. Okay.  Do you have any reason to
14  believe that any of those interviewers on
15  any of those six panels were racist towards
16  black applicants or candidates?
17      A. Repeat the question.
18      Q. Sure.  Do you have any reason to
19  believe that any of those interviewers on
20  those panels for those six promotions that
21  we're talking about, any reason to believe
22  that those people were racist towards black
23  candidates?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 41

1  A. No.
2  Q. Okay. Do you have any reason to think
3  that the people above them, after the
4  results came out of the interviews, that the
5  people above them who made the actual
6  decisions about the promotions, do you have
7  any reason to believe that those folks are
8  racist towards black candidates?
9  A. No.
10  Q. Do you have any reason to believe that
11  the people on those interview panels for
12  those six promotions discriminated against
13  you on the basis of race other than what
14  you've already testified to?
15  A. Repeat the question.
16  Q. Sure. Do you have any reason to
17  believe that those interviewers, those
18  people on the panels for those six
19  promotions, do you have any reason to
20  believe that those people discriminated
21  against you on the basis of your race other
22  than for the reasons that you have already
23  testified to?

Page 42

1  A. No.
2  Q. Okay. Are you aware of any of those
3  interviewers or panelists, or the
4  decision-makers above them, are you aware of
5  any of them in the Mental Health Department
6  making any racist statements at any time?
7  A. No.
8  Q. Okay. Do you have any information
9  other than what you've already testified to
10  that suggests that those interviewers or the
11  people above them who actually made the
12  decision after those interview results, that
13  those people were motivated by race in
14  making their selections for those
15  promotions?
16  A. Okay. I don't understand the
17  question.
18  Q. Okay. We're talking about now these
19  people -- we're talking about two different
20  types of people. The people who interviewed
21  on the panels, right, for these six
22  promotions. Do you understand that?
23  A. Yes.

Page 43

1  Q. And we're talking about the people
2  above them who actually made the decisions
3  after they got the interview results.
4  So I'm asking you, do you have any
5  reason to think other than what you've
6  already testified to, that those people were
7  motivated by race in making the promotion
8  decisions that you're complaining about?
9  A. I don't understand the question
10  because you're asking me the people that
11  made the decisions and the people that were
12  above them. I don't understand what you
13  mean when you say the people making the
14  decisions and the ones that were above.
15  Q. All right. Then let me -- that's a
16  fair point. That's sort of a compound
17  question.
18  With regard to the people that
19  interviewed you, just as to them, the people
20  that interviewed you on these six panels, do
21  you have any reason to think they were
22  motivated by race in evaluating the
23  candidates that they heard from other than

Page 44

1  what you've already testified to?
2  A. I still don't understand the question.
3  Q. Okay. Let me just drop that last part
4  off. With regard to the people on those
5  panels, and you were interviewed several --
6  it sounds like you were interviewed six
7  different times at least, right, because
8  we've talked about six promotions that you
9  didn't get that you're complaining about.
10  Right?
11  A. Right.
12  Q. Okay. With regard to the people on
13  those interview panels, do you have any
14  reason to think they were motivated by race
15  and race discrimination against a black
16  candidate and against you? Do you have any
17  reason to think they were motivated by race
18  in making those decisions other than what
19  you have already testified about?
20  A. That's a question I can't answer.
21  Q. Okay. So you don't have any
22  information?
23  A. I can't answer that question because I

11 (Pages 41 to 44)

## FREEDOM COURT REPORTING

Page 45

1 still don't understand.
2    Q. Okay. Please tell me what you don't
3 understand?
4    A. Okay. You're saying the people that
5 made the decision that interviewed me were
6 the people that made have made the decision.
7    Q. I dropped that part out. All I talked
8 about was the people that interviewed you.
9    A. And I can't remember exactly on which
10 case who interviewed me on all of them.
11    Q. That's fair, and you told me that.
12 What I'm asking is do you have any
13 information that any of the people who
14 interviewed you, any of the people who
15 interviewed you on those panels for any of
16 the those six decisions, do you have any
17 reason to think or any information that
18 those people on those interview panels were
19 motivated by race?
20    A. I don't have reason to think that they
21 were.
22    Q. Okay. Do you have any reason to think
23 that the people on those interview panels

Page 46

1 did not believe that they were choosing the
2 most qualified candidate in terms of
3 knowledge, skills and abilities?
4    A. Repeat the question.
5    Q. Sure. Do you have any reason to think
6 that those panelists that interviewed you
7 were choosing a candidate that did not have
8 the best knowledge, skills and abilities?
9    A. Yes.
10    Q. All right. Why is that?
11    A. Because I was not chosen for the
12 position and I had the qualifications
13 necessary to fill the position.
14    Q. Have you learned any new information,
15 Mrs. Finch, that supports your claims of
16 race discrimination in this lawsuit relating
17 to these six promotions since I deposed you
18 in 2001?
19    A. No.
20    Q. Okay. So in 2001, when I deposed you,
21 you told me all the information that you
22 were aware of that supported your six
23 promotions claims; right?

Page 47

1    A. To the best of my knowledge.
2    Q. And you have not learned anything
3 since that time?
4    A. No.
5    Q. Okay. You told me at that time that
6 the witnesses that you were aware of that
7 had knowledge that supported your claims
8 were Don Bush, Calvin Barnes and Brenda
9 Walker. Do you remember telling me those
10 names?
11    A. Yes.
12    Q. Okay. Are there any other witnesses
13 that you are aware of that you would say
14 support your claims of discrimination on
15 these six promotion claims you're making?
16    A. You mean in terms of people that know
17 about the position?
18    Q. That's right. Is there anybody else
19 that you think has any knowledge that
20 relates to your claim that all of these six
21 promotion decisions that were made were
22 racially discriminatory?
23    A. That may be several other people that

Page 48

1 may know about the discrimination.
2    Q. Okay. All right. And when you say
3 the discrimination, I want to be real
4 specific. We're now clear that there are
5 six promotions that you think you should
6 have gotten and you didn't get and you think
7 it's because of your race. Are there any
8 witnesses that you're aware of that have any
9 information relating to those decisions
10 being race discrimination other than Calvin
11 Barnes, Don Bush and Brenda Walker?
12    A. I'm not sure at this point.
13    Q. Do you want to think about it for a
14 second? You may.
15      MR. CALVIN: Do you want to take a
16 quick break and get some coffee while she's
17 thinking? It's up to you.
18      MR. LIGHTFOOT: Sure.
19      (Short recess was had.)
20    Q. (BY MR. LIGHTFOOT) All right. You
21 wanted to take a minute to think about any
22 other witnesses that have any information
23 that support your six promotion claims

12 (Pages 45 to 48)

**FREEDOM COURT REPORTING**

Page 49

1  against Mental Health. Are there any?
2  A. Can you be a little bit more specific?
3  Q. Not really, but I can try.
4  A. You can try.
5  Q. When I asked you if you had any
6  witnesses, anybody who would sort of support
7  your claims in the deposition six years ago,
8  you gave me three names; Don Bush, Calvin
9  Barnes and Brenda Walker. I'm asking you if
10  there are any other witnesses that you're
11  aware of that have knowledge that could
12  support your six promotion claims against
13  Mental Health.
14  A. These are people that may be aware;
15  Ronald Armstrong, Joseph Tolbert.
16  Q. Tolbert?
17  A. Yes, sir.
18  Q. Do you know how to spell his name?
19  A. The last or the first?
20  Q. Last.
21  A. T-O-L-B-E-R-T.
22  Q. Okay. Is that it?
23  A. That's all I can think of at this

Page 50

1  point.
2  Q. Okay. Which of the six promotions do
3  you think Don Bush might have information
4  about?
5  A. Terry Avery.
6  Q. Terry Avery. Any of the others?
7  A. I think all of them should have
8  information about Terry Avery.
9  Q. All of these five people that you've
10  listed?
11  A. Yes, sir.
12  Q. Okay. All right. So they all know
13  about Terry Avery.
14  Okay. Any of these other promotions
15  that Don Bush would know about?
16  A. Actually, they should -- all of them
17  should know about all of the promotions.
18  Q. All should know about all. Are you
19  aware of any of those five people giving a
20  statement, either a written statement or an
21  affidavit, or anything like that relating to
22  any of these six promotions to anybody?
23  A. Not that I'm aware of.

Page 51

1  Q. Okay. And where are these six people
2  located now, please? Let's start with Don
3  Bush. Where is Don Bush?
4  A. He lives in Birmingham.
5  Q. Do you know where he works?
6  A. He either works for Partlow or Bryce.
7  Q. So he's a State employee?
8  A. Yes.
9  Q. Okay. Calvin Barnes?
10  A. I don't know.
11  Q. Brenda Walker?
12  A. She lives in Birmingham.
13  Q. Where does she work?
14  A. Disability Determination Service.
15  Q. Oh, she's with you.
16  A. Yes.
17  Q. Okay. Is she a friend of yours?
18  A. Yes.
19  Q. Is she a close friend?
20  A. Yes.
21  Q. Have you talked to her about this
22  lawsuit?
23  A. I have.

Page 52

1  Q. What information does she know about
2  any of these six claims -- well, I guess,
3  first of all, does she know about the Terry
4  Avery promotion?
5  A. I can't tell you exactly what she
6  knows about him.
7  Q. Can you tell me anything she knows
8  about the Terry Avery promotion?
9  A. She knows that he was promoted.
10  Q. Okay. Anything else that you can tell
11  me that she knows about Terry Avery?
12  A. I can't speak for her.
13  Q. Calvin Barnes, where is he -- oh, you
14  told me you didn't know. Ronald Armstrong?
15  A. Birmingham.
16  Q. Where does he work?
17  A. Probation and Parole.
18  Q. And that's a State job; right?
19  A. Yes.
20  Q. All right. Joseph Tolbert?
21  A. He lives in Bessemer.
22  Q. Where does he work?
23  A. I'm not sure.

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1    MR. LIGHTFOOT: No further questions
2  at this time.
3  EXAMINATION BY MS. BYRNE:
4    Q. Mrs. Finch, I'm Alice Ann Byrne. I'm
5  a lawyer for the State Personnel Department.
6  I met you just a few minutes ago.
7    We've never before; have we?
8    A. Not to my knowledge.
9    Q. Not to my knowledge either. I've got
10 some questions specifically with regard to
11 the State Personnel Department and your
12 lawsuit against that department.
13    You have been a State employee off and
14 on for, what, nearly twenty-five years?
15    A. No.
16    Q. Okay. Twenty years, fifteen years?
17    A. Twenty plus.
18    Q. Okay. Twenty plus years. And the
19 reason I'm asking you that, is after twenty
20 plus years, you probably understand the
21 difference in departments; correct?
22    A. I do.
23    Q. Okay. You currently work for the

Page 54

1  Department of Education; right, Disability
2  Determination?
3    A. Yes.
4    Q. Okay. And before you worked for
5  Department of Mental Health?
6    A. Yes.
7    Q. And you understand that those are
8  different two agencies; correct?
9    A. Yes.
10    Q. And one has one appointing authority
11 and the other one has a different appointing
12 authority; correct?
13    A. Yes.
14    Q. You also understand after your years
15 of service the difference between merit
16 system jobs and exempt jobs with the
17 Department of Mental Health; is that
18 correct?
19    A. Yes.
20    Q. What is your understanding of the
21 difference between those two jobs -- types
22 of jobs?
23    A. Okay. The merit system, you are on

Page 55

1  the register for the job and you're
2  appointed by State Personnel.
3    Q. What about exempt, what is the
4  difference?
5    A. Exempt, you can be hired through the
6  agency in which you apply.
7    Q. Now, when you say appointed by State
8  Personnel, the agency is actually the one
9  who decides who is promoted and who is
10 hired; is that correct?
11    A. Yes.
12    Q. You filed an EEOC complaint, and I
13 would like to have this marked, back in '93;
14 is that correct?
15    MS. BYRNE: I would like to mark this
16 (indicating) as Exhibit Number One.
17    (Defendant's Exhibit Number was marked
18 and attached.)
19    Q. (BY MS. BYRNE) I would ask you to
20 please identify it for the record.
21    A. This is the first time seeing this
22 particular document (indicating). Is this a
23 document that came through EEOC?

Page 56

1    Q. Yes, ma'am. I'll represent to you
2  that that was also that sent to the
3  Department of Mental Health regarding your
4  EEOC charge about the promotion you didn't
5  get from Mental Health. Is that accurate
6  from your recollection of meeting with the
7  EEOC and your charge at that time?
8    A. Yes.
9    Q. You list one classification from
10 Department of Mental Health; is that
11 correct?
12    A. Yes, that's what is listed here
13 (indicating).
14    Q. Okay. You didn't have any complaints
15 against State Personnel at that time when
16 you filed it; did you?
17    A. Not to my knowledge.
18    Q. Okay. Did you ever go and file
19 another EEOC complaint alleging something
20 that State Personnel did regarding any of
21 your jobs that you applied for but were not
22 deemed to have met the minimum
23 qualifications?

14 (Pages 53 to 56)

Page 57

1   A. No.
2   Q. Is there a reason you did not go back
3   and say that State Personnel discriminated
4   against you?
5   A. I didn't know I had to do that.
6   Q. You did not know you had to do that?
7   A. No, ma'am.
8   Q. Were you represented by counsel at
9   that time?
10  A. No.
11  Q. When did you first file your motion to
12  intervene?
13  A. I can't give you an exact date.
14  Q. I believe it was '95. Is that
15  correct? Does that sound correct?
16  A. I'm not sure.
17  Q. Okay. I'll show you and refresh your
18  memory. This is a motion to intervene
19  (indicating), and I'm showing it to you, and
20  ask you if you can identify that as the
21  motion to intervene?
22  A. Yes.
23  Q. And that is your motion to intervene;

Page 58

1   is that correct?
2   A. Yes.
3   Q. Okay. And the date on that is what,
4   please, ma'am?
5   A. July 13, 1995.
6   Q. 1995. Okay. Thank you. And at that
7   time you were represented by counsel;
8   correct?
9   A. At that time, yes.
10  Q. And you have been continually
11  represented by counsel since that time;
12  correct?
13  A. Yes.
14  Q. Now, you first applied for the
15  position with the State Personnel that you
16  make the basis of your claim in 1996;
17  correct?
18  A. Repeat the question.
19  Q. You first applied for a position under
20  the State Merit System with State Personnel
21  in 1996; is that correct?
22  A. No.
23  Q. Okay. Which jobs are you complaining

Page 59

1   about against State Personnel, maybe we
2   should start with that?
3   A. May I talk with my attorney?
4   MR. CALVIN: What's the question
5   again?
6   MS. BYRNE: Could you repeat the
7   question?
8   (Reporter reads requested portion.)
9   MR. CALVIN: Do you know what she's
10  asking you?
11  THE WITNESS: Which jobs am I
12  complaining against State Personnel.
13  Q. (BY MS. BYRNE) State Personnel. I'm
14  just interested in State Personnel. You
15  filed a lawsuit and you're making
16  allegations about some of our jobs that we
17  are in charge of. And I'm asking you -- do
18  you even know which jobs you are complaining
19  about without talking to your attorney? If
20  you can't, that's fine. I just need to
21  know.
22  A. I'm not sure.
23  Q. Okay. That's fine. Let's go at it

Page 60

1   this way then: Let's start with one that's
2   in your complaint, and if you can remember
3   when you applied for the job, and that would
4   have been Rehabilitation I and
5   Rehabilitation II positions. Are you
6   familiar with those positions?
7   A. Yes.
8   Q. Okay. And you applied for those
9   positions in 1996; is that correct?
10  A. I don't know the exact date. I
11  applied for them more than once.
12  Q. You applied for them twice; is that
13  correct?
14  A. I'm not sure.
15  Q. Have you seen the expert report filed
16  in this case?
17  A. I have.
18  Q. Have you read the expert report?
19  A. I have gone through it.
20  Q. Okay. Do you disagree with any
21  information in the expert report?
22  A. I'm sure I do, but I can't tell you
23  exactly what I disagree with at this point.

15 (Pages 57 to 60)

# FREEDOM COURT REPORTING

Page 61

1  I don't have it right in front of me.
2    Q. Well, let's go through it. I've got
3  it right in front of me. You can tell me
4  what you disagree with about it.
5      When did you review this (indicating)?
6    A. Whatever it was given to me.
7    Q. And that would have been in the last
8  couple of months?
9    A. It would have been November. This
10 month.
11   Q. Okay. If you would -- I guess we can
12 take a break and let you review it and you
13 can tell me what you disagree with that's in
14 that report.
15     MR. CALVIN: Well, let me object.
16 She's not an expert. If there's a
17 particular fact in here that you want her to
18 comment on, that's great, but she's not here
19 of offer any sort of opinion testimony.
20     MS. BYRNE: Well, I appreciate that
21 observation. However, she said she
22 disagreed with something in it and I'm
23 entitled to find out what it is she

Page 62

1  disagrees with. I'm asking her to review
2  and tell me what it is she disagrees with.
3    A. It may take me longer than ten minutes
4  to review it and disagree with it.
5    Q. (BY MS. BYRNE) That's more than fine.
6  You're the one who said you disagreed with
7  it. I'm just asking you why you disagree
8  with it and we can take as long as you want
9  to review it. That's fine with me.
10   A. (Witness complies.)
11     Do you have the job announcements for
12 these jobs other than what you have written
13 here(indicating)?
14   Q. I do.
15   A. May I see those?
16   Q. Do you need that to disagree with the
17 report?
18   A. Yes.
19   Q. Did you have that with you when were
20 you looking at the report initially?
21   A. I may have.
22   Q. You just don't remember. Let the
23 record reflect I am showing her what's

Page 63

1  previously marked in another deposition as
2  Defendant's Exhibit 117?
3      MR. CALVIN: 1117.
4      MS. BYRNE: Thank you.
5    Q. (BY MS. BYRNE) And 1116. 1116 and
6  1117. And the next one is the Senior
7  Services, you can look at that one as well.
8    A. (Witness complies.)
9      Can you tell me which two positions? It
10 says those applications included in those
11 identified in her complaint as being
12 rejected due to a raise. It says for two of
13 these, Mrs. Finch applied twice, resulting
14 in the same determination by the Personnel
15 Department.
16     So which --
17   Q. You want me to explain to you your
18 case, is that what you're asking me to do?
19   A. If I could.
20   Q. Okay. I'll be happy to tell you why
21 you're suing the State Personnel Department.
22 It's for applying for Rehabilitation
23 Specialist I and II in '96, and again in

Page 64

1  '96. You applied for them twice in '96.
2  You were rejected both time.
3      Rehabilitation Specialist II, you
4  applied -- it was rejected on 4-25-96.
5      Rehabilitation Specialist I, 4-25-96.
6  Rejected both times for experience.
7      Senior Service Worker, you were
8  rejected 10-31-96 for education.
9      You then re-applied for Rehabilitation
10 Specialist just a few months later, and you
11 were again rejected 11-14-96 for experience.
12     Again, Rehabilitation Specialist I,
13 11-14-96, application rejected for
14 experience.
15     That's my understanding of your
16 lawsuit. Do you have anything else you
17 would disagree with that statement regarding
18 the claims in this lawsuit?
19   A. I do.
20   Q. Okay. What else?
21   A. You said that you had to have the
22 qualifications for Rehabilitation
23 Specialist. Was that not on the list for

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 65

1 Rehabilitation Specialist?
2    Q. Tell me what it is that you disagree
3 with in that report, that's what I'm asking
4 you? It's a simple question.
5    A. All right. The report states Mrs.
6 Finch's application to the Rehabilitation
7 Specialist position was judged by the SPD to
8 be insufficient with respect to the
9 experience requirement.
10    Q. Okay.
11    A. Now, these requirements, I do have the
12 requirements; a Master's degree in
13 counseling --
14    Q. Could you please read for the court
15 reporter the requirements, the full
16 requirements?
17    A. Okay. It says a Master's degree in
18 rehabilitation, psychology, counseling,
19 human development, social work, nursing or
20 allied health occupation; four years of
21 professional level experience, provided
22 independent living skills, special
23 education, vocational rehabilitation or

Page 66

1 medical rehabilitation services to
2 individuals with disabilities is also
3 required --
4    Q. Okay. So you're saying --
5    MR. CALVIN: She's not finished.
6    A. Training programs: Planning and
7 conducting research or assisting the
8 development of organizational programs in
9 the specialty area. Four years of
10 experience in one of these specialty areas
11 below may substitute for the required
12 rehabilitation experience.
13    Knowledge of rehabilitation processes
14 in various disabilities is needed for this
15 classification.
16    The following abilities are needed for
17 this classification: The ability to
18 communicate orally and in writing, gather
19 information and resources from a variety of
20 different sources. Apply knowledge and
21 new -- new or problem situations in
22 interpersonal abilities.
23    This classification also requires

Page 67

1 knowledge in one or more of the following
2 specialty areas: Vocational rehabilitation,
3 independent living, early intervention,
4 nursing, social work, occupational therapy,
5 audiology, nutrition, physical therapy,
6 speech pathology, blindness, visual
7 impairment, deafness, hard of hearing,
8 traumatic brain injury and learning
9 disabilities.
10    All of these were requirements that I
11 did at Glen Ireland Developmental Center.
12    Q. (BY MS. BYRNE) And let me go back to
13 my original question. Were you not rejected
14 not on education but because SPD determined
15 you did not have the appropriate experience?
16    A. That's what the report says, but I
17 have the appropriate experience.
18    Q. I understand you contend you have the
19 appropriate experience. My question to you
20 is: Did State Personnel reject you because
21 of experience?
22    A. That's what your report says.
23    Q. Do you have any belief that you were

Page 68

1 rejected for another reason besides
2 experience?
3    A. The report says I was it was because
4 of the experience requirements.
5    Q. And my question to you is: Do you
6 have any other reason to believe that you
7 were rejected for a different reason other
8 than experience?
9    A. I was experienced in the area, so I
10 can't answer that question.
11    Q. So which portion of the report is
12 incorrect? I believe it stated that State
13 Personnel determined that you did not have
14 experience. Is that not a correct
15 statement?
16    A. The State Personnel determined that I
17 didn't have the experience based on maybe
18 the individual that was reviewing the
19 report.
20    Q. Correct. Isn't that what the report
21 said, State Personnel determined that you
22 did not have the appropriate experience?
23    A. If that's what your report says.

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 69

1    Q. Well, you've got it in front of you.
2    A. If that's what your report says --
3    Q. Ma'am, you read it. You -- why don't
4  you read it again. Let's makes sure the
5  record is clear. What portion of the report
6  do you disagree with, read it for the
7  record, please?
8       MR. CALVIN: Are you asking her
9  whether or not she disagrees with the report
10  in connection with what your position is, or
11  whether or not she disagrees with the report
12  in the respect that it's factually
13  inaccurate?
14       MS. BYRNE: I'm asking her to answer
15  the question and then I'll follow-up with
16  more specific questions depending on how she
17  answers my question.
18       MR. CALVIN: Well, what is the
19  question?
20       MS. BYRNE: Well, she obviously could
21  understand it, she answered it one time and
22  didn't finish.
23    Q. (BY MS. BYRNE) Would you please

Page 70

1  re-state and re-read for the record what you
2  previously said you disagreed with in the
3  report?
4    A. Okay. Now, which part of the report?
5  Can you point that out to me?
6    Q. No, ma'am. You read the report. We
7  spent nearly ten minutes sitting here
8  waiting for you to read the report, and you
9  said that you read it and that you disagreed
10  with a portion of it. I'm asking for you to
11  tell me what portion of the report you
12  disagree with?
13       MR. CALVIN: Other than what you've
14  already spent time going over? Did you not
15  understand her answer?
16       MS. BYRNE: No, I didn't understand
17  her answer.
18    A. The application said I was rejected
19  due to the qualifications.
20    Q. (BY MS. BYRNE) And you agree that you
21  were rejected because of qualifications or
22  experience, you just disagree that you
23  should have been rejected because of that;

Page 71

1  is that correct?
2       Your attorney is nodding in assent.
3  I'm assuming that he agrees with it.
4       MS. BYRNE: I would ask you not to
5  nod.
6       MR. CALVIN: Well, I'm nodding because
7  that's finally the correct way to ask the
8  question.
9       MS. BYRNE: You're nodding for her to
10  answer.
11       MR. CALVIN: No, I'm not. I'm
12  approving finally you getting the right
13  question out on the table.
14       MS. BYRNE: I would ask you to reframe
15  whether you like my questions or don't like
16  my questions, or whether you agree or not
17  agree to not nod affirmatively or shake your
18  head when there's a question pending.
19       Could you repeat the question, please,
20  ma'am.
21       (Reporter reads requested portion.)
22    A. Can you repeat it one more time
23  please.

Page 72

1       (Reporter reads requested portion.)
2       MR. CALVIN: Object, compound
3  question.
4    Q. (BY MS. BYRNE) You can answer.
5    A. Can you rephrase it in a different
6  way?
7    Q. Okay. We'll take it one little step
8  at a time.
9    A. Please.
10    Q. Okay. The report states that SPD said
11  you did not have the qualifications for this
12  position. Do you agree that SPD said you
13  did not have the qualifications?
14    A. I agree that that's what they said in
15  the report.
16    Q. Now, you also agree that you believe
17  you did have the qualifications; is that
18  correct?
19    A. Yes.
20    Q. Okay. Is there anything else in the
21  report that you disagree with?
22    A. Yes.
23    Q. What else?

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1    A. It says in September 2003, Mrs. Finch
2  was also selected for the position of Senior
3  Disability Specialist Class Code 50403.
4    Q. What do you disagree with about that?
5    A. It didn't say that I applied for that
6  position before and I got a card saying I
7  was not selected for that particular
8  position.
9    Q. Okay. But you were on the register,
10  correct, you just weren't selected by your
11  employer; correct?
12    A. I was on the register?
13    Q. Yes, ma'am. State Personnel put you
14  on the register, but your employer did not
15  hire you at that time; is that correct?
16    A. No, my employer said I was not on
17  register when they went and they checked.
18    Q. When was that?
19    A. That would have been August of 2003.
20    Q. Okay. Did you apply for that
21  position?
22    A. I did.
23    Q. And did you get rejected for that

Page 74

1  position?
2    A. According to State Personnel I did.
3    Q. In August of 2002?
4    A. 2003.
5    Q. 2003.
6    A. Because I was promoted September 2003.
7    Q. Okay. So they checked in October and
8  you weren't on the register and then they
9  hired you in '03, one month later?
10    A. Yes, ma'am.
11    Q. Did you apply twice for that position?
12    A. No, ma'am.
13    Q. So you applied once and you weren't on
14  the register when they checked, and the next
15  time they checked, you were on the register?
16    A. I was not promoted up at that time
17  because they said that my name was not on
18  the list. In August 2003, I received a
19  letter stating that I was not promoted to
20  that position.
21    Q. Okay.
22    A. However, I was promoted.
23    Q. You were promoted the 16th. Your

Page 75

1  appointment date -- you were on the
2  certification on September 16th, 2003, and
3  you were appointed September 20th, 2003; is
4  that correct?
5    A. I don't know the exact dates.
6    Q. Okay. Let me show you.
7    A. It should have been August of 2003.
8  These are the three people that were
9  promoted at that time (indicating). We were
10  on the list before this particular time.
11    Q. I'm asking you to look at the dates,
12  please.
13    A. The dates on here (indicating)?
14    Q. Yes, ma'am.
15    A. 9-29-03, is that the particular date
16  you're --
17    Q. Well, there is an appointment date.
18  But it is September, is that correct --
19    A. Uh-huh.
20    Q. -- of '03? Okay. So you're
21  complaining that you didn't get promoted in
22  August, and you think State Personnel had
23  something to do with that?

Page 76

1    A. You were asking me about the report,
2  if everything in the report was correct.
3    Q. And I'm confused as to what it is that
4  is incorrect with what's in the report.
5    A. Because the report stated in September
6  2003 Mrs. Finch was also selected for the
7  position, which I was, Senior Disability
8  Specialist.
9    Q. So that's a correct statement?
10    A. That particular statement is correct.
11  But you don't have that I applied prior to
12  -- I applied in August. You don't have that
13  information in here, the disability report
14  in here. You've got part of the part.
15    Q. Okay. So you're saying it's incorrect
16  because it leaves out that you wanted to be
17  promoted in August but weren't on the
18  register until September; is that correct?
19    A. I don't know whether I was on the
20  register in August or not.
21    Q. You told me that your boss told you
22  weren't on the register. Is that right or
23  wrong?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

|  | Page 77 |
|---|---|
| 1 | A. Let me go back. August of '03 was |
| 2 | when -- I think I applied for Disability |
| 3 | Specialist in July of '03, if I'm not |
| 4 | mistaken. I received a card stating that I |
| 5 | was not selected for that position. |
| 6 | Q. Who did you receive the card from? |
| 7 | A. State Personnel. |
| 8 | Q. State Personnel sent you a card saying |
| 9 | you were not selected for that position? |
| 10 | A. Yes, ma'am. |
| 11 | Q. State Personnel doesn't send cards |
| 12 | that say that. |
| 13 | A. Yes, ma'am. |
| 14 | Q. No, ma'am, they don't. |
| 15 | MR. CALVIN: Let's not argue. |
| 16 | Q. (BY MS. BYRNE) Do you have the card? |
| 17 | A. I don't have it with me. |
| 18 | Q. I didn't think so. Do you have it at |
| 19 | home? |
| 20 | A. I'm not sure, but I will look for it. |
| 21 | Q. Please look for it. I believe that |
| 22 | would be responsive. |
| 23 | Okay. So other than the fact that you |

|  | Page 79 |
|---|---|
| 1 | MS. BYRNE: I would like to have this |
| 2 | marked as Exhibit Number Two (indicating). |
| 3 | I think we understand each other. |
| 4 | (Defendant's Exhibit Two was marked |
| 5 | and attached.) |
| 6 | Q. (BY MS. BYRNE) When you were at |
| 7 | Hillcrest, what were your hours? |
| 8 | A. I worked Saturdays from 6:30 or seven |
| 9 | o'clock. |
| 10 | Q. I'm sorry? |
| 11 | A. Saturdays. |
| 12 | Q. 6:30 or seven o'clock? |
| 13 | A. I went in either at 6:30 or 7:00 a.m. |
| 14 | Q. And you worked how long; an eight hour |
| 15 | day, ten hour day, twelve hour day? |
| 16 | A. When I first started Hillcrest, I |
| 17 | worked from 2:00 to 10:30 I think maybe |
| 18 | about a month. And then after that, I began |
| 19 | working on Saturdays from -- every other |
| 20 | Saturday sixteen hours. |
| 21 | Q. And you did that for approximately |
| 22 | four years? |
| 23 | A. Approximately. |

|  | Page 78 |
|---|---|
| 1 | got a card in August saying that you were |
| 2 | not selected for the position from State |
| 3 | Personnel, but yet you were selected less |
| 4 | than a month later? |
| 5 | A. Yes. |
| 6 | Q. Okay. So you're complaining that the |
| 7 | report does haven't that information in |
| 8 | there? |
| 9 | A. Yes. |
| 10 | Q. Okay. Anything else about the report |
| 11 | that you disagree with? |
| 12 | A. I agree -- with the experience |
| 13 | requirements on the Rehabilitation I job, I |
| 14 | disagree with that because I did have that |
| 15 | experience. |
| 16 | Q. But the report doesn't indicate |
| 17 | anything other than the fact that State |
| 18 | Personnel said you didn't have the |
| 19 | experience? |
| 20 | A. Okay. You're asking me -- repeat your |
| 21 | question. |
| 22 | Q. I'm not going to repeat the question. |
| 23 | I'm going to move on. |

|  | Page 80 |
|---|---|
| 1 | Q. Okay. Why did you quit? |
| 2 | A. Well, I quit because I was still |
| 3 | working at Sears and still for Disability |
| 4 | and I got a foster child, so I had to quit. |
| 5 | Q. Now, when you were working for the |
| 6 | family home, what were your hours? |
| 7 | A. It varied when I could see clients. |
| 8 | Q. How many hours did you work |
| 9 | approximately a week? |
| 10 | A. It varied. |
| 11 | Q. Did you ever work forty hours a week? |
| 12 | A. No. |
| 13 | Q. Was it a part-time job? |
| 14 | A. Yes. |
| 15 | Q. Getting back to the original questions |
| 16 | in the report, would you agree that you |
| 17 | applied for the Rehabilitation Specialist |
| 18 | position in '96? |
| 19 | A. Yes. |
| 20 | Q. Okay. And you do agree that you never |
| 21 | filed an EEOC complaint against State |
| 22 | Personnel for those positions; correct? |
| 23 | A. Right. |

20 (Pages 77 to 80)

# FREEDOM COURT REPORTING

Page 81

1    Q. And the Senior Service Social Worker,
2  which is also complained about, would you
3  agree that you applied for that position in
4  1996 as well?
5    A. I'm sure I did. I don't know the
6  exact date.
7    Q. Okay. Well, it's in the report that
8  you read and you said you gave me the two
9  things you disagreed with. Do you disagree
10 with other information in the report?
11   A. No.
12   Q. Okay. And you agree you never filed a
13 complaint or an EEOC charge against State
14 Personnel regarding the Senior Service
15 Social Worker position; correct?
16   A. Correct.
17   Q. When did you believe that you were
18 improperly rejected for the Rehabilitation
19 Specialist position?
20   A. Can you rephrase that question?
21   Q. Can you not answer the question? If
22 you can't answer the question, I'll rephrase
23 it, but it's pretty straight forward. When

Page 82

1  did you believe that you were improperly
2  rejected by State Personnel for the
3  Rehabilitation Specialist position?
4    A. Maybe when I got the report back.
5    Q. So that would have been in '96?
6    A. Yes.
7    Q. Are you aware of any whites who
8  got accepted for the position of
9  Rehabilitation Specialist?
10   A. No.
11   Q. Okay. Are you aware of any blacks who
12 got accepted for the position of
13 Rehabilitation Specialist?
14   A. No.
15   Q. Let me go back and limit it to the
16 timeframe that we're talking about here, in
17 '96. Were you aware in '96, or have you
18 since learned of any whites that were
19 accepted for Rehabilitation Specialist I or
20 II?
21   A. No.
22   Q. I'll ask the same question for Senior
23 Service Social Worker, are you aware of any

Page 83

1  whites whose applications were accepted for
2  the position of Senior Service Social Worker
3  in '96?
4    A. No.
5    Q. Are you aware of any blacks whose
6  applications for Senior Service Social
7  Worker were accepted in or around '96?
8    A. No.
9    Q. If you would, tell me, please, ma'am
10 who you believe was hired or placed on the
11 register that was less qualified than you?
12   A. I don't know.
13   Q. All right. Are you aware of anyone
14 who was awarded the position of
15 Rehabilitation Specialist I or
16 Rehabilitation Specialist II --
17   A. No.
18   Q. -- who are white or black?
19   A. No.
20   Q. If the report states, and you have
21 read it and said you -- let me make sure.
22 Have you told me everything that -- you have
23 read the report and that you disagree with?

Page 84

1    A. At this point.
2    Q. Okay. In the report, it said that you
3  had applied for I believe twenty-seven
4  positions -- you submitted twenty-seven
5  applications and you met the minimum
6  qualifications for twenty-three of those
7  twenty-seven. Would you agree with that
8  statement?
9    A. In what timeframe?
10   Q. In the timeframe covered by the report
11 that you reviewed and said you had no
12 further disagreements with.
13   A. Right, I agree with that.
14   Q. So are you basing your claim on the
15 fact that three jobs out of twenty-seven
16 that you were rejected for -- your minimum
17 qualifications were rejected, is that the
18 basis of your complaint?
19   A. Yes.
20   Q. Can you tell me -- are you aware of
21 any other times that you were rejected by
22 State Personnel other than contained in this
23 report or made the basis of this lawsuit?

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1    A. I don't know right off.
2    Q. Okay. What are you going to look at
3  or review that would give you some
4  indication as to whether or not that was an
5  appropriate statement?
6    MR. CALVIN: I object to the phrase
7  appropriate statement.
8    Q. (BY MS. BYRNE) Accurate statement.
9    MR. CALVIN: What statement?
10    MS. BYRNE: Could you repeat it,
11  please?
12    MR. CALVIN: Are you talking about
13  your statement?
14    MS. BYRNE: Could you repeat the
15  question, please?
16    MR. CALVIN: Which question?
17    (Reporter reads requested portion.)
18    MR. CALVIN: I still object. I don't
19  know what you're talking about.
20    A. What's the statement?
21    MS. BYRNE: Could you go back two
22  questions, please, and read my question and
23  her answer.

Page 86

1    (Reporter reads requested portion.)
2    Q. (BY MS. BYRNE) I'll do a different
3  question. You don't know right off was your
4  answer. Is there anything that you're going
5  to look at to refresh your memory that may
6  change your answer?
7    A. Not at this time.
8    Q. What documents might exist that would
9  give you more information than what you have
10  right now?
11    A. I don't have any at this time.
12    Q. Why are you qualifying your statement?
13  Is there anything you anticipate looking at?
14    A. Not at this time.
15    Q. Is there any documents that you know
16  of that you might look at whether or not at
17  this time or not?
18    A. Not at this time I don't.
19    Q. Have you ever filed a complaint
20  against State Personnel prior to this
21  lawsuit?
22    A. No.
23    Q. Maybe there is a mistake in the

Page 87

1  complaint. Let me find it again.
2    Are you claiming retaliation by the
3  State Personnel Department?
4    A. When you say retaliation, what are you
5  meaning?
6    Q. Well, I'm referring to your complaint
7  which you said defendant State Personnel has
8  a pattern and practice of race
9  discrimination and retaliation.
10    Is that a mistake, or is that --
11    MR. CALVIN: Where are you?
12    MS. BYRNE: It's on page twelve,
13  number five of your lawsuit. And if it's
14  not, that's fine.
15    MR. CALVIN: At the bottom of twelve?
16    MS. BYRNE: Number five.
17    MR. CALVIN: Paragraph five. I think
18  that's a mistake.
19    MS. BYRNE: All right. That's fine.
20    Let me review this (indicating). I
21  think I'm through, Mrs. Finch.
22    Q. (BY MR. BYRNE) When you were at Mental
23  Health, who gave you your work assignments?

Page 88

1    A. My direct supervisor.
2    Q. Okay. Who set your working hours?
3    A. They were set by the facility.
4    Q. Okay. And who gave you performance
5  evaluations?
6    A. My direct supervisor.
7    Q. Who decided who got promoted?
8    A. I am not sure of that.
9    Q. I mean, was it Mental Health?
10    A. I'm not sure.
11    Q. You don't know who decided on
12  promotions, whether or not it was someone
13  outside the Department of Mental Health or
14  not?
15    A. The facility.
16    Q. Okay. Tell me the same regarding the
17  Department of Education, the Department of
18  Disability Determination where you work now,
19  who sets your work hours at that facility at
20  that agency?
21    A. It's set by the director.
22    Q. And who is it that?
23    A. Mr. Tommy Warren.

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1  Q. Okay. And who decides what your job
2  assignments are?
3  A. They are set by the director.
4  Q. Is that Tommy Warren?
5  A. Yes.
6  Q. Okay. Who decides your performance
7  evaluations?
8  A. My direct supervisor.
9  Q. Okay. And who is that?
10  A. Joyce Cottle.
11  Q. And is that someone at the Department
12  of Disability Services?
13  A. Yes.
14  Q. If someone is to be promoted, who
15  makes that decision?
16  A. I'm thinking it's the director.
17  Q. Is that Tommy Warren?
18  A. Maybe the designee. I'm not exactly
19  sure who determines who is promoted.
20  Q. Okay. Are there interviews for
21  promotions?
22  A. Yes.
23  Q. Were you interviewed for promotions?

Page 90

1  A. I have been.
2  Q. Were you for your last promotion?
3  A. No.
4  Q. You were just promoted without an
5  interview?
6  A. Yes.
7  Q. And that decision was made by the
8  Department of Disability?
9  A. Yes.
10  MS. BYRNE: I believe those are my
11  questions. Thank you very much.
12
13  RE-EXAMINATION BY MR. LIGHTFOOT:
14  Q. With regard to Defendant's Exhibit
15  Number One, which was the EEOC charge, on
16  that it looks to me like based upon the
17  dates on it, you're talking about the date
18  that it occurred was somewhere in February
19  of '93, and you're talking about a promotion
20  that you didn't get to the Rehabilitation
21  Coordinator. Are you talking in this EEOC
22  charge about the promotions to Diane
23  McCollum and Jonathan Graves, is that what

Page 91

1  your EEOC charge is about?
2  A. It may have been. The letter would
3  have everything that's in there that I
4  received from EEOC. This may have just the
5  beginning charge (indicating).
6  Q. What letter are you talking about?
7  A. The actual EEOC review.
8  Q. You mean their determination?
9  A. Yes.
10  Q. Okay. The EEOC determination talks
11  about one white male and one white female
12  being promoted somewhere around January 1993
13  to the HTC/HTL positions. And what I was
14  asking you is -- I don't really care what
15  the EEOC says. I care what you are making
16  your charge about. When you filled this
17  charge out, and it looks like it's dated
18  July of 1993, that's right next to your
19  signature on the next page, is what you were
20  complaining about in this EEOC, was it the
21  promotions that Diane McCollum and Jonathan
22  Graves got?
23  A. I'm not exactly sure, but it may have

Page 92

1  been.
2  Q. Can you think of anything else you
3  would have been talking about in this
4  charge, because I can't?
5  A. No.
6  Q. You did not fill out an EEOC charge
7  with regard to the promotion that Terry
8  Graves got; correct? You told me -- that
9  was like in '94 or '95. Excuse me, Terry
10  Avery.
11  A. I didn't fill out an additional
12  charge.
13  Q. And you didn't fill out an amended
14  charge to this EEOC charge relating to the
15  Terry Avery promotion; did you?
16  A. I went to the attorney.
17  Q. But you didn't go back to the EEOC
18  about Terry Avery; did you?
19  A. No.
20  Q. This was in '93, and the Terry Avery
21  promotion you're complaining about was in
22  '94 or '95. You didn't go back to the EEOC
23  and complain about the Terry Avery

23  (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  promotion; did you?
2      A. No.
3      Q. Why not?
4      A. I didn't know I had to.
5          MR. LIGHTFOOT: No further questions.
6          MR. CALVIN: All right.
7          MR. LIGHTFOOT: Thank you.
8          FURTHER DEPONENT SAITH NOT
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 94

1          C E R T I F I C A T E
2
3          I, SUSAN MASTERS GOLDMAN, Certified
4  Shorthand Reporter, License Number 83, and
5  Commissioner, hereby certify that the above
6  and foregoing deposition was taken down by
7  me on Computerized Stenotype, and the
8  questions and answers thereto were
9  transcribed by me, and that the foregoing
10  represents a true and correct transcript of
11  the deposition given by said witness upon
12  said hearing.
13          I further certify that I am neither
14  attorney or counsel for, nor related to or
15  employed by any of the parties to the action
16  in which this deposition is taken.
17
18          SUSAN MASTERS GOLDMAN
19          CSR, LICENSE NO. 83
20
21
22
23

24  (Pages 93 to 94)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

**A**

abilities 46:3,8
  66:16,22
ability 66:17
accepted 82:8
  82:12,19 83:1
  83:7
accurate 25:12
  56:5 85:8
acting 6:2
action 94:15
actual 31:15
  41:5 91:7
additional 6:23
  92:11
address 8:5
administrative
  21:15
Administrator
  29:12 30:13,16
  33:18,23
advised 1:21
affidavit 50:21
affirmatively
  71:17
agencies 21:16
  54:8
agency 55:6,8
  88:20
ago 6:20 8:11
  23:19 24:3
  25:23 49:7
  53:6
agree 70:20
  71:16,17 72:12
  72:14,16 78:12
  80:16,20 81:3
  81:12 84:7,13
AGREED 2:11
  2:20 3:4,13
agrees 71:3
ahead 22:23
al 1:8 2:8
Alabama 1:2,7

1:14 2:2,7,18
  4:10,16,19,21
  5:3,5 6:4 8:8
  8:18 9:11 11:4
  12:4,6
Alice 5:2 53:4
alive 27:10,19
  27:21
allegations
  59:16
alleging 56:19
allied 65:20
amended 1:15
  25:21 27:1,2,3
  27:9 28:10
  92:13
amendment
  26:23
amounts 19:6
AmSouth 2:17
  4:15 6:7
Ann 5:2 53:4
announcements
  62:11
answer 7:10,14
  7:15 22:22
  23:16 44:20,23
  68:10 69:14
  70:15,17 71:10
  72:4 81:21,22
  85:23 86:4,6
answered 69:21
answers 69:17
  94:8
anticipate 86:13
anybody 38:10
  38:13 47:18
  49:6 50:22
anyway 9:17
APPEARAN...
  4:1 5:1
APPEARING
  4:5,11
applicants 40:16

application
  64:13 65:6
  70:18
applications
  63:10 83:1,6
  84:5
applied 17:2
  56:21 58:14,19
  60:3,8,11,12
  63:13 64:1,4
  73:5 74:13
  76:11,12 77:2
  80:17 81:3
  84:3
apply 55:6 66:20
  73:20 74:11
applying 17:8
  63:22
appointed 55:2
  55:7 75:3
appointing
  54:10,11
appointment
  75:1,17
appreciate
  61:20
appropriate
  67:15,17,19
  68:22 85:5,7
approving 71:12
approximately
  9:20 10:11,12
  11:14 16:14
  19:12,15 79:21
  79:23 80:9
area 66:9 68:9
areas 66:10 67:2
argue 77:15
Armstrong
  49:15 52:14
asked 9:14,15
  28:18 36:4
  37:22 38:1
  49:5

asking 6:22 7:12
  33:13 43:4,10
  45:12 49:9
  53:19 59:10,17
  62:1,7 63:18
  65:3 69:8,14
  70:10 75:11
  76:1 78:20
  91:14
assent 71:2
assign 3:9
assignments
  87:23 89:2
assisting 66:7
assume 7:11
  16:19
assuming 71:3
attached 55:18
  79:5
attorney 22:4,8
  59:3,19 71:2
  92:16 94:14
audiology 67:5
AUDREY 1:4
  1:11 2:4,13
  6:10,14
Audry 8:4
August 73:19
  74:3,18 75:7
  75:22 76:12,17
  76:20 77:1
  78:1
authority 54:10
  54:12
Avery 30:15
  33:19 34:6,12
  40:1 50:5,6,8
  50:13 52:4,8
  52:11 92:10,15
  92:18,20,23
awarded 83:14
aware 17:6,7,9
  17:11 19:22
  23:15,23 27:12

30:20 32:14,16
  33:13 34:11,16
  34:18,21 35:1
  35:7,11,15
  38:12 42:2,4
  46:22 47:6,13
  48:8 49:11,14
  50:19,23 82:7
  82:11,17,23
  83:5,13 84:20
**a.m** 2:19 6:9
  79:13

**B**

B 1:17 4:12
back 8:21 9:7
  13:23 14:6
  16:22 17:2,8
  21:5 55:13
  57:2 67:12
  77:1 80:15
  82:4,15 85:21
  92:17,22
bankruptcy
  21:19
Barnes 47:8
  48:11 49:9
  51:9 52:13
based 27:7
  68:17 90:16
basing 84:14
basis 41:13,21
  58:16 84:18,23
beat 40:9
began 79:18
beginning 91:5
behalf 4:5,11
  25:21
Behavioral
  10:22,23 14:15
belief 67:23
believe 8:20
  17:13 23:3
  30:21 34:4

35:19 36:23
37:6,22 38:3
40:14,19,21
41:7,10,17,20
46:1 57:14
68:6,12 72:16
77:21 81:17
82:1 83:10
84:3 90:10
**believed** 38:16
**Bell** 4:13 21:8
39:19
**Bessemer** 52:21
**best** 25:11,14
46:8 47:1
**Birmingham**
2:18 4:10,16
6:8 8:7 10:18
12:15,16,17
15:8 51:4,12
52:15
**bit** 38:12 49:2
**biweekly** 15:23
16:5,16 18:10
18:12,19 19:5
19:13,18
**bi-weekly** 18:7
**black** 40:16,22
41:8 44:15
83:18
**blacks** 82:11
83:5
**blindness** 67:6
**boss** 76:21
**bottom** 87:15
**brain** 67:8
**break** 48:16
61:12
**Brenda** 47:8
48:11 49:9
51:11
**brought** 22:18
**Bryce** 51:6
**Building** 4:8

**Bush** 47:8 48:11
49:8 50:3,15
51:3,3
**Byrne** 3:19 5:2
53:3,4 55:15
55:19 59:6,13
61:20 62:5
63:4,5 67:12
69:14,20,23
70:16,20 71:4
71:9,14 72:4
77:16 79:1,6
85:8,10,14,21
86:2 87:12,16
87:19,22 90:10

-----

**C**

**C** 94:1,1
**called** 29:11
**Calvin** 4:6 22:15
22:22 23:1,8
25:4 26:13
27:18,22 28:8
28:14,18,22
31:7 32:1 47:8
48:10,15 49:8
51:9 52:13
59:4,9 61:15
63:3 66:5 69:8
69:18 70:13
71:6,11 72:2
77:15 85:6,9
85:12,16,18
87:11,15,17
93:6
**candidate** 44:16
46:2,7
**candidates**
40:16,23 41:8
43:23
**caption** 26:18
**card** 73:6 77:4,6
77:8,16 78:1
**cards** 77:11

**care** 91:14,15
**case** 26:17 27:7
28:11 45:10
60:16 63:18
**cashier** 15:7
**cause** 6:10
**Center** 67:11
**cents** 18:23
**Century** 14:21
15:11,12
**certification**
75:2
**Certified** 2:15
94:3
**certify** 6:2 94:5
94:13
**change** 25:16
86:6
**charge** 21:4,4,11
21:16 56:4,7
59:17 81:13
90:15,22 91:1
91:5,16,17
92:4,6,12,14
92:14
**checked** 73:17
74:7,14,15
**child** 80:4
**Childs** 4:7
**choosing** 46:1,7
**chosen** 46:11
**Civil** 1:14 6:4
**claim** 27:13 28:1
28:14,19,21,22
31:13 47:20
58:16 84:14
**claiming** 30:20
87:2
**claims** 23:23
26:3,4,6,8,10
26:11,21,21,23
27:10,17 31:3
31:16,19 46:15
46:23 47:7,14

47:15 48:23
49:7,12 52:2
64:18
**clarify** 7:9 26:14
**Class** 73:3
**classification**
56:9 66:15,17
66:23
**clean** 7:19 38:12
**clear** 26:9 28:2,9
40:8 48:4 69:5
**clearly** 7:23
**clients** 80:7
**close** 32:8 35:3
51:19
**closed** 9:6,8 10:2
15:15 17:22
19:14 20:9
31:23 32:6,9
32:11,18 34:8
34:9,13 35:17
**closes** 33:5
**closing** 32:21
33:8
**Code** 73:3
**coffee** 48:16
**commencing**
2:19
**comment** 61:18
**Commissioner**
3:15 94:5
**communicate**
66:18
**complain** 92:23
**complained** 35:6
81:2
**complaining**
29:6,7 30:2
34:15 43:8
44:9 58:23
59:12,18 75:21
78:6 91:20
92:21
**complaint** 25:22

27:1,1,2,2,3,4
27:9,11 28:10
30:6 55:12
56:19 60:2
63:11 80:21
81:13 84:18
86:19 87:1,6
**complaints**
21:14 28:4
56:14
**compliance** 3:1
**complies** 62:10
63:8
**compound**
43:16 72:2
**Computerized**
94:7
**conducting** 66:7
**confused** 13:22
76:3
**connection**
69:10
**contained** 84:22
**contend** 67:18
**continually**
58:10
**continue** 32:23
33:20
**continued** 5:1
32:20 33:7,10
33:22 34:2,4,6
35:1
**continuing**
32:17 33:4,14
34:22 35:12
**continuous** 14:6
14:8
**Cooper** 2:16
4:14 6:7
**Coordinator**
90:21
**copied** 23:4,13
**correct** 8:22
10:3 19:9 31:1

33:9,21 53:21
54:8,12,18
55:10,14 56:11
57:15,15 58:1
58:8,12,17,21
60:9,13 68:14
68:20 71:1,7
72:18 73:10,11
73:15 75:4,18
76:2,9,10,18
80:22 81:15,16
92:8 94:10
**Cottle** 89:10
**counsel** 2:13 3:6
3:8 6:5 57:8
58:7,11 94:14
**counseling**
65:13,18
**couple** 20:2
24:19 61:8
**court** 1:1,22,23
2:1 3:2 26:22
65:14
**covered** 27:14
27:17 36:20
84:10
**Crumb** 26:16
**CSR** 1:16 4:3
6:1 94:19
**current** 8:5
**currently** 8:16
53:23

**D**

**D** 1:4,11 2:4,13
6:10,14
**date** 6:3 10:1
24:17 32:17
57:13 58:3
60:10 75:1,15
75:17 81:6
90:17
**dated** 91:17
**dates** 75:5,11,13

90:17
**day** 1:19 2:18
6:8 79:15,15
79:15
**dead** 40:9
**deafness** 67:7
**December** 11:8
36:6
**decided** 88:7,11
**decides** 55:9
89:1,6
**decision** 42:12
45:5,6 89:15
90:7
**decisions** 41:6
43:2,8,11,14
44:18 45:16
47:21 48:9
**decision-make...**
42:4
**declared** 19:3
21:18
**deemed** 56:22
**defendant** 1:9
2:9 21:1 87:7
**DEFENDANTS**
4:11
**Defendant's**
3:21,22 55:17
63:2 79:4
90:14
**definite** 27:6
**degree** 65:12,17
**delivering** 1:17
**demotion** 27:23
**Denise** 8:4
**department** 1:8
2:8 13:11,12
16:23 17:3
37:20 42:5
53:5,11,12
54:1,5,17 56:3
56:10 63:15,21
87:3 88:13,17

88:17 89:11
90:8
**departments**
53:21
**depending**
69:16
**DEPONENT**
93:8
**deposed** 8:10,20
13:23 21:7
22:3 24:7 26:7
46:17,20
**deposition** 1:11
2:13,22,23 3:3
3:11,14 6:21
9:16 21:22
22:9,20 23:4
23:20 24:2,6,8
25:9,13,16,19
27:14,17 29:4
29:16 30:6,19
36:21 49:7
63:1 94:6,11
94:16
**designee** 89:18
**determination**
8:19 13:13,14
51:14 54:2
63:14 88:18
91:8,10
**determined**
67:14 68:13,16
68:21
**determines**
89:19
**development**
65:19 66:8
**Developmental**
67:11
**Diane** 30:10
34:20 39:14
90:22 91:21
**difference** 53:21
54:15,21 55:4

**different** 26:6
26:18 29:4
31:15 38:22
42:19 44:7
54:8,11 66:20
68:7 72:5 86:2
**differently** 18:4
**direct** 88:1,6
89:8
**director** 88:21
89:3,16
**disabilities** 66:2
66:14 67:9
**disability** 8:19
8:22 9:2 13:9
13:13,14,22
14:16 15:13,22
16:9,14 18:13
35:20 36:14
51:14 54:1
73:3 76:7,13
77:2 80:3
88:18 89:12
90:8
**disagree** 60:20
60:23 61:4,13
62:4,7,16
64:17 65:2
69:6 70:12,22
72:21 73:4
78:11,14 81:9
83:23
**disagreed** 61:22
62:6 70:2,9
81:9
**disagreements**
84:12
**disagrees** 62:1,2
69:9,11
**discriminated**
41:12,20 57:3
**discrimination**
29:6 30:23
44:15 46:16

47:14 48:1,3
48:10 87:9
**discriminatory**
47:22
**dismiss** 27:7
**DISTRICT** 1:1
1:2 2:1,2
**DIVISION** 1:3
2:3
**document** 22:19
23:1,2,3,6,16
55:22,23
**documents**
22:18 23:12,13
23:15,18,22
24:1,3 86:8,15
**dollars** 10:17
11:16 16:5
18:7,9,19,21
18:22 19:1,5
19:13,18
**Don** 47:8 48:11
49:8 50:3,15
51:2,3
**Dr** 38:5,16 40:2
**Drive** 8:7
**drop** 44:3
**dropped** 45:7
**due** 63:12 70:19
**duly** 6:15

**E**

**E** 94:1,1
**early** 67:3
**Edith** 35:9 39:9
**education** 13:13
54:1 64:8
65:23 67:14
88:17
**EEOC** 21:3,4,11
21:16 55:12,23
56:4,7,19
80:21 81:13
90:15,21 91:1

91:4,7,10,15
91:20 92:6,14
92:17,22
**effect** 2:23
**effective** 1:15
**eight** 16:4,11
18:7 19:4,12
19:17 79:14
**either** 28:23
36:3 38:8
50:20 51:6
53:9 79:13
**eleven** 11:16,22
**employed** 8:17
8:18,21 34:7
36:3 94:15
**employee** 13:15
51:7 53:13
**employees** 19:23
**employer** 73:11
73:14,16
**employment**
20:3
**ended** 16:3
**entitled** 61:23
**Esq** 1:18 4:6,12
4:13,18 5:2
**esteemed** 22:2
**et** 1:8 2:8
**evaluating** 43:22
**evaluations** 88:5
89:7
**eventually** 39:4
**evidence** 3:11
**exact** 10:1 20:6
57:13 60:10
75:5 81:6
**exactly** 11:15
27:22 45:9
52:5 60:23
89:18 91:23
**examination**
3:17 6:11,18
53:3

**examined** 26:15
**Excuse** 92:9
**exempt** 54:16
55:3,5
**Exhibit** 55:16,17
63:2 79:2,4
90:14
**exhibits** 1:20
3:20
**exist** 86:8
**experience** 64:6
64:11,14 65:9
65:21 66:10,12
67:15,17,19,21
68:2,4,8,14,17
68:22 70:22
78:12,15,19
**experienced**
68:9
**expert** 60:15,18
60:21 61:16
**explain** 63:17

---

**F**

**F** 94:1
**facilities** 33:11
33:15,22 34:3
35:2,14
**facility** 17:21
19:14 20:9
31:23 32:6,7
32:18 33:5,6,8
33:23 34:8,8
34:17,23 35:3
35:17 88:3,15
88:19
**fact** 9:1 17:17
30:9 61:17
77:23 78:17
84:15
**factually** 69:12
**fair** 43:16 45:11
**familiar** 60:6
**family** 9:8,10

80:6
**far** 23:5
**February** 90:18
**female** 91:11
**fifteen** 53:16
**fifty-four** 18:22
**file** 17:7 56:18
57:11
**filed** 1:23 20:20
21:3,5,12,14
25:20,21 27:3
27:4,5 55:12
56:16 59:15
60:15 80:21
81:12 86:19
**filing** 3:14
**fill** 46:13 92:6
92:11,13
**filled** 91:16
**finally** 71:7,12
**Finch** 1:4,11 2:4
2:14 6:10,14
6:19 8:4,6
20:21 21:22
24:7 46:15
53:4 63:13
73:1 76:6
87:21
**Finch's** 65:6
**find** 61:23 87:1
**fine** 29:2 59:20
59:23 62:5,9
87:14,19
**finish** 69:22
**finished** 11:19
66:5
**first** 6:15 17:16
25:13 26:7
29:17 37:11
49:19 52:3
55:21 57:11
58:14,19 79:16
**five** 18:9,14 50:9
50:19 87:13,16

87:17
**folks** 41:7
**following** 6:12
66:16 67:1
**follows** 6:16
**follow-up** 6:22
6:23 69:15
**force** 2:23
**foregoing** 6:5
94:6,9
**form** 3:7
**forty** 80:11
**forward** 81:23
**foster** 80:4
**four** 10:12 11:11
12:20 18:6,8
36:10 65:20
66:9 79:22
**freeze** 20:12
**freezes** 20:1
**friend** 51:17,19
**front** 61:1,3 69:1
**full** 3:1 65:15
**further** 2:20 3:4
3:13 53:1
84:12 93:5,8
94:13

---

**G**

**Gale** 2:17 4:14
**Gale,2400** 6:7
**gap** 10:5 36:4
**gather** 66:18
**getting** 35:7
71:12 80:15
**given** 20:15 24:3
61:6 94:11
**giving** 50:19
**Glen** 9:5,7 10:2

15:15 16:3
17:17,18,21
19:14,19 20:8
28:13 31:22
32:6,18,21
34:8 35:17
67:11
**go** 9:5 10:20
12:2 13:7 17:2
17:8 22:23
33:17 56:18
57:2 59:23
61:2 67:12
77:1 82:15
85:21 92:17,22
**going** 6:21 18:9
18:14,20 19:4
22:3,15 34:17
70:14 78:22,23
85:2 86:4
**Goldman** 1:16
2:14 4:3 6:1
94:3,18
**gotten** 30:21
31:14 48:6
**government**
21:15
**Graves** 30:11
39:16,21 90:23
91:22 92:8
**great** 61:18
**grounds** 3:9
**group** 11:1 12:8
12:9
**guess** 25:23 33:4
52:2 61:11

---

**H**

**H** 4:6
**half** 11:11 36:11
**handed** 23:14
**happened** 37:10
**happy** 7:9 63:20
**Harbert** 2:17

4:15 6:7
**hard** 67:7
**head** 7:17 71:18
**health** 9:2 10:22
    10:23 12:8
    14:15 16:23
    17:3,9,13,19
    18:6 20:3,18
    28:4 31:8,10
    31:17 34:7
    36:17 37:19
    42:5 49:1,13
    54:5,17 56:3,5
    56:10 65:20
    87:23 88:9,13
**heard** 43:23
**hearing** 7:22
    67:7 94:12
**here(indicating)**
    62:13
**higher** 11:22
**Hillcrest** 10:21
    10:23 12:2,14
    12:21,22,23
    13:8 14:15
    36:5,15,18
    79:7,16
**hire** 73:15
**hired** 55:5,10
    74:9 83:10
**home** 9:8,10
    11:1 12:8,9
    77:19 80:6
**horse** 40:9
**hospital** 11:2
**hour** 10:17
    11:16 79:14,15
    79:15
**hours** 79:7,20
    80:6,8,11 88:2
    88:19
**HTC** 29:10 30:5
    34:1,20
**HTC/HTL**

91:13
**HTL** 29:11 30:5
    34:20
**HTS** 18:15
    29:10,18,19
    30:1 35:7 39:4
**HTS's** 34:1
**huh-uh** 7:17
**human** 65:19
**hundred** 16:4
    18:6,9,18,21
    18:22 19:1,4
    19:13,17

—— **I** ——
**identified** 29:19
    63:11
**identify** 55:20
    57:20
**II** 29:12 30:13
    30:16 33:18,23
    60:5 63:23
    64:3 82:20
    83:16
**III** 4:6
**ill** 11:3
**impairment**
    67:7
**improperly**
    81:18 82:1
**inaccurate**
    69:13
**included** 63:10
**incorrect** 68:12
    76:4,15
**increase** 20:5
**independent**
    65:22 67:3
**INDEX** 3:16
**indicate** 78:16
**indicating** 55:16
    55:22 56:13
    57:19 61:5
    75:9,13 79:2

87:20 91:5
**indication** 85:4
**individual** 26:21
    30:19 68:18
**individuals** 30:3
    66:2
**information**
    42:8 44:22
    45:13,17 46:14
    46:21 48:9,22
    50:3,8 52:1
    60:21 66:19
    76:13 78:7
    81:10 86:9
**informed** 20:14
**initially** 62:20
**injury** 67:8
**instance** 26:9
    28:3 39:1
**insufficient** 65:8
**interested** 59:14
**interpersonal**
    66:22
**intervene** 57:12
    57:18,21,23
**intervenor**
    26:17
**intervenors**
    26:19
**intervention**
    67:3
**interview** 37:14
    37:17 38:4
    41:11 42:12
    43:3 44:13
    45:18,23 90:5
**interviewed**
    36:23 37:2,4,6
    39:3 42:20
    43:19,20 44:5
    44:6 45:5,8,10
    45:14,15 46:6
    89:23
**interviewers**

40:14,19 41:17
    42:3,10
**interviews** 37:9
    37:12,23 38:3
    40:11 41:4
    89:20
**involved** 29:14
**Ireland** 9:5,7
    10:2 15:15
    16:3 17:17,18
    17:21 19:14,19
    20:9 28:13
    31:22 32:7,18
    32:21 34:8
    35:17 67:11

—— **J** ——
**January** 91:12
**job** 12:3 36:11
    39:22 52:18
    55:1 60:3
    62:11 78:13
    80:13 89:1
**jobs** 14:18 33:6
    54:16,16,21,22
    56:21 58:23
    59:11,16,18
    62:12 84:15
**Joe** 26:1 28:17
**John** 35:9 39:1,4
**Jonathan** 30:10
    34:20 39:16,21
    90:23 91:21
**Joseph** 4:6
    49:15 52:20
**Joyce** 89:10
**Jr** 1:18 4:12
**Judd** 38:5,17
    40:3
**Judge** 26:18
**judged** 65:7
**July** 58:5 77:3
    91:18
**June** 13:20

15:16 35:20
**Justice** 35:9
    39:1,4

—— **K** ——
**know** 7:6 9:14
    16:8 18:4 23:5
    26:19 29:20,22
    34:3,6,12
    35:10,16 36:4
    37:1,8,10,11
    39:5,7 47:16
    48:1 49:18
    50:12,15,17,18
    51:5,10 52:1,3
    52:14 57:5,6
    59:9,18,21
    60:10 75:5
    76:19 81:5
    83:12 85:1,19
    86:3,15 88:11
    93:4
**knowledge**
    25:12,14 46:3
    46:8 47:1,7,19
    49:11 53:8,9
    56:17 66:13,20
    67:1
**knows** 52:6,7,9
    52:11
**Kress** 4:8

—— **L** ——
**law** 6:6
**laws** 3:2
**lawsuit** 21:1
    24:1 26:4,14
    26:16 27:5,11
    27:13 28:7,23
    31:4,18 46:16
    51:22 53:12
    59:15 64:16,18
    84:23 86:21
    87:13
**lawsuits** 20:20

26:20
**lawyer** 22:2,2
23:14 24:2
25:1,21 53:5
**layoff** 28:12
**leading** 3:7
**learn** 20:12
**learned** 46:14
47:2 82:18
**learning** 67:8
**leaves** 76:16
**left** 14:5 35:2
**letter** 74:19 91:2
91:6
**let's** 8:2 9:16
13:21 33:17
51:2 59:23
60:1 61:2 69:4
77:15
**level** 65:21
**License** 1:16
2:15 4:3 6:1
94:4,19
**life** 20:21
**Lightfoot** 1:17
3:18 4:12 6:18
6:20 21:9 22:7
22:17,23 23:7
23:9,12 27:15
27:20,23 28:12
28:16,20 29:2
29:3 31:9,12
32:3,5 39:20
48:18,20 53:1
90:13 93:5,7
**limit** 82:15
**list** 56:9 64:23
74:18 75:10
**listed** 50:10
56:12
**little** 13:21 26:5
38:12 49:2
72:7
**lived** 8:13

**lives** 51:4,12
52:21
**living** 65:22 67:3
**located** 51:2
**location** 33:1
**long** 10:5,10
11:9 12:18
62:8 79:14
**longer** 27:18,20
62:3
**look** 63:7 75:11
77:20,21 85:2
86:5,16
**looking** 62:20
86:13
**looks** 15:18 18:1
18:2,5 26:5
90:16 91:17

——————————
**M**
**making** 26:4,5,6
26:8 31:4,17
42:6,14 43:7
43:13 44:18
47:15 59:15
91:15
**male** 91:11
**manipulated**
28:5
**March** 9:20,20
9:23 10:3
19:15,19 31:22
35:3 36:1
**mark** 55:15
**marked** 55:13
55:17 63:1
79:2,4
**Mary** 35:9 39:9
**Masters** 1:16
2:14 4:3 6:1
94:3,18
**Master's** 65:12
65:17
**Maynard** 2:16

4:14 6:7
**ma'am** 56:1 57:7
58:4 69:3 70:6
71:20 73:13
74:10,12 75:14
77:10,13,14
83:9
**McCollum**
30:10 39:14
90:23 91:21
**mean** 21:23
28:23 33:3
43:13 47:16
88:9 91:8
**meaning** 87:5
**medical** 66:1
**medication** 7:21
**meet** 22:7
**meeting** 56:6
**memo** 20:16
**memory** 57:18
86:5
**mental** 9:2 12:8
16:23 17:3,8
17:12,19 18:6
20:3,18 28:4
31:8,10,17
34:7 36:17
37:19 42:5
49:1,13 54:5
54:17 56:3,5
56:10 87:22
88:9,13
**mentally** 11:3
**merit** 13:15 19:2
19:23 20:14
54:15,23 58:20
**met** 6:20 22:10
22:13 53:6
56:22 84:5
**MIDDLE** 1:2
2:2
**mind** 32:1,3
33:5

**minimum** 56:22
84:5,16
**minute** 48:21
**minutes** 53:6
62:3 70:7
**mistake** 86:23
87:10,18
**mistaken** 77:4
**Montgomery**
4:21 5:5
**month** 61:10
74:9 78:4
79:18
**months** 10:8,12
12:20 24:22
25:23 61:8
64:10
**Moore** 35:9 39:9
**morning** 22:12
29:1
**motion** 27:5,6
57:11,18,21,23
**motivated** 42:13
43:7,22 44:14
44:17 45:19
**move** 78:23

——————————
**N**
**name** 6:19 8:2
13:11 30:14
35:10 49:18
74:17
**names** 30:9 34:3
35:8 47:10
49:8
**nearly** 53:14
70:7
**necessary** 3:5
46:13
**need** 7:18 26:2
59:20 62:16
**needed** 66:14,16
**neither** 94:13
**never** 28:14 36:4

53:7 80:20
81:12
**new** 46:14 66:21
66:21
**nine** 18:9
**nineteen** 16:15
16:17 18:11
**nod** 71:5,17
**nodding** 7:17
71:2,6,9
**North** 4:9,20 5:4
**NORTHERN**
1:3 2:3
**Notary** 2:16 4:4
6:2
**notice** 3:14
22:20 23:4
**November** 1:20
2:19 6:9 32:9,9
32:11 35:4
61:9
**number** 1:16
2:15 4:3 6:2
18:12,13 55:16
55:17 79:2
87:13,16 90:15
94:4
**numbers** 18:10
**nursing** 65:19
67:4
**nutrition** 67:5

——————————
**O**
**oath** 7:2
**object** 22:16
61:15 72:2
85:6,18
**objections** 3:6,9
**observation**
61:21
**obviously** 69:20
**occasions** 20:2
**occupation**
65:20

occupational 67:4
occurred 90:18
October 25:20 74:7
offer 61:19
offered 3:11
offices 6:6
official 13:10
OFF-THE-RE... 22:5 23:11
oh 9:4 13:19 14:14 51:15 52:13
okay 7:12,19 8:2 8:5,9,13,20 9:5 10:5,10,13,18 11:6,9,12 12:1 12:7,18 13:1,7 14:14 15:10,17 15:21 16:13,19 17:6,12 18:1 18:10 19:11 20:7,12,17 21:3,18,21 22:1,13 23:7 23:18 24:18,21 25:4,8,11,15 26:17 28:16 29:2 31:3,21 32:11,14,23 33:17 34:11,19 35:5 36:3 37:8 37:19,22 38:8 40:13 41:2 42:2,8,16,18 44:3,12,21 45:2,4,22 46:20 47:5,12 48:2 49:22 50:2,12,14 51:1,9,17 52:10 53:16,18 53:23 54:4,23

56:14,18 57:17 58:3,6,23 59:23 60:8,20 61:11 63:20 64:20 65:10,17 66:4 70:4 72:7 72:10,20 73:9 73:20 74:7,21 75:6,20 76:15 77:23 78:6,10 78:20 80:1,20 81:7,12 82:7 82:11 84:2 85:2 88:2,4,16 89:1,6,9,20 91:10
once 60:11 74:13
ones 43:14
opinion 61:19
oral 1:19 6:11
orally 66:18
organizational 66:8
original 1:18 27:4 67:13 80:15
outside 88:13
owned 12:9
o'clock 79:9,12

——————
P
——————
P 4:13
page 3:17 87:12 91:19
panel 38:2,6,17 39:3,21
panelists 39:7 39:10 40:10 42:3 46:6
panels 38:10,13 40:15,20 41:11 41:18 42:21 43:20 44:5,13

45:15,18,23
Pantazis 4:7
Paragraph 87:17
Parole 52:17
part 25:15 44:3 45:7 70:4 76:14,14
particular 55:22 61:17 73:7 75:10,15 76:10
parties 2:12 3:8 94:15
Partlow 51:6
part-time 15:2,3 36:11 80:13
pasted 23:4
pathology 67:6
pattern 87:8
pay 10:16 11:13 13:5 15:22 20:5
pending 71:18
people 11:3 29:18 30:6,8 34:22 35:6,8 35:11,11,16 40:22 41:3,5 41:11,18,20 42:11,13,19,20 42:20 43:1,6 43:10,11,13,18 43:19 44:4,12 45:4,6,8,13,14 45:18,23 47:16 47:23 49:14 50:9,19 51:1 75:8
perform 35:12 35:13
performance 88:4 89:6
period 17:14 29:22,23 35:23

person 30:15 38:19
Personnel 1:7 2:7 53:5,11 55:2,8 56:15 56:20 57:3 58:15,20 59:1 59:12,13,14 63:14,21 67:20 68:13,16,21 73:13 74:2 75:22 77:7,8 77:11 78:3,18 80:22 81:14 82:2 84:22 86:20 87:3,7
person's 30:14
Pharrams 4:18
PHP 12:4,5,7,16 12:19 13:5
phrase 85:6
physical 67:5
place 17:16,18 20:13
placed 83:10
plaintiff 1:5 2:5 4:5 26:16
Planning 66:6
Plaza 2:17 4:15 6:8 14:22 15:11,12
please 1:21 7:8 7:14 8:3 17:9 22:6 45:2 51:2 55:20 58:4 65:14 69:7,23 71:19,23 72:9 75:12 77:21 83:9 85:11,15 85:22
plus 53:17,18,20
point 10:9 20:18 22:1 43:16 48:12 50:1

60:23 70:5 84:1
portion 59:8 68:11 69:5 70:10,11 71:21 72:1 85:17 86:1
position 9:12 29:10,11,12 30:4,5,13,14 33:19,20 34:13 34:16,17 39:5 46:12,13 47:17 58:15,19 65:7 69:10 72:12 73:2,6,8,21 74:1,11,20 76:7 77:5,9 78:2 80:18 81:3,15,19 82:3,8,12 83:2 83:14
positions 26:12 29:5,9,10,13 29:14,19 30:7 31:13,15,21 32:15,15,17,20 33:4,7,10,14 33:21 34:21,21 35:7,12,13,13 37:1 38:1 60:5 60:6,9 63:9 80:22 84:4 91:13
practice 87:8
prepare 21:21 22:8
pretty 81:23
prevents 7:22
previous 30:18 36:21
previously 63:1 70:2
prior 3:11 12:21

| | | | | |
|---|---|---|---|---|
| 21:6 22:13<br>76:11 86:20<br>**probably** 11:16<br>53:20<br>**Probation** 52:17<br>**problem** 66:21<br>**Procedure** 1:14<br>6:4<br>**proceedings**<br>6:12<br>**processes** 66:13<br>**produced** 24:2<br>**professional**<br>65:21<br>**programs** 66:6,8<br>**promoted** 52:9<br>55:9 74:6,16<br>74:19,22,23<br>75:9,21 76:17<br>88:7 89:14,19<br>90:4 91:12<br>**promotion**<br>18:15 26:10,11<br>30:1,16 31:18<br>34:15 43:7<br>47:15,21 48:23<br>49:12 52:4,8<br>56:4 90:2,19<br>92:7,15,21<br>93:1<br>**promotions** 29:8<br>30:2,20 31:5<br>31:16 36:22<br>40:20 41:6,12<br>41:19 42:15,22<br>44:8 46:17,23<br>48:5 50:2,14<br>50:17,22 88:12<br>89:21,23 90:22<br>91:21<br>**provided** 6:3<br>65:21<br>**psychology**<br>65:18 | **Public** 2:16 4:4<br>6:2<br>**put** 20:1,13<br>22:20 26:20<br>73:13<br><hr>**Q**<br>**qualifications**<br>46:12 56:23<br>64:22 70:19,21<br>72:11,13,17<br>84:6,17<br>**qualified** 46:2<br>83:11<br>**qualifying** 86:12<br>**question** 7:7<br>17:5 19:16<br>22:6 31:11<br>33:9,12 38:21<br>40:17 41:15<br>42:17 43:9,17<br>44:2,20,23<br>46:4 58:18<br>59:4,7 65:4<br>67:13,19 68:5<br>68:10 69:15,17<br>69:19 71:8,13<br>71:18,19 72:3<br>78:21,22 81:20<br>81:21,22 82:22<br>85:15,16,22<br>86:3<br>**questions** 3:7,8<br>6:22 7:1,5,10<br>7:14 26:1 53:1<br>53:10 69:16<br>71:15,16 80:15<br>85:22 90:11<br>93:5 94:8<br>**quick** 48:16<br>**Quinn** 4:7<br>**quit** 80:1,2,4<br><hr>**R**<br>**R** 4:18 94:1 | **race** 29:6,8<br>30:22 41:13,21<br>42:13 43:7,22<br>44:14,15,17<br>45:19 46:16<br>48:7,10 87:8<br>**racially** 47:22<br>**racist** 40:15,22<br>41:8 42:6<br>**raise** 19:23<br>63:12<br>**raises** 16:20<br>18:2,20 19:3<br>20:2,15<br>**rate** 10:16 13:5<br>15:22 18:18<br>19:12,19<br>**rates** 11:13<br>**read** 18:3 24:12<br>24:14 25:2,6<br>29:1 60:18<br>65:14 69:3,4,6<br>70:6,8,9 81:8<br>83:21,23 85:22<br>**reading** 2:21<br>**reads** 59:8 71:21<br>72:1 85:17<br>86:1<br>**real** 48:3<br>**really** 10:7,8<br>26:10 49:3<br>91:14<br>**reason** 19:7<br>40:13,18,21<br>41:2,7,10,16<br>41:19 43:5,21<br>44:14,17 45:17<br>45:20,22 46:5<br>53:19 57:2<br>68:1,6,7<br>**reasons** 41:22<br>**recall** 10:5 11:6<br>11:20 20:9,11<br>25:18 37:3,13 | 37:15 38:6,18<br>40:9,12<br>**recalled** 38:2,5<br>**receive** 29:8<br>77:6<br>**received** 74:18<br>77:4 91:4<br>**receiving** 20:17<br>**recess** 48:19<br>**recollection** 56:6<br>**record** 7:19 8:3<br>23:10 27:12<br>55:20 62:23<br>69:5,7 70:1<br>**referring** 87:6<br>**reflect** 62:23<br>**reframe** 71:14<br>**refresh** 57:17<br>86:5<br>**regard** 29:9,17<br>29:17 31:8,9<br>34:19 35:5<br>37:23 43:18<br>44:4,12 53:10<br>90:14 92:7<br>**regarding** 56:3<br>56:20 64:17<br>81:14 88:16<br>**register** 55:1<br>73:9,12,14,17<br>74:8,14,15<br>76:18,20,22<br>83:11<br>**registers** 28:5<br>**regular** 23:2<br>**rehabilitation**<br>60:4,5 63:22<br>64:3,5,9,12,22<br>65:1,6,18,23<br>66:1,12,13<br>67:2 78:13<br>80:17 81:18<br>82:3,9,13,19<br>83:15,16 90:20 | **reject** 67:20<br>**rejected** 63:12<br>64:2,4,6,8,11<br>64:13 67:13<br>68:1,7 70:18<br>70:21,23 73:23<br>81:18 82:2<br>84:16,17,21<br>**related** 94:14<br>**relates** 47:20<br>**relating** 3:2<br>46:16 48:9<br>50:21 92:14<br>**relevant** 22:16<br>**remember** 10:1<br>10:15 11:12,21<br>13:4 15:21<br>18:16 19:11<br>20:17 21:5<br>24:17,23 30:9<br>32:5,7 36:20<br>39:2,9,20 40:5<br>45:9 47:9 60:2<br>62:22<br>**remembered**<br>39:18<br>**repeat** 19:16<br>22:6 31:11<br>40:17 41:15<br>46:4 58:18<br>59:6 71:19,22<br>78:20,22 85:10<br>85:14<br>**repeating** 32:1,3<br>**rephrase** 22:21<br>72:5 81:20,22<br>**report** 60:15,18<br>60:21 61:14<br>62:17,20 65:3<br>65:5 67:16,22<br>68:3,11,19,20<br>68:23 69:2,5,9<br>69:11 70:3,4,6<br>70:8,11 72:10 |

72:15,21 76:1
76:2,4,5,13
78:7,10,16
80:16 81:7,10
82:4 83:20,23
84:2,10,23
reporter 1:22
2:15 59:8
65:15 71:21
72:1 85:17
86:1 94:4
represent 56:1
represented
57:8 58:7,11
represents 94:10
request 22:19
23:2,2,3,6
requested 59:8
71:21 72:1
85:17 86:1
requests 23:16
required 66:3
66:11
requirement
65:9
requirements
65:11,12,15,16
67:10 68:4
78:13
requires 66:23
research 66:7
residence 8:9
residents 11:2
resources 66:19
respect 65:8
69:12
respective 2:12
responsive
22:19 77:22
resulting 63:13
results 41:4
42:12 43:3
retained 1:22
retaliation 87:2

87:4,9
review 17:7 24:6
61:5,12 62:1,4
62:9 85:3
87:20 91:7
reviewed 84:11
reviewing 68:18
re-applied 64:9
RE-EXAMIN...
90:13
re-read 70:1
re-state 70:1
right 8:16 9:2,19
10:4,10,15
12:1,18 13:4
13:10,21 14:14
14:23 15:12
16:6,7 17:19
19:6,20,21
20:23 22:3,17
24:10 25:19
27:15,16,22
28:21 29:3,15
30:12,18 36:6
36:8 40:8
42:21 43:15
44:7,10,11
46:10,23 47:18
48:2,20 50:12
52:18,20 54:1
61:1,3 65:5
71:12 76:22
80:23 83:13
84:13 85:1
86:3,10 87:19
91:18 93:6
Ronald 49:15
52:14
roughly 18:6
row 14:12
Rule 1:13 6:3
rules 1:14 3:2
6:4
run 12:12

**S**
SAITH 93:8
salary 15:23
Saturday 79:20
Saturdays 79:8
79:11,19
saw 23:13
saying 33:6 45:4
66:4 73:6
76:15 77:8
78:1
says 63:10,12
65:17 67:16,22
68:3,23 69:2
73:1 91:15
Sears 14:20,20
14:21 15:3,6
15:10 80:3
second 37:9,12
37:16 48:14
securities 27:7
see 8:2 13:21
26:2,10,11,13
62:15 80:7
seeing 55:21
seen 24:9 60:15
selected 30:7,8
73:2,7,10 76:6
77:5,9 78:2,3
selection 39:3
selections 38:14
42:14
send 20:16 25:2
77:11
Senior 63:6 64:7
73:2 76:7 81:1
81:14 82:22
83:2,6
sent 23:1 56:2
77:8
separate 14:3
26:20
September
25:22 73:1

74:6 75:2,3,18
76:5,18
Seraaj 9:8,10
10:6,11
series 16:20
18:20
service 8:19
13:13,14 51:14
54:15 64:7
81:1,14 82:23
83:2,6
services 63:7
66:1 89:12
set 88:2,3,21
89:3
sets 88:19
seven 8:7 18:18
18:21,22 19:1
79:8,12
seventeen 18:19
seventy-four
18:14
seventy-seven
16:5,11 19:5
19:13,17
seventy-three
19:1
shake 71:17
Short 48:19
Shorthand 2:15
94:4
show 57:17 75:6
showing 57:19
62:23
signature 2:21
91:19
similar 35:13
simple 65:4
simultaneously
13:3
sir 49:17 50:11
sitting 70:7
situations 66:21
six 6:20 8:10

23:19 24:2,21
30:19 31:5,13
31:15,18 32:15
36:22 37:4,14
38:1,14 40:10
40:15,20 41:12
41:18 42:21
43:20 44:6,8
45:16 46:17,22
47:15,20 48:5
48:23 49:7,12
50:2,22 51:1
52:2
sixteen 79:20
sixty-nine 16:15
16:17 18:12
skills 46:3,8
65:22
social 65:19 67:4
81:1,15 82:23
83:2,6
sorry 9:9 79:10
sort 14:2 43:16
49:6 61:19
sound 16:6 19:6
19:20 57:15
sounds 16:7
19:21 44:6
sources 66:20
SPD 19:3 65:7
67:14 72:10,12
speak 52:12
special 65:22
Specialist 63:23
64:3,5,10,12
64:23 65:1,7
73:3 76:8 77:3
80:17 81:19
82:3,9,13,19
83:15,16
specialty 66:9
66:10 67:2
specific 27:8
48:4 49:2

| | | | | |
|---|---|---|---|---|
| 69:16 | 83:20 | S-E-R-A-A-J | terms 18:1 29:12 | 89:16 |
| specifically | stating 74:19 | 9:18 | 36:21 46:2 | third 30:12 |
| 53:10 | 77:4 | | 47:16 | thirty-five 18:21 |
| speech 67:6 | Stenotype 94:7 | **T** | Terry 30:14 | Thompson |
| spell 49:18 | step 72:7 | T 94:1,1 | 33:19 34:6,12 | 26:18 |
| spent 70:7,14 | STIPULATED | table 71:13 | 39:19 40:1 | thought 28:5 |
| Springs 8:7 | 2:11,20 3:4,13 | take 48:15,21 | 50:5,6,8,13 | 38:4 39:17 |
| stage 37:9,11,12 | STIPULATION | 61:12 62:3,8 | 52:3,8,11 92:7 | 40:2 |
| start 13:17 51:2 | 2:10 | 72:7 | 92:9,15,18,20 | thousand 16:1 |
| 59:2 60:1 | stipulations 6:5 | taken 1:19 2:14 | 92:23 | three 10:8 26:11 |
| started 11:7,17 | straight 9:1 | 26:19 94:6,16 | testified 6:16 | 29:4,9,9,13,18 |
| 14:9,10 16:8 | 81:23 | talk 7:18 9:16 | 38:15 41:14,23 | 30:2 31:14 |
| 18:2,5 35:19 | Street 4:9,20 5:4 | 22:4 26:11 | 42:9 43:6 44:1 | 35:6 49:8 75:8 |
| 35:20 79:16 | submitted 84:4 | 59:3 | 44:19 | 84:15 |
| starting 11:13 | substitute 66:11 | talked 18:11 | testimony 1:19 | Tim 35:9 39:12 |
| 15:22 | suggest 25:2 | 27:8 29:5 31:6 | 25:12,16 28:17 | time 3:10,10 |
| State 1:7 2:7 | suggests 42:10 | 31:13,19 32:16 | 29:1 61:19 | 8:14 14:5,7 |
| 4:19 5:3 8:2,18 | suing 63:21 | 33:18 37:2 | Thank 58:6 63:4 | 15:13 17:10 |
| 9:11 11:4 | supervisor 88:1 | 44:8 45:7 | 90:11 93:7 | 19:14 21:7 |
| 12:10,12 19:23 | 88:6 89:8 | 51:21 | Theodore 4:13 | 24:7 26:7,7 |
| 20:13 51:7 | support 23:23 | talking 31:7 | therapist 10:14 | 29:22,23 36:14 |
| 52:18 53:5,11 | 47:14 48:23 | 36:22 40:21 | therapy 67:4,5 | 37:22 42:6 |
| 53:13 55:2,7 | 49:6,12 | 42:18,19 43:1 | thereto 3:12 | 47:3,5 53:2 |
| 56:15,20 57:3 | supported 46:22 | 59:19 82:16 | 94:8 | 55:21 56:7,15 |
| 58:15,20,20 | 47:7 | 85:12,19 90:17 | things 81:9 | 57:9 58:7,9,11 |
| 59:1,12,13,14 | supports 46:15 | 90:19,21 91:6 | think 6:20 9:7 | 64:2 69:21 |
| 63:21 67:20 | sure 10:9 11:15 | 92:3 | 9:23 12:19,22 | 70:14 71:22 |
| 68:12,16,21 | 13:6 17:5 19:9 | talks 91:10 | 14:9 15:13 | 72:8 73:15 |
| 73:13 74:2 | 31:12 34:10 | Tamara 4:18 | 16:1 19:7 21:9 | 74:15,16 75:9 |
| 75:22 77:7,8 | 37:21 38:19,22 | tell 7:8 17:9 18:4 | 27:15,16,16 | 75:10 86:7,11 |
| 77:11 78:2,17 | 40:18 41:16 | 20:5 25:8 28:3 | 29:13 35:8 | 86:14,17,18 |
| 80:21 81:13 | 46:5 48:12,18 | 33:3 45:2 52:5 | 36:5 38:8,9 | timeframe 82:16 |
| 82:2 84:22 | 52:23 57:16 | 52:7,10 60:22 | 39:16 41:2 | 84:9,10 |
| 86:20 87:3,7 | 59:22 60:14,22 | 61:3,13 62:2 | 43:5,21 44:14 | times 19:22 20:4 |
| stated 68:12 | 69:4 77:20 | 63:9,20 65:2 | 44:17 45:17,20 | 44:7 64:6 |
| 76:5 | 81:5 83:21 | 70:11 83:9 | 45:22 46:5 | 84:21 |
| statement 27:6 | 88:8,10 89:19 | 84:20 88:16 | 47:19 48:5,6 | Tim's 35:10 |
| 50:20,20 64:17 | 91:23 | telling 18:23 | 48:13,21 49:23 | today 6:23 7:3,5 |
| 68:15 76:9,10 | Susan 1:15 2:14 | 47:9 | 50:3,7 75:22 | 7:21 22:3,18 |
| 84:8 85:5,7,8,9 | 4:3 6:1 94:3,18 | ten 14:11,13 | 77:2,18 79:3 | 24:4 |
| 85:13,20 86:12 | sworn 6:15 | 15:19 16:20 | 79:17 87:17,21 | Tolbert 49:15 |
| statements 42:6 | system 13:15 | 17:13 62:3 | 92:2 | 49:16 52:20 |
| states 1:1 2:1 | 54:16,23 58:20 | 70:7 79:15 | thinking 7:22 | told 22:2 35:20 |
| 65:5 72:10 | S-A-R 9:17 | tenures 14:3 | 9:22 48:17 | 36:5,10 38:9 |

## FREEDOM COURT REPORTING

39:17 40:2
45:11 46:21
47:5 52:14
76:21,21 83:22
92:8
**Tommy** 38:5,17
40:3 88:23
89:4,17
**Training** 66:6
**transcribed** 94:9
**transcript** 1:18
24:8 94:10
**traumatic** 67:8
**trial** 3:10
**true** 94:10
**truth** 25:8
**try** 26:9 38:11
49:3,4
**trying** 26:3
**Tuscaloosa**
12:14
**twelve** 79:15
87:12,15
**twenty** 53:16,17
53:18,19
**twenty-five**
10:17 53:14
**twenty-seven**
15:1,3 84:3,4,7
84:15
**twenty-three**
84:6
**twenty-two** 16:1
16:15,17
**twice** 60:12
63:13 64:1
74:11
**two** 3:22 10:8
14:2,18 28:2
30:6,7 34:14
42:19 54:8,21
63:12 79:2,4
81:8 85:21
**type** 30:4,12

**types** 26:12
31:15 42:20
54:21
**T-O-L-B-E-R-T**
49:21

_____

**U**
**uh-huh** 7:16
16:12 75:19
**understand** 7:2
7:7 21:23 26:3
30:1 38:22
42:16,22 43:9
43:12 44:2
45:1,3 53:20
54:7,14 67:18
69:21 70:15,16
79:3
**understanding**
7:23 54:20
64:15
**understood** 7:11
29:15
**unemployment**
35:23
**Union** 4:20 5:4
**UNITED** 1:1 2:1

_____

**V**
**varied** 80:7,10
**variety** 66:19
**various** 66:14
**verbally** 7:15
**vicinity** 16:4
**visual** 67:6
**vocational** 65:23
67:2
**Vs** 1:6 2:6

_____

**W**
**waiting** 70:8
**waived** 2:22
3:15
**walk** 38:23
**Walker** 47:9

48:11 49:9
51:11
**want** 7:6 25:16
26:9 28:1 39:1
48:3,13,15
61:17 62:8
63:17
**wanted** 48:21
76:16
**Warren** 1:17
4:12 6:19
88:23 89:4,17
**way** 7:17 25:17
31:4 38:22
60:1 71:7 72:6
**week** 80:9,11
**weeks** 24:19
**went** 9:1,8,10
10:6,21 15:13
30:3 35:17
36:6 37:8
73:17 79:13
92:16
**weren't** 13:22
30:9 73:10
74:8,13 76:17
76:22
**We'll** 72:7
**we're** 36:22
40:21 42:18,19
43:1 48:4
82:16
**we've** 31:5 44:8
53:7
**whichever** 38:15
**white** 29:18 30:3
30:8,15 83:18
91:11,11
**whites** 82:7,18
83:1
**Wiggins** 4:7
**withdraw** 25:17
**witness** 2:22
6:10 59:11

62:10 63:8
94:11
**witnesses** 47:6
47:12 48:8,22
49:6,10
**wondering** 37:3
**words** 20:1,14
**work** 10:11 14:5
14:15,19,21
15:2 16:22
17:3 36:8
51:13 52:16,22
53:23 65:19
67:4 80:8,11
87:23 88:18,19
**worked** 11:1,1
12:4,19 14:2
14:11,13,18,19
15:1 17:12,16
17:18 36:10,14
54:4 79:8,14
79:17
**Worker** 64:7
81:1,15 82:23
83:2,7
**working** 13:22
36:13,17,18
79:19 80:3,5
88:2
**works** 51:5,6
**writing** 66:18
**written** 24:8
28:21 50:20
62:12
**wrong** 19:8
76:23

_____

**Y**
**Yeah** 33:12
**year** 15:14 16:2
17:13 20:8,11
20:15 25:22
34:14
**years** 6:20 8:10

11:11 14:13
15:2,3,19
16:20 18:8
20:6 23:19
24:2 36:11
49:7 53:14,16
53:16,18,20
54:14 65:20
66:9 79:22
**y'all** 23:19 27:5

_____

**0**
**03** 74:9 75:20
77:1,3
**06** 9:20

_____

**1**
**10-31-96** 64:8
**10:00** 2:19 6:9
**10:30** 79:17
**11-14-96** 64:11
64:13
**1116** 63:5,5
**1117** 63:3,6
**117** 63:2
**13** 58:5
**15** 1:15
**16th** 74:23 75:2
**19** 8:21
**19th** 4:9
**1988** 1:15
**1990** 18:8
**1991** 18:15
**1993** 21:16
91:12,18
**1994** 18:23
**1995** 19:2 20:7
58:5,6
**1996** 16:23 17:4
19:4 31:22
32:7 36:1
58:16,21 60:9
81:4
**1997** 15:16
35:21

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

| **2** | **8** |
|---|---|
| **2:00** 79:17 | **825** 8:7 |
| **2:07CV24-M...** | **83** 1:16 2:16 4:4 |
| 1:6 2:6 | 6:2 94:4,19 |
| **20th** 1:19 2:18 | **86** 17:14 29:20 |
| 6:8 75:3 | 29:21 |
| **2001** 8:21 13:17 | |
| 13:23 22:14 | **9** |
| 24:9 25:20 | **9th** 13:20 15:16 |
| 26:15 27:3,14 | **9-29-03** 75:15 |
| 29:4,16 46:18 | **90** 3:18 |
| 46:20 | **91** 18:13 29:20 |
| **2002** 74:3 | 29:21 |
| **2003** 73:1,19 | **92** 18:20 |
| 74:4,5,6,18 | **93** 18:22 21:8,9 |
| 75:2,3,7 76:6 | 55:13 90:19 |
| **2007** 1:20 2:19 | 92:20 |
| 6:9 | **94** 33:19 92:9,22 |
| **2400** 2:17 4:15 | **95** 33:19 57:14 |
| | 92:9,22 |
| **3** | **96** 9:21,22,23 |
| **30** 6:3 | 10:3 11:8 |
| **301** 4:9 | 17:14 19:15,19 |
| **35203** 4:10,16 | 32:10,12 35:3 |
| **35215** 8:8 | 35:4 36:6 |
| **36130** 4:21 5:5 | 63:23 64:1,1 |
| | 80:18 82:5,17 |
| **4** | 82:17 83:3,7 |
| **4-25-96** 64:4,5 | **97** 13:18,19,20 |
| | 14:9,10 15:14 |
| **5** | |
| **5(d)** 1:13 | |
| **50403** 73:3 | |
| **53** 3:19 | |
| **55** 3:21 | |
| | |
| **6** | |
| **6** 3:18 | |
| **6:30** 79:8,12,13 | |
| **64** 4:20 5:4 | |
| | |
| **7** | |
| **7:00** 79:13 | |
| **79** 3:22 | |

## DECLARATION OF JIM ELLIOT

My name is Jim Elliot. I am over the age of 18 and competent to make this declaration. The statements made herein are based on my personal knowledge and/or review of records of the State of Alabama Department of Mental Health, and are true and correct to the best of my knowledge.

1.     I have been employed by the Department of Mental Health since October 1988. I am currently employed as the Personnel Director at Bryce Hospital. During the period relevant to Audrey Finch's complaint I served as the Assistant Personnel Director and then the Acting Personnel Director. I am familiar with the Department's recordkeeping practices.

2.     In her First Amended Complaint and her depositions Audrey Finch identifies an individual named "Tim" who she claims was promoted to an Habilitation Treatment Specialist position between 1986 and 1991. I am not aware of anyone named "Tim" being promoted to an HTS position in or around this time, and am unable to identify any such individual.

3.     The positions at issue, Habilitation Treatment Specialist, Habilitation Treatment Coordinator/Habilitation Treatment Leader, and Administrator II, all would have entailed an increase in pay, the addition of new duties and responsibilities, and a change in the chain of responsibility for Finch.

4.     Exhibit A is Audrey Finch's EEOC charge filed against this Department, which has been kept and maintained in the ordinary course of business.

5.     Exhibit B is a letter appointing Terry Avery to the position of Administrator II as of July 25, 1992. This letter has been kept and maintained in the ordinary course of business.

6.      Exhibit C is a letter to Audrey Finch on January 8, 1993 informing her that she was not selected to the Habilitation Treatment Coordinator positions. This letter has been kept and maintained in the ordinary course of business.

7.      Exhibit D is the position announcement for the Habilitation Treatment Coordinator positions from November 1992. The requirements and qualifications stated in this announcement are similar to the requirements and qualifications posted for all Habilitation Treatment Positions during the period at issue in this litigation. This position announcement has been kept and maintained in the ordinary course of business.

8.      John Justice and Mary Edith Moore (whose last name at the time was May) both applied for Habilitation Treatment Specialist positions at Glenn Ireland during the period in question. Both had Bachelor's degrees in Psychology.

9.      Exhibit E is a letter confirming John Justice's appointment to the position of Cottage Supervisor effective December 7, 1987. This letter has been kept and maintained in the ordinary course of business. The Cottage Supervisor position became the Habilitation Treatment Specialist position in January 1988.

10.     Exhibit F is a letter from February 28, 1990 confirming Mary Edith Moore's appointment as Habilitation Treatment Specialist. This letter been kept and maintained in the ordinary course of business.

11.     Exhibit G is Diane McCullar's application for the Habilitation Treatment Coordinator position. This application has been kept and maintained in the ordinary course of business. As noted on her application, McCullar had been performing duties as an acting HTC due to personnel shortages.

12.     Exhibit H is Jonathan Graves's application for the Habilitation Treatment Coordinator position.  This application been kept and maintained in the ordinary course of business.

13.     Exhibit I is the position announcement from March 17, 1992 for the position of Administrator II.  This announcement has been kept and maintained in the ordinary course of business.

14.     Exhibit J is a letter dated June 22, 1992, from Jim Elliot, Acting Personnel Officer, requesting to appoint Terry Avery to the open Administrator II position.  This letter has been kept and maintained in the ordinary course of business.

I declare the above to be correct under penalty of perjury this 20th day of December, 2007.

Jim Elliot

# EXHIBIT A

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

| |
|---|
| PERSON FILING CHARGE |
| Finch, Audrey D |
| THIS PERSON (check one) |
| [X] CLAIMS TO BE AGGRIEVED |
| [ ] IS FILING ON BEHALF OF ANOTHER |

CHIEF EXECUTIVE OFFICER
GLENN IRELAND II DEVELOPMENTAL CTR
91 BLACK CREEK ROAD
TARRANT, AL 35217

| DATE OF ALLEGED VIOLATION | |
|---|---|
| Earliest | Most Recent |
| 02/06/93 | 02/06/93 |

PLACE OF ALLEGED VIOLATION
TARRANT, AL

CHARGE NUMBER
130932561

### NOTICE OF CHARGE OF DISCRIMINATION
(See EEOC "Rules and Regulations" before completing this Form)

You are hereby notified that a charge of employment discrimination has been filed against your organization under:

[X] **TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

[ ] **THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967**

[ ] **THE AMERICANS WITH DISABILITIES ACT**

[ ] **THE EQUAL PAY ACT (29 U.S.C, SECT. 206(d))** Investigation will be conducted concurrently with our Investigation of this charge.

The boxes checked below apply to your organization:

1. [ ] No action is required on your part at this time.

2. [X] Please submit by **08/16/93** a statement of your position with respect to the allegation(s) contained in this charge, with copies of any supporting documentation. This material will be made a part of the file and will be considered at the time that we investigate this charge. Your prompt response to this request will make it easier to conduct and conclude our investigation of this charge.

3. [X] Please respond fully by **08/16/93** to the attached request for information which pertains to the allegations contained in this charge. Such information will be made a part of the file and will be considered by the Commission during the course of its investigation of the charge.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

Birmingham District Office
1900 Third Avenue, North
Birmingham, AL 35203-2397

_Arthur Sanders, Investigator_
(Commission Representative)

_(205) 731-1170_
(Telephone Number)

[X] Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

[X] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NAT. ORIGIN  [ ] AGE  [ ] DISABILITY  [ ] RETALIATION  [ ] OTH

CIRCUMSTANCES OF ALLEGED VIOLATION

See enclosed Form 5, Charge of Discrimination.

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 07/26/93 | Warren A. Bullock, Director | _Warren A. Bullock_ |

EEOC FORM 131 (Rev. 08/92)

EXHIBIT A

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA ☒ EEOC | 130932561 |

_____ and EEOC

State or local Agency, if any

| NAME (Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area C |
|---|---|
| Ms. Audrey D. Finch | (205) 252-1604 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF B |
|---|---|---|
| 1309 21ST STREET NORTH APT 101, | BIRMINGHAM, AL 35234 | 02/06/ |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITT STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area |
|---|---|---|
| GLENN IRELAND II DEVELOPMENTAL CTR | Cat A (15-100) | (205) 849-065 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 91 BLACK CREEK ROAD, TARRANT, AL 35217 | | 073 |

| NAME | TELEPHONE NUMBER (Include Area C |
|---|---|

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE DISCRIMINATION TOOK PL |
|---|---|
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN  ☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify) | EARLIEST   LATEST  02/06/93   02/06/9 |
| | ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

On about February 6, 1993, the above named employer failed to promote me to the position of Habilitation Coordinator for which I applied. Despite my qualifications the positions were filled with less qualified White employees. My position is Habilitation Treatment Specialist, and I have been employed since January 21, 1986.

I was not given a reason as to why I was not promoted.

I believe I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

a. Of approximately 6 Habilitation Coordinators only one is Black.

b. It is my belief that the White applicants selected to fill the positions of Habilitation coordinator are less qualified than I, with less education and experience with Glenn Ireland.


Jul. 19, 1993.

| ☐ I want this charge filed with both the EEOC and the state or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belie |
| | SIGNATURE OF COMPLAINANT |
| Date 7/19/93   Audrey D. Finch   Charging Party (Signature) | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year) |

Enclosed are (1) a Notice of Charge of Discrimination and (2) a copy of the actual cha... filed against your organization. The Commission is required by law to investigate char... filed with it. For purposes of determining the scope of our investigation, your organizat... is requested to submit the following information and records:

1.    Give the correct name and address of the facility named in the charge.

2.    State the total number of persons who were employed by your organization duri... the relevant period. Include both full and part-time employees. How many employe... are employed by your organization at the present time?

3.    Submit a written position statement on each of the allegations of the charg... accompanied by documentary evidence and/or written statements, where appropriat... Also include any additional information and explanation you deem relevant to th... charge.

4.    Submit copies of all written rules, policies and procedures relating to the issue ... raised in the charge. If such does not exist in written form, explain the rules, polici... and procedures.

The completeness of your response and supporting documentation, will enable the Commissio... to more expeditiously and objectively investigate the allegation(s). Upon receipt of you... response, we will be in a better position to assess the merits of the allegation(s) an... determine the extent of the need for further investigation. You may be assured that an... information or explanation supplied by your organization will not be made public.

Your response should be sent to the attention of the Commission Representative shown on... the enclosed Notice of Charge of Discrimination. This individual should also be contacted... concerning any matters relating to this charge.

# EXHIBIT B



STATE OF ALABAMA

## DEPARTMENT OF MENTAL HEALTH
## AND MENTAL RETARDATION

**GLENN IRELAND II DEVELOPMENTAL CENTER**
**REGION V**

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217

PHONE (205) 849-0654



BILLY R. STOKES, Ed.D., M.B.A.
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

ELLEN B. GILLESPIE, Ph.D.
REGIONAL DIRECTOR

July 25, 1992

GUY HUNT
GOVERNOR

ROYCE G. KING
COMMISSIONER

Mr. Terry D. Avery
4527 18th Avenue E
#127
Tuscaloosa, Alabama  35405

*8846005*

Ref:  Administrator II

Dear Mr. Avery:

This letter confirms your appointment to the above named classification at Glenn Ireland II Developmental Center.  Your rate of pay will be $1,293.00 bi-weekly. Since State government requires a two week delay in processing payroll, you will receive your first paycheck from our Department four weeks after your appointment date.  Your first day of employment will begin on __July 25, 1992__ .  Please report to the Personnel Office at 8:00 a.m. for orientation.  Prior to reporting to your assigned work area, you will be required to participate and successfully complete an extensive orientation training which will be conducted by our Staff Development Department.

Please bring your Social Security card with you and be prepared to designate two beneficiaries related to insurance and retirement programs.  You will be asked to provide the name, address and birthdate of these beneficiaries.  In addition, you will be given an opportunity to choose your group health insurance plan with either Blue Cross/Blue Shield or Complete Health.  Also, you will be given an opportunity to enroll your eligible dependents under the plan you choose.  Coverage for your dependents may be effective the day you report for work if you so choose. The monthly rate to cover your dependents will be $141.00 per month.

Your appointment is contingent upon the completion of a favorable background and security check which we have already begun.  Also, all new employees will be required to have a full screening for hepatitis during their probationary period.

We welcome you as a valued employee of the Glenn Ireland II Developmental Center and look forward to many years of association in the future.

Sincerely,

Jim Elliott
Acting  Personnel Officer

cc:  Director's Office
     Staff Development
     Executive Department Head
     Department Head
     Personnel File

EXHIBIT B

# EXHIBIT C

STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH
# AND MENTAL RETARDATION

### GLENN IRELAND II DEVELOPMENTAL CENTER

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217-1999

PHONE (205) 849-0854

BILLY R. STOKES, Ed.D., M.B.A
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

ELLEN B. GILLESPIE, Ph.D
REGIONAL DIRECTOR

D. FRED SECHTEL
FACILITY DIRECTOR

January 8, 1993

GUY HUNT
GOVERNOR

ROYCE O. KING
COMMISSIONER

Ms. Audray D. Finch
Habilitation Treatment Specialist
Glenn Ireland II Developmental Center
Tarrant, AL 35217

Re:  Habilitation Treatment Coordinator

Dear Ms. Finch:

Thank you for your interest in applying for the above referenced position at the Glenn Ireland II Developmental Center.  Unfortunately, you were not selected for this position.  We appreciate the time and effort you have expended and invite you to apply for other jobs in the future.  Many qualified applicants applied for this position and the decision regarding whom to select was a difficult one.

Again, thank you.

Sincerely,

Jim Elliott
Assistant Personnel Officer

JE/cc

cc:  Applicant File

EXHIBIT C



# APPLICATION FOR EMPLOYMENT

## Exempt Classification

RETURN TO

State of Alabama

Department of Mental Health

and Mental Retardation

Glenn Ireland II Developmental Center

91 Black Creek Road

Tarrant, Alabama 35217

**RECEIVED**

OCT 15 1992

PERSONNEL

GENERAL INSTRUCTI

Complete all portions of
that are applicable t
the position for which you a
ing. Failure to do so may res
not being considered for th
for which you applying Typ
clearly in ink.

## AN EQUAL OPPORTUNITY EMPLOYER

Full Name: FINCH   AUDREY   D
Last   First   Middle

Social Security Number: 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

Address: 1309-21ˢᵗ ST No. #101
Home or Apartment No.   Street

Birmingham AL 35234
City   State   Zip Code

If you are applying for a specific current vacancy, please position title: **HTC**

Telephone Number — Home: (205) 252-1684   Office: (205) 849-0654

Legal Residence: Birmingham JEFF AL
City   County

Place of Birth: Birmingham JEFF AL
City   County

Minimum annual salary you would consider: _____

## LOCATIONS

Your application will be retained in our non-merit recruitment files for one year, and you will be notified of vacancies for which you qualify at those facilities in which you express an interest. Please indicate below at which of our facilities you would consider employment. You will only be sent announcements of openings at facilities which you check. After one year and after each succeeding year, you will need to contact this office and request that your application remain in our active files and/or submit an updated application. Failure to do so will result in your name being removed from our mailing list and your application will be destroyed. You will not be sent announcements of positions for which you exceed the qualifications unless you request such.

### Mental Illness Facilities

( ) Bryce Hospital — Tuscaloosa, AL
( ) Searcy Hospital — Mt. Vernon, AL
( ) Eufaula Adolescent Center — Eufaula, AL
( ) North Alabama Regional Hospital — Decatur, AL
( ) Thomasville Adult Adjustment Center — Thomasville, AL
( ) Hardin Secure Medical Facility — Tuscaloosa, AL
( ) Greil Psychiatric Hospital — Montgomery, AL

### Mental Retardation Facilities

( ) William D. Partlow Developmental Center — Tuscaloosa, AL
( ) Albert P. Brewer Developmental Center — Mobile, AL
( ) Lurleen B. Wallace Developmental Center — Decatur, AL
( ) J. S. Tarwater Developmental Center — Wetumpka, AL
( ) Glenn Ireland Developmental Center — Birmingham, AL

( ) Central Administrative Offices — Montgomery, AL

(See map to get right for locations of facilities)

### REFERRAL

Where did you learn about the job for which you applied about the Department's application procedure?

_____ Voluntary Walk-In
_____ State Employment Service
_____ College Career Day
_____ DMH/MR Employee
_____ Newspaper Ad
_____ Professional Journal Ad
_____ Radio/TV Ad
_____ Private Employment Agency
_____ State Personnel Department
_____ Professional Convention
_____ Friend/Relative
_____ Responded to Announcement of Vacancy
_____ Other — Please explain:

Are you willing to accept shift work during evening and night hours? Yes ( ✓ )  No ( )

Are you available to work _____ Full Time ✓ _____ Part T
_____ Temporary?

**The Alabama Department of Menta**
**Retardation is an Equal Opp**
discriminate with respect to

## EDUCATION

High school graduate or GED? ( ✓) Yes ( ) No    Be as specific as possible about degree and major.

| Type of School | Name and Address | From Mo/Yr | To Mo/Yr | Did You Graduate? | Degree and Date | Major |
|---|---|---|---|---|---|---|
| College Undergraduate | ALABAMA STATE UNIVERSITY 915 So. Jackson St MONTGOMERY, AL 36195 | | | YES | M.S. | Counsel |
| College Undergraduate | | | | | | |
| College Graduate | ALABAMA STATE UNIVERSITY 915 So. Jackson St MONTGOMERY, AL 36185 | | | | B.A. Sociology | Sociol |
| College Graduate | | | | | | |
| Vocational Business | | | | | | |

Circle Highest Grade Completed

High School  9  10  11  12    College  13  14  15  16    Graduate School  (17)  18

If you attended college in pursuit of either an undergraduate or graduate degree and did not obtain such, please indicate how many hours were received toward the degree:    Sem. Hrs. _____    Qtr. Hrs. _____

Professional certificates/licenses, date and state where issued: _____

## REFERENCES

List three reliable persons, not relatives or present employer, who know you well enough to give information about your professional/educational background.

| Name | Address/Zip Code | Telephone Number | Occupation |
|---|---|---|---|
| FAYE J. WILSON | #78 Norwood Cir Bham 35234 | (205) 251-1392 | Quality Assuran (RN) |
| SHELA MATHEWS | 30 Sweet St Tarrant 35217 | | |

Have you ever been involuntarily terminated or forced to resign from a position?    ( ) Yes (✓)

Have you ever been convicted of a felony or other law violation, other than minor traffic violations during the last seven years? (Conviction will not necessarily disqualify applicant from employment)    ( ) Yes (✓)

If you answered "Yes" to any of the above questions, attach an explanation on a separate sheet.

Have you filed an application with this Department before?    (✓) Yes    ( ) No.    If yes, give date and facility na

Date _____    Facility Name _____

Are you a citizen of the U.S. or otherwise legally eligible to work in this country? (✓) Yes    ( ) No. If give Visa type/status _____    (Proof of U.S. citizenship or be required upon employment.)

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME IS ATTACHED

Beginning with your PRESENT or most recent employment, list in REVERSE ORDER periods of employment. Each time you changed jobs or your title changed should be listed as a separate period. Describe in detail your specific duties as they relate to the duties of the position for which you are applying. (Attach additional sheets if necessary). Please account for or explain any gaps in employment.

**Current or Last Employer:** Glenn Ireland II

**Your Official Job Title:** Habilitation Treatment Specialist

**Name/Zip Code:** 91 Black Creek RD.

**Telephone Number:** 849-0654   35217

**Type of Business:** STATE

FROM 01 91 TO Total Months / Fulltime ( ) Parttime ( ) Hours per week 40

**Name of Supervisor:** Len Hamilton

**Ending Salary:** $ ____ per ____

**May we contact current employer?** Yes

**Number/Title of Employees you Supervised:** Mental Health Workers (10)

**Equipment you Operated:**

**Reason for Leaving:**

**Describe your Duties in Detail:**
Directly supervise all cottage staff assigned to the cottage responsible for assuring that all policies and procedures, and guidelines are implemented in the cottage (for staff that I directly supervise) and I participate in the development of the habilitation programs and insures compliance with the habilitation team recommendations. Monitors habilitative programs to insure correct implementation and consistency. Insures data is collected for individuals on a training programs. Schedule mental health workers to assigned tasks in the cottage and to a group of individuals to which they are responsible for caring for. Also assist mental health workers with the individuals in the cottage during dining, rec, bathing, & leisure

**Employer:** Glenn Ireland II

**Your Official Job Title:** Mental Health Worker

**Name/Zip Code:** 91 Black Creek RD.   35217

**Telephone Number:** 849-0654

**Type of Business:** STATE

FROM 01 06 91 TO 01 91 Total Months / Fulltime ( ) Parttime ( ) Hours per week 40

**Name of Supervisor:** Stephanie Mayford

**Ending Salary:** $ ____ per ____

**Reason for Leaving:**

**Number/Title of Employees you Supervised:**

**Equipment you Operated:**

**Describe your Duties in Detail:**
Account for assigned individuals. Daily grooming needs. Ensure that individuals were dressed appropriate. Assist individuals with dining and grooming.

EXHIBIT D



STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH
## AND MENTAL RETARDATION

### GLENN IRELAND II DEVELOPMENTAL CENTER

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217-1999

PHONE (205) 849-0654

BILLY R STOKES Ed D  M B A
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

GUY HUNT
GOVERNOR

ELLEN B GILLESPIE Ph D
REGIONAL DIRECTOR

ROYCE G KING
COMMISSIONER

D REED BECHTEL
FACILITY DIRECTOR

## ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT SYSTEM POSITION
## (WE ARE AN EQUAL OPPORTUNITY EMPLOYER)

JOB TITLE: HABILITATION/TREATMENT SPECIALIST    NO:   92 - 27

JOB CODE:  01000                                PCQ: 8846102
                                                     8846104

SALARY RANGE: 63($18,660 - $28,366)             DATE: 11-06-92
                                                UNTIL FILLED

JOB LOCATION: GLENN IRELAND II DEVELOPMENTAL CENTER
              91 BLACK CREEK ROAD
              TARRANT, ALABAMA   35217

QUALIFICATIONS: Bachelor's degree from accredited
university in Psychology, Special Education, Social Work,
Business Administration, Management or Graduation from an
approved two year college program in mental health
technology including supervised clinical experience with 2-6
years experience in a mental health setting.  Perfer some
experience in a supervisory capacity.

KIND OF WORK: Directly supervise all Client Training
Specialists assigned to the Unit.  This position includes,
but is not limited to the following specific duties:  Assign
staff to the basic client care duties to include, but not
limited:  clean soiled clients after toileting accidents,
clean up spills, change soiled bed linen and make beds,
attend to clients' behavior disruptions and seizures, etc.;
responsible for assuring that all Ireland Center policies,
procedures and guidelines are implemented in their assigned
work areas and are adhered to at all times; insures
compliance with habilitation team recommendations; monitor
habilitative programs, to insure correct implementation,
consistency and quality control; insure data is collected;
prepared monthly progress reports on each client regarding
their program involvment for submission to the Habilitation
Team Leader; responsible for the clients' schedules,
including accuracy, revision, corrections and disseminating
schedules; coordinate and integrates clients programmatic
schedule with non-programmatic activities as identified;
insure availability of supplies for program implementation;
maintain accurate program files for living areas; attend

EXHIBIT D

Habilitation/Treatment Specialist
Page 2

professional staff meetings as required; conduct cottage
staff meetings; prepareshift reports on a daily basis to
provide communication to Unit Director; will insure that all
Client Training Specialists are aware and are maintaining a
current and working knowledge of the Federal Court Order
Standards as related to their job position, also the Title
XIX Standards as they relate to their job position; will
correct and report any deviation to the Unit Director;
evaluate, counsel and take disciplinary action with the Unit
Director.

REQUIRED KNOWLEDGE, SKILLS, AND ABILITIES:  Considerable
knowledge of principles and practice of supervision and
methods, policies and procedures used in supervising.
Ability to work with a minimun of supervision of follow-up.
Ability to deal effectively with employees, relatives of
clients and general public in delicate, frustrating or tense
situations.  Ability to work effectively with people in
situations which require the cooperation of many people.
Ability to speak and write clearly grammatically and
effectively.

METHOD OF SELECTION:  Applications will be rated on an
evaluation of their training experience and education and
should provide adequate work history related to the duties
and minimum qualifications.  All relevant information is
subject to verification.

HOW TO APPLY:  Use an Application for Professional
Employment which may be obtained from this office.
Application should be returned to the Personnel Office at
the above address.  In order to be considered for this
position, your application should be received by
 December 11, 1992   .

DHR/MR FT. ...

NOV 13 '92

RECEIVED

# EXHIBIT E



STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

**GLENN IRELAND II DEVELOPMENTAL CENTER REGION V**

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217

PHONE (205) 849-0654

November 24, 1987



**GUY HUNT**
GOVERNOR

J. W. (BILL) McFARLAND
COMMISSIONER

LARRY L. LATHAM, PhD.
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

RITA A. WRIGHT
REGIONAL DIRECTOR

Mr. John Phill Justice
1494-E Milner Crescent
Birmingham, AL  35205

Dear Mr. Justice:                    Ref: Cottage Supervisor

This letter confirms your appointment to the above named classification at Glenn Ireland II Developmental Center.  Your rate of pay will be $ 605.60 biweekly.  Since State Government requires a two-week delay in processing pay-roll, you will receive your first paycheck from our Department four weeks after your appointment date.  Your first day of employment will begin on Monday, December 7, 1987 .  Please report to the Personnel Office at 8:00 a.m. for orientation.  Prior to reporting to your assigned work area, you will be required to participate in a  4 weeks  orientation training which will be conducted by our Staff Development Department.  All new employees must success-fully complete the new employee training program.

Please bring your Social Security card with you and be prepared to designate two beneficiaries related to insurance and retirement program.  You will be asked to provide the name, address and birthdate of these beneficiaries.  In addition, you will be given an opportunity to choose your group health insurance plan with either Blue Cross/Blue Shield PMD or Complete Health.  Also, you will be given an opportunity to enroll your eligible dependents under the plan you choose.  Coverage for your dependents may be effective the day you report for work if your so choose. If you do choose this option, a check must be sent to the Insurance Board for either the full or prorated amount.  The monthly rate to cover your dependents will be $90.00 per month.

Your appointment is contingent upon the completion of a favorable background and security check which have already begun.  Also, new employees will be required to have a full screening for hepatitis and tuberculosis during their probationary period.  We welcome you as a valued employee of the Glenn Ireland II Developmental Center and look forward to many years of association in the future.

Sincerely,

*Sally Grier*

Sally Grier
Personnel Officer

cc: Ms. Rita A. Wright
Ms. Phyllis Springfield
Executive Department Head
Department Head
Personnel file

EXHIBIT E

# EXHIBIT F

STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

**GLENN IRELAND II DEVELOPMENTAL CENTER**
**REGION V**

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217

PHONE (205) 849-0654

February 28, 1990



LARRY L. LATHAM, PhD.
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

RITA A. WRIGHT
REGIONAL DIRECTOR

GUY HUNT
GOVERNOR

J. W. (BILL) McFARLAND
COMMISSIONER

Ms. Mary Edith May
315 Wildbrook Ln.
Hoover, AL 35216

                    Ref: Habilitation/ Treatment Specialist

Dear Ms. May:

This letter confirms your appointment to the above named classification at Glenn Ireland II Developmental Center. Your rate of pay will be $ 667.60 bi-weekly. Since State government requires a two week delay in processing payroll, you will receive your first paycheck from our Department four weeks after your appointment date. Your first day of employment will begin on March 12, 1990. Please report to the Personnel Office at 8:00 a.m. for orientation. Prior to reporting to your assigned work area, you will be required to participate in and successfully complete an extensive orientation training which will be conducted by our Staff Development Department.

Please bring your Social Security card with you and be prepared to designate two beneficiaries related to insurance and retirement programs. You will be asked to provide the name, address and birthdate of these beneficiaries. In addition, you will be given an opportunity to choose your group health insurance plan with either Blue Cross/Blue Shield or Complete Health. Also, you will be given an opportunity to enroll your eligible dependents under the plan you choose. Coverage for your dependents may be effective the day your report for work if you so choose. The monthly rate to cover your dependents will be $ 141.00 per month.

Your appointment is contingent upon the completion of a favorable background and security check which we have already begun. Also, all new employees will be required to have a full screening for hepatitis during their probationary period.

A further condition of employment requires that you must have the university/college from which you graduated forward an original transcript with an official seal attesting to its validity to us. We cannot accept a substitute, a copy of a transcript or one delivered to us except from the university/college. Failure to have this documentation furnished to us will result in termination of your employment. If this document has been furnished previously, please advise us when you report to work.

We welcome you as a valued employee of the Glenn Ireland II Developmental Center and look forward to many years of association in the future.

                                        Sincerely,

cc:  Director's Office                  *Sally Grier*
     Executive Department Head
     Department Head                    Sally Grier
     Staff Development                  Personnel Officer
     Personnel File

                        EXHIBIT F

# EXHIBIT G

# APPLICATION FOR PROFESSIONAL EMPLOYMENT
### Exempt Classification

RETURN TO:
Glenn Ireland II
Developmental Center
91 Black Creek Road
Tarrant, Alabama 35217

**RECEIVED**
MAY 11 1992
**PERSONNEL**

**GENERAL INSTRUCTION**

Complete all portions of application that are applicabl you and the position for which are applying. Failure to do so result in your not being consid for the position for which you applying. Type or print clearly in

## AN EQUAL OPPORTUNITY EMPLOYER

| Full Name | Wanda Diane McCullar | | |
|---|---|---|---|
| | First | Middle | Last |

Address  4607 7th Ave South, Apt 4
House or Apartment No.          Street

B'ham, Al.          35222
City          State          Zip Code

Legal Residence  Birmingham, Jefferson, Alabama
City          County          State

Title of Position For Which You Are Applying
R-QMRP- Habilitation Treatment Coordi

| Date of Birth | | | Telephone Number | Home: 591-6167 |
|---|---|---|---|---|
| Mo. | Day | Yr. | | Office: 849-0654 |
| 07 | 17 | 67 | | |

Place of Birth
Birmingham, Jefferson, Alabama
City          County          State

Social Security Number

| NOTE: This Department is an equal opportunity employer. To comply with Federal reporting requirements we must maintain statistics on employment of protected classes. | Sex (Check one) 1. [ ] Male 2. [X] Female | Age 24 | Race (Check one) [X] White [ ] Black [ ] His [ ] Other |
|---|---|---|---|

**EDUCATION**     High school graduate or GED?  [X] Yes   [ ] No

If no, circle highest grade completed:     1   2   3   4   5   6   7   8   9   10   11   12

| Name and location of business, correspondence, or vocational school attended: | FROM (Mo.) (Yr.) | TO (Mo.) (Yr.) | Did you Graduate? | Area of Study | Deg |
|---|---|---|---|---|---|
| | | | | | |

| Name and location of Colleges and Universities Attended | FROM (Mo.) (Yr.) | TO (Mo.) (Yr.) | Did you Graduate? | Field(s) of Study Major(s) | Minor(s) | Degree and Date |
|---|---|---|---|---|---|---|
| Judson College | 8-1985 | 6-1988 | Yes | Psychology | Sociology | B.S./6 |
| | | | | | | |
| Graduate or Professional School | | | | | | |

If you attended college, but did not graduate, show credit received.  Sem. hrs. _____  Qtr. hrs. _____

List professional certificate(s) or license(s) and state where issued
_____

List below courses included in your education which are particularly related to the duties or qualifications of the position for which you are apply

| Subjects | Sem. hrs. | Qtr. hrs. | Subjects | Sem. hrs. | Q |
|---|---|---|---|---|---|
| Intro to Exceptional Learners | 3 | | Growth and Development | 3 | |
| English Composition | 3 | | | | |
| Behavior Analysis | 4 | | | | |
| Physiological Psychology | 4 | | | | |
| Abnormal Psychology | 4 | | | | |

**CERTIFICATE (Must be signed in ink by applicant):**
I certify that all statements on or attached to this application are true and correct to the best of my knowledge. I understand that any false state may cause me to be refused the opportunity of employment or cause my employment to be immediately terminated without recourse to due pro protection provided by law.

Signed  Wanda Diane McCullar          Date  5-1-92

## EXHIBIT G

## REFERENCES

List three reliable persons, not relatives or pre... employer, who know you well enough to give inf...ation about you.

| Name | Address | Occupation |
|------|---------|------------|
| Mickey Mosgell | Brewer Center, Mobile, Alabama | Program Director |
| Letha Seay | Ireland Center, Birmingham, Alabama | Acting Program Director |
| Michael Persner | 801 31st Street South | Management |

Do you have any physical handicaps or health problems that would keep you from doing the kind of work for which you are making application?   | | Yes  | X | No

Have you ever been involuntarily terminated or forced to resign from a position?   | | Yes  | X | No

Have you ever been convicted of a law violation other than a minor traffic violation?   | | Yes  | X | No

**If you answered "Yes" to any of the above questions, attach an explanation on a separate sheet.**

## WORK HISTORY

### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME' IS ATTACHED

Beginning with your PRESENT or most recent employment, list in REVERSE ORDER periods of employment. Each time you changed jobs or yo... title changed should be listed as a separate period. Describe in detail your specific duties as they relate to the duties of the position for which you a... applying. (Attach additional sheets if necessary)

**1. Current or Last Employer**
Glenn Ireland Developmental Center

**Your Official Job Title** Psychology Assistant / Acting HTC I

**Address** 91 Black Creek Road

**Type of Business** Developmental Center

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week | Beginning Salary $ _____ per _____ | Ending Salary $ 8.33 per hour | May we contact employer? X Yes  No |
|---|---|---|---|---|---|---|
| 6 90 | Present | 24 | | | | |

**Number/Title of Employees you Supervised** O

**Equipment you Operated**

**Reason for Leaving**

Describe your Duties in Detail:

Train functional living activities

Manage client behavior

Instruct and assist clients

Write and complete documents

Supervise + Delegate duties

Evaluate clients

Acting HTC I Duties:

Write and implement behavior management programs

Write habilitation programs

Monitor training and data collection

Coordinate team meetings

Prepare monthly progress reports

**2. Employer** Parkside Lodge of Birmingham

**Your Official Job Title** Substance Abuse Counselor

**Address** Warrior, Alabama

**Type of Business** Drug / Alcohol Recovery

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week | Beginning Salary $ 6.50 per hour | Ending Salary $ 6.95 per hour |
|---|---|---|---|---|---|
| 5 89 | 6 90 | 13 | | | |

**Number/Title of Employees you Supervised**

**Equipment you Operated**

**Reason for Leaving** More desired position

Describe your Duties in Detail:

Enhanced 12 step programs

Updated charts

Conducted group and individual therapy sessions

Transported patients to and from 12 step meetings

Maintained contact with parents or guardians.

**3. Employer**  SouthTrust Bank

Your Official Job Title  Teller

Address

Type of Business  Banking

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week _____ | Beginning Salary | Ending Salary |
|---|---|---|---|---|---|
| 6  88 | 5  89 | 11 | | $ 4.50 per hour | $ 4.50 per hour |

Number/Title of Employees you Supervised  0

Equipment you Operated

Reason for Leaving  More desired positio

Describe your Duties in Detail:

Registered debits and credits
Cashed checks / Entered deposits
Balanced cash drawer
Balanced vault

**4. Employer**

Your Official Job Title

Address

Type of Business

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week _____ | Beginning Salary | Ending Salary |
|---|---|---|---|---|---|
| | | | | $ _____ per _____ | $ _____ per _____ |

Number/Title of Employees you Supervised

Equipment you Operated

Reason for Leaving

Describe your Duties in Detail:

**5. Employer**

Your Official Job Title

Address

Type of Business

| FROM Month Year | TO Month Year | Total Months | If part-time, number of hours per week _____ | Beginning Salary | Ending Salary |
|---|---|---|---|---|---|
| | | | | $ _____ per _____ | $ _____ per _____ |

Number/Title of Employees you Supervised

Equipment you Operated

Reason for Leaving

Describe your Duties in Detail:

6. Using the above format, show other experience by using additional sheets

## AVAILABILITY

Your application will be retained in our non-merit recruitment files for one year, and you will be notified of any vacancies for which qualify at those facilities in which you express an interest. Please indicate below at which of our facilities you would consider employme You will only be sent announcements of openings at those facilities which you check. After one year and after each succeeding year, will need to contact this office and request that your application remain in our active files and/or submit an updated application. Fail to do so will result in your name being removed from our mailing list and your application will be destroyed.

## LOCATIONS



**Mental Illness Facilities**

[ ] Bryce State Hospital — Tuscaloosa, AL

[ ] Searcy State Hospital — Mt. Vernon, AL

[ ] Eufaula Adolescent Adjustment Center — Eufaula, AL

[ ] North Alabama Regional Hospital — Decatur, AL

[ ] Thomasville Adult Adjustment Center — Thomasville, AL

[ ] Hardin Secure Medical Facility — Tuscaloosa, AL

[ ] Greil Psychiatric Hospital — Montgomery, AL

**Mental Retardation Facilities**

[ ] Partlow State School & Hospital — Tuscaloosa, AL

[ ] Albert P. Brewer Developmental Center — Mobile, AL

[ ] Lurleen B. Wallace Developmental Center — Decatur, AL

[ ] I.S.Tarwater Developmental Center — Wetumpka, AL

[ ] Glenn Ireland II Developmental Center — Birmingham, AL

[ ] Central Administrative Offices — Montgomery, AL

What is the minimum annual salary that you would consider? _____

Are you willing to accept shift work during evening and night hours?  Yes [ ]    No [ ]

## AUTHORITY TO RELEASE INFORMATION

TO WHOM IT MAY CONCERN:

I hereby authorize the Security Division or Personnel Office of the Alabama Department of Mental Health and Mental Retardation bearing release or copy thereof, within six (6) months of this date, to obtain any information in your files pertaining to my previous employment, education records and/or transcripts, arrests and/or conviction records and any medical record reflecting treatment or care for any illness or disability sustai by me within the past three (3) years. I hereby authorize you to release such records or information upon request of the bearer of this release docum The information you supply will be used principally as a basis for an investigation to determine my qualifications, suitability and fitness employment with the Alabama Department of Mental Health and Mental Retardation. I hereby release you as the custodian of such records from and all liability damages which may result to me, my heirs or family, because of compliance with this authorization and request to release informati or any attempt to comply with it. Should there be any question as to the validity or authenticity of this release, you may contact me as indicated be

FULL NAME _Warda Diane McCullar_
(No Initials Please)                Signature

FULL NAME: _Wanda Diane McCullar_
(Typed or Printed Name)

DATE OF BIRTH _7-17-67_

PLACE OF BIRTH _Birmingham, Alabama_

WITNESS: _____ TITLE _____

SOCIAL SECURITY NUMBER _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_

CURRENT ADDRESS _4607 7th Ave South, Apt.4_
_B'ham, Al. 35222_

DATE _May 1, 1992_

DATE _____

# EXHIBIT H



**APPLICATION FOR EMPLOYMENT**

**Exempt Classification**

RETURN TO

State of Alabama

Department of Mental Health

and Mental Retardation

P.O. Box 3710

Montgomery, Alabama 36109-0710

(205) 271-9200

**RECEIVED**

SEP 24 1992

**PERSONNEL**

INSTRUCTIONS

Complete all portions of this
cation that are applicable to you
the position for which you are
ing. Failure to do so may result
not being considered for the p
for which you applying Type
clearly in ink.

## AN EQUAL OPPORTUNITY EMPLOYER

| Full Name | Graves | Jonathan | Frank |
|---|---|---|---|
| | Last | First | Middle |

Social Security Number    424 78 8559

Address    255 Retreat Lane

Columbiana    AL.    35051
City    State    Zip Code

If you are applying for a specific current vacancy, please
position title:    HTC I    updated 10/9/92
HTS, Psy. Assistant, Quality Assurance

| Telephone Number | Home: (205) 664-8483 |
|---|---|
| | Office: (205) 959-2880 |

Legal Residence    Columbiana    Shelby    AL.
City    County    State

Place of Birth    Gadsden    Etowah    AL.
City    County    State

Minimum annual salary you would consider:    negotiable

## LOCATIONS

Your application will be retained in our non-merit recruitment files for one year, and you will be notified of vacancies for which you qualify at those facilities in which you express an interest. Please indicate below at which of our facilities you would consider employment. You will only be sent announcements of openings at facilities which you check. After one year and after each succeeding year, you will need to contact this office and request that your application remain in our active files and/or submit an updated application. Failure to do so will result in your name being removed from our mailing list and your application will be destroyed. You will not be sent announcements of positions for which you exceed the qualifications unless you request such.

**Mental Illness Facilities**

( ) Bryce Hospital — Tuscaloosa, AL
( ) Searcy Hospital — Mt. Vernon, AL
( ) Eufaula Adolescent Center — Eufaula, AL
( ) North Alabama Regional Hospital — Decatur, AL
( ) Thomasville Adult Adjustment Center — Thomasville, AL
( ) Hardin Secure Medical Facility — Mt. Vernon, AL
(X) Greil Psychiatric Hospital — Montgomery, AL

**Mental Retardation Facilities**

( ) William D. Partlow Developmental Center — Tuscaloosa, AL
( ) Albert P. Brewer Developmental Center — Mobile, AL
( ) Lurleen B. Wallace Developmental Center — Decatur, AL
(X) J. S. Tarwater Developmental Center — Wetumpka, AL
(X) Glenn Ireland Developmental Center — Birmingham, AL

(X) Central Administrative Offices— Montgomery, AL

(See map on last page for locations of facilities)

PLEASE DO NOT OMIT SIGNATURE AND AUTHORITY TO RELEASE INFO

**REFERRAL**

Where did you learn about the job for which you applie
about the Department's application procedure?

_____ Voluntary Walk-in
_____ State Employment Service
_____ College Career Day
__X__ DMH/MR Employee
_____ Newspaper Ad
_____ Professional Journal Ad
_____ Radio/TV Ad
_____ Private Employment Agency
_____ State Personnel Department
_____ Professional Convention
_____ Friend/Relative
_____ Responded to Announcement of Vacancy
_____ Other — Please explain:

Are you willing to accept shift work during evening and night hours?  Yes (X)  No ( )

Are you available to work __X__ Full Time _____ Part Ti Temporary?

The Alabama Department of Mental Health
Retardation is an Equal Opportunity Empl
discriminate with respect to race, color
origin, sex, age, or disability.

## EDUCATION

High school graduate or GED? ( X ) Yes    ( ) No        Be as specific as possible about degree and major

| Type of School | Name and Address | From Mo/Yr | To Mo/Yr | Did You Graduate? | Degree and Date | Major |
|---|---|---|---|---|---|---|
| College Undergraduate | Samford University Birmingham, AL | 8/72 | 12/73 | from card | — | Psy |
| College Undergraduate | University of Alabama Tuscaloosa, AL. | 1/74 | 9/76 | Yes | BS 9/76 | Psy |
| College Graduate | University of Alabama at Birmingham | 1/90 | 10/90 | No | — | Spec. Ed. EC |
| College Graduate | | | | | | |
| Vocational Business | | | | | | |

Circle Highest Grade Completed

High School   9   10   11   12    College   13    14    15    (16)    Graduate School   17    18    19

If you attended college in pursuit of either an under-graduate or graduate degree and did not obtain such, please indicate how many hours were received toward the degree.

Sem. Hrs. _____
Qtr. Hrs. _____

Professional certificates/licenses, date and state where issued:
_____
_____
_____

## REFERENCES

List three reliable persons, not relatives or present employer, who know you well enough to give information about your professional/educational background.

| Name | Address/Zip Code | Telephone Number | Occupation |
|---|---|---|---|
| Pam Brown | 601 Woodland Village Birmingham, AL. 35216 | 856-1877 | Social Worker |
| Clarice Wortham | 3304 Earlwood Road Fairfield, AL. 35064 | 923-1452 | Teacher |
| T.R. Bice | 2 Nivenshire Place B'ham, AL. 35242 | 991-0602 | Management - Education |

Have you ever been involuntarily terminated or forced to resign from a position?    ( ) Yes    (X) No

Have you ever been convicted of a felony or other law violation, other than minor traffic violations during the last seven years? (Conviction will not necessarily disqualify applicant from employment)    ( ) Yes    (X) No

**If you answered "Yes" to any of the above questions, attach an explanation on a separate sheet.**

Have you filed an application with this Department before?    (X) Yes    ( ) No.    If yes, give date and facility name:

Date _____ 1985 _____    Facility Name _____ Glenn Ireland II _____

Are you a citizen of the U.S. or otherwise legally eligible to work in this country? (X) Yes give Visa type/status _____    (Proof of citizenship or eligibility for employment will be required upon employment.)

Case 2:07-cv-00024-MHT-CSC Document 1-12 Filed 12/20/2007 Page 31 of 40

## WORK HISTORY
### THIS SECTION MUST BE COMPLETED REGARDLESS OF WHETHER OR NOT A RESUME IS ATTACHED

Beginning with your PRESENT or ~~~
changed jobs or your title changed ~~~
the duties of the position for which you ~~~
gaps in employment.

**1. Current or Last Employer**
Glenwood Mental Health Services

**Address/Zip Code**
150 Glenwood Lane, B'ham, AL 35272

| FROM | | TO | | Total Months | Fulltime ( X) Parttime ( ) | Ending Salary | May we contact current employer |
|------|------|------|------|------|------|------|------|
| Month | Year | Month | Year | | | | |
| 10 | 90 | present | | 24 | Hours per week 40 | $ 12.00 per hr. | [ ] Yes [X] |

**Number/Title of Employees you Supervised**
7/ Vocational Instructor

**Equipment you Operated**
Personal Computer

Name of Supervisor: J. Carter
Type of Business: Mental Health

**Reason for Leaving**
job satisfaction

**Describe your Duties in Detail:**
develop work opportunities for clients
supervise staff
monitor clients in supported employment
develop and maintain client records

**2. Employer**
Glenwood M.H.S., Inc.

**Your Official Job Title**
Home Manager

**Address/Zip Code**
150 Glenwood Lane, B'ham, AL 35242

**Telephone Number**
969-2880

**Type of Business**
Mental Health

| FROM | | TO | | Total Months | Fulltime ( X) Parttime ( ) | Name of Supervisor | Ending Salary |
|------|------|------|------|------|------|------|------|
| Month | Year | Month | Year | | | | |
| 2 | 88 | 10 | 90 | 33 | Hours per week 40 + | J. Carter | $ 12.00 per hr. |

**Number/Title of Employees you Supervised**
10/ Mental Health Worker

**Equipment you Operated**

**Reason for Leaving**
transfer

**Describe your Duties in Detail:**
develop treatment plans for clients
supervise staff
provide direct care services to clients
monitor physical facility
maintain records

**3. Employer**
Glenn Ireland II Dev. Ctr.

**Your Official Job Title**
In-Service Instructor

**Address/Zip Code**
91 Black Creek Rd. Tannt 3520

**Telephone Number**
759-0054

**Type of Business**
State Mental Health

| FROM Month / Year | TO Month / Year | Total Months |
|---|---|---|
| 12 85 | 2 88 | 26 |

**Fulltime (✓) Parttime ( )**
Hours per week 40

**Name of Supervisor**
P. Springfield

**Ending Salary**
$ 18.00 per hour

**Number/Title of Employees you Supervised**
8

**Equipment you Operated**
Video editing / Rev. Comp.

**Reason for Leaving**
Work w/ Autism

**Describe your Duties in Detail:**
develop video tapes for instruction of staff
write instructional materials for staff
write training programs for residents of the facility
teach classes on a variety of Topics to staff and opp. groups outside the facility

**4. Employer**
Tuscaloosa Assoc. for Retarded Citizens

**Your Official Job Title**
Workshop Supervisor

**Address/Zip Code**
University Blvd., Tusc., Al.

**Telephone Number**

**Type of Business**
Work activity center

| FROM Month / Year | TO Month / Year | Total Months |
|---|---|---|
| 3 85 | 12 85 | 9 |

**Fulltime (✓) Parttime ( )**
Hours per week 40

**Name of Supervisor**
N. Johnson

**Ending Salary**
$ 4.00 per hour

**Number/Title of Employees you Supervised**
3 / instructors

**Equipment you Operated**
packaging

**Reason for Leaving**
move to Dhan

**Describe your Duties in Detail:**
supervision of staff and client
develop and implement contracts with business community

S. Partlow —
4 1/2 y Psychologist I.

## AUTHORITY TO RELEASE INFORMATION

TO WHOM IT MAY CONCERN: I hereby authorize an official of the Alabama Department of Mental Health/Mental Retardation bearing this release or copy there within one year of this date, to obtain any information in your files pertaining to my previous employment, educational records and/or transcripts, or convictio records. I hereby authorize you to release such records or information upon the request of the bearer of this release document. The information you supply w be used principally as a basis for an investigation to determine my qualifications for employment with the Alabama Department of Mental Health/Men Retardation. I hereby release you as custodian of such records from any and all liability damages which may result to me, my heirs or family because of comp ance with this authorization and request to release information, or any attempt to comply with it. Should there be any question as to the validity or authentici of this release, you may contact me as indicated below.

**FULL NAME** _____ (No Initials) (Signature)

**SOCIAL SECURITY #** 42_-___-3559

**FULL NAME** Jonathan Frank Graves (Typed or Printed Name)

**CURRENT ADDRESS** 293 Retreat Lane

**DATE OF BIRTH** 10/11/53 **PLACE OF BIRTH** Godsden, Al.

Columbiana, AL 3505

**WITNESS** Joy Graves **TITLE** Tech **DATE** 

### CERTIFICATE / SIGNATURE
Must be signed in ink, by
I certify that all statements on or attached to this application are true and correct to the best of

# JONATHAN F. GRAVES
### 295 Retreat Lane
### Columbiana, Alabama 35051
### (205) 664-3656

## PROFESSIONAL OBJECTIVE

Incorporation of my professional knowledge, experience and interpersonal skills in performing tasks in a responsible an challenging position.

## EDUCATION

Samford University, Birmingham, Alabama and University of Alabama, Tuscaloosa, Alabama (August 1972 to August 1976)
Degree: Bachelor of Science  Major: Psychology  Minor: Political Science

## WORK EXPERIENCE

**Vocational Coordinator**                                    October 1990 to Present
Glenwood Mental Health Services, Birmingham, Alabama

Responsible for developing work opportunities (both community and in-house) for Autistic adults and monitoring each client's progress in the setting once he/she is placed. Responsible for supervision of vocational staff including scheduling, evaluating, and networking. Responsible for developing and maintaining client and staff records. Utilize computer in completion of tasks.

**Home Manager**                                    February 1988 to October 1990
Glenwood Mental Health Services, Birmingham, Alabama

Responsible for developing and maintaining treatment plans an records of Autistic children in a residential setting. Responsible for direct care services to clients and monitoring their living environment. Responsible for supervision of direct care staff. Promoted to Vocational Coordinator.

**In-service Instructor II**                                    December 1985 to February 1988
Glenn Ireland II Developmental Center, Tarrant, Alabama

Responsible for developing and presenting instructional programs and in-services to staff. Created video and training tapes for staff and residents. Utilized video cameras, editing equipment, and still photography equipment.

**Workshop Supervisor**                    March 1981 to December 1985
Tuscaloosa Association for Retarded Citizens
McGraw Activity Center, Tuscaloosa, Alabama

Responsible for development, implementation, and supervision of contract work done by
mentally retarded adults for businesses in the community.  Supervision of staff and clients
in a work setting.

**Psychologist I**                    September 1976 to March 1981
Partlow ~~State School and Hospital~~, Tuscaloosa, Alabama
        Developmental Center (TR)

Responsible for the training and supervision of mentally retarded residents of the ~~facility~~.
(TR) ~~management programs~~.  Responsible for writing and implementing training and behavior
management programs.

Specific responsibilities as a Psychologist I:

1. Directly supervised approximately 35 direct care employees
2. Scheduled employees days off and kept records of time worked.
3. Disciplined/reprimanded employees as necessary.
4. Developed clients training programs and schedules
5. monitored clients in regards to physical well being, training,
6. maintained records of clients training, behavior, etc.
7. monitored records of clients
8. Performed actual training
9. Instructed staff in regards to training skills

# EXHIBIT I




STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

**GLENN IRELAND II DEVELOPMENTAL CENTER REGION V**

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217

PHONE (205) 849-0654

BILLY R. STOKES Ed D  M.B.A
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

ELLEN P. GILLESPIE Ph.D
REGIONAL DIRECTOR

GUY HUNT
GOVERNOR

ROYCE KING
COMMISSIONER

## DEPARTMENTAL

### ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT SYSTEM POSITION
(We are an Equal Opportunity Employer)

| | | | |
|---|---|---|---|
| **JOB TITLE:** | ADMINISTRATOR II | **NUMBER:** | 92 - 04 |
| **JOB CODE:** | A1500 | **POS. #:** | 8846005 |
| **SALARY RANGE:** | 74($26,364 - $39,936) | **DATE:** | 03-17-92 |
| **LOCATION:** | GLENN IRELAND II DEVELOPMENTAL CENTER<br>91 BLACK CREEK ROAD<br>TARRANT, ALABAMA  35217-1999 | | |

**QUALIFICATIONS:**  Graduation from a four-year college or university with a major in Business or related field.  Experience in the mental health field, including some supervisory or administrative experience.  Other job related experience may be substituted for all or part of the basic requirements upon approval of the Job Evaluation Committee.

**REQUIRED KNOWLEDGE, SKILLS AND ABILITIES:**  Knowledge of Department and Division policies and procedures.  Organizational and supervisory skills.  Skills in composing complex documents and in oral presentations.

**KIND OF WORK:**  Responsible for development and implementation of Regional Office projects.  Work includes supervision of some shared facility and community services functions, including human resources development.  The employee composes plans, correspondence, project results, policies and procedures, and other documents.  Participates in, and may facilitate, a variety of meetings including executive staff, facility meetings, community services meetings, personnel meetings, and others per Regional Director's instructions.  Reads and reviews documents of an administrative nature and provides data to the Regional Director.  Supervises/instructs/observes/advises/delegates/ evaluates staff in order to assure critical work is completed. Develops monthly reports as required by the Regional Director and by Central Office staff.

EXHIBIT I

STATE OF ALABAMA

## DEPARTMENT OF MENTAL HEALTH
## AND MENTAL RETARDATION

### GLENN IRELAND II DEVELOPMENTAL CENTER

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217-1999

PHONE (205) 849-0654

BILLY R. STOKES, Ed D., M.B.A
ASSOCIATE COMMISSIONER
FOR MENTAL HEALTH

ELLEN B. GILLESPIE, Ph D.
REGIONAL DIRECTOR

D. REED
FACILITY DIRECTOR

GUY HUNT
GOVERNOR

ROYCE G. KING
COMMISSIONER

EQUAL OPPORTUNITY EMPLOYER

ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT SYSTEM POSITION

| | | |
|---|---|---|
| JOB TITLE: | Administrator II Third Shift | NUMBER: 93 - 03 |
| JOB CODE: | A1500 | DATE: 02-19-92 |
| SALARY RANGE: | 74($26,364 - $39,936) | POS.#: 8846096 |

JOB LOCATION:  GLENN IRELAND II DEVELOPMENTAL CENTER
91 BLACK CREEK ROAD
TARRANT, ALABAMA  35217

QUALIFICATIONS: Graduation from a four-year college or
university with a degree in Psychology, Social Work, Special
Education or a closely related field. Other job related
education and/or experience may be substituted for all or
part of these basic requirements upon approval of the job
evaluation committee. Must possess at least 2-6 years
experience in a mental retardation setting including progressively
responsible experience in a supervisory or administrative capacity.

KIND OF WORK: Insure all Title XIX Standards are met.
Insure proper physical maintenance and security of cottages.
Assists in selection of cottage personnel. Inservice and
monitor programs. Insure all programs are carried out
correctly and on schedule. Consults with Habilitation
Treatment Coordinators and other necessary professionals to
insure adequate standards of clients care. Insures clients'
rights to privacy, dignity and humane care. Insures that
clients records are maintained in accordance with policies
and procedures. Insure cottage coverage levels are adequate,
approve leave as appropriate, maintain schedule boards.
Performs other duties as assigned.

REQUIRED KNOWLEDGES, SKILLS AND ABILITIES: Must be able to
work third shift and weekend duty. Must be able to deal
effectively with all levels of staff. Must be knowledgeable
of behavior modification techniques. Must be knowledgeable
of Title XIX (ICF/MR) and Wyatt Court Settlement Standards.

METHOD OF SELECTION: Applicants will be rated on the basis
of an evaluation of their training, experience and education
and should provide adequate work history identifying
experiences related to the duties and minimum qualifications
as above mentioned. All relevant information is subject to
verification.

HOW TO APPLY: Use an official Application For Professional
Employment which may be obtained from this office.
Application should be returned to the Personnel Office,
Glenn Ireland II Developmental Center, 91 Black Creek Road,
Tarrant, Alabama  35217 by __April 21, 1993__ in order to
be considered for this position. Have an official copy of
undergraduate transcript forwarded to the Personnel Office
at the above address.



DEPARTMENT OF MENTAL HEALTH
AND MENTAL RETARDATION

GLENN IRELAND II DEVELOPMENTAL CENTER

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217-1999

PHONE (205) 849-0654

BILLY R. STOKES, Ed D., M.B.A.
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

ELLEN B. GILLESPIE, Ph.D.
REGIONAL DIRECTOR

D. REED BECHTEL
FACILITY DIRECTOR

GUY HUNT
GOVERNOR

ROYCE G. KING
COMMISSIONER

<u>ANNOUNCEMENT OF INTENT TO FILL A NON-MERIT SYSTEM POSITION</u>
(We are an Equal Opportunity Employer)

| <u>JOB TITLE:</u> | ADMINISTRATOR II | <u>NUMBER:</u> | 92 - 28 |
|---|---|---|---|
| <u>JOB CODE:</u> | A1500 | <u>PCO #:</u> | 8846175 |
| <u>SALARY RANGE:</u> | 74$26,364 - #39,936) | <u>DATE:</u> | 12-11-92 |

<u>LOCATION:</u>        GLENN IRELAND II DEVELOPMENTAL CENTER
91 BLACK CREEK ROAD
TARRANT, ALABAMA  35217

<u>QUALIFICATIONS:</u>  Graduation from a four year college or university
with a major in business or related field.  Considerable experience
(25 - 72 months) in the mental retardation field, including progressively
responsible supervisory or administrative experience.  Other job related
experience may be substituted for all or part of the basic requirements
upon approval of the Job Evaluation Committee.

<u>KIND OF WORK:</u>  This is a responsible professional
administrative position.   This person must exercise a high
degree of independent judgement in the planning,
development, and implementation of supported living
services, primarily development of housing and arrangement
of support services, for supported living across the Region.
This position will also have supervisory responsibility for
other community living services through Region V Community
Services.  Other responsibilities as assigned.

<u>REQUIRED KNOWLEDGE AND SKILLS:</u>

Knowledge of and extensive experience in community -
centered service delivery and development of community
living alternatives for individuals with mental retardation,
considerable experience in supervision, and interagency
cooperation and coordination.  Knowledge of Region V.

<u>METHOD OF SELECTION:</u>  Applicants will be rated on the basis
of an evaluation of their training, experience, and
education, and should provide adequate work history
identifying experience related to the duties and minimum
qualifications as mentioned above.  All relevant information
is subject to verification.

<u>HOW TO APPLY:</u>  Use of an official Application for
Professional Employment which may be obtained from this
office.  Applications should be returned to the Personnel
Office at the above address.  In order to be considered for
this position, your application should be received by
May 7, 1993          .

EXHIBIT J



STATE OF ALABAMA

# DEPARTMENT OF MENTAL HEALTH AND MENTAL RETARDATION

### GLENN IRELAND II DEVELOPMENTAL CENTER
### REGION V

91 BLACK CREEK ROAD
TARRANT, ALABAMA 35217

PHONE (205) 849-0654

BILLY R. STOKES, Ed.D., M.B.A.
ASSOCIATE COMMISSIONER
FOR MENTAL RETARDATION

ELLEN B. GILLESPIE, Ph.D.
REGIONAL DIRECTOR

GUY HUNT
GOVERNOR

ROYCE G. KING
COMMISSIONER

June 22, 1992

TO:        Billy R. Stokes, Ed.D., M.B.A.

FROM:      Ellen B. Gillespie, Ph.D.

SUBJECT:   Request to Fill Administrator II Position

Interviews have been completed for the Region V Administrator II position (Director of Human Resources Development). Based on these interviews and the applicants' qualifications, we wish to appoint Mr. Terry Avery to this position. This Human Resource Development position includes coordination of personnel, risk management, investigators, and police, with the responsibilities covering the community and the facility. Although Mr. Avery has extensive, relevant experience in these areas and is enrolled in the Business Administration degree program at the University of Alabama, he has not completed this degree. For this reason, I am requesting that you forward this application to the Job Evaluation Committee for their consideration.

Mr. Avery has 16 years of experience with the Department of Mental Health and Mental Retardation, working in increasingly responsible administrative and leadership positions. He has extensive knowledge of personnel and facility policies and procedures as well as applicable laws and regulations. He has demonstrated skill in the application of interviewing techniques and is skilled in handling sensitive disciplinary matters. He is an excellent supervisor who understands complex assignments and works well with subordinates in coordinating assignment completions. He has demonstrated skill in planning, organizing, and coordinating.

His leadership in the area of investigations is known throughout the Department. His assistance at the Ireland Center in reorganizing the police department and developing and implementing the investigation process has had a major impact on the center. He often represents the

EXHIBIT J

Billy R. Stokes
June 22, 1992
Page 2


Department in providing training in investigations and topics relating to
mental health for law enforcement agencies, universities, and
professional groups.

I feel that Mr. Avery's job related experience and demonstrated skills
are appropriate substitutes for the degree requirement. I would
appreciate your consideration of this matter and the assistance of the
Job Evaluation Committee in filling this critical position.

/lh




APPROVAL: _____
            Royce G. King
            Commissioner